

# Lawn Managers, Inc.,

# v.

# Progressive Lawn Managers, Inc.

## DAMAGES EXPERT REPORT OF FERNANDO TORRES

Submitted by:

**IPmetrics**
Intellectual Property Consulting
9320 Chesapeake Drive
Suite 110
San Diego, CA  92123
858.538.1533

September 27, 2016

© 2016 IPmetrics, LLC

Ms. Norah Ryan  
LMI v. PLMI  
September 27, 2016

Expert Damages Report  
Page i



## TABLE OF CONTENTS

I. ASSIGNMENT ................................................................................................ 1

II. QUALIFICATIONS .......................................................................................... 1

III. BACKGROUND .............................................................................................. 2
    A. The Parties ............................................................................................ 2
    B. Damaging Actions ................................................................................. 3
    C. Law and Economics of Trademarks ..................................................... 6

IV. DAMAGES ASSESSMENT ............................................................................ 8
    A. Likelihood of Confusion ......................................................................... 8
    B. Economic Damages .............................................................................. 9
    C. The Lawn Care Market ......................................................................... 9
    D. Defendant's Profits ............................................................................. 10
    E. Plaintiff's Lost Profits .......................................................................... 13
    F. Corrective Advertising ........................................................................ 15

V. PREJUDGMENT INTEREST ....................................................................... 16

VI. SUMMARY OF OPINIONS ........................................................................... 16

EXHIBITS ............................................................................................................ 18

APPENDICES ..................................................................................................... 21

© 2016 IPmetrics, LLC

Ms. Norah Ryan
LMI v. PLMI
September 27, 2016

Expert Damages Report
Page 1



## I. ASSIGNMENT

IPmetrics® LLC ("IPmetrics") has been retained by Norah J. Ryan, Attorney at Law on behalf of client and Plaintiff Lawn Managers, Inc., to provide expert damages consulting services in Civil Action No. 16-00144 pending before the US District Court for the Eastern District of Missouri.

Specifically, the engagement includes the analysis and assessment of damages to Plaintiff as a result of the alleged Federal trademark claims.[1]

IPmetrics' Chief Economist, Fernando Torres, is the author of this report, which includes multiple appendices containing information required by Federal Rule of Civil Procedure 26(a)(2)(B). These consist of the qualifications of the testifying expert with a list of publications over the last ten years, testimony experience during the previous four years (Appendix A), a list of documents reviewed and relied upon in this matter (Appendix B), and disclosure of compensation arrangements (Appendix C). IPmetrics' compensation in this matter is not, in any way, dependent upon the conclusions reached during the performance of the analysis.

## II. QUALIFICATIONS

I am a member and Chief Economist at IPmetrics LLC, an intellectual property consulting firm specializing in the strategic analysis, valuation, and expert witness assessment of the full spectrum of intangible assets. I have over 30 years of professional experience in economics, financial analysis, and business management in the U.S. and Mexico.

Since 2004, I have specialized in intellectual property matters, applying my economics, finance and business experience, as well as skills in quantitative techniques, to the analysis and valuation of intangible assets, including valuation for transactional and litigation purposes. Prior to joining IPmetrics, I was the Senior Economist at Consor® Intellectual Asset Management.

As an intellectual property economist, I have undertaken projects involving the valuation and/or the assessment of infringement damages regarding rights of publicity, trademarks, patents, trade secrets, copyrights, and other intangible assets in such industries as online advertising, apparel and footwear, retail, pharmaceuticals, entertainment, telecommunications, and non-profit organizations, among others.

I regularly publish analyses and give presentations on topics related to intangible asset valuation in a variety of venues, many of which qualify for CLE credit. During the past few years, I have been an instructor for the course "Valuing Intangible Assets for Litigation," which is part of the requirements of the Certified Forensic

---

[1] Complaint, at §29 et seq. filed February 4, 2016 (USDC EDMO 16-CV-00144).

© 2016 IPmetrics, LLC



Financial Analyst designation issued by the National Association of Certified Valuation Analysts (NACVA).

I am a member of the National Association of Forensic Economics, and of the American Economic Association, among others. My career has spanned from academia, to branches of government, private industry and consulting.

I earned a B.A. degree in Economics from the Metropolitan University in Mexico City (1980), and went on to earn a Graduate Diploma in Economics from the University of East Anglia (U.K., 1981), and a Master of Science Degree specializing in Econometrics from the University of London, England (1982).

My professional Vitae, which is attached as Appendix A, outlines the balance of my education and experience.

### III. BACKGROUND

#### A. The Parties

Plaintiff Lawn Managers, Inc. ("Lawn Managers"), a Missouri corporation, operates a lawn and tree care services business since 1979 in and around the St. Louis, MO area and has a federal registration for its logo (design plus words) since May 2012 and for the standard character mark "LAWN MANAGERS" since October, 2015.[2]

**Figure 1
Plaintiff Lawn Managers' Registered Logo**



**Figure 2
Defendant's Infringing Logo**



---

[2] According to trademark registration files at the US Patent and Trademark Office for registrations Nos. 4189623 and 4826435 (Trademark Electronic Search System, TESS, at: www.uspto.gov ).

Ms. Norah Ryan  
LMI v. PLMI  
September 27, 2016

Expert Damages Report  
Page 3



Defendant Progressive Lawn Managers, Inc. ("Progressive") began offering lawn and tree care services under that trade name in the same general geographic area beginning in 2012. Progressive was established pursuant to a May, 2012 divorce settlement agreement between the respective principals of the two companies.[3] By agreement in 2014 Progressive was granted permission to use the mark LAWN MANAGERS up to December 31, 2014,[4] After that date, the Defendant was expected to use the full trade name of the corporation (Progressive Lawn Managers, Inc.) or a different name altogether. Furthermore, both parties agreed at that time to divide the areas of operation with regard to residential customers by zip code, and agreed to not solicit residential customers in the other's designated area.[5] This division was agreed to be maintained for two years, until July 25, 2016.[6]

### B. Damaging Actions

As alleged in the Complaint, Defendant Progressive has continued to use the mark LAWN MANAGERS to market its services, without authorization, after the agreed upon date of December 31, 2014 referenced above.[7] The parties' July 25, 2014 settlement indicates Defendant may continue to use the full trade name "Progressive Lawn Managers, Inc."[8] Nevertheless, Defendant's marketing communications and activities have continued to prominently use Plaintiff's mark, minimized the differentiating elements of its trade name and, therefore, are creating confusion among existing and prospective customers in the target areas.

The categories of damaging marketing activities alleged in the complaint are:

- Use of a logo likely to confuse. As shown in figure 2 above, Defendant's logo separates the LAWN MANAGERS mark from the Progressive trade name and prominently displaying it in a font size 3.25 times larger[9] than the font used to render the name "Progressive," which is effectively separate and hidden in the graphic.

- Actual confusion evidence: I understand that in the course of the litigation, the Plaintiff has documented evidence of a variety of instances of actual confusion in the market. This is the strongest type of indication that the accused infringing use of the LAWN MANAGERS mark has caused actual damages and that confusion in the market is not only likely, but prevalent.

---

[3] Complaint, at §8.  
[4] Complaint, at §9.  
[5] Complaint, at §10 and Answer in case 16-cv-00144, Filed March 14, 2016, Exhibit 1 at §3.  
[6] Ibid.  
[7] Complaint, at §11 et seq.  
[8] Answer Exhibit 1, at §7.  
[9] On computer screens, the fonts used render at a ratio of approximately 39 pixels (for LAWN MANAGERS) to 12 pixels (for "Progressive").

Ms. Norah Ryan
LMI v. PLMI
September 27, 2016

Expert Damages Report
Page 4



This evidence has been disclosed to Defendant and, therefore, I need only summarize here that I have considered the evidence of:

- Approximately 72 documented incidents of current or prospective customers of Defendant's business made in recent months.

- A variety of email received by, and calls wrongly made to, Plaintiff's business from prior, existing, and prospective customers of the Defendant.

- Several instances of actual confusion potentially damaging the reputation of Plaintiff's business even if the confusion is clarified, such as the case of an alleged forged check issued to Defendant's business,[10] or problems with the performance of services by Defendant's business.[11]

- The accused logo, in conjunction with its use on Defendant's FACEBOOK page, also led at least one visitor to be confused as to the trademark of the business. Figure 3 shows a visitor's post, currently accessible on that page,[12] making evident the confusion between LAWN MANAGERS and Defendant's business.

**Figure 3
Example of Actual Confusion – Facebook Page Visitor's Post[13]**



- Another factor of actual confusion is the use of similar coupons, as shown in Figure 4, highlights another aspect of the sources of confusion among existing and prospective customers.[14]

---

[10] Email correspondence dated November 14, 2015 from P. Higgins regarding the case of customer S. Frain.
[11] E.g. email correspondence dated June 17, 2015 from B. Kolman, or June 7, 2015 email from D. Held.
[12] The implied confusion ratio is 20% as there are currently only 5 such postings accessible on the page (not counting the page owner's own posts). This ratio is not proffered here as a statistically-significant ratio due to the small sample size.
[13] Defendant's Facebook page (https://www.facebook.com/plmi.us/) accessed May 18, 2016.
[14] Complaint, at §19 and Exhibits E and F.



Ms. Norah Ryan
LMI v. PLMI
September 27, 2016

Expert Damages Report
Page 5

## Figure 4
### Plaintiff's and Defendant's Coupons



- In online marketing communications, Defendant's control the highly confusing domain name "LawnManagersInc.com" and have traffic automatically redirected to "plmi.us" so that even users typing Plaintiff's trade name directly into their browser's address bar get diverted to the Defendant's site.

- Online advertising placements in several local directories under the entry LAWN MANAGERS vis-à-vis the correct trade name. The complaint includes 17 instances of these listings.[15] Examples of these listings are shown in Figure 4. These listings, as a first impression for new or potential customers, clearly create an initial confusing impression that LAWN MANAGERS is the same company as Progressive. These listings deliberately use the Plaintiff's mark as a headline, while referring prospects to call the Defendant's phone numbers, write to the Defendant's email address, or to visit the Defendant's website(s) at domain names "plmi.us" or "ProgressiveLawnManagers.com".

- In some cases, even including some online directory listings, it may arguably not be the intention of the business to be listed. Rather, the website scours the internet for likely businesses and "scrapes" or copies the information available. Arguendo, this may be the case of the Service Noodle website listing,[16] which tellingly asks "Is this your business?" This particular infringing use may be unintended directly but is evidence that these "search and copy" websites are confused as to the actual trademark corresponding to the business being listed. In other words, this listing type is additional evidence of actual confusion attributable to the Defendant's use of Plaintiff's mark in marketing Progressive's services.

---

[15] Complaint, at §16-17.
[16] At: http://www.servicenoodle.com/lawn-managers-p-521441 (last accessed May 18, 2016).

Ms. Norah Ryan
LMI v. PLMI
September 27, 2016

Expert Damages Report
Page 6



## Figure 5
### Examples of Online Directory Listings for Defendant's Business Using Plaintiff's Mark[17]



- Vehicle and company signage utilizing the alleged infringing logo (Figure 2) reinforce the likelihood of confusion among both customers and prospects of both parties' business.

### C. Law and Economics of Trademarks

Trademarks are recognized as potentially among the most important and valuable assets of a business. By identifying them as the source of specific goods and distinguishing them from the competition, a trademark allows businesses to build goodwill among the public and accrue an intangible asset capturing the benefits of its reputation in the relevant markets.[18]

Generally, a trademark can be a distinctive word, logo, slogan, package design, or other source indicator identifying a particular source of goods or services.[19] In the US, trademark legal rights are developed through use, but limited to the geographic area in which the mark is used.[20] However, trademarks that qualify

---

[17] Websites depicted based on Complaint listings at §16 numbers 16, 8, and 5 (from left to right in the figure).
[18] See, inter alia, International Trademark Association, Trademark Basics: A guide for Business, INTA 2012.
[19] See, e.g., United States Patent and Trademark Office, Protecting Your Trademark, USPTO 2015.
[20] Common Law trademark rights, governed by state law.


for federal registration, such as LAWN MANAGERS®, benefit from enhanced rights such as enforcement through the federal courts and through US Customs, among others.[21] A trademark is, in this analysis, the legal right to exclusively use a word (or words) as an identifier in a specific class of goods or services.[22]

Economically, the function of trademarks is to increase sales in otherwise competitive markets by reducing the costs consumers bear in searching and processing information about the relevant attributes of the goods available to buy to meet their needs and wants.[23] The lawn care segment in and around the St. Louis area, where the parties operate, is highly competitive. A local business search shows about 227 distinct business listed by the Better Business Bureau for the area, including both parties to this action.[24]

Additional investments in marketing intangibles designed to enhance and preserve the economic value of trademarks form the basis for the broader concept of the 'Brand' and 'Brand Equity.'[25] While oftentimes the terms 'trademark' and 'brand' are used interchangeably, trademark has specific legal implications and characteristics, while brand is properly a broader economic term.

The term Brand Equity, finally, is a concept that strives to capture the value of a brand in four dimensions which are key to a business' communications with its target audience: brand awareness, brand loyalty, brand associations, and perceived quality.[26] Awareness reflects the visibility of the trademark(s) and the familiarity among the target consumers. Loyalty drives sales at reduced marketing costs, and affords a defense from competition. Consumers' (and the media's) brand associations and perceptions of quality are key to differentiating the company's offerings in the market and are often the main reason consumers buy and communicate information about the product and the company, thus creating the environment for sales growth and potential extensions to other segments.[27]

---

[21] On the legal rights associated with federal trademark registration see: USPTO.gov, at: http://www.uspto.gov/trademark.

[22] The broader classification of 34 goods and 11 services classes was established in the Nice Agreement (1957), and it has since been refined significantly seeking an increasing level of specificity (narrowing) of the classes covered by the trademark rights. World Intellectual Property Organization (WIPO), http://www.wipo.int/treaties/en/classification/nice/summary_nice.html.

[23] See: W. M. Landes and R. A. Posner, "Trademark Law: An Economic Perspective" in: Journal of Law and Economics, Vol. 30, No. 2, (Oct., 1987), pp 265-309.

[24] BBB website accessed May 17, 2016.

[25] The original concept of Brand Equity defined it as a set of brand assets and liabilities linked to a trademark, which add to or subtract from the value provided by a product or service (D.A. Aaker, Managing Brand Equity, Free Press (1991).

[26] See, e.g., D. Aaker, "What Is Brand Equity and Why is it Valuable?" Sept. 4, 2013 in: Aaker on Brands blog (https://www.prophet.com/blog/aakeronbrands/156-what-is-brand-equity-and-why-is-it-valuable).

[27] Aaker (2013), *Ibid*.

© 2016 IPmetrics, LLC

Case: 4:16-cv-00144-DDN   Doc. #: 30-3   Filed: 12/06/16   Page: 10 of 19 PageID #: 196

Ms. Norah Ryan  
LMI v. PLMI  
September 27, 2016

Expert Damages Report  
Page 8



Moreover, in the present context, it is important to note that a brand is built on the basis of trademarks as well as policies and procedures to enhance, protect, enforce, and develop them. If, and when, **a trademark's confusing use reduces the ability of a trademark to function as intended, the investment in the brand is deemed to be lost as well.**

The brand LAWN MANAGERS has acquired its reputation and brand equity through its use over 35 years. The confusing use to which Defendant's activities have subjected it in the past few years is likely to disrupt the association in consumers' minds between the brand and the Plaintiff's business, subjecting the cumulative marketing and goodwill of the Plaintiff's business to increasing economic losses.

## IV. DAMAGES ASSESSMENT

Based on the foregoing background information, I proceeded to evaluate, from an economic perspective, the likelihood of confusion affecting the Plaintiff's trademark as a result of the Defendant's actions. I then estimate the monetary recovery of damages that Federal law provides for this type of uses, according to the cause of action stated in the complaint.

### A. Likelihood of Confusion

From an economic perspective it is my opinion that Defendant's use of Plaintiff's mark is likely to cause confusion and, eventually, loss in brand value. The bases for this opinion are several and can be analyzed in the following aspects:

**Appearance of the Trademarks**

The most salient damaging aspect of Defendant's accused trademark infringement actions is the overwhelming similarity of appearance, sound, connotation and commercial impression of the marks. The Defendant either uses the exact word mark LAWN MANAGERS, as shown in Figures 4 and 5, or materially emphasizes the mark within its own logo (as in Figure 2), signage and website.

**Characteristics of the Business**

The services offered by both parties are substantially the same lawn care services. Moreover, both service customers through the same trade channels such as mailers, online marketing, and signage. In this business segment, customers need to choose among many competitors, and confusion of one service provider for another due to a similar trademark may prevent customers dissatisfied with one provider to try the services of the other, or to disseminate wrong word-of-mouth bad reviews.

Case: 4:16-cv-00144-DDN   Doc. #: 30-3   Filed: 12/06/16   Page: 11 of 19 PageID #: 197

Ms. Norah Ryan
LMI v. PLMI
September 27, 2016

Expert Damages Report
Page 9



### Priority of Use

As acknowledged in the 2012 and 2014 agreements, Plaintiff retained the business in existence since 1979. Automatically, Plaintiff has substantial prior use of the mark and, since 2012, Federal registrations. The Plaintiff's mark has associated with it, as the prior mark, the goodwill accrued over 30 years in business. Thus, Defendant's use is necessarily leveraging and infringing Plaintiff's brand equity.

### Actual Confusion

Despite the parties exclusive allocation of residential customers by zip code during the transition period ending July 2016, Defendant's uses identified in the preceding sections have caused instances of actual confusion and is evidently more than likely to confuse customers.

### B. Economic Damages

Since this trademark infringement case is a Federal case due to the Plaintiff's Federal registrations, it is my understanding that section 35 of the Lanham Act applies. According to the statute, if the court finds infringement of Plaintiff's trademark rights, the Plaintiff is entitled to recover Defendant's profits, any damages sustained by the Plaintiff, and the costs of the action.[28]

In assessing profits, the Plaintiff is required to prove Defendant's sales only; it is the Defendant's burden to prove all elements of cost or deduction claimed.[29] Moreover, depending on the circumstances, the court may increase damages up to three times the actual damages found and, in exceptional cases; the court may award reasonable attorney fees to the prevailing party.[30]

### C. The Lawn Care Market

To establish the economic context of the economics of the lawn care business in the St. Louis area, I relied on the most authoritative official information sources. Specifically, data from entities of the U.S. Department of Commerce, as described in the following.

The latest Economic Census data refers to the year 2012.[31] As of that date, the Landscaping services industry segment[32] shows 1,877 establishments with employees in the state of Missouri,[33] with average annual sales receipts of

---

[28] 15 USC 1117 (a), see, e.g. http://www.bitlaw.com/source/15usc/1117.html.
[29] Ibid.
[30] Ibid.
[31] US Census Bureau, Industry Statistics Portal at: www.census.gov/econ/isp/.
[32] North American Industry Classification System (NAICS) No. 56173.
[33] There is also a significant number of self-employment in the segment, with a lower level of revenue per establishment.

Ms. Norah Ryan
LMI v. PLMI
September 27, 2016

Expert Damages Report
Page 10


$441,000 each, with 5.5 employees per establishment. The gross profit over payroll in this segment averages 67% of Sales.

According to Census data,[34] at the end of 2014 there were a total of 517,493 owner-occupied residential units ("OOU") in the 81 Zip Codes in which the area was divided between the parties. This statistic provides a suitable proxy for the market size volume for residential accounts for the lawn care business.[35]

Of that total, the area allocated to Progressive has ▮▮▮ OOUs, while the area allocated to Lawn Managers has ▮▮▮ OOUs. The median value of these residences varies significantly. Since this was the agreed division of the business in the 2012 settlement, it is not surprising that the aggregate ratio of the median value of OOUs in both of these areas is very close to a 50/50 division of the value of OOUs. Therefore, the median value of OOUs can reliably serve as an indicator of the business potential for the lawn care business in the area.

### D. Defendant's Profits

Pursuant to the 2012 settlement among the parties, Plaintiff's residential business area during the relevant damages period, which starts in January 2015, includes 61 zip codes as listed in Exhibit 1-A to this report. Defendant's corresponding residential business area includes 20 zip codes as listed in Exhibit 1-B.

The trademark infringement activities identified in the corresponding section above occurred, since January 2015 given that Defendant continued using Plaintiff's mark beyond the agreed upon transition period, and based its marketing activities upon online and physical signage, which were not limited to the agreed-upon business area. Thus, the damages measure will, in principle, apply to the infringing use in both areas. In Defendant's area because the Plaintiff's mark is used to elicit business from residential customers who are likely to be confused as to the true identity of the company that will provide the services; in Plaintiff's area as the likelihood of confusion has lead consumers in that area to call the wrong company and, if not properly informed and re-directed by Defendant's personnel may not necessarily take the time and trouble of contacting the business that services their area by agreement.

---

[34] Source: U.S. Census Bureau, 2010-2014 American Community Survey 5-Year Estimates (Census.gov).

[35] This statistic is considered a proxy because in some areas it may be counting condominiums as owner occupied units which typically may not have a lawn to take care of and, in fact, may be more likely to be part of a commercial account. On the other hand, this statistic understates those rental units that can have a lawn and may be in the market to contract lawn care services. Overall, the effect of these discrepancies is minimized and this source of data remains a reliable, public, and independent source.

© 2016 IPmetrics, LLC

Ms. Norah Ryan  
LMI v. PLMI  
September 27, 2016

Expert Damages Report  
Page 11



According to the information produced by Defendant,[36] the amount of Defendant's Infringing Sales[37] since January 1, 2015 is ▇▇▇. This total is made up of sales associated with addresses in both Plaintiff's and Defendant's Areas, as well as each of the two years, as shown in Table 1 below. The detailed schedule of sales by year and zip-code derived from the production is in Exhibit 2.

Since, as discussed in the preceding sections, the Defendant willfully uses the Plaintiff' mark in all advertising and marketing of its own services during the damages period (Starting on January 1, 2015), there is a clear nexus between the Defendant sales and the unauthorized continued use of the Plaintiff's intellectual property at issue. Specifically, Progressive saliently features Plaintiff's "LAWN MANAGERS" mark in signage and marketing communications which are the main strategy Defendant uses to generate additional sales and has led to the aforementioned instances of actual confusion.

**Table 1**

| Progressive Lawn Managers, Inc. – Profit Disgorgement Analysis<br>Gross Revenue By Area and Year<br>For the period January 1, 2015 through 2016* | | | |
|---|---|---|---|
| Description | 2015 | 2016 | TOTAL |
| Plaintiff's Area<br>Gross Revenue | ▇▇ | ▇▇ | ▇▇ |
| Defendant's Area<br>Gross Revenue | ▇▇ | ▇▇ | ▇▇ |
| **TOTAL GROSS REVENUE** | ▇▇ | $ ▇▇ | $ ▇▇ |

Source: PROGRESSIVE 000621-000674, 000675-000727, and 000730-000731.  
* The ending date of the 2016 year-to-date report produced is undisclosed in the production.

Furthermore, as the Plaintiff's burden is to prove infringing sales only, it remains Defendant's burden to prove allowable deductions to arrive at profits.

---

[36] Specifically: PROGRESSIVE 000621-000674, 000675-000727, and 000730-000731. In the following analysis, in order to differentiate revenues by zip codes, I relied on the detailed reports. There are annual accounting summaries that have slight differences ▇▇▇▇) and the tax return numbers ▇▇▇▇ These differences are well within the normal errors one would expect among these kinds of reports developed at different times with different criteria.

[37] The amounts considered are those identified in the TOTPAY column of the tables in the production, which are assumed to be actual amounts collected by customer. Defendant, as usual in small businesses, records transactions on a Cash Basis, not on Accrual.

Ms. Norah Ryan  
LMI v. PLMI  
September 27, 2016

Expert Damages Report  
Page 12



Nevertheless, I have considered the Tax Return information that the Defendant has produced[38] to arrive at a first approximation of Defendant's Profits.

The revenue amount is directly the amount listed as Gross Sales in the Tax Returns or Net Sales if any "returns and allowances" are identified and deducted.[39] On the other hand, "cost" is a broad economic term that encompasses a variety of definitions and contexts; there is no single way to define and measure costs. For the purposes of calculating damages, the generally accepted concept is that of "Incremental Costs," that is, the necessary costs to sell and render the additional services that are based on the continued use of the trademark at issue. Furthermore, not all expenses that are eligible for tax deductions are incremental costs in this sense; most fixed costs or overhead expenses would have been incurred regardless of the use of the trademark. Examples of these non-incremental costs are: rent expense; officers' compensation; and, interest on debt. In addition, there typically are differences in the way costs are tracked and recorded in small businesses, and the conceptual "necessary incremental costs."

In this case, based on the Defendant's tax returns, the two main expenses are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."[40] The information in the tax returns is not sufficient to verify that all the purchases included under that term are necessary costs to deliver the services through which Progressive generates revenue and profits. Assuming, arguendo, that all of these expenditures are necessary to render the lawn care services under the trademark at issue, the tax return information also provides additional operating expenses that are likely related, such ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮", ▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Considering the expenses identified in the following table, to arrive at a measure of profits often known in financial analysis as EBITDA, or "earnings before interest, taxes, depreciation, and amortization," which is the level of profits that best measures the operation of a business.[41] Additional deductions often found in tax returns accounting for capital structure and fixed costs that are uncorrelated to the level of operations, and excludes taxes since damages awards are taxable and, thus, measured before taxes. In Table 2, I have calculated Progressive's profits as the EBITDA for the three fiscal years disclosed and obtained the weighted-average profit margin. Excluded from these costs are non-incremental cost deductions such as interest, Officer's compensation, life insurance premiums, charitable contributions, as well as depreciation.

---

[38] Production identified as Progressive 000436-000483 (Tax returns 2015, 2014, 2013).  
[39] Defendant's Tax Returns do not list any "Returns and Allowances" so, in this case, its Gross Sales are equal to Net Sales.  
[40] On average between 2013 and 2015, purchases amount to 30% of revenue, and salaries to ▮▮▮  
[41] See, e.g., REUTERS – Financial Glossary – EBITDA, available at:  
(http://glossary.reuters.com/index.php?title=EBITDA).

Ms. Norah Ryan  
LMI v. PLMI  
September 27, 2016

Expert Damages Report  
Page 13



## Table 2
## Defendant's Profits
### (Based on Federal Tax Returns)



Therefore, the estimate of Defendant's profits can be derived using Progressive's average profit margin calculated from Table 2. Applied to the amount of infringing revenue for the 2015-to-date damages period identified above. The calculation yields an amount of Defendant's profits of ▮▮▮.[42]

### E. Plaintiff's Lost Profits

Independently of Defendants' profits, damages in this case also encompass the profits from sales lost by Plaintiff from customers that, due to the confusion created by Defendant's advertising use of the LAWN MANAGERS mark, directed their inquiries to Defendant's business and were discouraged from further contacting Plaintiff, even in those cases Defendant's business clarified the confusion.

As of the date of this report, I have reviewed Plaintiff's financial and operating information for the years leading up to 2016 and year-to-date data for 2016 as well as full year projections.[43] Based on this review, I first determined the Plaintiff's average profit margin applying the same methodology as in the Defendant's analysis, as shown in Table 3 below.

---

[42] Directly, ▮▮▮  
[43] Information relied upon encompasses financial statements (Bates # LMI 358-363), tax returns (Bates # LMI 364-423), and operational summaries (Bates # LMI 353-357).




**Table 3
Plaintiff's Profits
(Based on Federal Tax Returns)**

| | 2013 | 2014 | 2015 | TOTAL | Average % |
|---|---|---|---|---|---|
| Net Sales | ▓ | ▓ | ▓ | ▓ | ▓ |
| COGS | | ▓ | ▓ | ▓ | ▓ |
| Gross Profit | ▓ | ▓ | ▓ | ▓ | ▓ |
| Advertising | ▓ | ▓ | ▓ | ▓ | ▓ |
| Salaries | ▓ | ▓ | ▓ | ▓ | ▓ |
| Rep & Maint | ▓ | ▓ | ▓ | ▓ | ▓ |
| Rent | - | - | - | - | ▓ |
| Other (net) | ▓ | ▓ | ▓ | ▓ | ▓ |
| EBITDA | $ ▓ | ▓ | ▓ | ▓ | ▓ |

As the table shows, during the three years ending in 2015, the Plaintiff's weighted average profit margin per unit of sales is ▓.

To consider the number of accounts and the revenue realized during the damages period (2015-2016), I relied on the operational information detailing the tracking of services performed and billed for 2015 and 2016 (year-to-date and anticipated/scheduled). The basic information is summarized in Table 4 below, and shows the calculation of the average annual revenue per account for the Plaintiff's business.

**Table 4
Plaintiff's Operating Parameters**

| Service Year | 2015 | 2016 Sched. | TOTAL |
|---|---|---|---|
| Total Services | ▓ | ▓ | ▓ |
| Total Sales | ▓ | ▓ | ▓ |
| Active Customers | ▓ | ▓ | ▓ |
| Avg. Services / yr / account | ▓ | ▓ | ▓ |
| Avg. Sales / yr / account | $ ▓ | ▓ | $ ▓ |

Ms. Norah Ryan  
LMI v. PLMI  
September 27, 2016

Expert Damages Report  
Page 15



Therefore, based on the relevant annual data,[44] I calculated that the amount of damages per account is ▮ annually in lost sales and, on this basis, a lost profits damages per account at ▮ annually, or ▮ in lost profits during the damages period of 516 days.[45]

The number of accounts lost, i.e., customers that would have gone on to become customers of Lawn Managers, Inc. instead of Defendant's business are made up of two groups: (a) customers located in the Zip Code areas assigned to Plaintiff, but serviced by Defendants; and (b) customers that would have been searching for services offered under the LAWN MANAGERS mark but were misdirected by the Defendant's confusing and allegedly infringing advertising, contacted Progressive, and did not hire either party on account of the confusion. At this time, I have not found the necessary information regarding the number of lost accounts to reliably quantify this number. If additional relevant information is produced, I anticipate calculating Plaintiff's lost profits based on the per-account annual parameter identified above. Furthermore, going forward, Plaintiff's Lost Profits will accrue if Defendant continues to infringe the Plaintiff's LAWN MANAGERS mark and captures additional accounts after the exclusive marketing areas agreement is deemed terminated. I understand the original termination date is July 25, 2016 and have calculated past damages on that basis.

### F. Corrective Advertising

In a trademark infringement action, such as the case at hand, prevailing plaintiffs are routinely granted injunctive relief requiring the defendant to discontinue use of the accused mark. An additional remedy, however, is corrective advertising. This could take the form of an order that Defendant Progressive engage in advertising to correct the misinformation disseminated by the infringing use of the mark in both online and signage media. In addition, or as an alternative, this remedy may be granted in the form of monetary relief by way of, for example, an order that Defendant Progressive make payments to the Plaintiff Lawn Managers to cover the costs of future advertising directed at correcting the wrongful marketing impressions created by Defendant's conduct since January 2015.[46]

At the current stage of discovery, a reliable estimate of the cost of a corrective advertising campaign to redress the impressions, at least on the ▮ households (OOUs) would be the cost of mailing a flyer to that effect to the residents of the area currently assigned to Defendants and opening up to competitive activity in July 2016. At current rates, the cost of a direct mail campaign utilizing mailed letters is in the order of ▮ per ▮ addresses, and using basic 4" x 6" post cards is in the order of ▮ per

---

[44] Federal Tax Returns for the years 2013 – 2015 (Bates # LMI 364-423), and "Season Summary per Cycle" spreadsheets (Bates # LMI 353-357).  
[45] For accounts lost for the whole damages period of 516 days ▮.  
[46] See, e.g., C.T. Micheletti, INTA Bulletin, January 1, 2015; Vol. 70, No. 1.

Ms. Norah Ryan
LMI v. PLMI
September 27, 2016

Expert Damages Report
Page 16


IPmetrics
Intellectual Property Consulting

addresses.[47] Thus, this category of damages is estimated at an amount in the range of no less than ▮▮▮.

## V. PREJUDGMENT INTEREST

I understand that, if the Plaintiff in this case prevails at trial and damages are awarded, prejudgment interest may be sought. In that event, if asked, I would apply the indicated interest rate[49] to the damages amount determined herein during the damages period, accounting for the passage of time, and the lost opportunity between each damages date and the date of trial.

## VI. SUMMARY OF OPINIONS

Upon reviewing the documentation listed in Appendix B to this report, performing independent research, as well as reviewing the relevant documentation produced in connection with the case, I arrived at the following conclusions regarding the alleged damages in this matter, the bases for which are explained in the preceding sections of this report.

1. Defendant's infringing revenues for the period January 1, 2015 through 2016[50] are ▮▮▮.
2. Economic damages in the form of a disgorgement of the Defendant's profits for the period January 1, 2015 through mid–2016 reflecting Progressive's estimated EBITDA margin ▮▮▮ amount to no less than: ▮▮▮.
3. Economic damages in the form of lost profits are quantifiable at a rate of no less than ▮▮▮ per new account/year for infringements after July 25, 2016.
4. Economic damages in the form of corrective advertising are estimated at no less than ▮▮▮.
5. If requested by the Court, I intend to provide a calculation of prejudgment interest on the damages award.

---

[47] See, e.g., all-inclusive rate sheet from US Mailing House at: http://www.usmailinghouse.com/small-postcards/.
[48] Calculated at the post card price of $385 per thousand, multiplied by the target ▮▮▮ households.
[49] I understand that, in Missouri, for these calculations a per annum interest rate equal to the intended Federal Funds Rate, as established by the Federal Reserve Board (currently at 0.25% to 0.50%), plus three percent is to be applied (Missouri Revised Statutes, Chapter 408 – www.moga.mo.gov/mostatutes/stathtml/40800000401.html). Thus, the anticipated range is ▮▮▮% to ▮▮▮.
[50] The detailed information produced is a listing by customer number for each year, without monthly detail, so the exact ending date of the current year's disclosure is not specified in the documents, but is assumed to be no later than July 31, 2016.

Ms. Norah Ryan
LMI v. PLMI
September 27, 2016

Expert Damages Report
Page 17



The foregoing conclusions are based upon the documents and information reviewed as of the date of this report, as well as my intellectual property valuation and damages assessment experience. I hold these opinions with a reasonable degree of professional certainty. I hereby reserve the right to amend these conclusions should additional information and / or documents become available for review.

Sincerely,

Fernando Torres MSc
Chief Economist,
IPmetrics LLC

© 2016 IPmetrics, LLC