### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

LAWN MANAGERS, INC., a Missouri     )
Corporation,     )
    )
      Plaintiff,     )
    )
      v.     )
    )
    ) **No 4:16-CV-00144-DDN**
PROGRESSIVE LAWN MANAGERS, INC.,     )
a Missouri Corporation,     )
    )
      Defendant.     )

### NON-JURY TRIAL – VOLUME 2
### BEFORE THE HONORABLE DAVID D. NOCE
### UNITED STATES MAGISTRATE JUDGE
### OCTOBER 31, 2017

APPEARANCES:

For Plaintiff:       Norah J. Ryan, Esq.
                        3407 South Jefferson Avenue
                        St. Louis, MO  63118

                        Annette P. Heller, Esq.
                        400 Chesterfield Center, Suite 400
                        St. Louis, MO  63017

                        Susan Nell Rowe, Esq.
                        2117 Nebraska
                        St. Louis, MO  63104

For Defendant:       Don V. Kelly, Esq.
                        Alexander M. Hurst, Esq.
                        EVANS AND DIXON, LLC
                        211 N. Broadway, Suite 2500
                        St. Louis, MO  63102

REPORTED BY:         SHANNON L. WHITE, RMR, CRR, CSR, CCR
                        Official Court Reporter
                        United States District Court
                        111 South Tenth Street, Third Floor
                        St. Louis, MO  63102
                        (314) 244-7966

PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

**INDEX — VOL. 2**

**DEBRA ALCORN**                                               PAGE
Cross-Examination Cont'd by Mr. Kelly .............    3
Redirect Examination by Ms. Ryan .................   13
Recross Examination by Mr. Kelly .................   21

**LISA KAUCHER**
Direct Examination by Ms. Ryan ...................   24
Cross-Examination by Mr. Kelly ...................   29

**CHRISTINE LAWSON**
Direct Examination by Ms. Ryan ...................   30
Cross-Examination by Mr. Kelly ...................   34

**SCOTT HEWETT**
Direct Examination by Ms. Ryan ...................   36
Cross-Examination by Mr. Kelly ...................   42

**CRYSTAL ALCORN**
Direct Examination by Ms. Ryan ...................   43
Cross-Examination by Mr. Kelly ...................   52
Redirect Examination by Ms. Ryan .................   58

**FERNANDO TORRES**
Direct Examination by Ms. Ryan ...................   62
Cross-Examination by Mr. Kelly ...................   88
Redirect Examination by Ms. Ryan .................  114
Recross-Examination by Mr. Kelly .................  116

**LINDA SMITH**
Direct Examination by Ms. Ryan ...................  117
Direct Examination by Mr. Kelly ..................  131

Case: 4:16-cv-00144-DDN Doc. #: 110 Filed: 11/30/17 Page: 3 of 161 PageID #: 1418

1          **(PROCEEDINGS STARTED AT 9:10 AM.)**

2               THE COURT:  You may continue.

3               MR. KELLY:  Thank you, Your Honor.

4               **CROSS-EXAMINATION CONTINUED**

5     **BY MR. KELLY:**

6     Q     Good morning, Ms. Alcorn.

7     A     Good morning, Mr. Kelly.

8     Q     Yesterday we were talking about certain exhibits in the

9     black notebook in front of you.  I would like you to turn to

10    Exhibit L-5.

11              Your Honor, that exhibit is not paginated; so I did a

12    handwritten one in the notebook right next to -- there.

13              THE COURT:  Okay.

14              MR. KELLY:  For that exhibit.

15    Q     (BY MR. KELLY) And we were speaking yesterday about

16    customers receiving the "we want you back" mailer in July of

17    2016.  Could you turn to page 19 in reference to customer Andy

18    Conover, please.

19    A     Okay.

20    Q     Thank you.  And according to this note, it said "Mr.

21    Conover called, wondering why he wasn't notified he was with

22    another company"; correct?

23    A     That's what the note says, yes.

24    Q     There's no indication that he was confused about anything

25    that Progressive did?

1    A    It's not noted on here, but this isn't my call.

2    Q    And this came in -- this customer interaction came in

3    after the letter Lawn Managers sent in July 2016; correct?

4    A    It came in on August 30, 2016.

5    Q    And was it in response to that mailer going out?

6    A    It doesn't say that on here either.

7    Q    It does indicate that this is one of the customers that

8    had been award Ms. Smith in 2012; correct?

9    A    It does.

10   Q    And that would have been a customer who received the "we

11   want you back" mailer; correct?

12   A    He would have.

13   Q    Could you turn to the next page, page 30.  I believe it's

14   Patty Force.

15   A    Okay.

16   Q    Is there any notation in there about this customer being

17   confused about any words or trademarks Progressive is using?

18   A    No.

19   Q    This is a customer inquiring about being switched to

20   another company and not being notified; correct?

21   A    That's correct.

22   Q    And it indicates she was upset; correct?

23   A    Yes.

24   Q    Thank you.  Would you look at page 21, customer Angela

25   Colbert.

10/31/17 LME Jt. BLWI   Volume 2

5

```
 1    A     Yes.

 2    Q     This is another customer that indicated that she was

 3    unaware of the change; correct?

 4    A     That's correct.

 5    Q     And that was not until after the "we want you back"

 6    mailer went out?

 7    A     8/23/16, correct.

 8    Q     There's no complaint of being confused in this customer

 9    complaint?

10    A     Not written on this note, no.

11    Q     Would you turn to page 23, please.  This is another --

12    A     Is that Susie Green?  I'm sorry.  My pages aren't --

13    Q     No.  It's Steven Krejci, K-r-e-j-c-i.

14    A     Okay.

15    Q     This is a report of another customer calling in, not

16    knowing he was transferred to Progressive in 2012; correct?

17    A     Correct.

18    Q     And this is in response to the "we want you back" mailer

19    that went out; correct?

20    A     Yes, it was.

21    Q     Would you turn to page 24, please.

22    A     Can you tell me the name?  I'm sorry.

23    Q     Yes.  Theresa Brueckmann, B-r-u-e-c-k-m-a-n-n.

24    A     Okay.

25    Q     And this is a note from a customer indicating that she
```

1    just received the letter from Lawn Managers; correct?

2    A    Yes.

3    Q    And that would again be the "we want you back" letter?

4    A    Well, she says, "I just received a letter from you."

5    Suggested customer read letter from her current provider.  It

6    doesn't say she received our letter.  She just says she

7    received a letter from us and if she was confused on her

8    company.

9    Q    And this is a customer that would have received the "we

10   want you back" letter in July?

11   A    They would have, yes.

12   Q    Yes.  And would you turn to page 25, please.  Customer

13   Mark Barbee, B-a-r-b-e-e.

14   A    Yes.

15   Q    This is another customer calling and asking to explain

16   the letter that she received?

17   A    That's correct.

18   Q    And that was about having been switched to another --

19   A    That's correct, yes.

20   Q    Would you go back to -- well, hold on a second.  Let me

21   just ask you this.  As part of the protocol in handling these

22   calls, was it the policy of Lawn Managers to ask and to try to

23   determine whether a customer was confused simply because

24   Progressive was using the name "Progressive Lawn Managers"?

25   A    No.  We didn't ask them if they were confused.  We

1    just -- they just asked if something about our company, like

2    they believed they were our customer, and we said, "I'm sorry,

3    you're not our customer," no, we didn't probe them for

4    confusion.

5    Q    Could you turn to Exhibit 86, please.  And page 7.  Do

6    you recognize the email?

7    A    I do.

8    Q    And this is from Mr. Brad Furfaro?

9    A    Yes, it is.

10   Q    Would you look at the third paragraph.

11   A    Okay.

12   Q    Would you read that, please.

13   A    "Oh, I just got something in the mail from Progressive

14   Lawn Managers.  Who the hell is this?  I thought it was you

15   guys at first.  They quoted me for one of my very first jobs I

16   ever did."

17   Q    Is there any indication in this email that he was

18   confused by anything other than the name "Progressive Lawn

19   Managers"?

20   A    He was confused about the mail that he got from

21   Progressive, yes.  That's all I see in here.

22   Q    No indication that he was confused by anything -- usage

23   of the words "Lawn Managers" alone by Progressive?

24   A    No.  He was confused because he was being marketed by

25   somebody with the name "Lawn Managers," the same as ours.  If

1  he would have got a letter from TruGreen, this email wouldn't

2  have came to me.

3  Q    And he actually put the words "Progressive Lawn Managers"

4  in quotes, didn't he?

5  A    Yes, he did.

6  Q    So whether he was confused just because the name was

7  "Progressive Lawn Managers" or for some other reason, you

8  don't know?

9  A    I don't know, no.

10 Q    All right.  Would you turn to page 55, please.

11        MS. RYAN:  Mr. Kelly, would you identify the

12 customers.  The page is not numbered.

13        MR. KELLY:  Yeah, it's actually the filtered customer

14 cancel report.

15        MS. RYAN:  Okay.

16        THE COURT:  Now, these -- I don't --

17        MR. KELLY:  Oh, it's in Exhibit 86.  It should be

18 numbered.  For the record, it's a filtered customer cancel

19 report-simple dated 12/16/15.

20 Q    (BY MR. KELLY) Is that correct, Ms. Alcorn?

21 A    That's correct.

22 Q    And this is a list that you prepared; is that correct?

23 A    That's correct.

24 Q    And were you preparing this in view of the possible

25 lawsuit that was filed in January 2016 against Progressive?

1    A    No.  I was preparing this to show Randy the customers we

2    lost because of the marketing letters that Linda sent out in

3    November of 2014.

4    Q    Okay.  And you thought there was something wrong with

5    those letters that went out?

6    A    They were -- yes, I did, because you don't market in

7    November.  And I believed that some of the people that she

8    marketed she pulled off of the court-provided reports that we

9    gave to her.

10   Q    Did you ever see the letter that you thought went out?

11   A    I did.  And I only spoke to the customers about it.

12   Q    So you did?

13   A    I did not.  I just spoke to the customers about it.

14   Q    But you know it went out in November of 2014?

15   A    Yes.

16   Q    And this is a list of customers who cancelled between

17   November of 2014 and May 2015; correct?

18   A    That's correct.

19   Q    And this document, according to your testimony, reflects

20   not just when the customers were cancelled but when the

21   customers requested cancellations; correct?

22   A    I don't understand what you mean.

23   Q    Well, you cancel -- when the customer requests a

24   cancellation, you cancel them immediately?

25   A    Absolutely, yes.

Case: 4:16-cv-00144-DDN   Doc. #: 110   Filed: 11/30/17   Page: 10 of 161 PageID #: 1425

1   Q     So these customers requested cancellation between

2   November 1 of 2014 and May 31, 2015?

3   A     That's correct.

4   Q     So some of these customers did not request cancellation

5   until May of 2015?

6   A     That's because they thought we were treating their lawn

7   in the beginning, and we didn't catch it until we came by and

8   treated it and then asked for their money and they said, "I

9   already paid."

10  Q     And you learned that in -- and up to May 2015?

11  A     Through -- yeah.  I figured by the time May was over, all

12  that had already been -- the customers had been addressed.

13  Q     So these customers had cancelled based on something they

14  received from Progressive in November of 2014?

15  A     Yes.

16  Q     And at the time, Progressive was allowed to use the words

17  "Lawn Managers" to market itself; correct?

18  A     They could.

19  Q     So according to this document, something Progressive did

20  in November of 2014 was causing cancellations to Lawn Managers

21  into 2015?

22  A     That's correct.

23  Q     Now, would you look at that list, please.  What's the

24  last name on that list?

25  A     Patrick King.

1  Q    Is that the same Patrick King who came and testified

2  yesterday and testified he didn't know Linda's business was on

3  120 Old Meramec Station?

4  A    I didn't hear his testimony, but it was the Patrick that

5  was here, yes.

6  Q    Now, according to this report, Mr. King was a Lawn

7  Managers customer but cancelled because of something he

8  received from Progressive; correct?

9  A    No.  His name is crossed out.  Only the ones with the

10 check marks are the ones that were cancelled because of what

11 they received from Progressive.

12 Q    So why is his name on the list?

13 A    Because he did cancel his account during that time, I

14 believe, because he was dealing with cancer and he couldn't

15 handle the expenses; so he cancelled his account.  So anybody

16 that cancelled -- what I was calling up here, you notice

17 there's some other ones that are crossed out too.  I'm not

18 blaming those on PLM.  I'm blaming -- those are our real

19 cancels.  Only the ones with the check marks.

20 Q    I see.  I got you, okay.  All righty.  Did the letter

21 that's denoted the fraudulent letter, did it go out in

22 response to that November 14 mailer?

23 A    Yes, it did.

24 Q    I'm going to hand you what is marked as Defendant's

25 Exhibit P-3.  Ask you just look at those and let me know when

1    you're done looking at that.

2    A    Okay.

3    Q    Do you know who prepared that?

4    A    It -- probably Crystal since she has control over

5    QuickBooks at this time or when this was dated.

6    Q    And do you have any knowledge whether that's a true and

7    accurate list of bills for Lawn Managers U.S. Postmaster for

8    all the transactions for the period from May 2, 2012, to June

9    30, 2016?

10   A    Through August 2013?

11   Q    No.  June 30, 2016.

12   A    Oh, I'm sorry.  I see it going through July 10.  I see

13   December 20.  Oh, sorry.  I see a July 10, 2016, at the very

14   top.

15   Q    That's the day it was printed; correct?

16   A    That's the date the bill was entered.  I'm sorry.  I'm

17   looking at the due date.  I'm sorry.  The other date, yes,

18   6/30.

19   Q    Okay.

20   A    Yeah.  6/30/16, yes.

21   Q    So it's a true and accurate --

22   A    It should be accurate, yes.

23        MR. KELLY:  Great.  Thank you.  I don't have any

24   further questions, Your Honor.

25        THE COURT:  All right.  Redirect?

1    **REDIRECT EXAMINATION**

2    **BY MS. RYAN:**

3    Q    Ms. Alcorn, you were asked about the "we want you back"

4    letter?

5    A    Yes.

6    Q    Just to be very clear, who did that go to?

7    A    That went out to the customers we lost in 2012 and 2014.

8    Q    And was there confusion generated by that letter?  Were

9    customers confused by the letter?  Mr. Kelly just showed you a

10   bunch of phone calls from people.

11   A    I don't think they were as much confused as they were a

12   little disheartened that they weren't informed in the

13   beginning.  They were discouraged because they weren't told

14   that they were being serviced by another company, and then it

15   was coming from us, you know, that -- after all of that time.

16         So I think it was -- it wasn't so much confusion

17   because the letter was kind of clearing up what had happened

18   in 2012.  It was more of they were upset that they hadn't been

19   notified.

20   Q    All right.  Thank you.  Now, you were asked yesterday

21   about records of phone calls, the print screens with the notes

22   that were written by you.

23   A    Yes.

24   Q    Were any of those forged?

25   A    Absolutely not.

1  Q    Were any of them generated days later by you?

2  A    No.

3  Q    Just quickly, the process again for generating those

4  notes was what?

5  A    When the customer would call, we asked them their

6  address.  When we pull the address up in the system, if they

7  are not our customer, especially if they were previous

8  customers, but some of the calls would actually come from

9  accounts that we had the address in our system but no customer

10  had ever been associated with it.  So immediately we would do

11  a print screen, and then we would -- as soon as we got off the

12  phone with the customer, we would document what that

13  conversation was about, and then it would just be thrown in a

14  bin.

15  Q    Now, you have been asked several times about the

16  marketing letter to -- that has the name "Furfaro Design" at

17  302 Gore?

18  A    Yes.

19  Q    In Webster Groves; right?

20  A    That's correct.

21  Q    Somewhere around page 6 of Exhibit 86 -- you don't need

22  to pull it out.  It's okay.

23  A    I know it, yeah.

24  Q    And then you were asked whether you have coded that as

25  commercial prior to May 1 of 2012?

1   A    Correct.

2   Q    And did you code that as commercial prior to May 1 of

3   2012?

4   A    No.

5   Q    Did you have access to change the coding of customers?

6   A    No.  I had no access -- really even after May 1, after

7   the companies had divided, I still had no access to our

8   server.  I was pretty much locked out of the server.  So it

9   wasn't until the end of May that, at that point in May, the

10  companies were separated.  So if anybody new came in, then I

11  would have coded them.  Prior to that, Linda was in control.

12  Q    And by the time you had access, Linda wasn't there

13  anymore; correct?

14  A    She left shortly after that, yes.

15  Q    Did you change any coding between the time you had access

16  and when Linda was no longer in the building?

17  A    Not on anything that were her accounts.  On some of

18  Randy's zip codes if they were commercial accounts that hadn't

19  been marketed in years, I started cleaning up the computer,

20  but other than that, no, I made no changes.

21  Q    Now, you were asked about customers who called in after

22  the restraining order and the preliminary injunction were

23  entered in the Hillsboro case.  Did you actually see those

24  orders, or were you just told about them?

25  A    I believe I was just told about them.

1    Q    And you were asked whether that was the first time that

2    customers had been told there was a separation.  Do you know

3    the answer to that?

4    A    I'm sorry?

5    Q    Let me just skip that.  Strike that question.

6         Do you get any calls for other lawn service companies

7    that are confused about whose customer they are, like

8    TruGreen, Rottler, any other company?

9    A    Nowhere near this volume.  Since I've been back in 2012,

10   we might have had two calls from Lawn Masters but nothing like

11   the volume of this.

12   Q    What is Lawn Masters?

13   A    It's a lawn care company that does pretty much the same

14   thing we do.

15   Q    You were asked whether, when the logo changed, did --

16   logo.  When Lawn Managers' logo changed, in other words the

17   color was changed to blue on everything -- well, first of all,

18   when did that occur?

19   A    That occurred -- it was discussed and prepared for at the

20   end of 2014 and took effect in the beginning of 2015.

21   Q    And you were asked whether you did anything to announce

22   it.  Were any letters sent out?

23   A    I did a newsletter to our customers, and I posted it on

24   Facebook.

25   Q    And by "newsletter," what do you mean?

1   A     I mean we have a newsletter that goes out three to four

2   times a year to communicate with our customers, things we're

3   seeing in the lawns, things that are going on; so when we

4   changed the colors of our logos and we were putting the actual

5   logos on the truck and changing that, we wanted them to be

6   aware of who we were.  So, yes, I posted it on Facebook, and I

7   sent out that newsletter.  Customers opt in by giving us their

8   email addresses.

9   Q     So it's not a paper newsletter?

10  A     It's not a paper newsletter.

11  Q     It's email only?

12  A     Yes.

13  Q     Only to active customers?

14  A     Only active customers, yes.

15  Q     You've been asked about that postage report.

16  A     Yes.

17  Q     Did you generate that?

18  A     No, I did not.

19  Q     Do you know what system it came out of?

20  A     QuickBooks.

21  Q     When a customer calls in and says they saw a truck in

22  their neighborhood and they're trying to get service, do any

23  ever say whose trucks they saw?

24  A     No.  They just say, "We saw a truck."

25  Q     And this morning you were asked about a series of

1   customers who were calling in, inquiring about being switched

2   to another company.  They weren't notified, a whole bunch of

3   people who weren't notified according to what they were

4   saying.  All of those phone calls were in 2016; correct?

5   A    The ones I was just looking at?

6   Q    Yes.

7   A    Yes.

8   Q    What was the date that Linda was supposed to -- or

9   Progressive was supposed to stop using "Lawn Managers" by

10  itself?

11  A    December 31, 2014.

12  Q    Going to the filtered customer cancelled report that you

13  just testified about.

14  A    Yes.

15  Q    I want to be very clear about that.  Whose customers were

16  they?  Let's say whose customers were they as of July 25,

17  2014?

18  A    They were Lawn Managers' customers.

19  Q    And you said information was disclosed.  What information

20  was disclosed?

21  A    With all of the reports we had to provide through the

22  court system, their names were disclosed; so -- and I can look

23  at some of the reports now, see those names that she would

24  have no knowledge of because those customers came to us after

25  2012.  They were a family friend of one of our technicians.

1   So that's -- I believe that's what was taken, along with their

2   address, their names.  Possibly -- I don't remember -- all the

3   reports provided possibly sizes because you need sizes to

4   determine price.

5   Q     So in other words, you're saying that information was

6   produced in the Hillsboro contempt proceedings in 2014 by Lawn

7   Managers?

8   A     Yes.

9   Q     It was produced to Progressive?

10  A     Yes.

11  Q     And from what you can tell, Progressive used that

12  information to send out marketing letters?

13  A     Yes.

14  Q     You've been asked about -- you've been asked about Lawn

15  Managers changing to the blue color?

16  A     Yes.

17  Q     And I think you were asked whether this was done to copy

18  from Progressive or to make Lawn Managers' signage or whatever

19  look more like Progressive's?

20  A     Was I asked that?  Yes.

21  Q     Yes.  I'm displaying on the ELMO -- I don't know if you

22  can see the screen.

23  A     I can see, uh-huh.

24  Q     A current Lawn Managers' yard sign?

25  A     That's correct.

```
 1            MR. KELLY:  Is that an exhibit?

 2            MS. RYAN:  No.  We're on rebuttal, aren't we?

 3            MR. KELLY:  No.  Has that been marked as an exhibit?

 4            MS. RYAN:  No, it has not.

 5            MR. KELLY:  Your Honor, I would object.  How is this

 6   rebuttal?

 7            THE COURT:  Well, I'm going to ask you to mark it,

 8   number one; so mark it, please.  And the objection is?  I will

 9   ask you to step up.

10            MR. KELLY:  Yeah.  I was just -- how is this rebuttal

11   to anything?  I mean, I'm not even sure.  Now we have a lawn

12   sign produced now for the first time?

13            THE COURT:  All right.  Was this gone into on

14   cross-examination?

15            MS. RYAN:  She was -- it was.  She was asked was --

16   did Lawn Managers change their signage to make it look more

17   like Progressive's signage?  This is what they changed to, and

18   that's what I'm asking her.

19            MR. KELLY:  This should have been given to me before.

20            THE COURT:  Do you have one?

21            MR. KELLY:  I don't have that sign.

22            MS. RYAN:  Your Honor, I can scan it and provide it

23   to him this morning during a break or run a copy.

24            THE COURT:  Well, ask the witness what it is.

25   Q   (BY MS. RYAN) I've marked this now Plaintiff's Exhibit
```

1    158.   What is this?

2    A    That's our current lawn sign.

3    Q    And this was developed in the process of changing to the

4    blue color; correct?

5    A    Yes, in 2015.

6    Q    So it's been used in 2015 and 2016?

7    A    Correct.

8         THE COURT:  Okay.  Now, how is this relevant?

9         MS. RYAN:  It's relevant to respond to the question

10   she was asked about whether Lawn Managers changed its signage

11   to resemble Progressive's by adopting the blue color.

12        THE COURT:  Did you ask that question?

13        MR. KELLY:  I asked if they changed their sign.  I

14   don't recall asking if it was specifically closer to

15   Progressive's.

16        THE COURT:  All right.  I will overrule the

17   objection.  That is sufficiently within rebuttal of

18   cross-examination.

19        MS. RYAN:  Your Honor, I have nothing further.

20        THE COURT:  All right.  Anything further of this

21   witness?

22        MR. KELLY:  Yes, Your Honor.

23                    **RECROSS-EXAMINATION**

24   **BY MR. KELLY:**

25   Q    Ms. Alcorn, please turn to page 55 again of Exhibit 86.

1    A    Okay.

2    Q    Every single customer on here is in Linda Smith's zip

3    code; correct?

4    A    Yes.

5    Q    And she was free to solicit them at any time since May

6    2012; correct?

7    A    Yes.

8    Q    And you don't know where she got the information to send

9    mailers out to these customers?

10   A    No.

11   Q    You're just surmising?

12   A    Correct.

13   Q    All these addresses are on generally available databases

14   which you can get to send mailers; correct?

15   A    The addresses, not the names.

16   Q    Well, you can get the names associated with -- you put

17   the names here.  You don't know what she sent; correct?

18   A    I didn't see it.

19   Q    You were asked about the "we want you back" mailer.  And

20   I'm going to put this up on the screen.  Can you read that?

21   Maybe I will zoom in for you.

22   A    It's pretty fuzzy.

23   Q    Yes, it is.  There we go.  Do you see that now?

24   A    I can see that.

25   Q    Can you read it now, Ms. Alcorn?

1    A    I can read it, yes.

2    Q    Now, you helped draft this?

3    A    I did, yes.

4    Q    Okay.  And what were the circumstances beyond Lawn

5    Managers' control in May of 2012?

6             THE COURT:  Now, was this gone into on redirect?

7             MR. KELLY:  She just -- yes.  She just asked her

8    about this "we want you back" mailer.

9             THE COURT:  Exhibit 51.

10            MR. KELLY:  Yes.  And it's already in, Your Honor.

11            THE COURT:  All right.

12            THE WITNESS:  I'm sorry.  What was your question?

13   Q    (BY MR. KELLY) The question is what were the circumstances

14   beyond Lawn Managers' control in May 2012 that you're

15   referencing in the first line of that letter?

16   A    The divorce and the separation of the companies.

17   Q    You don't think the divorce was in the control of Mr.

18   Zweifel?

19   A    It wasn't in the control of Lawn Managers.

20   Q    He wasn't?

21   A    No.  I'm saying the separation of the customers, you

22   know, we had no control over what he was -- what he had to

23   turn over to Linda.  So that's the circumstances beyond our

24   control, because if it would have been in our control, we

25   would have kept all of the customer, but the court ordered him

1    to give the customers to someone else; so that was beyond our

2    control.

3    Q    That was a negotiated Marital Settlement Agreement.

4           THE COURT:  Okay.  I've heard enough about this.  You

5    may step down.

6           THE WITNESS:  Thank you.

7           THE COURT:  We've had enough examination of this

8    witness.  You may call your next witness.

9           MS. RYAN:  Your Honor, I'm going to call Lisa

10   Kaucher, K-a-u-c-h-e-r.

11          THE COURT:  Step up and be sworn, please.

12                   **(WITNESS SWORN BY THE CLERK.)**

13                        **LISA KAUCHER,**

14   **HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS**

15   **FOLLOWS:**

16                      **DIRECT EXAMINATION**

17   **BY MS. RYAN:**

18   Q    Good morning.  Would you state your name for the record,

19   please?

20   A    Lisa Kaucher.

21          THE COURT:  Can you be sure and speak up.  Maybe

22   louder than you normally speak.

23          THE WITNESS:  Okay.

24   Q    (BY MS. RYAN) Lisa, by whom are you employed?

25   A    Lawn Managers.

1   Q     And what is your job title?

2   A     Customer service representative.

3   Q     And what are the duties of the job?

4   A     Assisting the customers, answering calls, and general

5   office duties.

6   Q     And how long have you worked for Lawn Managers?

7   A     One year.

8   Q     Just about exactly one year?

9   A     Just about.

10  Q     In the course of your duties -- and you take -- you

11  answer calls from people on the phone; correct?

12  A     Correct.

13  Q     I'd like you to turn to Exhibit 89, if you can find it in

14  those books.  And that purports to be a list of -- or a front

15  part of it is a list of calls that you took; correct?

16  A     Correct.

17  Q     And on the back part of it is the actual print screens

18  and records of the phone calls; correct?

19  A     Yes.

20  Q     And do we accidently have a couple pages in here that

21  weren't actually your phone calls?

22  A     Yes, we do.

23  Q     Are those the ones related to Dan Graney?  They're near

24  the front of the group; correct?

25  A     Yes, that is correct.

26

1    Q     So we should ignore those couple of pages.

2             THE COURT:   State the name, please.

3             MS. RYAN:   Dan Graney, G-R-A-N-E-Y.

4    Q    (BY MS. RYAN) Your name is on the print screen, but that's

5    not your handwriting?

6    A    Correct.

7    Q    So you don't really know about this call.  You just

8    printed the paper, and somebody else wrote the note?

9    A    That is correct.  I don't recall.

10   Q    Thank you.  Now, do you actually recall -- let me ask you

11   this.  How many phone calls do you take in a day?

12   A    It really varies.  It could be anywhere from 20 calls a

13   day to, during marketing, more and then our slow period less.

14   I would say on average 20.

15   Q    And I'm asking you personally that's the number of calls

16   you take?

17   A    Correct.

18   Q    Now, looking at, say, the first print screen in this

19   group, you looked through all of these; correct?

20   A    Correct.

21   Q    All the others relate to phone calls that you took?

22   A    Yes.

23   Q    And/or there's a few pages of additional documentation

24   that you might have printed out that related to the call?

25   A    Yes.

27

1   Q    What is your process for generating these records of the

2   phone calls?

3   A    When a customer calls in and has questions, we ask for

4   their address, and that's how we pull up the customer screen.

5   And if there's any confusion about which company they have

6   their lawn care through, we would print the screen at that

7   time and then write on the bottom what transpires during that

8   conversation.

9   Q    So do you have independent recall of any of these phone

10  calls just in general?

11  A    For the most part, yes.

12  Q    But if I were to ask you about a customer who lived on

13  Hickory Wood Drive call you, can you tell me with a date

14  and --

15  A    No.

16         MS. RYAN:  Thank you.  Your Honor, I would like to

17  offer Plaintiff's Exhibit 89 into evidence.

18         THE COURT:  Any objection?

19         MR. KELLY:  No objection, Your Honor.

20         THE COURT:  It will be received.

21  Q    (BY MS. RYAN) Lisa, please turn to Exhibit 91.

22  A    Okay.

23  Q    And what is that piece of paper there?

24  A    That is a record of a phone conversation that occurred

25  that did not come from a customer with an address.  It was

1   someone driving on the road that called in.

2   Q    And you took the call?

3   A    I did.

4   Q    Is this in your handwriting?

5   A    It is.

6   Q    And what was the person calling about?

7   A    The person said that someone in one of our work vehicles

8   was driving dangerously or erratically and they were very

9   upset they had been cut off, I believe, by the person in the

10  car.

11  Q    And did they say what kind of vehicle it was?

12  A    They said it was Lawn Managers, but they said it was a

13  Scion, and we don't own any Scions.

14         MS. RYAN:  Your Honor, I'd like to offer Plaintiff's

15  Exhibit 91 into evidence.

16         THE COURT:  Any objection?

17         MR. KELLY:  No objection, Your Honor.

18         THE COURT:  It will be received.

19  Q    (BY MS. RYAN) Lisa, just so we have it in the transcript,

20  what was the date of that phone call?

21  A    May 31, 2017.

22         MS. RYAN:  All right.  I have nothing further of this

23  witness, Your Honor.

24         THE COURT:  All right.  Cross-examination?

25         MR. KELLY:  Yes, Your Honor.  Just a few.

**CROSS-EXAMINATION**

**BY MR. KELLY:**

Q      Morning, Ms. Kaucher.

A      Good morning.

Q      Similar question in that I asked Ms. Alcorn.  At any time you were documenting the conversations with these calls, did you seek to determine whether the customer was confused or -- because of the Progressive Lawn Managers name?

A      I did not question that.  Some of the customers did offer that information voluntarily.

Q      And it looks like everyone -- and please take your time to confirm, but everyone in this Exhibit 89 called Lawn Managers after July of 2016.  Could you just please count.

A      I started in September of 2016; so I couldn't have taken calls before then.

Q      Very good.  So they all do?

A      Correct.

        MR. KELLY:  Great.  Thank you very much.  That's all I have, Your Honor.

        THE COURT:  All right.  Redirect?

        MS. RYAN:  None, Your Honor.

        THE COURT:  All right.  You may step down.  Thank you.

        MS. RYAN:  Chris Lawson.

        **(WITNESS SWORN BY THE CLERK.)**

1          **CHRISTINE LAWSON,**

2  **HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS**

3  **FOLLOWS:**

4          **DIRECT EXAMINATION**

5  **BY MS. RYAN:**

6  Q    Good morning.

7  A    Good morning.

8  Q    Would you please state your name for the record.

9  A    Christine Lawson.

10  Q    And, Ms. Lawson, by whom are you employed?

11  A    Lawn Managers.

12  Q    What is your position with Lawn Managers?

13  A    I'm a customer service representative.

14  Q    And what are the duties of that job?

15  A    General office duties, assist the customers when they

16  call over the phone, take a lot of phone calls, assist them

17  with their accounts.

18  Q    Now, would you turn to Plaintiff's Exhibit 88.  It's in

19  that book.  It should have a tab on it.  Actually, I should

20  have asked you how long have you worked for Lawn Managers?

21  A    I started January 23, 2013.  Almost five years.

22  Q    Thank you.  Turning to Plaintiff's Exhibit 88, are you

23  familiar with that document?  It's a group of documents;

24  correct?

25  A    Correct.

1  Q    It's got a cover page with it; correct?

2  A    Correct.

3  Q    And then some other print screens and phone call records

4  and other things --

5  A    Correct.

6  Q    At the very first one -- I'm sorry.  Second page of the

7  exhibit, this is Exhibit 88, is that filtered customer cancel

8  report that's been talked about this morning?

9  A    Yes.

10  Q    If you know.  Did you -- on the note on the second

11  page -- I'm sorry -- the third page, has your name, "Chris."

12  Is that something that you generated?

13  A    It is.  This is a photocopy of a call log detail report.

14  Q    And is it -- did you log information on this phone call?

15  A    Yes, I did.  It was a call log entered into our computer

16  system to Randy.

17  Q    And your handwritten note is on that piece of paper?

18  A    Correct.

19  Q    Just generally, what occurred with this customer?

20  A    It appears on May 6 of 2015, I entered a call log.  I

21  received a customer from -- a call from a Customer Browne.  I

22  let Randy know for his information that "Mr." called.  He was

23  confused, wanting to know why he showed a balance on his

24  account, because he had said he had prepaid his account; so

25  there should not have been a balance.

 1              THE COURT:  Now, what page are you using?

 2              MS. RYAN:  Your Honor, I'm on the third page of

 3    Exhibit 88.

 4              MR. KELLY:  It's the second customer.  Second page of

 5    customers; right?

 6              MS. RYAN:  This.

 7              MR. KELLY:  Right.

 8              MS. RYAN:  Here, I'll put it on the ELMO.

 9              THE COURT:  I just want to be sure that --

10              MS. RYAN:  Yeah, let me go ahead and put it on the

11    ELMO.

12    Q   (BY MS. RYAN) You have that in front of you; correct?

13    A    Correct.

14              MS. RYAN:  And, Your Honor, I apologize.  I should

15    have numbered the pages within the documents, and I didn't do

16    that.

17    Q   (BY MS. RYAN) So this was a call that you took?

18    A    Correct, to Randy.  Gave the information to Randy.  The

19    customer had called, Mr. Browne.  Said he was confused,

20    wanting to know why he showed a balance on his account,

21    because he had indicated that he had already prepaid for his

22    account.

23              He also said that his applications were being applied

24    twice, and I explained to him that he had probably paid

25    Progressive.  He was going to contact them to find out what

33

1    was going on, and then he asked that we did not do any more

2    applications on his account until he had found out that

3    information.

4          So my handwritten note at the bottom indicates on the

5    same day he then did call us back to say he was cancelling his

6    account, that he had already paid Progressive, and he was just

7    going to stay with them.

8    Q    Thank you.  And do you recall the content of these phone

9    calls?

10   A    Generally, yes.

11   Q    Thank you.  Now, there's a number of other records -- 18,

12   20 or so records?

13   A    Uh-huh, correct.

14   Q    Do you recall the content of each of these phone calls?

15   A    Not specifically without reading the information that

16   I've written on them.  I do notice it is my handwriting on all

17   of them.  Going through them, I can tell you the customer's

18   name.  Did you want me to read each one entirely?

19   Q    No, no, no.

20   A    The date on which they were cancelled.  And I did note at

21   the bottom the reason for their call, if they had confusion,

22   basically trying to clear up the confusion or just referring

23   them to any invoices they may have received for clarification.

24          MS. RYAN:  Thank you.  Your Honor, I'd like to offer

25   Exhibit 88 into evidence.  I don't think I did that yet.

1          MR. KELLY:  No objection, Your Honor.

2          THE COURT:  All right.  It will be received.

3          MS. RYAN:  And I have no further questions for this

4     witness.

5          THE COURT:  Cross-examination?

6          MR. KELLY:  Just a few, Your Honor.

7                        **CROSS-EXAMINATION**

8     **BY MR. KELLY:**

9     Q    Morning, Ms. Lawson.

10    A    Good morning.

11    Q    In taking these calls, you did not seek to determine

12    whether any of these customers may have been confused simply

13    because Progressive was using the "Progressive Lawn Managers"

14    name?

15    A    I did not question the customers.  It was voluntarily --

16    the information was voluntarily given to us by the customers.

17    Mostly the reason for their calls was out of confusion.

18    Q    And let me ask you about the filtered customer cancel

19    report.  It's the second page of the exhibit you were just

20    talking about a few minutes ago.

21    A    Uh-huh.

22    Q    That's the same report that Ms. Alcorn was testifying to;

23    correct?

24    A    It appears.

25    Q    Okay.  And you attached the page behind it regarding Matt

35

1    and Lindsey Browne; correct?

2    A    That is a photocopy of a call log detail report that was

3    prepared by myself.

4    Q    And they are on this list?

5    A    That is correct.

6    Q    And you attached the call log report regarding Matt and

7    Lindsey Browne because you -- it was associated with this call

8    log report; correct?

9    A    I assume.  I did not attach it.

10   Q    Okay.  Well, somebody at Lawn Managers did.  Do you know

11   who did?

12   A    I do not.

13   Q    Okay.  In any event, they are ones who received the

14   November 24 -- excuse me -- the November 2014 mailer?

15   A    Per this information, correct.

16   Q    Yes.  And so the record is clear, that was a 2014 mailer

17   from Progressive; correct?

18   A    Correct.  November of 2014.

19   Q    And the Brownes cancelled on May 6, 2015?

20   A    Going by this information, I'm not actually looking at

21   the computer screens; so I can't see the entered information.

22   Q    That was the day it was entered.

23   A    I received the phone call on May 6.

24        MR. KELLY:  Thank you very much.  That's all I have,

25   Your Honor.

1        THE COURT:  All right.

2        MS. RYAN:  Your Honor, no redirect.

3        THE COURT:  All right.  You may step down.  Thank

4   you.

5        MS. RYAN:  I would like to call Scott Hewett.

6        THE COURT:  All right.

7        MS. RYAN:  It's H-e-w-e-t-t.

8                **(WITNESS SWORN BY THE CLERK.)**

9                      **SCOTT HEWETT,**

10  **HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS**

11  **FOLLOWS:**

12                   **DIRECT EXAMINATION**

13  **BY MS. RYAN:**

14  Q    Good morning.

15  A    Morning.

16  Q    Lean forward so that we can hear you.

17  A    Oh, you'll hear me.

18  Q    Would you state your name for the record, please.

19  A    Scott Hewett.

20  Q    And by whom are you employed, Scott?

21  A    Lawn Managers.

22  Q    How long have you worked for Lawn Managers?

23  A    Thirty-three years.

24  Q    And what is your current position with Lawn Managers?

25  A    General manager.

1   Q    What are the duties or your duties as general manager?

2   A    Day-to-day operation of technicians.

3   Q    So would that -- if I called technicians "field staff,"

4   you --

5   A    Correct.

6   Q    -- supervised the field staff?

7   A    Yes.  Applicators, yes.

8   Q    And how long have you been the general manager?

9   A    Eight years, six years -- I don't remember.

10  Q    Prior to that, you were employed with Lawn Managers.

11  What was your position?

12  A    I started out as different -- I've had different

13  positions over the years.  So I started out as an applicator,

14  went to assistant manager, went to manager, so forth.

15  Q    Now, when you say applicator and technician, are those --

16  A    They're the same, yes.

17  Q    Okay.  They are the same?

18  A    Yes.

19  Q    Are those positions -- is there any licensing required

20  for those positions?

21  A    Yes.

22  Q    And what is that licensing?

23  A    Pesticide technician license.

24  Q    And who issues the licensing?

25  A    The Department of Agriculture.

Case: 4:16-cv-00144-DDN   Doc. #: 110   Filed: 11/30/17   Page: 38 of 161 PageID #: 1453

1   Q      And that would be the State of Missouri Department of

2   Agriculture?

3   A      Correct.

4   Q      And you're very familiar with those rules; correct?

5   A      Correct.

6   Q      Are applicators required to reapply for licensing?

7   A      Yes.

8   Q      Periodically?

9   A      Every three years.

10  Q      Are all of Lawn Managers' employees who apply substances

11  to lawns licensed?

12  A      Yes.

13  Q      What is the difference between a commercial customer and

14  a residential customer for Lawn Managers?

15  A      A residential customer is somebody who you treat through

16  the homeowner themselves.   A commercial account is somebody we

17  treat through another service.   They are a full-service

18  company that they subcontract us out to actually do the

19  applications on their property that they have.

20  Q      And those, the properties where the treatment would

21  occur, could be either residential or commercial in nature?

22  A      Correct.

23  Q      Do they tend to be more residential?

24  A      Yes.

25  Q      Now, were you with the company on May 1 of 2012?

1   A      Yes.

2   Q      And were you with the company in August of 2012?

3   A      Yes.

4   Q      At that time, did Lawn Managers have commercial customers

5   in Linda's zip codes?

6   A      Yes.

7   Q      And do you have an idea of how many?

8   A      In 2012?

9   Q      Yes.

10  A      Fifty, sixty.

11  Q      Now, were you asked that question in your deposition?

12  A      Correct.

13  Q      In looking back on your deposition, do you think you may

14  have not understood the question?

15  A      I misunderstood, did not know what year it was discussed.

16  Q      Are you aware of any efforts from 2012 to 2016 to avoid

17  servicing residential customers -- any efforts made by Lawn

18  Managers --

19  A      Yeah.

20  Q      -- to avoid servicing -- let me finish the question --

21  residential customers in the zip codes that were assigned to

22  Linda?

23  A      Yes.

24  Q      And what efforts were those?

25  A      Asking them where they lived.  If they lived in those zip

1   codes, we just didn't treat them.

2   Q    Do you generate the routes that are given to your

3   technicians?

4   A    I don't generate them, no.

5   Q    Do you hand them out to the technicians?

6   A    They're printed a group of invoices, and then they route

7   those invoices.  They could get a hundred at a time, which

8   would be a week's worth of invoices.  So I don't necessarily

9   route each day.  They get a group, and then they're

10  responsible for routing their own invoices.

11  Q    And by you give the technician the invoice, they go to

12  the address, they leave the invoice at the address; is that

13  correct?

14  A    Correct.

15  Q    And if the customer's prepaid, would they also leave an

16  invoice, or what would they leave?

17  A    They leave the invoice, yes.

18  Q    So that -- and what is the purpose of doing that?

19  A    Notification of the application.

20  Q    So the customer knows what happened?

21  A    Correct.

22  Q    Now, when Lawn Managers treated addresses for commercial

23  customers in Linda's zip codes, were lawn signs left, Lawn

24  Managers' lawn signs left?

25  A    Depend on the request of the commercial applicator -- or

1    the commercial account.  Some requested.  Some requested do

2    not leave.

3    Q    So it was sometimes, sometimes not?

4    A    Correct.

5    Q    And just going back for a second like the commercial

6    account, you're meaning the mowing company or the landscaping

7    company, the full-service company that was subcontracting;

8    correct?

9    A    Correct.

10   Q    Did you have an opportunity to observe the quality of

11   Progressive Lawn Managers' work?

12   A    Yes.

13   Q    Over the years?

14   A    Yes.

15   Q    After 2012?

16   A    Yes.

17   Q    And what's your observation about the quality of the work

18   that Progressive was doing?

19   A    The lawns seemed good, they seemed fine, depending on the

20   time of the year, of course, normal stress in summer, but most

21   of the accounts appeared to be in good shape.

22   Q    Now, at the time of the division of the companies,

23   division of the accounts, what was the date that you stopped

24   supervising the employees that were going with Progressive?

25   A    April 25.

1   Q    And why -- do you recall that date specifically?

2   A    I just remember it was the end of April.  It was right at

3   the time of the separation or -- that was final.

4   Q    And that's the year 2012?

5   A    Correct.

6        MS. RYAN:  Thank you, Your Honor.  I have nothing

7   further.

8        THE COURT:  Cross-examination.

9        MR. KELLY:  Yes, Your Honor.

10                      **CROSS-EXAMINATION**

11  **BY MR. KELLY:**

12  Q    Morning, Mr. Hewett.

13  A    Morning.

14  Q    You didn't have any discussions or conversations with

15  customers in the field about Progressive, did you?

16  A    Not in the field, no.

17  Q    You never discussed with any customers the question of

18  confusion or identity of the companies with any customers

19  since the divorce; correct?

20  A    Not that I recall, no.

21  Q    And other than seeing the Progressive vehicles driving

22  through the zip codes awarded Mr. Zweifel, you haven't seen

23  any of them treating any residences in those zip codes;

24  correct?

25  A    No, I have not.

```
 1            MR. KELLY:  Thank you.  No further questions, Your

 2   Honor.

 3            THE COURT:  All right.  Redirect?

 4            MS. RYAN:  None, Your Honor.

 5            THE COURT:  All right.  You may step down.  Thank

 6   you.

 7            MS. RYAN:  Your Honor, I would like to call Crystal

 8   Alcorn.

 9            THE COURT:  All right.  Step up, please.

10                 (WITNESS SWORN BY THE CLERK.)

11                      CRYSTAL ALCORN,

12   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

13   FOLLOWS:

14                    DIRECT EXAMINATION

15   BY MS. RYAN:

16   Q    Good morning.  Would you please state your name for the

17   record.

18   A    Crystal Alcorn.

19   Q    Thank you.  By whom are you employed, Crystal?

20   A    Lawn Managers.

21   Q    How long have you worked for Lawn Managers?

22   A    Three years.

23   Q    And what is your current position?

24   A    I'm currently the office manager.

25   Q    And how long have you been the office manager?
```

1    A    Since October 2016.

2    Q    Prior to that, what was your position with the company?

3    A    Just customer service representative.

4    Q    As a customer service person, what were your duties?

5    A    Answering the phones, taking care of all the customer

6    needs.

7    Q    Lean forward so we can hear you a little better.

8    A    Taking care of the customer needs and just the general

9    office duties.

10   Q    And in that position did you, and subsequently do you,

11   have occasion to answer the telephone?

12   A    Yes.

13   Q    Now, you said you became office manager in October of

14   2016; is that correct?

15   A    Yes.

16   Q    What are your duties as office manager?

17   A    I oversee everybody in the office to make sure everything

18   runs smoothly.  I enter in all of the payables and

19   receivables, I process payroll, and I still answer phones, and

20   basic general office duties.

21   Q    Thank you.  Now, I want you to turn to what's been marked

22   as Plaintiff's Exhibit 87.  Do you have that in front of you?

23   A    Yes.

24   Q    The cover page just has a list of names and dates;

25   correct?

1    A    Correct.

2    Q    Have you looked through the whole exhibit?

3    A    Yes, I have.

4    Q    And is this a record of phone calls that you took?

5    A    Yes, they are.

6    Q    And primarily -- and it's primarily notations that are

7    made on what we've been calling "print screens"?

8    A    Correct.

9    Q    I'm just sort of randomly turning a couple of pages in to

10   Olliver Chrissler.  Do you have that one?

11   A    Yes, I do.

12   Q    It's about the fourth page in on the print screens;

13   correct?

14   A    Correct.

15   Q    Does that have your handwriting?

16   A    Yes, it is.

17   Q    And did you take that phone call?

18   A    Yes, I did.

19   Q    You've looked through the whole exhibit.  Were there any

20   that accidentally got in there that weren't actually calls

21   that you took?

22   A    Yes.

23   Q    There are a few?

24   A    There's one.

25   Q    There's one.  Okay.  Do you know the name on that?

1    A    Can I just look through?

2    Q    Why don't you look at the list on the front and see if

3    you can remember from that instead of taking the time.

4    A    It's LMI223.

5    Q    Martha Smith?

6    A    Yes.

7    Q    About page 12; is that right?  About the 12th page in?

8    A    There's no page number.

9    Q    But that's not a call that you took?

10   A    No, it is not.

11   Q    The rest of them are, though?  Okay.  Now, what was your

12   process for generating these records?

13   A    When the customer calls, we ask them their address and

14   enter it into the computer.  It pulls up their customer

15   screen.  And if they are not our customer, we try to let them

16   know "you're not our customer."  After the conversation is

17   over, we record the conversation on the print screen.

18   Q    And do you, at this moment, have independent recall of

19   all of these phone calls?

20   A    A couple of them.

21   Q    And I really don't want to take the time to go into them

22   individually, but if it has your handwriting, you took the

23   phone call; correct?

24   A    Correct.

25         MS. RYAN:  All right.  Your Honor, I would like to

1   offer Exhibit 87 into evidence.

2          MR. KELLY:  No objection, Your Honor.

3          THE COURT:  All right.  It will be received.

4   Q   (BY MS. RYAN) Now, Crystal, in your capacity as office

5   manager, have you been trying to track what's going on with

6   Progressive's website and changes that might have been made to

7   Progressive's website?

8   A     Yes.  I was instructed to.

9          MS. RYAN:  And, Your Honor, at this point I want to

10  offer Exhibit 99, 100, 101, and 102.  A couple of those are

11  video files; so I'm going to need to take a moment just to

12  plug the computer in and get that turned on.

13         THE COURT:  So each of these are a video exhibit; is

14  that correct?

15         MS. RYAN:  Several of them are, yes.

16         THE COURT:  Several?

17         MS. RYAN:  Some cases we have a piece of paper, kind

18  of a place holder in the book.

19         THE COURT:  All right.  Is there any objection to any

20  of these four exhibits?

21         MR. KELLY:  I'm sorry.  I've got 99, 101 --

22         MS. RYAN:  101 and 102.

23         MR. KELLY:  What was the other?

24         MS. RYAN:  101 and 102.

25         MR. KELLY:  I don't think I object.  Let me just look

```
 1   on the exhibit list, please.  No.  No objection.

 2            THE COURT:  All right.  They will be received.

 3            MS. RYAN:  I'm not sure I need help connecting to the

 4   projection on this, but let me go ahead and pull it up.

 5                        (VIDEO PLAYED.)

 6            THE COURT:  What exhibit was that?

 7            MS. RYAN:  That is Exhibit 101, Your Honor.

 8   Q    (BY MS. RYAN) Can you turn to 101 in the book, please.

 9   Sorry.  I don't have a date on it.  Crystal, have you looked

10   at this video as of July of this year?

11   A    As of July?  I don't have a 101 in here.

12   Q    Do you have a page that just says "video"; right?

13   A    Yes.

14   Q    So let me just ask you this.  Did you look at the website

15   and look at the video in July of this year?

16   A    I did.

17   Q    And did it look like this, and was the wording the same

18   in July of this year?

19   A    Yes.

20   Q    And have you looked at it more recently, the video?

21   A    Yes, I have.

22   Q    Were any changes made?  Like, say, as of the beginning of

23   October of this year?

24   A    No.

25   Q    So it still shows up as "Lawn Managers" with
```

1   "Progressive" inside of the logo when you looked at it in

2   October?

3   A    In the beginning of October, yes.

4          MS. RYAN:  Your Honor, I can go ahead and play 102,

5   but it's identical.  Do you want me to go ahead and do that?

6          THE COURT:  Yeah, please.  So that was 101 that was

7   played.  Go ahead and play Exhibit 102.

8                          **(VIDEO PLAYED.)**

9   Q    (BY MS. RYAN) So, Crystal, is that how -- that was Exhibit

10  102 just for the record.  Is that how the video appeared

11  earlier this month, in October --

12  A    Yes, it is.

13  Q    Thank you.  Now, going -- I don't think I had you look at

14  Exhibit 99 yet.  Are you familiar with Exhibit 99?

15  A    Yes, I am.

16  Q    And what is that?

17  A    This is the Progressive Lawn Managers site.

18  Q    As of what date?

19  A    July 6, 2017.

20  Q    These are basically printouts from the website; correct?

21  A    I'm thinking it is.

22  Q    All right.  Turning to the second to the last page, is

23  there a little link on there for the video that you can see?

24  Second to the last page?

25  A    Yes.

1    Q    And that's the video that we viewed; correct?

2    A    Correct.

3         MS. RYAN:  Your Honor, I would like to offer 99, 100.

4    Maybe I should identify 100.  We haven't done that yet.  Let

5    me back up.

6    Q    (BY MS. RYAN) Turn to Exhibit 100, please.  Are you

7    familiar with that?

8    A    Yes.

9    Q    And what's the date on that?

10   A    August 3, 2017.

11   Q    So it's another date.  And what is that?

12   A    That is Progressive Lawn Managers' website.

13   Q    Turning again to the second to the last page of that

14   exhibit, is that a link for the video that we just saw?

15   A    Yes, it is.

16   Q    The same video.

17        MS. RYAN:  Your Honor, I'd like to offer Plaintiff's

18   Exhibits 99, 100, 101, and 102 into evidence.

19        THE COURT:  They're received.

20        MS. RYAN:  Thank you.

21   Q    (BY MS. RYAN) Crystal, would you turn to Exhibit 90,

22   please.  What is that document?

23   A    This is a voicemail we received in July of 2016 from an

24   officer trying to contact us about a Lawn Managers' truck or

25   vehicle that did not pay for gas at a Mobil on the Run gas

1    station, I believe is what it said.

2         MS. RYAN:  Your Honor, I would like to go ahead and

3    play this audio file.

4         THE COURT:  Any objection?

5         MR. KELLY:  No, Your Honor.

6         THE COURT:  All right.  It will be received.  Go

7    ahead.

8                    **(AUDIO FILE PLAYED.)**

9         THE COURT:  All right.  If you're going to offer

10   that -- well, it has been received into evidence -- I'm going

11   to ask you to make a transcript of that.  That was not

12   entirely easy for me to understand each of the words that were

13   spoken.  So I will task you with preparing a transcript.

14   Provide the proposed transcript to Mr. Kelly and --

15        MR. KELLY:  Could we have that before tomorrow, Your

16   Honor, so that I can have my client -- will that be possible?

17        THE COURT:  Well, since it will benefit both, the two

18   of you can work together on getting that done, if you wish.

19        MS. RYAN:  We'll get it done, Your Honor.

20        THE COURT:  All right.

21        MS. RYAN:  I would note that this was produced quite

22   a long time ago.

23        THE COURT:  All right.

24        MS. RYAN:  Thank you.  And that was Exhibit 90,

25   actually.  I don't know that I offered it yet, but I would

```
 1    like to go ahead and do it.
 2              THE COURT:  It's received.
 3              MS. RYAN:  Thank you.  I have nothing further for
 4    this witness.
 5              THE COURT:  Cross-examination.
 6              MR. KELLY:  Yes, Your Honor.  Just a little bit.
 7                         CROSS-EXAMINATION
 8    BY MR. KELLY:
 9    Q    Good morning, Ms. Alcorn.
10    A    Good morning.
11    Q    Could you turn to Exhibit 87 in the black notebook in
12    front of you.  It has numbered pages.
13    A    87, you said?
14    Q    Yes.
15    A    Okay.
16    Q    And this is the exhibit, the collection of customer
17    interactions, which are mostly yours?
18    A    Correct.
19    Q    Could you turn to page 6, please, if you could.  Just
20    please read and note and let me know when you're finished.
21    The customer is, I believe, Glenn Stahl.
22    A    Okay.
23    Q    This is a customer in a zip code awarded Linda Smith?
24    A    Correct.
25    Q    And the call came in on March 1, 2016?
```

1    A    Correct.

2    Q    And this customer indicated he got a mailer with Lawn

3    Managers' phone number and address on it; is that correct?

4    A    Correct, according to the notes.

5    Q    Would you turn to page 9, please.  This is a note of a

6    customer interaction on March 18, 2016; correct?

7    A    Correct.

8    Q    And it involves a customer in another zip code awarded to

9    Ms. Smith; correct?

10   A    Correct.

11   Q    And you had to -- you had to inform the customer that

12   Lawn Managers doesn't service that zip code?

13   A    I'm not sure if this was a customer awarded to her,

14   because it obviously was not in our system.  That is why it is

15   on a new sale info sheet, because we put anybody's that the

16   address is not in our system on a page like this, and it looks

17   like I said that we do not service her zip code.

18   Q    And that was true at the time for residential customers;

19   correct?

20   A    Correct.

21   Q    And we can flip through all of these, but you don't have

22   to read them.  You had to tell a lot of customers that:  "We

23   don't service your zip code."  Is that right?

24   A    Correct.

25   Q    That was before the "we want you back" letter that went

54

1    out last July of 2016?

2    A     It was before our noncompete ended, yes.

3    Q     And you had to tell them again once Lawn Managers was

4    enjoined last year; correct?

5    A     Excuse me?

6    Q     You had to tell the customers that again after Lawn

7    Managers was enjoined last year; is that right?

8    A     Right.

9    Q     Would you turn to page 29.  This is for customer Jackie

10   London; is that correct?

11   A     Correct.

12   Q     And it's for a customer who was assigned to Ms. Smith

13   back in 2012; correct?

14   A     Correct.

15   Q     And this came in on September 9, 2016?

16   A     Correct.

17   Q     And this would have been a customer that received the

18   mailer; correct?

19   A     Correct.

20   Q     And, now, this customer is asking what the difference is

21   between Lawn Managers and Progressive.

22   A     Yes.  That's what the note says.

23   Q     Would you turn to page 42, please.

24           THE COURT:  What was the page again?

25           MR. KELLY:  It's 42, Your Honor.

55

1          THE COURT:  All right.  Thank you.

2    Q    (BY MR. KELLY) It's customer Cindy Roach.

3    A    Hold on.  I have to flip it around.  Cindy Roach?

4    Q    Yes.  It says she received the letter a couple of months

5    ago, saying that you changed your name to "Progressive Lawn

6    Managers"; is that right?

7    A    That's what the note says.

8    Q    But there was no letter that, to your knowledge, that

9    went out indicating that?

10   A    We never sent a note saying our "Lawn Managers" was

11   changed to "Progressive Lawn Managers," no.

12   Q    Now, can you please turn to the next page.

13   A    Excuse me?

14   Q    Can you please turn to the next page.  And this has a

15   copy of a check and looks like your handwriting underneath it?

16   A    Yes.

17   Q    And in the body of this note it indicates that you

18   returned the check with a letter to the customer explaining

19   that we can't cash it with the wrong address; is that right?

20   A    Correct.

21   Q    So the bank wouldn't let Lawn Managers cash it if it had

22   the wrong address on it; is that right?

23   A    Typically, banks do not cash a check addressed to a

24   company that does not have that address on their account.

25   Q    Would you turn to page 46.  This is for customer Susan

1   Rhodes; is that correct?

2   A    Correct.

3   Q    And this was a customer awarded to Ms. Smith back in May

4   2012?

5   A    Actually April 25, 2012.

6   Q    That's the cancel date; correct?  Is that correct?

7   A    Correct.

8   Q    And when we see that date in these records, it means it

9   was transferred as part of the divorce in 2012?

10  A    Correct.

11  Q    And this customer, Susan Rhodes, indicated that she had

12  the number programmed into her phone; is that right?

13  A    That's what the note says, yes.

14  Q    So she had Lawn Managers' number programmed in her phone,

15  but she was a Progressive customer; is that correct?

16  A    Correct.

17  Q    Had she been solicited by Lawn Managers?

18  A    No, she has not.

19  Q    Is there any explanation of why she put the Lawn Managers

20  name in her contacts?

21  A    I could not tell you that.  I was not there.

22  Q    And do you have any estimate as to the number of people

23  who called Lawn Managers because they had the Lawn Managers'

24  name in their contacts?

25  A    I wouldn't know.

```
1          MR. KELLY:  I don't have any further questions, Your

2    Honor.

3          THE COURT:  All right.  I do.  With respect to -- I

4    mean, and this question and answer had been made a couple of

5    times previously.  What phone number would this customer have

6    called?

7          THE WITNESS:  You're speaking to me?

8          THE COURT:  Yes.  It's to you.

9          THE WITNESS:  I'm sorry.  (636)671-7077.  It's a

10   brand-new phone number.

11         THE COURT:  So that's the number this customer

12   called?

13         THE WITNESS:  Correct.

14         THE COURT:  Okay.  And when did that number go into

15   effect?

16         THE WITNESS:  I think it was May of 2012.  Maybe

17   June.  I was not there; so I can't tell you for sure.

18         THE COURT:  All right.  You may follow up, if you

19   wish.

20         MR. KELLY:  Thank you, Your Honor.  No further

21   questions.

22         THE COURT:  Redirect?

23         MS. RYAN:  Your Honor, there's something I neglected

24   to do the first time around, if I can just quickly go back to

25   a couple of earlier exhibits.  May I do that?
```

58

```
 1              THE COURT:  Any objection to going back?

 2              MR. KELLY:  I'm not sure what the exhibits are.

 3              MS. RYAN:  They're 22, 23, 24.

 4              MR. KELLY:  No, Your Honor.

 5              THE COURT:  All right.

 6                      REDIRECT EXAMINATION

 7   BY MS. RYAN:

 8   Q    Crystal, do you have the volume with those exhibits in

 9   front of you?

10   A    It's over here.  I'm sorry.

11   Q    It's the first one.  Turn to Exhibit 22.  Just do you

12   have that in front of you?

13   A    I do.

14   Q    Real quickly, what is that?

15   A    It looks like a printout of Progressive Lawn Managers,

16   maybe a Google that I've done.

17   Q    Can we turn to the ELMO just a second.  Thank you.

18              Did you look at that website around that date or on

19   that date, if you recall?  Is that how this particular

20   progressivelawnmanagement.com looked on that date?

21              THE COURT:  What date?

22              MS. RYAN:  It's April 29, 2016.

23   A    I'm not too sure if I printed this one.

24   Q    Okay.  Well, let's skip over that one, then.

25   Twenty-three?
```

1   A    Yes.

2   Q    And are you familiar with Exhibit 23?

3   A    Yes.

4   Q    And is this something that you printed out off of the

5   internet on September 14, 2016?

6   A    Yes.

7   Q    It's dated?

8   A    It is.

9   Q    It's printed in black and white; right?

10  A    This one is in color.

11  Q    Oh, yours is in color?  Okay.

12  A    Yes.

13  Q    Mine isn't.  Sorry.  And does this accurately reflect how

14  the Progressive Lawn Managers name appeared on their website

15  on that date?

16  A    Correct.

17  Q    And that's in September of 2016; correct?

18  A    Correct.

19  Q    Then turning to Exhibit 24, is this something that you

20  would have generated?

21  A    Yes.

22  Q    And it's just a different page of the same website on the

23  same date; correct?  I believe it was still 9/14.  Maybe

24  I'm --

25  A    Correct.

1    Q    This is something you printed, though; correct?

2    A    Yes, it is.

3    Q    So you saw this on the internet and printed the page;

4    correct?

5    A    Correct.

6    Q    And does it show a link to the video that we've played?

7    A    It says it's PLMI.US.

8    Q    That's the domain or the web address; correct?

9    A    Yes.

10   Q    Does it show a link for the video that we've already

11   played?

12   A    Yes.

13         MS. RYAN:  Your Honor, I'd like to offer 23 and 24

14   into evidence.

15         THE COURT:  Any objection to either of those two?

16         MR. KELLY:  I don't have an objection, but I might

17   have misheard.  Did you refer to this as 9/24?

18         MS. RYAN:  I might have.

19         MR. KELLY:  It's 9/14.

20         MS. RYAN:  9/14.  That's fine, thank you.

21         THE COURT:  So they were both on 9/14?

22         MS. RYAN:  Yes, Your Honor.  They are.

23         THE COURT:  Well, 23 and 24 will be received.  But

24   what's the difference between the two?

25         MS. RYAN:  They're just different pages of the

1  website.

2          THE COURT:  Oh.

3          MS. RYAN:  Perhaps I should have stuck them together.

4          THE COURT:  Pardon?

5          MS. RYAN:  Maybe I should have put them together, but

6  they're two pages from the same website.

7          THE COURT:  All right.

8  Q    (BY MS. RYAN) Now, you were asked about having to tell

9  customers "we do not service your zip code" and that you, I

10  think, had to tell people that again after the injunction was

11  entered?

12  A    Correct.

13  Q    Would that apply only to the customers that were

14  awarded -- actually awarded to Linda in her zip codes in 2012

15  and 2014?

16  A    Correct.

17          MS. RYAN:  Thank you.  Your Honor, I have nothing

18  further.

19          MR. KELLY:  No further questions, Your Honor.

20          THE COURT:  All right.  You may step down.  Thank

21  you.

22          MS. RYAN:  Your Honor, our next witness will be our

23  expert, and I'm wondering if we can take a short break before

24  we begin that.

25          THE COURT:  All right.  We'll take a ten-minute

```
 1    recess at this time.

 2              MS. RYAN:  Thank you.

 3         (COURT RECESSED FROM 10:42 AM UNTIL 11:00 AM.)

 4              THE COURT:  You may call your witness.

 5              MS. RYAN:  We'd like to call Fernando Torres.

 6              THE COURT:  Step up and be sworn, please.

 7                  (WITNESS SWORN BY THE CLERK.)

 8                        FERNANDO TORRES,

 9    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

10    FOLLOWS:

11                        DIRECT EXAMINATION

12    BY MS. RYAN:

13    Q    Please state your name.

14    A    Fernando Torres.

15    Q    Mr. Torres, by whom are you employed?

16    A    Our company is IPmetrics.

17    Q    Move that closer to your face, please.  Thank you.

18    A    My company is IPmetrics, LLC.

19    Q    And where is the company located?

20    A    In San Diego, California.

21    Q    What is the business of IPmetrics?

22    A    Intellectual property consulting.

23    Q    Would you describe just generally what that means.

24    A    Basically, we cover all types of intangible assets and

25    intellectual property, and we do valuation work.  We do
```

1    sometimes monetization and expert witness analyses and

2    reports.

3    Q    Generally what is the subject matter of what the company

4    consults about?

5    A    Well, trademarks, patents, copyrights, rights of

6    publicity are the main -- and trade secrets -- are the main

7    topics.  It could be transactions that are being contemplated

8    or have just been consummated, or it could be litigation

9    situations where there is infringement questions.

10   Q    Thank you.  Would you turn to Exhibit 120.  Turning to

11   page 23 --

12   A    Just a second.  Okay.

13   Q    Have you provided -- this is a section of your report;

14   correct?

15   A    Yes.

16   Q    And does it list your qualifications?

17   A    Yes.

18   Q    And just briefly, what is your educational background?

19   A    Well, I studied economics at the B.A. level in Mexico

20   City and then did a diploma, graduate diploma, in economics at

21   the University of East Anglia in England, did a Master's of

22   Science degree in economics with a specialty in econometrics

23   from University of London.  And as far as educational, that

24   would be the bulk of it.

25            Then I started working as an economist in the

64

1    government in Mexico City and teaching economics at the

2    university at my alma mater.

3    Q     Which is?

4    A     The Metropolitan University.

5    Q     Thank you.  How long have you been working as a

6    consultant with IPmetrics?

7    A     With IPmetrics since 2010.  So it's going to close on the

8    seventh year.

9    Q     Prior to that, what were you doing?

10   A     I was pretty much in the same function with another

11   company called CONSOR, you know, like intellectual property

12   consulting.  And that was from 2005 through 2009.

13   Q     And did you ever work specifically for a single company?

14   A     Not as an IP consultant, no.

15   Q     No, okay.  So your consulting work has been since the

16   time that you worked for --

17   A     Yes, the last 12 to 13 years.

18   Q     Thank you.  And you've listed some memberships on this

19   list of qualifications.  What organizations are you a member

20   of?

21   A     Mainly the National Association of Forensic Economics and

22   the American Economic Society, well, Economic Association, the

23   Western Economics Association International, and the

24   International Trademark Association.  And those would be the

25   main ones.

1  Q    And then going to the second page, page 24 of the report,

2  the second page of the qualifications, you have a list of

3  speeches and presentations; correct?

4  A    Yes.

5  Q    And the dates for all of those?

6  A    Correct.

7  Q    And there's a number of them, of valuation topics that

8  you've spoken about; correct?

9  A    Yes.

10 Q    Valuation and damages calculations.

11 A    Yes.

12 Q    Thank you.  And there's a separate list of publications;

13 correct?

14 A    Yes.

15 Q    On page 25?

16 A    Yes.

17 Q    With the number of things that you've written; correct?

18 A    Yes, things I've written -- articles, book chapters,

19 things of that nature.

20 Q    And were any of those written with other people, or are

21 they all your own work?

22 A    Well, the articles, the blog posts, and the chapters that

23 are mentioned here, I wrote them by -- on my own.  Obviously,

24 the book chapters are included in a edited book that have a

25 long volume, yes.

66

1   Q    Volume.  Thank you.  Now, turning to page 27, have you

2   provided a list of your litigation-related experience?

3   A    Yes.

4   Q    And was it your understanding that the federal court

5   rules require you to provide this information?

6   A    Yes.  By Rule 26, I need to provide the past four years

7   of litigation-related involvement.

8   Q    And that's what pages 27 --

9   A    And 28.

10  Q    -- and 28 are; correct?

11  A    Yes.

12  Q    You have this case actually listed at the bottom of 28?

13  A    Yes.

14  Q    Now, prior -- I just want to run through this quickly.

15  Appendix B is a list of the documents you consulted in

16  preparation of your report; correct?

17  A    Yes.

18  Q    And did that include tax returns for both Lawn Managers,

19  Inc. and Progressive Lawn Managers, Inc.?

20  A    Yes.

21  Q    Did it also include financial statements for both

22  companies?

23  A    Yes.

24  Q    And those were provided to you by me; correct?

25  A    Yes.

1   Q    Did you review any other documents?

2   A    Well, there were what I would call operational reports,

3   services done by zip code, services summaries, and outside

4   sources that I consulted usually, but within the documents

5   produced in the case, those would be the documents.

6   Q    Okay.  Then it continues on to page 30; correct?

7   A    Yes.

8   Q    And then there's some other government sources and other

9   information that you consulted?

10  A    Yes.

11  Q    All right.  And then, finally, Appendix C lists your

12  compensation; correct?

13  A    Correct.

14        MS. RYAN:  Your Honor, I just want to note that

15  Exhibit 120, as we're preparing to offer it, has been redacted

16  to comply with your *Daubert* order; so there's certain sections

17  that were deleted, and at the section headings were also

18  deleted.

19        THE COURT:  All right.

20  Q    (BY MS. RYAN) So what is the date of this report, Mr.

21  Torres?

22  A    It's October 19, 2017.

23  Q    Did you have some earlier versions of this report?

24  A    Yes.  There were, I think, two prior versions:  One about

25  a year ago, in September, if I remember correctly; and earlier

1    in this year, in April or May.

2    Q    Of 2016?

3    A    April or May of 2017 there was an update with a full year

4    of 2016 included.  And this includes information through

5    August 31 of 2017.

6    Q    So the purpose of updating the report and issuing a

7    report in October was to bring the numbers current through

8    August 31, 2017; correct?

9    A    Yes.  And to comply with the order about striking some

10   sections.

11   Q    Oh, correct.  Right.  Page 1 talks a little bit about

12   your assignment.  Just generally, what were you asked to do?

13   A    Well, generally as a damages expert, I was asked to

14   consider, assuming liability is proven at trial, what would

15   the infringement damages be according to what the law provides

16   and what the case law provides, and calculated in this case,

17   what would be the damages?

18   Q    All right.  So your review of the financial -- the tax

19   returns and the financial statements was part of that process

20   of determining --

21   A    Yes.  To determine those damages, then I have to look at

22   both businesses, and the financial and accounting records are

23   key.  Tax returns are helpful, but they're very summarized.

24   So the accounting records, the operational records are

25   important.

1    Q    They're helpful?

2    A    Yes.

3    Q    You must have them to do the report; correct?

4    A    Yes.

5    Q    Now, the background section of -- can you just

6    describe -- I'm on page 2 of the report.  You just describe

7    the parties?

8    A    Yes.

9    Q    And you have examples of the two logos; correct?

10   A    Yes.

11   Q    And then you have some background information, and we're

12   hearing a lot of evidence today.  I don't think we necessarily

13   need to go into that, okay?

14   A    Right.

15   Q    All right.  And then several pages of redactions;

16   correct?

17   A    Yes.

18   Q    Starting on page 6 where you talk about the law and

19   economics of trademarks, I think the Court permitted this

20   section to remain in the report; correct?

21   A    Yes.

22   Q    And we looked very carefully; correct?

23   A    Yes.

24   Q    So it's just a general description of trademarks and --

25   well, you tell me what it is.

1  A    Well, first to establish the general principles of what

2  trademarks represent from an economic perspective as business

3  assets.  From a legal perspective, they are often protected by

4  registrations at the federal level; so they're considered

5  intellectual property in that sense.  And there is a lot of

6  literature and colloquial, or informal, talking about

7  trademarks, combining the term "brand," "brand equity," and

8  "trademark."  So I'm also discussing there how all of those

9  terms that are used in the financial and economic literature,

10  how did those relate to the concept of trademarks that is

11  being analyzed in this report.

12  Q    Thank you.  Then going over on to page 7, what is the

13  discussion here?

14  A    Well, basically bringing it all together, there is

15  that -- the fact of the -- or the characteristic that

16  trademarks are used by businesses to attract customers because

17  customers create a connection between the trademark and what

18  they experience, the satisfaction of their needs or wants, and

19  trademark law protects those consumers in the sense of

20  enabling them to identify the source of their goods or

21  services that are being provided.  That's the goal.

22  Q    Okay.  And it's important for the consumer to be able to

23  accurately identify the source?

24  A    Yes.

25  Q    Now, starting on page 8, there is a beginning of a

1    discussion about assessing damages, and then there's some

2    redactions; correct?

3    A    Yes.

4    Q    You do note that Lawn Managers acquired its reputation in

5    brand equity through its use over 35 years; correct?

6    A    Correct.

7    Q    And then on page 9 you go into a discussion of the lawn

8    care market?

9    A    Yes.

10   Q    And this is the section where you use Commerce Department

11   and census data; correct?

12   A    Yes, to just establish a quantitative basis of what is

13   the size of the market, what are the general characteristics

14   of the market for these types of services.

15   Q    And did you analyze that or find the data for that with

16   regard to Missouri?

17   A    Oh, yes.

18   Q    All right.  And then did you also tie it to the 81 zip

19   codes that were divided up in the nonsolicitation and

20   noncompete agreements here?

21   A    Correct.

22   Q    So that's what's being refreshed at the bottom of page 9;

23   correct?

24   A    Yes.

25   Q    The 81 zip codes?

72

1    A    Yes.

2    Q    So you specifically linked that to the zip codes?

3    A    Correct.

4    Q    Now, in your deposition you were asked about various

5    municipalities and how they related to the zip codes.  You're

6    not from St. Louis, are you?

7    A    No.

8    Q    So if I asked you where Ladue was and what its zip code

9    was, you wouldn't be able to tell me, would you?

10   A    I only remember we passed it on the way from the airport.

11   Q    Okay.  Do you know the zip code for Ladue?

12   A    No.

13   Q    Thank you.  So then beginning on page 10, you go into the

14   analysis of -- the profit analysis; correct?

15   A    Yes.

16   Q    And can you just briefly explain what you did here?

17   A    Yes.  Well, one of the categories of damages that the law

18   provides for in an infringement case and for trademarks is the

19   recovery of defendant's profits attributable to the

20   infringement.

21        So I looked in this case to the generation of profits

22   for Progressive Lawn Managers, Inc. and identified the

23   activities that occurred after January 2015 when, according to

24   the documentation, they should have stopped using "Lawn

25   Managers" as a trademark and then calculated first what are

1    the sales, because that is the plaintiff's burden to first

2    establish what the sales by the defendant were that were using

3    the trademark at issue.

4    Q    All right.  And by "sales," you mean the gross revenues

5    of the company?

6    A    Yes.  Yes.

7    Q    And were you made aware of any other business activities

8    that Progressive Lawn Managers, Inc. conducts under any other

9    trademark?

10    A    Well, my understanding was that there was no other

11    trademark being used, per se.  There is also a distinction

12    between the name of the company and the trademark under which

13    you trade.  So for example, from 2012 onwards the company

14    Progressive Lawn Managers, Inc. was created and awarded some

15    zip codes for a time and also the right to use -- to do

16    business as Lawn Managers for a limited time.

17         So those are two things.  The right to be Progressive

18    Lawn Managers, Inc. is indefinite.  It's not defined, but the

19    right to use the trademark "Lawn Managers" was defined as for

20    the next two years, roughly speaking.

21    Q    And it had an end date?

22    A    And it had a definite end date, yes.

23    Q    And so that's why you started with January 12, 2015;

24    correct?

25    A    Yes, because that's the definite date where the right to

1   use the trademark "Lawn Managers" ended.  So according to the

2   documentation, that trademark was still being used.  So if it

3   was still being used, it was being infringed.  So the sales

4   were being generated on the basis of that trademark.

5   Q    Thank you.  And that actually is going to be the issue

6   for the Court to find; correct?

7   A    Yes.

8   Q    Whether it was infringed or not after January 1, 2015?

9   A    Yes.  To calculate the damages, I have to assume that

10  liability is found.  Otherwise, the whole report is moot.

11  Q    Thank you.  Now, going into page 11, can you tell me what

12  the discussion on that page is?

13  A    Well, first is that there is a direct nexus between the

14  use of the trademark and the generation of revenue or sales.

15  There may be situations where that isn't the case, but in this

16  particular industry in this particular case, it seems pretty

17  close that nexus between the sales and the use of the

18  trademark.

19  Q    Let me just -- let me interrupt you just for a moment.

20  So if we had as an example of the use of a trademark where a

21  company might have multiple trademarks, it might be a company

22  that makes pet food, but they make dog food and they make cat

23  food and they have two different brands.

24  A    Yes.

25  Q    Correct?

1  A    So there it's necessary to carve out exactly what sales

2  correspond to which infringed trademark.  In some situations

3  the products could be very similar but sold under different

4  trademarks -- the same product.

5         So that was definitely not the case here, where all

6  of the sales are generated by the same type of activities, the

7  same -- under the same umbrella brand.

8  Q    All right.  And then tell us what Table 1 is on page 11.

9  A    So Table 1 is the gross revenues by area and year from

10  the operational reports, from the reports that are generated

11  in the management of the company.  It's not necessarily the

12  full accounting, just the operational side.

13         And it lists -- so I was able to segregate from the

14  total gross revenue for the years 2015, 2016 which revenue was

15  generated from the zip codes that were in the list of the

16  plaintiff's area, or Lawn Managers, Inc., and the revenue that

17  was generated from zip codes assigned to Progressive Lawn

18  Managers.

19  Q    On my screen I can't really read those numbers, but it's

20  just under $9,000 being generated in --

21  A    Yes.

22  Q    -- Lawn Managers' zip codes, but this is Progressive's

23  revenues; correct?

24  A    Progressive's revenue from Lawn Managers, Inc. area were

25  8,964 in 2015 and 8,735 in 2016 through the end of July.

1  Q    Now, you've also got figures for 2017 in this table?

2  A    Yes.  So the third page is the "all areas" line that

3  covers from August through December of 2016 and January

4  through the end of August for 2017.

5  Q    Did you have a tax return for either party available to

6  you for 2017?

7  A    No, because those are annual calendar year companies that

8  are using, you know, calendar year tax returns; so there's no

9  tax returns.

10 Q    So they haven't filed yet for 2017; correct?

11 A    No.

12 Q    They can't do that until the year is over?

13 A    They can't.

14 Q    All right.  And so this is showing gross revenue and --

15 correct?

16 A    Yes.

17 Q    And if we were to stop here -- you did further analysis,

18 but if we were to stop here, these would be gross revenues of

19 Progressive, and then it would be their burden -- under your

20 understanding, it would be their burden to prove the costs

21 that are to be deducted; correct?

22 A    Correct.

23 Q    Did you, however, go forward and do some additional

24 analysis?

25 A    Yes.  It's generally best practices not to presume that

1    all of the revenue is profit and anticipate the framework for

2    the deduction of the incremental costs that are associated

3    with those revenues specifically.

4    Q    So what information did you look at to figure out what

5    the costs were?

6    A    So for the costs I had to rely on the tax returns as

7    opposed to the operational returns because the operational

8    information does not have detailed costs or anything like

9    that.  And for the years 2015 and 2016, because they're full

10   years, we do have the tax returns for the defendant.

11         And the criteria to select what costs are deductible

12   from revenue in order to find the profits derived from the

13   infringement involves going through the different cost

14   categories that are itemized in the tax return or in the

15   accounting records, if you're going through accounting

16   records, and consider whether or not that expense is not only

17   necessary for the operation but varies with the volume of

18   sales being done.

19   Q    So let me interrupt you just for a moment.  So does that

20   mean that certain costs that a business might have would

21   generally not be deducted from the gross revenue in this

22   analysis?

23   A    For infringement analysis, that's correct.  There's a

24   difference between what the incremental costs that are a

25   proper analysis for infringement from the accounting costs

Case: 4:16-cv-00144-DDN   Doc. #: 110   Filed: 11/30/17   Page: 78 of 161 PageID #: 1493

1    that are proper from a generally accepted accounting

2    principles, or GAAP.  There's slightly different rules for

3    certain deductions for tax purposes; so those may be three

4    different measures of profits for taxes, for financial

5    reporting, or for infringement analysis.

6           For example, for taxes it may be correct in tax

7    accounting to deduct charitable contributions, but it's not a

8    necessary expense from a financial perspective or from an

9    economic infringement perspective either.

10   Q    In other words, because it's not tied to the generation

11   of the revenue?

12   A    Right.  Because it's really a disposition of profit.

13   That's where -- it's really profit that is being dedicated

14   outside of the company by a voluntary decision.

15   Q    And are there other categories of expenses that are

16   similar to that?  I've got this open to page 12 of your

17   report; correct?

18   A    Twelve and 13 is the detailed table from the tax returns

19   and the accounting report through the end of August of 2017.

20   So the first category that is deductible in all three

21   methodologies is the cost of goods sold.  There's --

22   Q    That C-O-G-S?

23   A    Yes.  That's the common abbreviation for the COGS.  And

24   that gives you a first level of profit that is often used, the

25   gross profit.  And generally in financial accounting, gross

1    refers to revenue minus the cost of the goods sold.

2    Q    Is salaries normally a part of cost of goods sold or --

3    A    Well, depending on the specific company, it's more common

4    in manufacturing to include the wages of the direct labor to

5    be included in the cost of goods sold, but in services, in the

6    services industry, it's not as easily accounted for; so those

7    types of salaries or payroll costs are part of what are called

8    operational expenses.  The operating expenses are listed after

9    the gross profit, and they're all types of costs that are

10   related to maintaining the operation of the company.

11   Q    So looking at page 13, Table 2, have you come up with a

12   number for the -- basically the net revenues that would be

13   attributable to profits due to the infringement by defendant

14   here?

15   A    Yes.

16   Q    And what is that number?

17   A    So the total number during the damages period is

18   $320,446, and that's made up of the three numbers from the two

19   years that we have the tax returns and the one year where we

20   only have partial year information from the accounting report.

21          And so what is important is that from these itemized

22   cost deductions, I have not included those cost line items

23   that are not necessary for the operation of the company or

24   necessary to obtain the revenue and that are typically not

25   included in this type of infringement analysis.

*10/31/17 LMI v. PMI — Volume 2*

80

1          And the concept is similar to the financial concept

2    of calculating earnings before interest, taxes, and

3    depreciation, and amortization because all those categories

4    reflect decisions and structures and factors that are either

5    voluntary, discretionary, or actually addressing profits.

6          So, for example, interest is not included.  That's a

7    deduction for infringement analysis and for financial

8    reporting for the EBITDA level of profit because it depends on

9    the financial structure of the company, and that's a decision,

10   how much to do to finance it with debt, how much with equity.

11         Taxes are meant to be a portion of the profit; so we

12   don't do the taxes for financial reporting and for the

13   infringement analysis.

14         Depreciation and amortization have very specific

15   rules under tax reporting because they are used as incentives

16   for investment; so those are arbitrary numbers.  From a

17   financial perspective, it's also arbitrary because it gives a

18   definite life to certain assets in which to recover the costs,

19   and it's not necessarily linked to the actual operation of the

20   company.  So an asset depreciates regardless of whether it's

21   in use or not.

22   Q    All right.  So thank you.  So setting aside some costs

23   that would be deducted on a tax return, for example, you've

24   kind of brought those back into the gross profit picture

25   because --

1    A    Yes.

2    Q    -- those other items are discretionary items and/or are

3    already in the profit number?

4    A    Correct.

5    Q    So when you said something about charitable donations as

6    an allocation of profit --

7    A    Yes.  So it's going to be a deduction from a tax

8    perspective, but it's not a proper deduction from revenue from

9    an infringement analysis perspective because economically it's

10   a disposition of profit.  It's not a necessary expense in

11   order to generate the revenue.

12   Q    Thank you.  Now, did you also attempt to conduct

13   another -- a different analysis of damages?  I'm looking at

14   the bottom of page 13.

15   A    Yes.  Well, as far as defendant's profits, because the

16   cost information is only available from the tax returns and

17   the tax returns give slightly different numbers for the

18   revenue than the actual operational reports -- not too

19   different, but it's slightly different -- I also applied the

20   average ratio between the defendant's incremental profits from

21   the period from infringement as a proportion of total revenue,

22   which is 15.8 percent, and applied that to the gross revenue

23   that I derived from the operational reports, and that's

24   basically the conclusion, the 322,753.  It's slightly

25   different, but that's because of some accounting manipulations

1   that are done for tax returns.

2   Q    So the bottom line is your calculation of defendant's

3   profits is this number or this number, which are very --

4   within $2,500 of each other?

5   A    Correct.  This is a tax return number in the table

6   considering the tax returns and the accounting report directly

7   or using the same proportion the concluded value of 322 at the

8   end of the paragraph, which corresponds to the total revenue

9   from the operational reports.

10  Q    Okay.  And then shifting gears into plaintiff's lost

11  profits, were you asked to take a look at that?  That's a

12  different category; correct?

13  A    Yes.  That's very different.

14  Q    And starting at the bottom of page 13, you did attempt to

15  do an analysis there; correct?

16  A    Yes.

17  Q    And going over on to page 14, what did you find?

18  A    Yes.  So first the consideration is from what the

19  trademark law establishes is that the trademark owner can also

20  recover his or her lost profits.  One would have to be in a

21  position to determine which customers would have gone to the

22  plaintiff but actually went to the defendant, and that is not

23  necessarily quantified in this particular case.

24       But what I was able to do is to calculate what the

25  profit margin would have been for a typical customer for the

1    plaintiff and estimate then how much profit was lost per

2    account that would have been in that situation.  But I don't

3    have a precise estimate of how many accounts were in that

4    situation; so I only have a calculation per account.

5    Q    And that's what's on page 15 of the report; correct?

6    A    Yes.

7    Q    And then at the bottom of 15, you begin a discussion of

8    corrective advertising?

9    A    Yes.  Another completely different category of damages

10   that in some cases is awarded is if it merits advising the

11   market participants of the infringement and of the distinction

12   between the trademarks.  So in this case I calculated a

13   measure of what the cost of a prospective corrective

14   advertising campaign would be, which would be to mail, for

15   example, the cheapest type of post card flyer, which would

16   communicate to the households that are affected in the area

17   currently designated to the defendant -- well, designated to

18   the defendants during the period between 2012 and 2016 --

19   where that confusion may have been the highest.  Although, of

20   course, people travel from -- to and from zip codes; so

21   they're exposed to both marks throughout the area.

22        But if a measure -- if a prudent measure of

23   mitigating the confusion is to correct the impression of the

24   people that live in those areas, then that campaign would have

25   to address 185,000 owner-occupied households which, according

84

1  to my analysis, was a reasonable estimate of the size of the

2  market.

3          And sending a mailer -- I priced what companies that

4  do that type of mailing.  It's about 38 cents per address.  So

5  they could do that mailing for $71,346.

6  Q    Thank you.  And in your experience, if you know,

7  corrective advertising -- is that necessarily a negative

8  mailed piece about the defendant, or does it say anything

9  negative, or can it be a piece that says something, you know,

10 here we are; we have a new company; we've changed our name?

11         MR. KELLY:  Your Honor, I would object to this line

12 of questioning.  A, it's not disclosed, and, B, it's outside

13 his area of expertise.

14         MS. RYAN:  Okay.  That's fine.  I'll withdraw the

15 question.

16 Q    (BY MS. RYAN) Going into prejudgment interest, do you have

17 a discussion of whether that's been calculated or not?

18 A    Well, I haven't calculated.  Usually it's the Court may

19 want to have it calculated in certain circumstances.  It's not

20 a big number in this case because there hasn't been that much

21 time or inflation; so the interest rates have been relatively

22 low.  But if asked, I can calculate those interest that has

23 accumulated from the different time periods -- 2015, 2016, and

24 2017.  And I just reference the Missouri Statutes if that is

25 what is available.

1    Q    Thank you.  And then going on to page 17, there's five

2    numbered paragraphs there.  Are those -- is this your

3    conclusion?

4    A    These are the summary of opinions.

5    Q    And can you just briefly run through those?

6    A    Yes.  So first to establish infringing revenues from

7    January 1, 2015, through August 31, 2017, I found $2,036,830.

8         Economic damages in the form of disgorgement of

9    defendant's profits for the same period, which would reflect

10   Progressive's estimated EBITDA margin of 15.8 percent, amount

11   to no less than $322,753.

12        Then the economic damages in the form of lost profits

13   are quantifiable at a rate of no less than $117.75 per new

14   account per year for infringements after July 25, 2016.

15        And the economic damages in the form of corrective

16   advertising are estimated at no less than $71,346.

17        And, finally, if requested by the Court, I intend to

18   provide a calculation of prejudgment interest on the damages

19   award.

20        MS. RYAN:  Thank you.  Your Honor, I just would want

21   to, at this point, make sure that we have the tax returns and

22   financial statements that he relied upon in the record.  I

23   think Exhibits 117, 118, and 119 have already been admitted.

24   I would like to offer, if there is no objection from Mr.

25   Kelly, Plaintiff's Exhibits -- or what's been marked as

1   Exhibit 74 to 77.  Those are the Progressive tax returns for

2   2013 through 2016.  And also Exhibit 116, which is

3   Progressive's interim financial statements through August 31

4   of 2017.

5          Exhibit 78, which is Progressive's balance sheet of

6   profit and loss statements for 2016 -- I think I have my dates

7   on my notes wrong.  I think they're 2013 to 2016 on balance

8   sheets.  So I would like to make sure those are all in the

9   record and make sure and offer them at this point.

10         MR. KELLY:  No objection.

11         THE COURT:  Let's see, 78, 116, 77, 76, 75, and 74

12   are admitted.

13         MS. RYAN:  Thank you.

14   Q   (BY MS. RYAN) Mr. Torres, have you had an opportunity to

15   review the reports -- well, first of all, let me ask you, you

16   have talked about --

17         MR. KELLY:  Your Honor, I'm going to object if he's

18   going to rebut anything in Mr. Toennies' report.  I've not

19   received a rebuttal report.  There's been plenty of time.

20         THE COURT:  You have a response?

21         MS. RYAN:  Your Honor, our expert updated his report.

22   He provided me with a rebuttal last week, and I'm going to ask

23   Mr. Torres to talk about the rebuttal.  I could have him wait

24   around and --

25         MR. KELLY:  It says nothing.

1    MS. RYAN:  -- observe the testimony.

2    THE COURT:  It says nothing about Mr. Toennies in

3 this report.

4    MS. RYAN:  Well, it couldn't because you hadn't

5 provided it yet.

6    MR. KELLY:  Mr. Toennies testified and gave his

7 report last spring.  There's never been a rebuttal report

8 about his methodology, assumptions, analysis, conclusions, or

9 calculations.  This is the first time I'm hearing rebuttal.

10    THE COURT:  Well, it is typical for experts to be in

11 the courtroom.  I will allow this witness to remain in the

12 courtroom during the testimony of the defendant's expert and

13 then to be re-called, and I will take up further objections at

14 that time.

15    MS. RYAN:  That will be fine.  Then I think I have no

16 further questions at this point, Your Honor.  I would like to

17 go ahead and offer Plaintiff's Exhibit 120, which is the

18 redacted expert's report dated October 19, 2017.

19    THE COURT:  Any objection to Exhibit 120?

20    MR. KELLY:  No, Your Honor.

21    THE COURT:  All right.  It will be received.  And

22 117, 118, and 119, I think, have been indicated as being

23 previously offered and received.  I do see that.  Okay.

24    MS. RYAN:  Thank you.

25    THE COURT:  Okay.  Anything further?

1          MS. RYAN:  No.

2          THE COURT:  All right.  Cross-examination.  We'll go

3     till about 12:15, and then we'll resume at two o'clock.

4                        **CROSS-EXAMINATION**

5     **BY MR. KELLY:**

6     Q    Mr. Torres, you are not an accountant?

7     A    No.

8     Q    And you are not authorized by any government body to

9     prepare tax returns on behalf of any third party?

10    A    No.

11    Q    In furtherance of preparing your report, did you do any

12    surveys?

13    A    Surveys, no.

14    Q    You did not speak to any customers?

15    A    No.

16    Q    You didn't speak to the principals or employees of any of

17    the parties?

18    A    No.

19    Q    Did you speak to any lawn care providers in the St. Louis

20    area to determine what factors drive lawn care business?

21    A    No.

22    Q    And did you speak to any lawn care providers to determine

23    how business for a St. Louis area lawn business fluctuates

24    during the year?

25    A    No.

1    Q     You didn't bother doing any type of analysis as to the

2    recognition of Lawn Managers by any population demographic

3    either before or after 2012?

4    A     You mean a survey?

5    Q     Well, you didn't try to do anything to determine its

6    public recognition at any time, did you?

7    A     No.  That was not my task, no.

8    Q     Never tried to assess the strength of its brand?

9    A     Tried to --

10   Q     Assess the strength of its brand?

11   A     No.

12   Q     Did you determine how long any of the logos the plaintiff

13   has been using were used?

14   A     In my -- for my initial report I did some research on

15   past and current, at the time, usage of logos.

16   Q     Is that factors -- I'm sorry.

17   A     But that portion was stricken from my report.

18   Q     So you haven't factored into how long Lawn Managers has

19   used any particular logos it has in your calculations?

20   A     For the calculation of revenue, I didn't have to do a

21   time line of the different logos of the different companies.

22   Q     So I'm just asking if it did do a logo change, your

23   calculations don't assess whether it was good or bad for

24   plaintiff?

25   A     Right.  I'm not evaluating the performance of the

1    companies.

2    Q    You said there was a clear nexus between use of the

3    market and revenues.  Can you cite to me any specific customer

4    that purchased services from the defendant because of her --

5    the use of an infringing mark?

6    A    The nexus is between the use of the mark and the revenue

7    generation.  There is a general linkage because it was a

8    specific -- I mean, which is evidenced for my perspective as

9    an economist, it's evidence in the fact that Progressive

10   insisted on using "Lawn Managers" not only at the beginning

11   two years, when it launched, but also has been using it

12   prominently, you know, up to the point where I did my last

13   review in 2017.

14        So the fact that they see it as an important

15   trademark to use was evidence for me as an economist that

16   that's how they viewed the mark in the market.  And their only

17   product or service -- or all their services are marketed under

18   that trademark.  There is no distinction of different services

19   branded different names or different sub brands.  So all of

20   the revenue generated by the services are generated under that

21   brand.

22   Q    And can you cite me any customer that purchased services

23   from the defendant because it used an infringing mark?

24   A    No.  That is not part of the analysis that is needed.

25   Q    And do you know what brands that Progressive used on its

Case: 4:16-cv-00144-DDN   Doc. #: 110   Filed: 11/30/17   Page: 91 of 161 PageID #: 1506

1    trucks?

2    A    I don't understand the question.

3    Q    Are you aware of what brands it used on its trucks?

4    A    I'm aware that it used signage on the trucks stating the

5    name of the company, the full name of the company, or

6    sometimes the logo, the stylized logo, that includes the Arch

7    in a circle with "Progressive" underneath and "Lawn Managers"

8    highlighted across the banner.

9    Q    So is it your assumption that all signage used by the

10   defendant is infringing?

11   A    My perspective -- and I'm not testifying as to

12   liability -- is that all use of the term "Lawn Managers" that

13   is highlighted in the marketing communication, that is an

14   infringing use if it's done after January 1 of 2015.

15   Q    And I'm not sure that answered my question.  I'm just

16   saying are you assuming that all usage, all signage used by my

17   client is infringing?  That's all I'm asking.  Is that what

18   you're assuming?

19   A    No.  I'm assuming liability.  So I am assuming that the

20   use of the Lawn Managers' trademark since January 1, 2015,

21   onwards would be infringing.

22   Q    So did you take into account whether there were any other

23   usages of signage or postings that were not infringing?

24   A    Up to the point of when I did the last of the report, I

25   haven't seen any updated logo from Progressive that did not

1   use "Lawn Managers" in a prominent manner.

2   Q    Have you seen any photographs of Progressive trucks going

3   back to 2013?

4   A    Not as part of my report.

5   Q    So your report does not try to assess what revenues of

6   Progressive were due to legal prominent use of its marks?

7   A    No.  Again, I have to assume liability.

8   Q    Did you account in your opinions for the fact that there

9   might be references to Lawn Managers on third-party sites not

10  controlled by Progressive?

11  A    I did not do a -- my task is not to do a survey of

12  websites or anything like that.  I analyze revenues from

13  Progressive.

14  Q    And did you ever analyze the effect on the marketplace of

15  defendant's use or right to use the words "Lawn Managers"

16  alone during the period May 12 through December 31, 2014?

17  A    Again, I have to assume liability in order to calculate

18  damages.  That is a period before the infringing use.

19  Q    So you did not do that analysis?

20  A    That's what I'm saying.

21  Q    And you agree that the information available is not

22  sufficient to differentiate the effects of confusion that

23  would have been created before or after January 1, 2015?

24  A    Correct.  The financial information that Progressive

25  provided does not allow for that.

1  Q    And you haven't tried to assess what confusion in the

2  marketplace is attributable to conduct of Progressive that was

3  in compliance with the divorce orders?

4  A    Again, I'm not analyzing liability or doing surveys of

5  use before January 1, 2015; so that's not even relevant to

6  what I did.

7  Q    I'm not limiting it to before 2015.  I'm just asking if

8  you tried to assess what confusion in the marketplace or

9  revenues of defendant were attributable to conduct that was

10 incompliant with the divorce decree?

11 A    That compliance would have been before January 1, 2015 --

12 Q    Wasn't the company allowed to use the name "Lawn

13 Managers" afterwards?

14 A    The name of the company, yes, but not the trademark "Lawn

15 Managers."

16 Q    Right.  And the name "Progressive Lawn Managers" fully

17 incorporates the words "Lawn Managers"; correct?

18 A    It incorporates the words, yes.

19 Q    I asked you about a customer -- customers that plaintiffs

20 may have gotten, but you could not identify one customer that

21 you believe plaintiff lost to defendant for any infringing

22 acts; is that right?

23 A    That's what I say in my report.

24 Q    And in calculating Progressive's profits, you included in

25 Progressive's revenues, revenues derived from residential

1    customers that were zip codes awarded to Mrs. Smith; correct?

2    A    Yes.

3    Q    And more specifically, sir, in calculating Progressive's

4    profits, you included in Progressive's revenues, revenues

5    derived from residential customers for which Mrs. Smith was

6    awarded all right, title, and interest by the Circuit Court of

7    Jefferson County; is that correct?

8    A    For the years 2015 and 2016, for example, those revenues

9    from those zip codes would still be infringing if they used

10   the trademark "Lawn Managers."  The right to market to

11   specific zip codes is separate from the analysis that has to

12   be done in terms of the use of the trademark.

13   Q    Thank you, sir.  I was just asking did you include in

14   your calculations Progressive's revenues from residential

15   customers that were specifically awarded to Ms. Smith in the

16   divorce decree?

17   A    If there were any -- any revenues generated from 2015

18   under that trademark would have been infringing; so I included

19   it.

20   Q    And even though they may have been customers going back

21   to 2012.

22   A    Yes.

23   Q    You referenced Department of Commerce data and the 1,877

24   establishments providing landscaping services over the past

25   five years.  Do you recall that?

1    A    Yes.

2    Q    And you can't tell where any of those establishments

3    provided landscaping services in the past five years, can you?

4    A    Not off the top of my head, but I have the report.

5    Q    And you said that data applies to landscaping businesses;

6    correct?

7    A    Lawn care is what I searched for.

8    Q    Well, I believe your report says "landscaping."

9    A    There are statistics for two things that are different

10   sources.  You may be confusing those.  The U.S. Census Bureau

11   in the Economic Census section uses the term "landscape

12   services" as a general term.  I also did a -- and that only

13   serves to calculate the number of owner-occupied units to

14   estimate the size of the market, but that is not part of the

15   calculation of revenue.

16   Q    So you used data --

17   A    There is another source that I cite in the report, that

18   is, the Better Business Bureau, where there I searched for

19   lawn care company, and that is also cited in the report, but

20   that is also only as a reference to the broad strokes of the

21   market as a framework, not a part of the calculation.

22   Q    So getting back to my question, your report on page 9

23   references you used census data attributable to landscaping

24   services; correct?  Second to last paragraph.

25   A    Well, it doesn't say that I used it.

96

1    Q    You said it refers to.

2    A    I'm just reporting what the latest economic census says.

3    Q    Was it important to your report or not?

4    A    As a frame of reference.  It's not part of the

5    calculation.

6    Q    Well, could you use the 1,877 for anything?

7    A    No.

8    Q    But you used the data.  Now, which of these --

9    A    No.

10   Q    -- which of these parties --

11   A    No.  There's no other data.

12   Q    Which of these parties is a landscaping business?

13   A    There's no other data that I used.

14   Q    That didn't answer my question.  Which of these parties

15   are landscaping businesses?

16   A    Oh, the parties of the case?

17   Q    Yes.

18   A    None of them.

19   Q    And there's nothing in that Department of Commerce data

20   in your report that indicates which companies provide only

21   residential, commercial, or both services, is there?

22   A    No.  That's why I didn't use the information.

23   Q    Now, you looked at census data; correct?

24   A    Economic census data, yes.

25   Q    Yes.  And what was the census data you used?

1   A    I looked at the economic census data that -- that's the

2   latest data that is published is for the year 2012.

3   Q    And that told us the number of owner-occupied residential

4   units?

5   A    It -- excuse me.  That was 2014.  And that's for the

6   owner-occupied units, yes.

7   Q    Right.  How many of those are apartments?

8   A    As I say in the report, you can't tell from the report,

9   from the census, whether these are -- if some of them may be

10  condominiums that would be owner-occupied units in apartments.

11  Q    Can you tell us how many are condominium owners,

12  duplexes, or single-family homes?

13  A    So that's what I'm saying.

14  Q    You can't tell?

15  A    The census information does not have that distinction.

16  That's why it's -- I'm considering the statistic as a proxy.

17  I'm not offering it as an absolute number.  It's Footnote 35.

18  Q    Can you turn to page 9 of your report, please.

19  A    Yes.

20  Q    Can you read the last sentence?

21  A    According to census data, Footnote 34, at the end of

22  2014, there were a total of 517,493 owner-occupied residential

23  units, OOUs, in the 81 zip codes in which the area was divided

24  between the parties.

25  Q    And what division are you talking about?

1   A    I think that's for the total, both.

2   Q    The division?

3   A    The sum of the two.

4   Q    The divorce in 2012?

5   A    Well, divided between the parties, yes.

6   Q    Right.  You're not referring to some other division.

7   You're talking about the division of --

8   A    Of course.

9   Q    -- zip codes between the parties in 2012; is that right?

10  A    Yes.

11  Q    Okay.  I just wanted to be sure.  And how many zip codes

12  did Ms. Smith get?

13  A    I don't recall.  I have it in my Exhibit 1.

14  Q    Would you agree she got 19?  Do you know?

15  A    I don't want to commit to a number.  I don't recall.

16  Q    So if Ms. Smith got 19 and Mr. Zweifel got 52, how many

17  would that leave?  Seventy-one, wouldn't it?

18  A    Okay.

19  Q    Not 81; correct?

20  A    I'm not sure if you're referring to the fact that

21  there's -- there may be an error.  But that's just recounting

22  what is available in the economic census, which is not part of

23  the information used in the report.

24  Q    You can't tell from the census data what percentage of

25  residential homes actually use a lawn care service, can you?

1    A    Not from the census data, no.  I didn't say that.

2    Q    And you can't tell from that data for the residential

3    homes in those zip codes that do purchase lawn services what

4    type of lawn services they purchase?

5    A    Again, that's a subset of the prior question; so the same

6    answer of no.

7    Q    You don't know what percentage of homes in the zip codes

8    that plaintiff was awarded use lawn care services, do you?

9    A    Again, no.

10   Q    And you have the same answer for the zip codes for

11   defendant?

12   A    Yeah.

13   Q    Now, in the United States we don't pay taxes on EBITDA;

14   is that correct?

15   A    That's correct.

16   Q    You mentioned charitable deductions.

17   A    Yes.

18   Q    Companies can make charitable payments for reasons of

19   goodwill; correct?

20   A    For many different reasons, yes.

21   Q    And one of those is goodwill?

22   A    I don't know what definition of that term you're using.

23   Q    Could you look at page 13 of your report, please.

24   A    Yes.

25   Q    Now, I'd like you to look at Table 2 on that report.

1          THE COURT:  I think this is probably going to take a

2     little bit; so we're going to recess at this time until two

3     o'clock.  Thank you very much.

4          **(COURT RECESSED FOR LUNCH FROM 12:12 PM UNTIL 2:10 PM.)**

5          THE COURT:  You may continue.

6          MS. RYAN:  Your Honor, could I just interrupt with a

7     housekeeping matter real quick?  We were trying to figure out

8     whether Exhibits 91 and 158 have been admitted.

9          THE COURT:  Oh, 91?

10         MS. RYAN:  Yes.  And 91 is the written record of the

11    phone call about the Scion, the erratic driving.  And 158.

12         THE COURT:  I show 91 being admitted.

13         MS. RYAN:  158 is the blue sign.

14         THE COURT:  You show 158, Ms. Stamm?

15         THE CLERK:  It was objected to and overruled, but I

16    didn't write "admitted."

17         THE COURT:  I have it identified, objected to, but I

18    don't think it has been admitted.

19         MS. RYAN:  I would like to go ahead and offer

20    Plaintiff's Exhibit 158 into evidence.

21         MR. KELLY:  Over my objection, I guess, Your Honor.

22         THE COURT:  And your objection again is what?

23         MR. KELLY:  It hadn't been produced before today.  It

24    was the first time I've seen it.

25         THE COURT:  Then I'll sustain the objection.

1          MS. RYAN:  Thank you.

2          THE COURT:  All right.

3    Q    (BY MR. KELLY) Mr. Torres, you can't state for any year

4    2015, 2016, or 2017 how much of defendant's revenue was from

5    customers awarded Ms. Smith in the divorce orders of 2012 or

6    2014; is that correct?

7    A    It's not segregated in those terms, no.

8    Q    And in calculating the defendant's profits, you only used

9    the incremental cost per services; is that right?

10   A    The incremental costs in the company, yes.

11   Q    You didn't use all overhead costs; correct?

12   A    All overhead costs in the sense of financial accounting,

13   no.

14   Q    And in calculating tax liability, a company isn't limited

15   to only deducting incremental cost; is that correct?

16   A    No.  The incremental cost is completely different from a

17   tax return cost allowance.

18   Q    So the answer would be yes, the company is not limited to

19   just simply just deducting incremental cost?  I just want to

20   make sure I got a clear answer.

21   A    Okay.  Yes.

22   Q    You've reviewed the tax returns of the defendant in this

23   case; is that correct?

24   A    Yes.

25   Q    And I believe that you have them before you as

1    Plaintiff's Exhibit 112.  Could you please open those up.

2              MS. RYAN:  Actually, 74 to 77, actually.

3    A    Yeah.

4    Q    All right.  Let's use 74 to 77.  Can you tell the Court

5    what the gross revenues for Progressive were in 2013?

6    A    Gross revenue in the tax return is $784,887 for 2013.

7    Q    2013?

8    A    Uh-huh.

9    Q    Thank you.  And for 2014?

10   A    That would be in another exhibit.  This one only has --

11   Q    Oh, yes.  This would be the next one after --

12   A    Not that one.  I don't see tax returns in the next

13   exhibit.

14   Q    This will speed things up.  Is 75 not in your book?

15   A    This was 112.

16   Q    No, no, no.  It's 74, 75, 76, and 77, sir.  Here, use

17   those.  Maybe that will speed things up.  Is that easier?

18   Okay.  There.

19   A    Okay.  Sir, if you can repeat the question.

20   Q    Yes, sir.  What were the gross revenues for 2014?

21   A    2014, $714,271.

22   Q    And for 2015 what were the gross revenues?

23   A    $764,567.

24   Q    And for 2016?

25   A    $693,583.

```
1    Q    So there was drop of about $70,000 from 2015 to 2016; is

2    that right?

3    A    Roughly.

4    Q    Did you make any inquiry as to what the source of that

5    drop was?

6         MS. RYAN:  Your Honor, I'm going to object on the

7    relevance on this question.

8    A    No.

9         THE COURT:  If he can answer, I will overrule the

10   objection.

11   Q    I think he answered "no."  Is that correct?

12   A    Correct.

13   Q    Sir, I'm going to hand you what's been marked as Exhibit

14   0-3, which is a copy of your report from May 2017.  Does that

15   look like a copy of your report, sir?

16   A    Yes.

17   Q    And would you turn to page 16, please.

18   A    Page 16?

19   Q    Page 16, yes, sir.

20   A    Uh-huh.

21   Q    Do you see that?

22   A    Yes.

23   Q    And in Item No. 2, in summary of opinions, you opined

24   that Progressive's profits were $186,423; is that right?

25   A    For the period January 1, 2015, through December 31,
```

1   2016.

2   Q    Correct.  For two years; is that right?

3   A    Yes.

4   Q    And in your current report, your opinion is that through

5   October -- or excuse me, August, Progressive's profits are

6   $322,753?

7   A    Yes.

8   Q    So according to my math, that's a -- Progressive made

9   profits so far this year of $136,330; is that right?

10  A    So the difference between those two numbers is that, yes.

11  Q    Okay.  Now, what kind of accounting does Progressive do?

12  A    In what sense?

13  Q    Is it a cash basis or accrual basis?

14  A    No.  They use a mixture, a mixed, accrual and cash.

15  Q    Are you sure about that?

16  A    Well, that's what they declare in the tax returns.

17  Q    Now, do you know how they source the -- I mean they

18  record their revenues?

19  A    I would say yes.

20  Q    Do you know -- do revenues for a business like

21  Progressive, are they front-loaded in any particular calendar

22  year, or are they balanced and steady over the course of the

23  year?

24  A    No.  They fluctuate particularly because the requirements

25  of the seasons are different.

1    Q    And what kind of revenue can Progressive expect for the

2    rest of the year?

3    A    Of what year?

4    Q    This year.

5    A    It would have to say that it's proportional to the last

6    four months of the year of the year of each of the previous

7    years.  I mean, it's a regular --

8    Q    Right.  You have to look at the previous years to get an

9    idea of what goes on throughout the calendar year; correct?

10   A    To project forward, yes.

11   Q    So according to you, Progressive had almost as much

12   profits in eight months as it did in two years?

13   A    Not according to me.  According to the accounting records

14   provided by Progressive for the first seven months.

15   Q    As you interpret them?

16   A    Eight months.

17   Q    Is that right?

18   A    As the numbers there are stating.

19   Q    Do they have a figure for incremental profit?

20   A    No.  But the numbers from the analysis of that

21   information, that's the number.

22   Q    Would you look at Table 2 of your May 8, 2017, report.

23            THE COURT:  Can I ask you what number that is again?

24            MR. KELLY:  Yes, Your Honor.  It's 0-3.

25            THE COURT:  Oh three.  Plaintiff's 0-3.

1          MR. KELLY:  Defendant's 0-3.  We got stuck with

2     letters.

3          THE COURT:  Oh, zero three.

4          MR. KELLY:  Yes.  And next time, Your Honor, I'm

5     going to ask the Court's indulgence to be Defendant 1, 2, 3,

6     4.

7          MS. RYAN:  Your Honor, it's the same as Plaintiff's

8     80, if that helps you.

9          THE COURT:  Same as Plaintiff's 87?

10         MS. RYAN:  Eighty, eight zero.

11    Q   (BY MR. KELLY) It's page 13 of your May 2017 report.  Do

12    you see that, sir?

13    A    Yes.

14    Q    All right.  Now -- and, Your Honor, maybe if I put it on

15    the ELMO, it will be easier.

16         In this report you've got your calculations and

17    you've got the EBITDA right there; is that right?

18    A    Yes.

19    Q    You put that in the report, and now if we look at your

20    report from two weeks ago, you've got a new item there called

21    "incremental profit"?

22    A    Yes.

23    Q    So you changed the terminology?

24    A    I did, yes.

25    Q    And this incremental profit -- strike that.  Why did you

1  make the change, sir?

2  A    Because I saw that defense's expert had thoroughly

3  confused the issue.  For infringement damages, one calculates

4  incremental costs and incremental profit, and he was trying to

5  discuss the determination of EBITDA as a general accounting

6  concept.

7  Q    Did you point out in your report anywhere where Mr.

8  Toennies, the accountant, made any kind of error or mistake in

9  his calculations?

10 A    My report does not address a rebuttal of his report.

11 Q    But you changed your terminology in your table, and

12 that's Table 2; correct?

13 A    Yes.

14 Q    And that's an important table in your report?

15 A    Well, the numbers are important.  The table is --

16 Q    Right.  So that's an important table --

17 A    It's a vehicle.

18 Q    So you just, without indication or notice, you changed

19 the terminology of the final number to try to rebut Mr.

20 Toennies; is that right?

21 A    No.  I was trying to make it clear for him.

22 Q    All right.  Now, let me ask you to turn to Table 1 of

23 your report.

24         THE COURT:  The current or --

25         MR. KELLY:  Yes, May of 2017.

1    A    Yes.

2    Q    And there we have in Table 1, you've got figures for

3    2015; correct?

4    A    Yes.

5    Q    And now when we look at Table 1 in your October 19

6    report, you have different numbers for 2015?

7    A    Yes.

8    Q    Is that true?  So you changed the numbers for 2015?

9    A    I made the correction, yes.

10   Q    Did you actually point out in the report anywhere that

11   you were making a correction?

12   A    In the text of the report?

13   Q    Yes, sir.

14   A    No.  I think we communicated with your office, stating a

15   detailed tracking of all the changes that occurred to

16   facilitate the comparison.

17   Q    And that was after I said there were changes made to this

18   report that went beyond just merely updating; correct?

19   A    That was when the final updated report was submitted.

20   Q    All right.  You submitted a first report a few days

21   earlier without any notification of what the changes were;

22   right?

23   A    And you complained about it; so we complied by stating

24   every single difference, commas, et cetera.

25   Q    Next to you, you have a notebook, a black notebook, right

1   on your left.  Nope.  Further left.  About nine o'clock, right

2   in front of you.  Yep, right there.

3          And there should be one for Your Honor right there.

4          You found the book?

5   A    This book?

6   Q    Yes.

7   A    Yes.

8   Q    Can you turn to Exhibit N-3, which, for the record, is

9   the expert's May 27, 2016, report.

10  A    Okay.

11  Q    Do you recognize the exhibit as such?

12  A    N-3 is my report of May 27, 2016.

13  Q    Thank you.  Would you turn to page 13, please.

14         MS. RYAN:  Don, hold on just a moment.  This report

15  was provided a couple of days prior to a mediation between the

16  parties which occurred on June 1, 2016.  I don't know that

17  it's appropriate to inquire into it as if it was produced for

18  litigation when it was actually provided in the course of the

19  mediation.  I handed it to Mr. Kelly during the mediation.  I

20  really think this should not come in, Your Honor.

21         MR. KELLY:  Yeah.  Actually, it's referenced in your

22  discovery responses.  It says "please see report provided

23  previously."  It was produced to us in discovery.

24         THE COURT:  I'm going to overrule the objection for

25  the reason that, I mean, the information in the mediation

Case: 4:16-cv-00144-DDN   Doc. #: 110   Filed: 11/30/17   Page: 110 of 161 PageID #: 1525

110

1  proceeding would be expected to be just as valid as in this

2  proceeding, and so I'm going to overrule the objection.

3  Q    (BY MR. KELLY) All right.  Are you looking at page 13,

4  sir?

5  A    Yes.

6  Q    And there's your summary of opinions?

7  A    Yes.

8  Q    And Item No. 2 you indicate the defendant had wrongful

9  profits of $478,332; is that correct?

10  A    For the period January 1, 2015, through May 31, 2016,

11  based on an industry estimated profit margin of 15 percent,

12  yes.

13  Q    What financial records of the defendant did you look at

14  to get to that figure?

15  A    I have to go back here.  I did not have tax returns or

16  anything from the defendant for that -- at that point.  I made

17  an estimate of the number of accounts and the annual revenue

18  based on information that I got from the census then and the

19  disclosures from the plaintiff.

20  Q    And what disclosures does your report indicate you

21  received from plaintiff?

22  A    The zip code breakdown information about the -- I think

23  the specific information was about a number of accounts and

24  the value per account and that the amount that was paid in

25  court or as a result of some court proceeding paying for a

1    number of accounts.

2    Q    You think?

3    A    Well, that's what I remember from, from a year and a half

4    ago.

5    Q    Right.  Because it doesn't indicate in your report, does

6    it?

7    A    Right, because this was an estimate.  It's titled

8    "preliminary damages summary."  It's not entitled "damages

9    report," because at the time, in the process of the settlement

10   negotiations, this was the information that was available.

11   Discovery had not proceeded to the point where defendant had

12   provided actual information; so it wasn't available to be

13   analyzed.

14   Q    And none of that was a barrier to you giving an opinion?

15   A    The lack of information requires an estimate to be

16   produced, and that's what the preliminary summary discloses:

17   What estimates I can make at this point in discovery at that

18   time, a year and a half ago.

19   Q    And I take it from your answer you didn't even look at

20   the plaintiff's financial records to render that calculation?

21   A    To render an opinion on defendant's profits, I didn't

22   have to look at plaintiff's profit, correct.

23   Q    Now, in your current report from October 2017, you have a

24   figure for corrective advertising; is that correct?

25   A    Yes.

1   Q    Have you seen any of the plaintiff's expenses from

2   mailing?

3   A    No.  I don't recall seeing that specific breakout from

4   the financials that I saw.

5   Q    And did you ask for their actual expenses for mailing

6   items?

7   A    Well, I asked for the financial information, and I got

8   the accounting information detailed -- I don't know that it --

9   there is an account for mailing, per se.  I think there is

10  advertising, marketing.  There may be postage as a separate

11  line item.  I think they do have an account for that.  But

12  it's not the whole thing.  So I didn't see a report on

13  marketing expenses.

14  Q    And your idea is that a mailer would be appropriate?  A

15  card being mailed would be appropriate for corrective

16  advertising; is that right?

17  A    Correct.  From my experience, that is one solution that

18  has been adopted.  In other situations, for example, among

19  online businesses, it's a notice in the online webpage that is

20  sufficient or in the video, et cetera.

21  Q    Now, you used information to come up with that corrective

22  advertising number; correct?

23  A    Yes.

24  Q    And one of those numbers was a number of households?

25  A    Yes.

113

1   Q      What was it, 185,315?  Is that correct?

2   A      Yes.

3   Q      You do not know how many of those households that you say

4   needs a flyer had ever seen anything with defendant's name or

5   mark on it; correct?

6   A      No.  I'm not claiming that; so it's correct.

7   Q      You cannot say how many of those households have ever

8   used defendant's services since January 1, 2015?

9   A      No.

10  Q      In fact, you can't say how many of those households have

11  ever even used a lawn care service since January 1, 2015?

12  A      Correct.  For the calculation of corrective advertising

13  in a prospective method, no.

14  Q      How many of those households even have a yard?

15  A      It's not known from the census information.

16  Q      How many of those may have received a mailer from

17  plaintiff in the past?

18  A      It's not known.

19  Q      And it's not known how many would have received a mailer

20  from defendant?

21  A      Correct.

22  Q      And there's nothing in your report that indicates if such

23  a mailer were sent how many people would actually read the

24  mailer; is that right?

25  A      I'm not claiming that at all, no.

1    Q    To your knowledge, has defendant corrected any of its

2    advertising over the last year?

3    A    I understand that very lately, I would say in the last

4    month, some changes to the logos have been made and where

5    "Lawn Managers" is not used prominently or as prominently as

6    it was before.

7    Q    And is that the limit of your understanding?

8    A    Yes.

9         MR. KELLY:  Thank you.  I don't have any further

10   questions, Your Honor.

11        THE COURT:  All right.  Redirect.

12                    **REDIRECT EXAMINATION**

13   **BY MS. RYAN:**

14   Q    Mr. Torres, what is the purpose of corrective

15   advertising?

16   A    Well, it's a category of the remedies of damages

17   available to the trademark owner to calculate in a prospective

18   manner, as I'm doing here, what it would take to redress the

19   wrong impression that has been generated in the market in

20   which the trademark operates.

21   Q    Were you present in the courtroom when testimony was

22   offered about the number of yard signs that are used by both

23   parties?

24   A    Yes.

25   Q    And did you hear the testimony about the number of

1    impressions that the public may have gotten from driving by

2    the yard signs in yards for either party?

3    A    Yes.

4    Q    So it's many thousands of impressions; correct?

5    A    Sure.  Anything that is facing the street is likely to

6    get a lot of impressions.

7    Q    Okay.  So if Progressive had 1,500 customers times 7

8    treatments --

9              MR. KELLY:  Your Honor, I'll object.  This isn't

10   in -- this is not even rebuttal.

11             THE COURT:  Let me take a look.  No.  I'm going to

12   overrule the objection.  You went into the information about

13   the numbers of households and the need for, or not, for

14   mailing a card and such.  I'll overrule the objection.

15             MS. RYAN:  Thank you.

16   Q    (BY MS. RYAN) So I think I was in the middle of a

17   question.  If it was 1,500 customers, 7 treatments, 6

18   treatments, whatever, say 9,000 signs --

19   A    Right.

20   Q    -- times however many drive by that sign before it's

21   taken down?

22   A    Correct.

23   Q    Correct.  Okay.  So many thousands of impressions?

24   A    Yes.

25   Q    This is a per year sort of a figure?

1   A    Yes.  And it would vary, of course, by location.  One

2   would take into account the presence of the vans while they're

3   stationary and moving.  All that would be generating

4   impressions in that sense.

5   Q    As well as the signage on the building?

6   A    Yes.

7        MS. RYAN:  Thank you.  I have nothing further, Your

8   Honor.

9        THE COURT:  All right.

10        MR. KELLY:  Just a few, Your Honor.

11                    **RECROSS-EXAMINATION**

12   **BY MR. KELLY:**

13   Q    Mr. Torres, did you ask for information regarding the

14   number of the yard signs that defendant had used?

15   A    Not specifically that, no.

16   Q    Not specifically.  Did you ask at all?

17   A    I asked about the financial records including

18   advertising, marketing, yes.

19   Q    Did you ask about the number of yard signs that were

20   populating the number of the residences?

21   A    As I said, I did not ask specifically for the number of

22   yards signs.

23   Q    Did you ask for any kind of data or metric on people who

24   may have seen this sign out front of Progressive's building?

25   A    No.

```
 1              MR. KELLY:  Thank you.  No further questions.

 2              THE COURT:  All right.  You may step down.  Thank

 3   you.

 4              MS. RYAN:  Your Honor, I would like to call Linda

 5   Smith.

 6              THE COURT:  All right.  Step up and be sworn, please.

 7              MR. KELLY:  Your Honor, can my client go to the

 8   bathroom first?

 9              THE COURT:  We will take a ten-minute recess.

10              (COURT RECESSED FROM 2:39 PM UNTIL 2:59 PM.)

11              THE COURT:  Step up and be sworn, please.

12                    (WITNESS SWORN BY THE CLERK.)

13              THE COURT:  You may proceed.

14                          LINDA SMITH,

15   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

16   FOLLOWS:

17                       DIRECT EXAMINATION

18   BY MS. RYAN:

19   Q    Would you please state your name for the record.

20   A    Linda Smith.

21   Q    Ms. Smith, are you the owner of all the stock of

22   Progressive Lawn Managers, Inc.?

23   A    Yes.

24   Q    And you've been the owner since the company was formed;

25   correct?
```

1    A    Yes.

2    Q    What year was it formed?

3    A    2012.

4         THE COURT:  Just one second.

5    Q    (BY MS. RYAN) The company was formed in 2012?

6    A    Yes.

7    Q    Were you present in the courtroom earlier today when the

8    video was shown?

9    A    Yes.

10   Q    Doesn't the video say that you've been in business for 24

11   years?

12   A    Yes.

13   Q    And says you have more than 20 employees?

14   A    Yes.

15   Q    Have you ever had more than 20 employees?

16   A    In my 24 years' experience, we've had more than 20.

17   Q    How long has your company been in business?

18   A    Since 2012.

19   Q    How many employees do you have right now?

20   A    Nine.

21   Q    How many employees did you have in 2016, total?

22   A    Anywhere from nine to ten.  It fluctuates.  Sometimes 11,

23   sometimes 12.

24   Q    How many -- have you ever had more than ten employees?

25   A    We hire seasonal work; so I would have to look back at

1    the previous years to see who we hired on.  We tend to hire

2    two to three people in the fall for seeding.

3    Q    Are they all W-2 employees?

4    A    Yes.

5    Q    Please turn to Exhibit 111.  Do you have that in front of

6    you?

7    A    Yes.

8    Q    Is that your federal payroll filing records?

9    A    I'm sorry?

10   Q    Take a good look at it.  Is it the payroll filing records

11   for Progressive?

12   A    It looks like W-2s.

13   Q    W-2s for 2012.  Go ahead and take the time to look

14   through it, please.

15   A    Yes.  I don't see '17.

16   Q    Do you see the --

17   A    Oh.  Yes.

18   Q    Okay.  So these are your records; correct?  Copies of

19   your records?

20   A    Correct.

21   Q    And is that showing that you ever had more than 16

22   employees in a year?

23   A    I have not said that I had 16 employees in a year.

24        MS. RYAN:  Okay.  Your Honor, I would like permission

25   to play the video one more time.

```
 1              THE COURT:  No.

 2              MS. RYAN:  No?

 3              THE COURT:  No.

 4    Q   (BY MS. RYAN) Doesn't that video say that you've been in

 5    business for more than -- for 24 years and you have more than

 6    20 employees?

 7    A    It says I've been in business for 24 years, and it says

 8    I've -- I have had up to 20 employees, I believe it says.

 9    Q    No.  It says more than 20 employees, more than 20

10    professionally trained employees is what it says.

11    A    Okay.

12              THE COURT:  Now, rather than you testifying and the

13    witness being unclear, go ahead and play the video.

14              MS. RYAN:  It's in evidence.  Okay.

15                         (VIDEO PLAYED.)

16    Q   (BY MS. RYAN) So it says you had more than 20

17    professionally trained employees; correct?

18    A    Yes.

19    Q    So that's not true now, and it has never been true;

20    correct?

21    A    It was true when I owned Lawn Managers.

22    Q    Was it ever true of Progressive Lawn Managers?

23    A    We've never had 20 employees.

24    Q    So it's never been true for Progressive Lawn Managers?

25    A    Not for Progressive.
```

1   Q     But this video has been on your website for a number of

2   years; correct?

3   A     I'm not sure when that video was put on my website.

4   Q     Well, do you want me to pull it up?  It says "Hibu 2013."

5   A     It may have been on a different forum before then.  I'm

6   not sure.  I had Hibu make changes, and they didn't remove

7   that video.

8   Q     The video's on your website now, isn't it?

9   A     No.

10  Q     Okay.  Did you change something about the video but it's

11  still on your website?

12  A     I changed my Hibu website, I think, in May, and they

13  failed to take the video down.

14  Q     So the video's still on there as of today?

15  A     No, it is not.

16  Q     Were you present in the courtroom when Crystal Alcorn

17  testified?

18  A     It is not on my website.

19         MS. RYAN:  Your Honor, I don't want to be in the

20  position of testifying, but perhaps we can bring some

21  verifying information to the Court tomorrow morning, because

22  we actually looked at it.

23         THE COURT:  We have a witness who's testified, we

24  have another witness who's testified, and it's up to me.

25  Let's proceed.

122

1           MS. RYAN:  Thank you.

2    Q    (BY MS. RYAN) Turn to Exhibit 17.  It's in a different

3    binder.

4    A    17?

5    Q    Do you have that in front of you?

6    A    I do.

7    Q    Is that an image from Progressive's website?

8    A    Yes.

9    Q    And what would be the date that that was on Progressive's

10   website?

11   A    I'm sorry.  I didn't hear you.

12   Q    What date was it on the website?  Would it help you if I

13   told you that in your deposition you testified that this was

14   how it looked?  No?  Okay.

15   A    This is the website created for me in 2012.

16   Q    So this is how your website -- looking at the logo part

17   of it, "Progressive" in large letters, "Lawn Managers"

18   smaller, is that how it looked prior to December 31, 2014?

19   A    This website is no longer really in use.  If I'm not

20   mistaken, I don't see where this redirects to

21   progressivelawnmanagement.com.  This was the first website

22   created for me back in 2012 by Synergetic Marketing, but it

23   has undergone changes since then, but it no longer -- we use

24   PLMI.US, and so Synergetic's work is forwarded to my current

25   website.

1   Q    I didn't ask you about your current website.  I asked

2   you --

3   A    This was created in 2012.

4   Q    And was this how it looked -- was this how the logo,

5   name, et cetera, on your website looked prior to December 31,

6   2014?

7   A    I am not sure.

8   Q    Please turn to Exhibit 18.  Is that the redesigned logo

9   that you began using after January 1, 2015?

10  A    Actually, this was --

11  Q    Just answer yes or no, please.

12  A    No.  2014 -- November of 2014 is when we started working

13  on this one.

14  Q    Why were you working on it in November of 2014?

15  A    Because I had to change my name from "Lawn Managers" on

16  everything by the beginning of '15.

17  Q    So you changed from a design where "Progressive" was

18  large relative to "Lawn Managers" to one where "Progressive"

19  is tiny compared to "Lawn Managers" at the end of 2014.  Is

20  that your testimony?

21  A    It was a new website builder.  It was Hibu.  And this is

22  the logo that we used for it, yes.

23  Q    Okay.  Please turn to Exhibit 30.  Do you recognize that?

24  A    Yes.

25  Q    Is that a document that you produced during the discovery

1    in the case?  Was this produced by you, given to Mr. Kelly,

2    and given to us?

3    A    Yes.

4    Q    And what is it?

5    A    It's a trifold brochure that I mailed to my customers.

6    Q    And you're still using this format?

7    A    I believe so.

8    Q    So on the first page of Exhibit 30 you've got a coupon;

9    correct?

10   A    Yes.

11   Q    And is that coupon -- turn to Exhibit 33, please.  Is

12   that coupon virtually identical to --

13   A    I'm sorry.  What?

14   Q    Thirty-three.

15   A    Is it what?

16   Q    Is it virtually identical to 33?

17   A    No.  I created this coupon early -- well, I created this

18   coupon years ago, while I was still at Lawn Managers.

19   Q    What are you talking about?

20   A    The $40 coupon -- I had created that coupon years ago at

21   Lawn Managers.

22   Q    You're referring to Exhibit 33?

23   A    Yes.  Only it said $25 then.

24   Q    Okay.  And the coupon that appears on Exhibit 30 -- which

25   is your brochure; correct?

1    A    Correct.

2    Q    -- is identical except that it has a phone number;

3    correct?

4    A    Correct.  And it has --

5    Q    What phone number is it?

6    A    (636)394-1212.

7    Q    And what number is that?  Is that one of your business

8    phone numbers?

9    A    Yes.

10   Q    And then it has the word "Progressive" in small type next

11   to "Lawn Managers"; correct?

12   A    Yes.

13   Q    And you're still using this at the present time; correct?

14   A    I ordered it last year.

15   Q    Thank you.  Did Progressive hire any consultants to

16   perform a survey to find out whether the Lawn Managers

17   trademark has lost its significance in the marketplace?

18   A    No.

19   Q    What is Progressive's standard program, treatment

20   program, for residential lawns?

21   A    Usually, it's either five for commercial or six for

22   commercial or six to seven for residential, but I change them

23   every year pretty much to meet the St. Louis area needs of

24   insect control or different things.  I change my product and

25   my applying at different times per what we're learning every

1    year.

2    Q    And what is the quality of Progressive's work?

3    A    I think it's exceptional.

4    Q    So you're not saying that Progressive does poor quality

5    work, are you?

6    A    No.

7    Q    Did you attach GPS devices to some of Lawn Managers'

8    vehicles?

9    A    Yes, I did.

10   Q    And did you and other Progressive employees take

11   photographs of Lawn Managers' employees at work on lawns?

12   A    Yes.

13   Q    Now, there's been a little bit of testimony about a tree

14   suit?

15   A    Yes.

16   Q    You've just recently filed a lawsuit on that?

17   A    I did.

18   Q    And just briefly, what is your claim in that case?

19   A    The day after my divorce was final, Randy had one of the

20   employees go to my home and spray my two and a half acres down

21   with weed control, and I had about $100,000 damage on my trees

22   and shrubs.

23   Q    Who was the employee?

24   A    Mike Smith.

25   Q    And who did he work for on -- what was the date of this

1    incident?

2    A    The date of the incident was May 2.

3    Q    And who did he work for on May 2?

4    A    Lawn Managers.

5    Q    That's your testimony?

6    A    Yes.

7    Q    Now, up to today's date, has Progressive ever told its

8    customers that it is a new company, separate from Lawn

9    Managers?

10    A    We do the name change when we send all of our information

11    out.

12    Q    What do you mean "name change"?

13    A    All of our documentation says "Progressive Lawn Managers"

14    in bold.

15    Q    So have you ever told your customers that Progressive is

16    a new company?

17    A    I haven't formally written a letter or anything, no.

18    Q    Isn't it true that as of a couple weeks ago, you're

19    telling customers, when they need to correct how their payment

20    is made, that you've changed the name of the company?

21    A    I've been doing that for years.

22    Q    Okay.  And not that it's a new company, a different

23    company; right?

24    A    I just tell them I've changed my name.

25    Q    And doesn't that imply that Lawn Managers has changed its

1  name?

2  A    I would never think that.

3  Q    Can you explain why you didn't take steps to distinguish

4  Progressive Lawn Managers from Lawn Managers?

5  A    I started taking the steps in 2012.

6  Q    How come you've never told customers that Progressive is

7  a new company?

8  A    I have put signage on my vehicles in early '13; so we

9  were going around in vehicles with "Progressive" very

10  prominent.

11  Q    But you've never told customers that it's a new company;

12  correct?

13  A    I've never sent any mailings out like that, no.

14  Q    I would like you to turn to -- I don't know if she's got

15  it up there.  Do you have Defendant's Exhibit --

16        MR. KELLY:  I don't think I do.  And we just noticed

17  that some of our exhibits are -- I think those are missing.

18  Let me check.  Yeah, W-1 --

19        MS. RYAN:  Your Honor, I offer --

20        THE COURT:  Say again.

21        MS. RYAN:  I'd like to offer these two pages to them

22  to examine.  They think they don't have them with them.

23        MR. KELLY:  Yeah.  Thank you, yeah.  We noticed some

24  of our -- absolutely fine.

25        MS. RYAN:  Okay.  Thank you.

1    Q    (BY MS. RYAN) There's a screen in front of you.  I'm just

2    going to lay it on here.  And can you see that okay?

3    A    Sure.

4    Q    And is that a photograph of a Progressive vehicle?

5    A    Yes.

6    Q    Is it a van?

7    A    Yes.

8    Q    And what's the date on this photo?

9    A    I took a picture of it, I think, maybe a month ago.

10   Q    So it's your testimony that this is how this particular

11   vehicle looked as of a month ago?

12   A    Yes.

13        MS. RYAN:  Your Honor, I would like to switch over

14   to --

15        THE COURT:  Now, I don't think you identified early

16   into the record what that exhibit number is.

17        MS. RYAN:  That was W-1.  Sorry.

18   Q    (BY MS. RYAN) Do you have X-1 on the screen in front of

19   you?

20   A    Yes.

21   Q    And what is that a photo of?

22   A    My little Scion.

23   Q    And you still own that vehicle?

24   A    Yes.

25   Q    Have you had the signage on that changed in the last

10/31/17 LML v. PTMT - Volume 2

130

1    couple of years?

2    A    Yes.

3    Q    When?

4    A    Three times.

5    Q    And when was this photograph taken?

6    A    That photograph, I believe, was taken last year.  I'm not

7    completely sure on that.  I'm sorry.

8             MS. RYAN:  Your Honor, I would like to offer Exhibits

9    17, 18, 111, and 30 into evidence.

10            MR. KELLY:  No objection, Your Honor.

11            THE COURT:  All right.  They'll be received.  So that

12   is 17, 18, 111, 30, 33, W-1, and X-1?

13            MS. RYAN:  I haven't offered W-1 and X-1, Your Honor.

14   I don't think we know enough about them.

15            THE COURT:  All right.  All right.

16            MS. RYAN:  Your Honor, I have nothing further at this

17   point.

18            THE COURT:  Cross-examination?

19            MR. KELLY:  Yes, Your Honor.

20            THE COURT:  Now, is Ms. Smith going to be a joint

21   witness in her case, in the plaintiff's case and the

22   defendant's --

23            MR. KELLY:  Yes.

24            MS. RYAN:  Well, that wasn't my intention, Your

25   Honor, but --

1    THE COURT:  Well, that's the question, not so much

2  for you.  I know that it's --

3    MR. KELLY:  Yeah.  So this raises a point.  Is the

4  plaintiff resting at this point?  It sounds like they have a

5  rebuttal witness, but it sounds like they're resting their

6  main case.

7    THE COURT:  Well, you're up -- I'm going to ask you

8  to proceed, and we're not going to get into that -- into any

9  motion practice just now, but I'll direct you to proceed by

10  noncross-examination.  Proceed by --

11    MR. KELLY:  Direct.

12    THE COURT:  By direct examination for the purpose of

13  placing her evidence, her testimony, into the defendant's

14  case.  All right.

15                       **DIRECT EXAMINATION**

16  **BY MR. KELLY:**

17  Q    Linda, can you tell us when you formed Progressive Lawn

18  Managers?

19  A    February of 2012.

20  Q    And I will put on the screen Plaintiff's Exhibit 2.  And

21  is that a copy of the articles of incorporation for

22  Progressive?

23  A    Yes.  Yes.

24  Q    And it was formed when?

25  A    I think it was February.  Does it say here?

1    Q    Well, we can certainly help you and turn the page.

2    A    It was in February.  February 25 of 2012.

3    Q    And was that done in furtherance of you separating from

4    Randy?

5    A    Yes.

6    Q    And for a period of time did you operate out of the same

7    building?

8    A    A few days, I think.

9    Q    And relative to that, when did the transfer of accounts

10   occur?

11   A    4/25/2012.

12   Q    And how were those accounts transferred to you?

13   A    By Peter Brown with Real Green.

14   Q    You obtained a new location at some time?

15   A    I had been working on a new location since November of

16   '11.

17   Q    And where was that new location?

18   A    120 Old Meramec Station Road.

19   Q    And are you still there today?

20   A    Yes.

21   Q    And can you describe the location for us?

22   A    It's in Manchester on Old Meramec Station Road, before

23   you get to Manchester Road.  It's an old highway, I guess you

24   could call it.

25   Q    Would it be fair to say it's behind a strip mall?

1    A    Yes.

2    Q    How many employees did you have when you started?

3    A    In 2012?

4    Q    Yes.

5    A    Seven or eight, I believe.

6    Q    I handed you what's been marked as Plaintiff's Exhibit

7    H-2.  Can you tell the Court what that is?

8    A    This is a customer cancel report.

9    Q    I think I know what it is.  Is that the list of your

10   customers when you started?

11   A    This --

12              THE COURT:  You said --

13   A    Yes.

14              THE COURT:  -- Plaintiff's Exhibit H-2, but isn't it

15   defendant's?

16              MR. KELLY:  Correct.  Thank you, Your Honor.

17              THE COURT:  Sure.

18   A    This is a report that Peter Brown ran, I believe, when he

19   did the transfer on 4/25/12.

20   Q    Who is Peter Brown?

21   A    He's basically the one that wrote the program for Real

22   Green that we both use.

23   Q    Is that your data processing program?

24   A    Yes.

25   Q    And is that a customer relations management program, I

1   should say?

2   A    It's a software program for the green industry.

3   Q    Green?  You mean lawn care companies?

4   A    Green industries.  Some people use it for pest.  You can

5   essentially use it for whatever you want.

6   Q    Now, handing you that.  And I've just handed you what's

7   marked as Plaintiff's Exhibit 13, and could you tell us what

8   that is?

9   A    It is my divorce decree and separation agreement.

10  Q    It's the one that you feel is applicable; correct?

11  A    May 1?  Yes.

12  Q    With respect to that decree, can you tell us how accounts

13  were divided?

14  A    Randy and I came to an agreement of a 60/40 split; so I

15  was to get 40 percent of the customer base that we had as

16  revenue and a continuing business, and he was supposed to get

17  60 percent.

18  Q    Okay.  And how many zip codes did you get?

19  A    Nineteen.

20  Q    And how many zip codes did Randy get?

21  A    Fifty-two.

22  Q    And I'm not suggesting that there was a disparity in

23  terms of -- but was that about approximate I mean revenue-wise

24  19 to 52 --

25  A    Yes, it would have been.

1    Q    Approximately the same?

2    A    Yes.

3    Q    If I can see Exhibit 13 again.  Thank you.  In fact, you

4    have books up here.  Yes, you can look at Exhibit 13 in that

5    one.

6    A    Okay.

7    Q    You were a half owner of Lawn Managers, weren't you?

8    A    Yes.

9    Q    Did that agreement have a nonsolicitation provision to

10   it?

11   A    Yes.

12   Q    And the split of the zip codes, what section of the

13   agreement was that?

14   A    Page 8.

15   Q    Under Section 5; is that correct?

16   A    So sorry.  Yes.

17   Q    And would you turn to page 9, please.  And under that

18   Section 2-A, residential accounts, of Section 5.02, what does

19   it say?

20   A    Residential accounts.  A, accounts ordered to Linda.

21   Linda's awarded all right, title, and interest in all the

22   residential accounts and accounts receivable of the

23   corporation in the following zip codes.

24   Q    Now, would you turn to Section 5.06.

25   A    Do you know what page?

1   Q    Page 15.  And the start of that section, is that the

2   section that indicates that you may use the name "Lawn

3   Managers" for a period of time no longer than two years?

4   A    Yes.

5   Q    Would you turn to the next page, same section.  And would

6   you read to the Court the second paragraph from the bottom.

7   A    Starting with "Randy and Linda acknowledge"?

8   Q    I believe it starts "Randy and Linda agree"?

9   A    "Randy and Linda agree that if either of them wishes to

10  sell any of their commercial accounts or any of their

11  residential accounts as referenced in Section 5.02, that each

12  of them will give the other party the first opportunity to

13  purchase the accounts that are up for sale."

14  Q    Now, approximately how many accounts did you get pursuant

15  to the decree in 2012?

16  A    Approximately 1,900.

17  Q    And so that record is clear, is that accounts to which

18  you were awarded all right, title, and interest?

19  A    Yes.

20  Q    Has Randy ever approached you about purchasing any of the

21  accounts that have been awarded to you?

22  A    No.

23  Q    Under that decree were you allowed to use the premises of

24  Lawn Managers in its High Ridge location for a period of time?

25  A    Yes.

1   Q    How long?

2   A    It was supposed to be till December 31 of 2012, I

3   believe.

4   Q    Now, was there anything in that decree, to your

5   knowledge, that gave Randy the right to control how you used

6   the name "Lawn Managers"?

7   A    No.

8   Q    Was there any restriction in favor of Randy as to what

9   logos or colors you could use?

10  A    No.

11  Q    Did it say how you were supposed to use the name

12  "Progressive Lawn Managers"?

13  A    No.

14  Q    Did the decree provide for what your company and Randy's

15  company was supposed to tell the customers about the division

16  of accounts?

17  A    No.

18  Q    Did it even provide you had to inform them?

19  A    No.

20  Q    Now, let me talk to you about right after the divorce.

21  You received the accounts.  Did you also receive some trucks?

22  A    Yes.

23       MS. RYAN:  Your Honor, if I could just object briefly

24  for a moment.  If we're going to try the entire Hillsboro case

25  and go through the entire history of the parties, I think it's

Case: 4:16-cv-00144-DDN  Doc. #: 110  Filed: 11/30/17  Page: 138 of 161 PageID #: 1553

1  not a good use of time.  We entered into a stipulation that's

2  been filed with the Court.  The joint stipulation of facts

3  goes into all of this background information about the

4  division of accounts.  All the zip codes are in there.

5  Division of trucks is talked about.

6        THE COURT:  All right.  You have a response to the

7  objection?

8        MR. KELLY:  Yeah.  I'm not sure what she's talking

9  about.  There's nothing in the stipulation about trucks.

10 There's nothing in the stipulations about the right to control

11 use of any of the names.  There's nothing in the stipulations

12 about the colors or logos, what I just asked.

13       THE COURT:  All right.  I'm going to overrule the

14 objection.  Let's proceed.

15 Q  (BY MR. KELLY) So as part of the split, did you obtain

16 some trucks that Lawn Managers had?

17 A    Yes.

18 Q    What vehicles did you get?

19 A    I believe I had four vans, two huge trucks with three- to

20 six-hundred gallon tanks.  I had my GMC.  I had Randy's

21 Cadillac.  I wasn't to get it.

22 Q    Let me ask you about the service vehicles.

23 A    Okay.

24 Q    Did they have any signage on them?

25 A    Yes.

Case: 4:16-cv-00144-DDN Doc. #: 110 Filed: 11/30/17 Page: 139 of 161 PageID #: 1554
10/31/17 LML v. PLMI - Volume 2

1 Q    And what was that?

2 A    It was a pretty much dark blue with a light colored in it

3 with "Lawn Managers" written across it with no phone number, I

4 don't think.

5 Q    The text "Lawn Managers"?

6 A    I'm sorry?

7 Q    The text "Lawn Managers"?

8 A    Yes.

9 Q    Did any of those service vehicles at that time have the

10 words "Progressive Lawn Managers" on it?

11 A    No.

12 Q    Now, as part of this split, did some employees go with

13 your company and some stay with Lawn Managers?

14 A    Yes.

15 Q    How many of those employees did you acquire or your

16 company acquire?

17 A    I think seven, six or seven.

18 Q    Let me ask you about the companies who work the field.

19 Were they wearing uniforms?

20 A    Yes.

21 Q    And did those uniforms have a company name on them?

22 A    Yes.

23 Q    What did the company name say?

24 A    "Lawn Managers."

25 Q    And how long did those employees use those uniforms?

140

1    A    Until the end of 2014.

2    Q    How long did you use the service vehicles with "Lawn

3    Managers" on them?

4    A    I began using some service vehicles in 2013 that had my

5    name, earlier '13, "Progressive," and then I kept the others

6    as well because I didn't have enough money to change them all

7    at the time.

8    Q    So during that two-and-a-half-year period you were mixing

9    logos on your vehicles?  Some were Progressive?  Some were

10   Lawn Managers?

11   A    On each vehicle.  There were never the same logo on two

12   vehicles.  At -- different logos on two vehicles.

13   Q    Linda, I'm going to put up -- excuse me.  Ms. Smith, I'm

14   going to put up on the ELMO --

15        THE COURT:  So just so I'm clear, that during 2013

16   some vehicles used by the witness had "Progressive Lawn

17   Managers" on it and some had just "Lawn Managers"?

18        THE WITNESS:  Yes.

19        THE COURT:  Okay.

20   Q    (BY MR. KELLY) Ms. Smith, I put up on the projector,

21   trying to get some resolution here, some photographs.  Do you

22   recognize those?

23   A    Yes.

24   Q    And for the record, this is Plaintiff's Exhibit 15.  What

25   do those show?

1  A    That shows what our vehicles looked like before I changed

2  some of them.

3  Q    And it's not clear on the projected image, but you can

4  see it in the paper image in front of you, I think.  What is

5  written on that signage?

6  A    "Lawn Managers."

7  Q    And is there a phone number?

8  A    I cannot make the phone number out.  Yes, there is.

9  Q    And what phone number is that?

10  A    Can you hold it still?  I'm sorry.  (636)677-1122.

11  Q    And whose number is that?

12  A    Mine.

13  Q    Also contained in Exhibit 15, on the third page, is the

14  image of the front end of a truck.  Can you identify that?

15  A    That was how that truck looked when we first left Lawn

16  Managers in High Ridge.

17  Q    Is that a different vehicle than the ones we looked at on

18  the front page of Exhibit 15?

19  A    It's the same vehicle.  It just the other pictures showed

20  the tanks.  This shows the door.

21  Q    That is the front end of the top picture on the first

22  page of 15; is that correct?

23  A    Yes.

24  Q    And how long did you use that vehicle shown on the third

25  page of 15?

1    A    If I'm not mistaken, we had changed one of those type of

2    vehicles to look like the Progressive and left that one the

3    same until the end of '14, when we began to try to change the

4    logo.

5         MR. KELLY:  I'm going to have to borrow one of your

6    copies of my exhibits, W-1.

7         THE COURT:  Seventy-one?

8         MR. KELLY:  W-1, Your Honor.  That is one of the ones

9    that looks like it may not have made it through to our -- yes.

10   Oh, Mr. Hurst has proved his worth.  He found it.  Thank you.

11        MS. RYAN:  This is the one I just asked her about a

12   little while ago?

13        MR. KELLY:  Yes.  Correct.  Is it not?

14        MS. RYAN:  It is.

15        MR. KELLY:  I've got it on the projector, Your Honor.

16        THE COURT:  All right.

17   Q   (BY MR. KELLY) Ms. Smith, I would like to ask you about

18   this Exhibit W-1, which you were inquired of in your

19   testimony.  When did you start using this van, if you

20   remember?

21   A    Early in probably May of 2013.

22   Q    Don't remember the exact time?

23   A    No.

24   Q    So sometime in 2013?

25   A    Early in '13, yes.

1    Q    Let's go through this picture.  It looks like you've got

2    the text "Progressive Lawn Managers" on there; is that right?

3    A    Yes.

4    Q    And there's some type of logo in the back.  Can you tell

5    us what that logo is at the back of the van?

6    A    It was supposed to be grass coming up inside of a blue,

7    light blue kind of a round circle.

8    Q    It also looks like to me that if I look down at the

9    bottom of this van, it looks like there's some type of grass

10   imagery at the bottom of the van?

11   A    Yes, sir.

12   Q    And that's got your company's phone number; is that

13   correct?

14   A    Yes.

15   Q    How long did you use this van?

16   A    We're still using it.  So sometime early mid '13 till

17   today.

18   Q    Till today.  When was the first time you used any type of

19   signage with the word "Progressive" on it after the May

20   divorce?

21   A    In May of '13, I believe it was.  Early '13.

22   Q    So would it be fair to say that from May of 2013 to the

23   end of 2014, you were using signage with both "Lawn Managers"

24   and both "Progressive Lawn Managers"?

25   A    Yes.

Case: 4:16-cv-00144-DDN   Doc. #: 110   Filed: 11/30/17   Page: 144 of 161 PageID #: 1559

144

1    Q    There were some contempt proceedings between you and

2    Randy in 2013 and 2014?

3    A    Yes.

4    Q    Don't want to ask you about 2013.  I want to ask you

5    about 2014.  Just explain briefly what the nature of those

6    were and how we got to the July 2014 orders.  What were the

7    nature of the proceedings or the allegations that you made

8    against Randy?

9    A    The '14 proceedings, first of all, have to do with money

10   still owing me from 2012; so that was a big issue.  It was

11   right at around 80,000 I believe.

12            And then I had already learned that Randy had taken

13   several of my big accounts, especially in Ladue, Creve Coeur,

14   Kirkwood, and was servicing them.  So I was trying to get

15   relief from the Court for the revenue from my customers that I

16   had lost.

17   Q    You were accusing him of being in your zip codes

18   improperly?

19   A    Yes.

20   Q    And servicing customers he shouldn't under the divorce

21   decree?

22   A    Yes.

23   Q    And did he make some allegations against you?

24   A    I think I was held in contempt from not making the

25   Flagstar payments.

1  Q    Okay.  And talking about the allegations that resulted

2  in, I believe it was, Exhibit 12 -- and this is a copy of the

3  2012 decree; is that right?

4  A    This is a new court order.

5  Q    Yeah.

6  A    Yes.

7  Q    You recognize that as the court order that resulted from

8  the dueling contempt proceedings in 2014?

9  A    Yes.

10 Q    It's in your book in front of you, Ms. Smith.

11        MS. RYAN:  Don, what exhibit are you talking about?

12        MR. KELLY:  12.

13 Q    (BY MR. KELLY) I'm not going to go through the whole

14 exhibit with you, but just to quickly summarize through it to

15 get to some questions, this agreement reaffirmed your right to

16 use the name "Progressive Lawn Managers"; is that true?

17 A    Yes.

18 Q    And it extended the right for your company to use "Lawn

19 Managers" through the end of 2014?

20 A    Yes.

21 Q    And I understand that there was a provision in this

22 decree about transferring accounts in certain zip codes?

23 A    Two separate zip codes, yes.

24 Q    What were those?

25 A    63038 and 63040.

1   Q    And how were those customers transferred to you?

2   A    By Peter Brown at Real Green systems.  Actually, he

3   provided the reports, and we had to manually enter them in.

4   Q    Okay.  Now, between the time of May 2012 to this decree,

5   had you formally transferred any accounts to Randy?

6   A    No.

7   Q    And pursuant to this decree and your understanding of it,

8   were you transferring any accounts to Randy?

9   A    No.

10  Q    And there was a payment by Mr. Zweifel to you under this

11  court order?

12  A    Yes.

13  Q    And is there any provision in this decree that you

14  recognize as him buying any of the customers he acknowledged

15  servicing before this decree?

16  A    No.

17  Q    And to put some sort of perspective on it, prior to July

18  of 2014, the decree had a nonsolicitation provision?

19  A    Yes.

20  Q    And explain what that was to the Court.

21  A    I believed it to mean we weren't going to take any

22  customers in each other's zip codes.

23  Q    Okay.  So you're not supposed to solicit in each other's

24  zip codes; correct?

25  A    Yes.

1   Q    And then pursuant to this decree, it changed.  It became

2   a complete noncompete for residential customers?

3   A    Yes.

4   Q    They were allowed to sign up new commercial accounts and

5   new miscellaneous accounts?

6   A    Yes.

7   Q    And am I correct that the noncompete for residential

8   customers was extended to July of 2016?

9   A    No.  December 31 of 2014.  Oh.  Oh, I'm sorry.  Yes.

10  Q    And was there anything in this order that you understood

11  that said that as of July 25, 2016, your customers to which

12  you had been given all right, title, and interest were up for

13  grabs and could be solicited?

14  A    No.

15  Q    Would you turn to Exhibit 8, Ms. Smith.  Have you turned

16  to Exhibit 8?

17  A    I'm sorry.  Yes.

18  Q    And you received this sometime when?

19  A    Sometime in November.

20  Q    2015?

21  A    Yes.

22  Q    And had anybody from Lawn Managers told you there was

23  anything wrong with your way your signs looked prior to this

24  time?

25  A    No.

1    Q    And what did you do after you received this letter?

2    A    I called the number on the letter and got a voicemail

3    only with a man's voice, and said that I would like to speak

4    about this.  And I left my business number to be called back.

5    I never received a phone call back; so I took it, I believe,

6    to my attorney in Hillsboro.

7    Q    Mr. Roberts?

8    A    Kevin Roberts.  And --

9    Q    All right.  And to your understanding, did he prepare a

10   response back?

11   A    Yes.

12   Q    Had you been made aware prior to the divorce that the

13   company had filed a trademark application?

14   A    No.

15   Q    Do you understand the significance of a trademark

16   registration?

17   A    I do now.

18   Q    You think you do?

19   A    Well, it's very limited, but I've learned a lot.

20   Q    Now, looking at this Exhibit 8, would you read it one

21   sentence at a time, please.

22   A    "Dear Mrs. Smith.  We represent Lawn Managers in their

23   trademark matters.  It has been brought to our client's

24   attention that your continued use of 'Lawn Managers' is not

25   proper trademark use.  Your company name is 'Progressive Lawn

1    Managers.'  Therefore, the phrase 'Lawn Managers' should be

2    the same size, type, and style as 'Progressive' as you have

3    used it on your website."

4    Q    Thank you.  So at this point it's indicating that the

5    usage on your website was okay?

6    A    Yes.

7    Q    Now, do you have a recollection when you received this

8    letter of ever having seen Lawn Managers' logo other than

9    yellow or green?

10   A    Yes.

11   Q    And what was that?

12   A    They started changing colors.

13   Q    And when was that, to your recall?

14   A    I would say sometime latter '13.

15   Q    Now, what kind of trucks was Lawn Managers using after --

16   immediately after the divorce?

17   A    The same trucks.

18   Q    The same trucks as Progressive?

19   A    Yes.  We were all using the same vehicles.

20   Q    Was the lettering the same?

21   A    Yes.

22   Q    Was there any type of Lawn Managers logo on those trucks?

23   A    I don't recall the feet being on the original trucks.

24   Q    Putting before you on the prompter Plaintiff's Exhibit

25   17, I believe you were asked about that in your direct.

1    A    Yes.

2    Q    And is that an image of one of your websites?

3    A    This was the original website.

4    Q    By "you," I mean Progressive.

5    A    Yes.

6    Q    Now, is it correct that you actually have several domain

7    names?

8    A    Yes.

9    Q    Which you --

10   A    Yes.

11   Q    Do you recall what domain name this website appeared

12   under?

13   A    This website was put under progressivelawnmanagement.com

14   as a error by Synergetic Marketing in Michigan.

15   Q    Do you have a main website that you have used?

16   A    That would have been the main one before Hibu.

17   Q    For the record, Hibu is a website developer?

18   A    Yes.

19   Q    So you were looking at this, and it had this lettering up

20   at the top, the "Progressive"?

21   A    Yes.

22   Q    And you elected to change that?

23   A    I never liked this logo.

24   Q    In fact, it's skewed; correct?

25   A    I feel like it goes up at the end too much

151

1    inconsistently.

2    Q    Somebody else made it for you?

3    A    Yes.

4    Q    Wanted them to change it.  And you thought that that was

5    an improvement?

6    A    Yes.

7    Q    Can you tell the Court --

8              MS. RYAN:  Do you have an exhibit number?

9              MR. KELLY:  Exhibit 18.  Thank you.

10   Q    (BY MR. KELLY) Can you tell the Court why you thought this

11   graphic was an improvement?

12   A    I had very limited funds in 2013, but I wanted to start

13   branding my name to my customers, my current customers.  So I

14   had someone create the previous that we looked at.  Never

15   really liked it.  I hired Extreme Wrap in South County,

16   Missouri to wrap as many vehicles as I could afford at the

17   time, and it was, in my estimation, very shoddy work.

18   Q    As far as the image, did you like this image better than

19   just the block lettering?

20   A    Yes.

21   Q    Did you feel that the Arch and the grass in the circle

22   made your name or logo distinctive?

23   A    Well, I had already had a round area in my previous logo

24   that people were seeing with the grass in it.  I just thought

25   putting the St. Louis Arch in it would brand it as a St. Louis

1  company, which it is.

2  Q    Okay.  And you're talking about the circle right there on

3  Exhibit 17?

4  A    Yes.

5  Q    And how long had you been using that little circle with

6  the grass in it?

7  A    Since early '13.

8  Q    And I take it you liked it?

9  A    That was part of the logo.

10 Q    And to your knowledge, did Lawn Managers have anything

11 similar to that on their signage?

12 A    No.

13 Q    Did any other company, to your knowledge, have anything

14 similar?

15 A    No.

16 Q    Putting on the display Exhibit 99, can you tell me what

17 that is?

18 A    That is my website.

19 Q    As it currently appears now?

20 A    Yes.

21 Q    And there's a print date of July 6, 2017?

22 A    That's the day I printed up the screen.

23 Q    And this is actually a Lawn Managers --

24 A    I'm sorry.  What?

25 Q    This is a Lawn Managers document, 99.  Okay.

1   A    I believe that I -- I thought I printed that up, but I

2   guess it is Lawn Managers.

3   Q    So you corrected your website?

4   A    Yes.

5   Q    And that was because of this lawsuit and the allegations?

6   A    Yes.

7   Q    You've actually now moved the word "Progressive" on the

8   name to the left of the word "Lawn Managers"?

9   A    Yes.

10  Q    When did you make this change?

11  A    I want to say May of this year.

12  Q    And let me ask you when you made that change, who did you

13  ask to make the change?

14  A    Hibu.

15  Q    I assume you're not proficient in website design; is that

16  right?

17  A    I don't think I have access to it.

18  Q    When you asked Hibu to change your website, did you also

19  tell them to fix the video?

20  A    Yes.  I said everything needed to be "Progressive Lawn

21  Managers" all the same font, typeset -- everything.  They

22  messed it up a couple of times, actually.

23  Q    And did you instruct them, actually, to pull the video

24  down?

25  A    Yes, I did.

```
 1    Q    And is that video up, to your knowledge?

 2    A    It is not up.

 3    Q    Now, this website that we were showing in 99, what is the

 4    domain name for that?

 5    A    In 99?

 6    Q    On Exhibit 99.  How do we get to that website?  What's

 7    the web address; do you know?  Can I show you?

 8    A    Can you put it back down?  That's PLMI.US.

 9    Q    Okay.  You were -- it was brought up that you own a

10    domain name with "Lawn Managers" in it?

11    A    Yes.

12    Q    When did you acquire that?

13    A    I want to say in '13.

14    Q    When you were allowed to do business as Lawn Managers;

15    correct?

16    A    Yes.

17    Q    And is that domain active?

18    A    PLMI?  Oh, no.

19    Q    Lawn Managers --

20    A    No, it is not.

21    Q    And it's been taken down?

22    A    Whatever you call -- I called them and told them to

23    suspend it or whatever they do.  I don't know the verbiage.

24    Q    If you type in the address, you don't come to a

25    Progressive Lawn Managers site, do you?
```

1   A     No.

2   Q     And how long has that been the case?

3   A     Oh, I want to say early in 2017.  I don't know for sure,

4   though.  It could have been '16.

5   Q     You were shown some pictures of vehicles.  Let me show

6   you what's been marked as Plaintiff's Exhibit 106.  The first

7   page, what is that?

8             MS. RYAN:  Your Honor, we had -- when we first

9   started the trial and we talked about withdrawing exhibits,

10  and were waiting to do it, this is an exhibit that I had

11  intended to withdraw.  So if defendant has an equivalent

12  exhibit somewhere, that's fine, but I really object to having

13  106 used, because I'm withdrawing it.

14            THE COURT:  Let me take a look.

15            MR. KELLY:  I think it's also Defendant's Exhibit

16  I-2.

17            THE COURT:  I-2?

18            MR. KELLY:  I-2, Your Honor.

19            THE COURT:  That's fine.  This is an exhibit that the

20  plaintiff has not used, and when I looked for that number in

21  the three-ring binder, it was just a place keeper saying

22  "withdrawn."  So it's not available under that number.

23            MR. KELLY:  Okay.  Then I-2 it is.

24  Q     (BY MR. KELLY) Ms. Smith, I would like you to look at the

25  first page of Exhibit I-2.  And what does that show?

1  A    That shows my little Scion as it looks now.

2  Q    And how long ago did you change it to look like this?

3  A    January or February of 2017.

4  Q    And I'm going to show you the second page of Exhibit I-2.

5  What does that show?

6  A    That's my sign on my building, my front door.

7  Q    Is that there presently?

8  A    Yes.

9  Q    How long has it been there?

10 A    Since 2013.

11 Q    I'm showing you now the third page of Exhibit I-2.  What

12 does that show?

13 A    That's my building banner as it looks now.

14 Q    And when did you change the banner?

15 A    I think late April, probably, of 2017.  I'm sorry.

16 Q    This would be the fifth page of Exhibit I-2.

17 A    That's my GMC Super Duty as it looks today.

18 Q    How long has it looked like that?

19 A    Since 2013.

20 Q    I'm showing you now the sixth page of Exhibit I-2.  What

21 does that show?

22 A    That's the flatbed with the big tank on it as it looks

23 today.

24 Q    And how long has that little signage been on that truck?

25 A    The same time as the little sign which was, I think, I

Case: 4:16-cv-00144-DDN  Doc. #: 110  Filed: 11/30/17  Page: 157 of 161 PageID #: 1572

1   want to say, probably the end of January of this year.

2   Q    The next page of Exhibit I-2, please tell the Court what

3   this is.

4   A    That's the tank of the door you showed me just a moment

5   ago.

6   Q    How long has that signage been on that tank?

7   A    The beginning of 2017.

8   Q    And by "tank," that's a tank that's actually on a truck?

9   A    Yes.

10  Q    The next page of Exhibit I-2, what does that show?

11  A    That's a van as it looks today.

12  Q    How long has it looked like that?

13  A    Since 2013.

14  Q    And that also has the green grass down at the bottom?

15  A    Yes.

16  Q    Is the next image a --

17       THE COURT:  I'm going to ask you to state the number

18  of the page.  I think we're up to 8, but I'm at page 8, but --

19       MR. KELLY:  Sorry, Your Honor.  Yes.  This one is 9.

20       THE COURT:  Okay.

21  Q    (BY MR. KELLY) This is page 9 of Exhibit I-2.

22  A    That's also a van as it looks today.

23  Q    Is that a different van or the same van as the previous

24  page?

25  A    I can't see the dent.  That's how I can tell the

1   difference.  I just took some photographs, and I have a couple

2   of my vans that look like that.

3   Q     And have they looked like that since 2013?

4   A     Yes.

5   Q     And this is page 10.  And what does this show?

6   A     My little Scion.

7   Q     As it looks today?

8   A     Yes.

9   Q     And when was that changed again?

10  A     Early of 2017.

11        MR. KELLY:  Excuse me, B-2.  B-2 is -- B-2 -- you

12  haven't used 25, have you?

13        MS. RYAN:  I don't think so.

14  Q     (BY MR. KELLY) Ms. Smith, I'm showing what's been marked

15  as Defendant's Exhibit B-2, and I'd ask you to identify that

16  for the Court, please.

17  A     That's my folder that I leave my estimates at homes.  Say

18  a new customer called me and wants me to do an estimate or a

19  seeding estimate or any kind of estimate, I put the paperwork

20  inside of that folder.

21  Q     And how long have you used that?

22  A     I believe that print happened in the beginning of '15.

23  Q     And you've used it since?

24  A     Yes.

25  Q     Showing you what was marked as Plaintiff's Exhibit 37,

1    and can you identify that for the record, please?

2    A    Yes.  That's a marketing letter sent to 1210 Devonworth

3    Drive, it looks like.

4    Q    What type of document is this?

5    A    It's our mass mailing document.

6    Q    And how long have you been using a mass mailing like

7    that?

8    A    Twenty years.  Well, many years.

9    Q    And as I see it, other than the word "save," would the

10   words "Progressive Lawn Managers" be the most prominent

11   lettering on that?

12   A    I think it is.

13   Q    You've also got what you thought was your pretty design

14   next to it?

15   A    Yes.

16        THE COURT:  I think at this time we're going to break

17   for the day.

18        MR. KELLY:  Okay.

19        THE COURT:  And I have some matters in the courtroom

20   at 8:45 tomorrow that should not go too much past nine.  So I

21   will just ask counsel -- you don't have to take everything off

22   the table, or I don't know where -- are you using the separate

23   conference rooms?

24        MR. KELLY:  No.

25        THE COURT:  Well, that's fine.  Just perhaps if you

Case: 4:16-cv-00144-DDN Doc. #: 110 Filed: 11/30/17 Page: 160 of 161 PageID #: 1575

1   leave things in the courtroom, put them at one end of the

2   table.  And so we will, you know, recess until tomorrow

3   morning at nine o'clock and, you know, take the usual breaks,

4   and we'll probably work until 4:30 or 5:00 tomorrow.

5          MR. KELLY:  For the Court's -- do you think we are

6   going to go that late?

7          MS. RYAN:  We may not, Your Honor, but --

8          THE COURT:  Okay.

9          MS. RYAN:  We'll have to see.  It would be nice for

10  all of us.

11         THE COURT:  All right.  Thank you very much.

12         MS. RYAN:  Thank you.

13         THE COURT:  We'll be in recess.

14              **(PROCEEDINGS CONCLUDED AT 4:15 PM.)**

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

I, Shannon L. White, Registered Merit Reporter and
Certified Realtime Reporter, hereby certify that I am a duly
appointed Official Court Reporter of the United States
District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and
accurate transcript of the proceedings held in the
above-entitled case and that said transcript is a true and
correct transcription of my stenographic notes.

I further certify that this transcript contains
pages 1 through 160 inclusive and that this reporter takes no
responsibility for missing or damaged pages of this transcript
when same transcript is copied by any party other than this
reporter.

Dated at St. Louis, Missouri, this 28th day of November,
2017.


/s/Shannon L White
/s/Shannon L. White
Shannon L. White, CRR, RMR, CCR, CSR
Official Court Reporter