### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

LAWN MANAGERS, INC., a Missouri     )
Corporation,    )
   )
    Plaintiff,    )
   )
    v.    )
   )
   ) No 4:16–CV–00144–DDN
PROGRESSIVE LAWN MANAGERS, INC.,    )
a Missouri Corporation,    )
   )
    Defendant.    )

### NON–JURY TRIAL – VOLUME 3
### BEFORE THE HONORABLE DAVID D. NOCE
### UNITED STATES MAGISTRATE JUDGE
### NOVEMBER 1, 2017

APPEARANCES:

For Plaintiff:      Norah J. Ryan, Esq.
              3407 South Jefferson Avenue
              St. Louis, MO  63118

              Annette P. Heller, Esq.
              400 Chesterfield Center, Suite 400
              St. Louis, MO  63017

              Susan Nell Rowe, Esq.
              2117 Nebraska
              St. Louis, MO  63104

For Defendant:     Don V. Kelly, Esq.
              Alexander M. Hurst, Esq.
              EVANS AND DIXON, LLC
              211 N. Broadway, Suite 2500
              St. Louis, MO  63102

REPORTED BY:       SHANNON L. WHITE, RMR, CRR, CSR, CCR
              Official Court Reporter
              United States District Court
              111 South Tenth Street, Third Floor
              St. Louis, MO  63102
              (314) 244-7966

PRODUCED BY COURT REPORTER COMPUTER–AIDED TRANSCRIPTION

**INDEX — VOL. 3**

**LINDA SMITH**                                                    PAGE
Direct Examination Cont'd by Mr. Kelly .............  3
Redirect Examination by Ms. Ryan ..................  24
Redirect Examination by Mr. Kelly .................  52

**FERNANDO TORRES** (Re-called)
Direct Examination by Ms. Ryan ....................  59

**BRIAN TOENNIES**
Direct Examination by Mr. Kelly ...................  63
Cross-Examination by Ms. Ryan .....................  80
Redirect Examination by Mr. Kelly .................  88
Recross-Examination by Ms. Ryan ...................  89

**DEBRA ALCORN** (Re-called)
Direct Examination by Ms. Ryan ....................  92
Cross-Examination by Mr. Kelly ....................  95

3

```
 1              (PROCEEDINGS STARTED AT 9:03 AM.)

 2         THE COURT:  You may continue.

 3         MR. KELLY:  Thank you.

 4         MS. RYAN:  Your Honor, before we proceed, I just

 5    wanted to offer you 90-A.  It's a transcript of that phone

 6    call.

 7         THE COURT:  Oh, all right.

 8         MS. RYAN:  This was emailed to Mr. Kelly yesterday

 9    evening.

10         THE COURT:  Is there any objection?

11         MR. KELLY:  No, Your Honor.

12         THE COURT:  Have you had a chance to review the

13    content?

14         MR. KELLY:  Yes.

15         MS. RYAN:  Your Honor, if I may just hand it to you,

16    I forgot to hole-punch it, but it can go in that file.

17         THE COURT:  Thank you very much.  It will be

18    received.

19         MS. RYAN:  Thank you.

20         THE COURT:  You may proceed.

21         MR. KELLY:  Thank you, Your Honor.

22                   DIRECT EXAMINATION CONTINUED

23    BY MR. KELLY:

24    Q    Morning, Ms. Smith.

25    A    Morning.
```

Case: 4:16-cv-00144-DDN  Doc. #: 111  Filed: 11/30/17  Page: 4 of 111 PageID #: 1580

1    Q    You remember yesterday during your examination you were

2    asked about the presence of a video on your website?

3    A    Yes.

4    Q    And you indicated that you were sure it was not there?

5    A    Yes.

6    Q    And you were examined vigorously on it, and as a result

7    of that, did you go and check your website?

8    A    Yes.

9    Q    And was the video in court, shown in court, on your

10   website?

11   A    No.

12   Q    Was there a video accessible?

13   A    Yes.

14   Q    Were you surprised to see that?

15   A    Yes.

16   Q    And what was the difference between that one and what was

17   shown in court?

18   A    The logo was changed to be bigger.

19   Q    It had your new logo --

20   A    Like my front page, yes.

21   Q    -- and the big letters "Progressive"?

22   A    Yes.

23   Q    Did you know that video had been put on your website?

24   A    No.

25   Q    All right.  Did you put it on, make it accessible on your

```
1   website?

2   A     No.

3   Q     Had you received confirmation that the video had been

4   taken down?

5   A     Yes.

6   Q     And had you ever proofed that video before going up?

7   A     No.

8   Q     Who put it up?

9   A     Hibu.

10  Q     Hibu.  Did you talk with Hibu last night?

11  A     Yes.

12  Q     And I assume you told them to get that video down?

13  A     Yes.

14  Q     Now, prior to you seeing it, you had checked previously

15  that that video was not accessible; correct?

16  A     Yes.

17  Q     And what would you see if you went to where the video

18  normally was?

19  A     Just a blank space.

20  Q     A blank space where it would allow you to click on the

21  video?

22  A     There was no thing to click.  It was just blank.

23  Q     And it was a field where the video would play?

24  A     Right.

25  Q     And had you checked that prior to yesterday to see that
```

6

1  the video was not accessible?

2  A    I had checked it several times.

3  Q    All right.  And after your discussion with Hibu, is the

4  field now on your website?

5  A    The what?

6  Q    The field where the normal video plays.

7  A    There's no video there, no.

8  Q    Okay.  All righty.  Had you ever seen that proofed -- I

9  mean that video with the new logo?

10 A    No.

11 Q    In fact, you said yesterday that you had that website

12 redesigned to include the new logo with the "Progressive"?

13 A    Yes.

14 Q    When was that?

15 A    Earlier in the spring.

16 Q    In the spring.  And did Hibu reformat, redesign your

17 website with the new logo?

18 A    Yes.

19 Q    And did they include a video on with that new redesign,

20 the first --

21 A    They did not redesign the video.

22 Q    They left the old one on?

23 A    They left the old one up.

24 Q    And what did you tell them?

25 A    To take it down.

```
1    Q     The whole video?

2    A     The whole video.

3    Q     Okay.  That didn't have anything to do with the words and

4    the content; it had to do with the logo?

5    A     Yes.

6    Q     All right.  Moving on.  Yesterday there was testimony

7    about Exhibit 91.  Do you recall this being discussed?

8    A     Yes.

9    Q     And what's the date of this?

10   A     5/31/17.

11   Q     A woman driving erratically in West County in a Scion; is

12   that right?

13   A     Yes.

14   Q     Is that the car you were driving on that day, May 31,

15   2017?

16   A     Yes.

17   Q     And for the record, I've put up page 1 of Exhibit I-2.

18   A     I'm sorry?  This?

19   Q     Yes.

20   A     Yes.  That's my Scion.

21   Q     Do you recall Ms. Westerhold coming to court and

22   testifying that on May 18 that she saw a van behind her that

23   honked at her?

24   A     Yes.

25            MS. RYAN:  Your Honor, I believe this affidavit is
```

8

1    not in evidence.

2            MR. KELLY:  Yeah, it is.  I mentioned it to her,

3    yeah.

4            MS. RYAN:  Did I offer 92?

5            MR. KELLY:  No, but I brought it up.  I asked her

6    about it.

7            MS. RYAN:  Well, before we show it to the witness,

8    can we find out if I offered it?

9            MR. KELLY:  It doesn't matter whether it's offered.

10   I established it with the witness.  Ninety-two, check mark,

11   notarized affidavit of Laura Westerhold.  It's received?  The

12   witness talked about it.

13           THE COURT:  Let's see, Exhibit -- Plaintiff's

14   Exhibit?

15           MR. KELLY:  Ninety-two.

16           THE COURT:  Ninety-two.  That was -- I have 92

17   offered and received with respect to testimony of Patrick

18   King.

19           MR. KELLY:  It would have been Laura Westerhold.

20           MS. RYAN:  Your Honor, I apologize.  And I withdraw

21   my objection.

22           THE COURT:  Ninety-three is with Laura Westerhold.

23           MS. RYAN:  The numbers are actually the reverse.

24   Q    (BY MR. KELLY) Do you recall that, Ms. Smith?

25           MS. RYAN:  Oh, wait.  Yes.

9

1      THE COURT:  All right.  So 93 is what was used with

2  respect to Patrick King, and 92 is what was used with respect

3  to Laura Westerhold?

4      MS. RYAN:  Yes.

5  A    Yes.  I recall the testimony yesterday.

6  Q    And she also presented this affidavit.  What is the date

7  of the affidavit?

8  A    May 18, 2017.

9  Q    Did you have any service vehicles in your fleet with the

10 old Progressive logo with the white letters in the grass?

11 A    No.

12 Q    Describe to the Court what the signage on your fleet

13 vehicles would have been as of that date.

14 A    As of that date, it would have been as they are now,

15 which was the Progressive --

16     MS. RYAN:  Your Honor, if I could interject, I think

17 the best evidence would be a photograph of the vehicle in

18 question on the day.

19     THE COURT:  No.  I'm going to overrule that

20 objection.

21 Q    (BY MR. KELLY) Ms. Smith, Plaintiff's Exhibit 90-A is a

22 written transcript of a phone recording played yesterday.

23 A    Yes.

24 Q    You're familiar with that phone recording?

25 A    I am.

10

1    Q     How were you made aware of it?

2    A     One of Lawn Managers' employees talked to my employee on

3    a lawn of ours and told them that the call had come in.

4    Q     Okay.  And can you explain to the Court what that

5    incident relates to?

6    A     I called the Kirkwood Police Department because I didn't

7    know anything about it until the -- John Bardot of Randy's

8    company said something.  So I called Kirkwood police and I

9    asked them, you know, "What's going on here?"

10         And they said that they had a video of the drive-off

11   from the gas station on Geyer Road and that I would need to

12   come down to the station and look at it.

13         So I said, "What kind of vehicle was it?"

14         And he said --

15   Q     Okay.  Let me stop you there.

16   A     Okay.

17   Q     All right.  And did the incident involve a Progressive

18   vehicle?

19   A     No.

20   Q     What did it involve?

21   A     The plates off of my Scion were stolen.

22   Q     And on another vehicle?

23   A     And put onto another vehicle.

24   Q     And did that vehicle have any ownership or relationship

25   to your company?

1    A    No.

2    Q    Now, when did you start trying to make corrections to

3    your advertising and signage?

4    A    As soon as I found out about this case.

5    Q    Okay.  And let me ask you this.  At some point last year,

6    you learned that some mailers had gone out from Lawn Managers

7    to your customers that had been assigned to you under the 2012

8    decree and the 2014 order; is that right?

9    A    Yes.

10   Q    We've seen that before.  I believe it was what?  Exhibit

11   51, I believe?  Yes, that was Exhibit 51.

12          Did that sending of that mailer have an effect on

13   your business?

14   A    Yes, it did.

15   Q    Okay.  And what started happening to --

16          MS. RYAN:  Your Honor, if I could interject at this

17   point.  I have a standing objection on the relevance of any of

18   this evidence of unclean hands.  We've briefed the issue.  And

19   I just would like to have a continuing objection.

20          THE COURT:  All right.  I'll take the objection with

21   the case for the purpose of receiving the evidence that may

22   come in.

23          MS. RYAN:  Thank you.

24   Q    (BY MR. KELLY) Did it have an effect on your business?

25   A    Yes.

1   Q    Can you explain to the Court what happened in the --

2   right after the mailer went out?

3   A    I started receiving phone calls from my customers to

4   cancel their services with me, and angry at me.

5   Q    Okay.

6   A    Calling me a fraud.  My servicemen were having to deal

7   with that out in the field.  People were confronting them.

8   Q    And you went to -- because of that, you sought the TRO in

9   Jefferson County?

10   A    Yes.

11   Q    And you obtained that; is that right?

12   A    Yes.

13   Q    And did you ask for a preliminary injunction?

14   A    Yes.

15   Q    And you obtained that?

16   A    Yes.

17   Q    Were you still experiencing what you thought were the

18   effects of that mailer?

19   A    I still am as of today, yes.

20   Q    Now, as part of your ongoing proceedings against Mr.

21   Zweifel, did you ask him to explain -- give an accounting of

22   certain customers?

23   A    Yes.

24   Q    I've handed you what's been marked as Exhibit F-4; is

25   that right?

1  A    Yes.

2  Q    And --

3         MS. RYAN:  Your Honor, if I could just have a moment

4  to look at the exhibit.

5         MR. KELLY:  For the record, it's the colorized

6  version of Exhibit 145, which I discussed with Mr. Zweifel.

7         MS. RYAN:  Your Honor, Exhibit 145 has been offered

8  by plaintiff, and I have objected to Exhibit F-4.  It's part

9  of my motion in limine, not specifically because I didn't have

10 the exhibit number at the time.

11        THE COURT:  What is F-4 again?

12        MR. KELLY:  Yes, Your Honor.  F-4 is a table produced

13 by defendant explaining why he -- or his version of why he was

14 or was not servicing --

15        THE COURT:  You say defendant.

16        MR. KELLY:  Oh, I said defendant?  Plaintiff I meant.

17 Thank you.

18        In the contempt proceedings, Ms. Zweifel sent a list

19 of customers, please explain when you service them or why you

20 feel you had a right to service them, and that was the -- the

21 information in the right column in the information Mr. Zweifel

22 said they replied back.

23        THE COURT:  Okay.  And the objection is what?

24        MS. RYAN:  Well, the objection, to begin with, is

25 that this was not produced until the exhibits were emailed to

11/01/17 LMI v. PMI - Volume 3

14

1   me on the evening of October 20 along with the pretrial list.

2   So this is a new exhibit that was never produced previously.

3   It goes along with C-6 and G-4, which all three of them were

4   the subject of the motion in limine which I filed, which was

5   to preclude -- seeking to preclude defendant from offering

6   undisclosed -- previously undisclosed evidence in this case.

7           Unclean hands -- do you want to hear argument at this

8   point, Your Honor?  It's the motion in limine.

9           THE COURT:  Go ahead and finish.

10          MS. RYAN:  All right.  The issue of unclean hands has

11  been in the case since their answer was filed, and it's the

12  same issue that was raised in their amended answer July of

13  2016.  They've had until now to develop and produce whatever

14  evidence they wanted to produce relating to this unclean hands

15  defense.

16          It wasn't until the eve of trial that they had

17  produced this F-4 that just came up, C-6 and G-4 in this case.

18  F-4 was produced October 20 in the evening, as I just said.

19  G-4 was produced October 17, and C-6 was produced in this case

20  the evening of October 20.  In this case, Your Honor.

21          Now, it is correct that we have had a protective

22  order in place in Jefferson County.  There's confidential

23  business information.  There's customer information.  There's

24  employee information.  It was important to us to have a

25  protective order in place.

1    By its terms the way Judge Partney entered it on our

2    request, it is one-sided.  However, Ms. Rowe, representing Mr.

3    Zweifel in that case, agreed to make it mutual.  I don't think

4    that was told to Mr. Kelly; so he's been objecting on the

5    ground that it was one-sided.

6        Whether it was one-sided or not, there was at least a

7    year for defendant to put its evidence together as to unclean

8    hands and to produce that either prior to the discovery cutoff

9    of July 14 or with a motion to compel filed 11 days later or

10   some other timely motion before trial.

11       Now, I did produce in a preemptive way in the

12   interest of full disclosure -- on August 25 I produced our

13   response to the unclean hands defense, which is the various

14   documents that we've got marked starting about, I think,

15   Exhibit 139.  It's Ms. Zweifel's interrogatory answers asking

16   us to -- or her interrogatories asking us to respond to a list

17   of customers.  It's our response in three tables.  A is

18   residential, B is miscellaneous commercial, C is regular

19   commercial, and then it's about a thousand pages of backup.

20       I produced that August 25 because I wanted to have it

21   on the record in case I needed it if defendant ever provided

22   me with what they were going to use to back up their unclean

23   hands defense.  They didn't do that until a couple of days

24   before trial.  And in my opinion, it should be excluded.

25       THE COURT:  So this was part of what was disclosed at

1    that time?  Ms. Ryan, is that accurate?

2              MS. RYAN:  Pardon me?

3              THE COURT:  This is part of what you disclosed in

4    this case at that time in August?

5              MS. RYAN:  Not Exhibit F-4.  Exhibit 145.  Exhibit

6    F-4 has been color coded by Mr. Kelly.

7              THE COURT:  I understand.  But it's the same content

8    other than the color coded?

9              MS. RYAN:  I disclosed --

10             THE COURT:  That's a question.

11             MS. RYAN:  I disclosed it August 25, yes.

12             THE COURT:  As part of your defense of the --

13             MS. RYAN:  Unclean hands, not knowing what his

14    evidence was to support the defense.

15             THE COURT:  Okay.

16             MS. RYAN:  But I felt that it was appropriate to

17    disclose it.

18             THE COURT:  Okay.

19             MR. KELLY:  That's right.  It's their document.  And

20    for the efficiency of the Court, I've just highlighted it so

21    that we can categorize and count.  That's all it is.  It's

22    their -- it's what I got on August 25.

23             THE COURT:  I'm going to overrule the objection.  It

24    will be received.

25    Q   (BY MR. KELLY) Do you have Exhibit F-4 in front of you?

11/01/17 LMI - v. PBMI - Volume 3

17

1   A    Yes.

2   Q    And as I was saying, we've color coded some of the

3   entries; correct?

4   A    Yes.

5   Q    And those are color coded by information you received

6   from plaintiff; correct?

7   A    Yes.

8   Q    And if we go to the last page, you will see there's a

9   little summary as to what the entries are?

10  A    Yes.

11  Q    And you went through and identified the ones where Mr.

12  Zweifel indicated these were awarded to you in 2012 but he

13  felt he had an absolute right to service or solicit after last

14  year; right?

15  A    Yes.

16  Q    Those are the pink ones?

17  A    Yes.

18  Q    And then we went through and we highlighted the ones

19  which showed up on a disclosure back in 2014; right?

20  A    Yes.

21  Q    And those are marked in yellow?

22  A    Yes.

23  Q    And then there's some green ones that this exhibit

24  indicates that were part of the settlement, the 2014, which

25  don't indicate -- don't show up on the disclosure; right?

1   A     Right.

2   Q     Now, I'm going to hand you what's marked as Exhibit E-4.

3   And would you identify E-4 for the Court, please?

4               MS. RYAN:  E-4?

5               MR. KELLY:  E-4.

6   A     E-4 is the exhibit of the disclosed accounts in 2014.

7   Q     What you received from Mr. Zweifel?

8   A     Yes.

9               MS. RYAN:  Your Honor, if I could once again object.

10  This is the same exhibit as Plaintiff's Exhibit 5 -- I'm

11  sorry, Respondent's Exhibit 5 from the Hillsboro case, I

12  believe.

13              THE COURT:  All right.  Just one second.

14              MS. RYAN:  Your Honor --

15              THE COURT:  Just one second, please.  All right.

16              Now, what is E-4?

17              MR. KELLY:  E-4 is the disclosure of accounts

18  received in 2014 from Mr. Zweifel, Your Honor.  It was used to

19  make the highlights on F-4.

20              THE COURT:  And the objection is what?

21              MS. RYAN:  It's the same objection, Your Honor.

22              THE COURT:  Overruled.  Let's proceed.

23  Q    (BY MR. KELLY) So that's how you were able to make the

24  yellow and green highlights on that Exhibit F-4; is that

25  correct?

```
1   A    Yes.
2            THE COURT:  And so these are the green --
3            MR. KELLY:  Yes, Your Honor.  Those were not
4   disclosed.
5   Q   (BY MR. KELLY) And that was just a list of customers that
6   you had asked about, but the number of cancellations after
7   that "we want you back" numbers how many?
8   A    Four hundred almost.
9   Q    And you feel that's hurt your company?
10  A    Several hundred thousand dollars.
11  Q    To your knowledge, was the customers awarded to you in
12  2012 or 2014 subject to any kind of term limit?
13  A    No.
14  Q    They were provided you in connection with the property
15  division of the company?
16  A    Yes.
17           MS. RYAN:  Your Honor, pardon me, but I could not
18  quite hear the year that Mr. Kelly named in his question.  Is
19  it 2014 or 2012?
20           MR. KELLY:  I think I said both.
21           THE COURT:  He did say both.  That's my -- those are
22  my notations.
23           MS. RYAN:  Thank you.
24  Q   (BY MR. KELLY) Ma'am, was your revenue from 2016 down from
25  2015?
```

```
1   A    I think you have the record.

2   Q    Well, do you know?

3   A    Oh, yes.  Several hundred thousand dollars.

4   Q    Now --

5         MS. RYAN:  Pardon me.  Are we pulling up G-4 at this

6   point?

7         MR. KELLY:  No.  I'm not pulling up G-4.  Can I try

8   my case?

9         MS. RYAN:  That is one of our rebuttal exhibits,

10  Plaintiff 155.

11        MR. KELLY:  Yes.

12        THE COURT:  I'm sorry.  You're going to have to --

13  what are we moving to?

14        MR. KELLY:  The Exhibit 155 was brought up yesterday

15  by the plaintiff.

16        THE COURT:  Exhibit 5?

17        MR. KELLY:  155, Your Honor.

18        THE COURT:  Exhibit 155.  It was offered and

19  received.

20        MR. KELLY:  Thank you.

21        MS. RYAN:  I apologize, Your Honor.  Thank you.

22  Q    (BY MR. KELLY) Linda, there was testimony in this case

23  about Exhibit 155, and it shows customers on Progressive's

24  records in Lawn Managers' zip codes.  Is that right?

25  A    Yes.
```

1    Q    Had you ever been advised before this case that any of

2    your servicing of customers in Lawn Managers' zip codes wasn't

3    proper?

4    A    No.

5    Q    And as we pointed out, there are allowed commercial and

6    miscellaneous accounts in the zip codes?

7    A    Yes.

8    Q    Putting up on the monitor Exhibit N-3, have you seen this

9    before?

10   A    Yes.

11   Q    And is this an accurate summary of the monthly revenues

12   for your company through August 31?

13   A    Yes.

14   Q    And it shows that in January a whole bunch of money in

15   the amount of $191,000 went in; is that right?

16   A    Yes.

17   Q    And then it looks like lesser amounts going through the

18   year -- I mean throughout the year in --

19   A    Yes.

20   Q    And that's how you do your accounting for the company?

21   A    The large number in January, people that are prepaying

22   for the season.

23   Q    Prepaying for the season.

24   A    Active customers that are prepaying for the season,

25   before advertisement starts.

22

1   Q     Right.  And so we've got a total number of receipts,

2   564,126.50; right?

3   A     Yes.

4   Q     And, now, after August you had four more months of the

5   year to fill the annual intake; right?

6   A     Yes.

7   Q     Now, those months usually bigger or smaller than the ones

8   we have on here?

9   A     Much bigger.

10  Q     I'm sorry?

11  A     Much bigger.

12  Q     In terms of money coming in?

13  A     Yes.

14  Q     Now, is that money actually deposited and credited to the

15  Lawn Managers --

16  A     Yes.

17  Q     So that number is going to go up for the year 564?

18  A     Yes.

19  Q     And what was it?  Last year you had approximately, was

20  it, 693,000 --

21  A     Yes.

22  Q     -- was your revenue?  And this year do you have an

23  expectation of what your revenue will be?

24  A     No.

25  Q     Will it be better -- bigger than 693?

1      MS. RYAN:  Your Honor, I'm going to object on the

2  ground it calls for speculation.

3      THE COURT:  I'm going to sustain the objection.

4  Q   (BY MR. KELLY) Based on current years, can you tell the

5  Court, then, what you'd typically -- income comes in from

6  September through December?

7  A    Yes.  In the fall of the year or starting in July, we

8  start to sell seeding jobs, so renovations to make the lawns

9  healthy.  Last year, before those renovations could begin, the

10 letterhead and then all the cancellations started.  So not

11 only did I miss out on all the extra work I would have got

12 last fall to carry me through the rest of the winter, but now

13 this year, instead of receiving all that extra revenue for

14 specials, let's say up sales like seeding jobs, aerations,

15 winterization treatments, the things that would carry me

16 through the winter, are gone; so no.

17 Q    Have you ever purposely solicited any customer awarded to

18 Randy in the 2012 decree?

19 A    No.

20 Q    Have you been told that it's happened inadvertently?

21 A    Yes.  I have seen three to four cases, I think.

22 Q    Okay.  Do you believe now, as of today, you've corrected

23 everything where you believe the word "Progressive" is

24 not prominent where it's used next to "Lawn Managers"?

25 A    Yes.

```
 1              MR. KELLY:  I don't have any other questions, Your
 2  Honor.
 3              THE COURT:  All right.
 4              You may inquire.
 5                      REDIRECT EXAMINATION
 6  BY MS. RYAN:
 7  Q    Ms. Smith, you just said that nobody ever told you --
 8  let's see, nobody ever told you that you -- or objected to you
 9  servicing customers in Lawn Managers' zip codes before?
10  A    Until this case started.
11  Q    Is it your testimony that Mr. Roberts' house in 63050 is
12  a commercial job?
13  A    Yes.
14  Q    And Mr. Wooten?
15  A    Yes.
16  Q    So you're saying that every customer on that list is a
17  commercial customer?
18  A    No.
19  Q    So there are residential customers in Mr. Zweifel's zip
20  codes that you've serviced; correct?
21  A    I do.
22  Q    You testified about a right of first refusal?
23  A    Yes.
24  Q    And what is a right of first refusal?
25  A    If I wanted to sell any of my accounts to, say, Chem Lawn
```

```
1    or Scotts Lawn Care, I would go to them and see what they

2    would want to give me for my customer base if I wanted to sell

3    my business, but in the divorce separation agreement either

4    one of us would have first right to that before we would put

5    it out there to a company that wasn't, I'd say, longstanding

6    customers, for instance, someone that's been with us since

7    '88.  Rather than sell them to a Chem Lawn, we would offer to

8    sell them back to each other.

9    Q    For the same price?

10   A    What you mean "the same price"?

11   Q    You get an offer from Chem Lawn, you go to Randy and say,

12   Chem Lawn's offered me X, Y, Z, and will you match it?

13   A    I wouldn't know, because I've never tried to sell to Chem

14   Lawn.

15   Q    Does it have -- so it has to do with a third-party offer

16   to purchase accounts; correct?  That's what you just said?

17   A    It has to do with letting either one of us take the first

18   right to buy those accounts.

19   Q    Before you sell them to somebody else?

20   A    Right.

21   Q    The 636-677-1122 phone number, did you testify yesterday

22   that's your phone number?

23   A    Yes.

24   Q    Was it your phone number prior to, say, April 25, 2012?

25   A    Charter, every three years, would make you update the
```

1    ownership of the account by email.  You would have to

2    electronically sign and send it back to --

3            THE COURT:  Excuse me.  What was the answer to the

4    question?

5    A    Yes, it was mine.

6    Q    Prior to April 25 of 2012?

7    A    Yes.

8    Q    Was it yours prior to April 1, 2012?

9    A    Yes.

10   Q    Okay.  When did you update the account to change the

11   ownership of the phone number?

12   A    I'm the one that begun the phone number when we moved

13   into the building in '97, I believe.

14   Q    When did you change the account to update the phone

15   number?

16   A    Charter --

17   Q    To update the ownership.

18   A    Charter requested it every three years.

19   Q    And when did you do that?

20   A    Probably in 2010, 2011.  I'm not sure.

21   Q    Oh, that's your testimony?

22   A    I'm not sure when it happened.

23   Q    Okay.  It didn't happen while you were sitting in the

24   office and Ms. Alcorn was sitting with you?

25   A    No.

27

1    Q    So even though the divorce -- the Marital Settlement

2    Agreement says that other than the specified assets that you

3    were to get, everything else stays with the company and goes

4    to Randy, you took the phone number; right?

5    A    No.  It was already mine.  It was in Linda Zweifel's

6    name.

7    Q    You took the phone number, and Lawn Managers is sitting

8    there without access to its phone number?

9    A    No.  I had it forwarded right back to one of the three

10   lines we were using.

11   Q    Thank you.  Turning to Exhibit 12, do you have that in

12   front of you?  It's in one of the binders.  Do you have that

13   in front of you there?

14   A    I sure do.

15   Q    Turning to page 4 of 4 of that exhibit.

16   A    I'm there.

17   Q    Do you recognize the document?

18   A    I do.

19   Q    And is that the agreement that was entered into when you

20   all were in court in Hillsboro on January 25, 2014?

21   A    Yes.  No, not January.  July.

22   Q    I'm sorry.  I misstated.  July 25, 2014.

23        MS. RYAN:  Your Honor, I would like to offer Exhibit

24   12 into evidence.

25        THE COURT:  Any objection?

```
 1              MR. KELLY:  No objection.

 2              THE COURT:  It will be received.

 3   Q   (BY MS. RYAN) Turning to page 4 of that exhibit, paragraph

 4   7, does that state "Petitioner shall cease to use the name

 5   'Lawn Managers' effective December 31, 2014"?

 6   A    Yes.

 7   Q    Turn to Exhibit 18, if you would, please.  My copy is

 8   black and white, but you have 18 in front of you?

 9   A    I do.

10   Q    And you testified yesterday that was the logo you had

11   developed and started using after December 31, 2014; correct?

12   A    I actually started in December of 2014.

13   Q    You started -- were you using this January 1, 2015?

14   A    Yes.

15   Q    Now, you said yesterday that you were not aware prior to

16   the -- getting a letter from Ms. Heller that there was a

17   trademark; is that correct?

18   A    Correct.

19   Q    But you said in your deposition that you had spoken with

20   Ms. Heller?

21   A    I had spoken with Ms. Heller about matters in 2011, I

22   believe.  It may have been '10.

23   Q    Are you aware of what kind of work she does?

24   A    Yes.  She was doing something for us because of some

25   company in O'Fallon, I believe.
```

1  Q    She is a trademark lawyer; correct?

2  A    Yes.

3  Q    You testified yesterday that --

4           THE COURT:  Just one second.  Are you saying that she

5  did work for you in the area of trademark or intellectual

6  property?

7           THE WITNESS:  When we were all Lawn Managers, I

8  believe it was either '10 or '11, there was a company that

9  sounded similar, and I remember talking to Annette Heller

10 then, and I remember being in receipt of a bill, and that's --

11          THE COURT:  Okay.  You can continue.

12          MS. RYAN:  Thank you, Your Honor.

13 Q    (BY MS. RYAN) So how did the video get taken off of the

14 website between last night and this morning?

15 A    I spoke with Hibu and told them to remove it.

16 Q    Where are they located?

17 A    Overseas somewhere.  I would say maybe India.

18 Q    So is it your testimony that it wasn't active as of

19 yesterday; that the link was there for the video but it wasn't

20 working?  Is that what you're saying?

21 A    No.  My testimony is it was completely removed.

22 Q    As of when?

23 A    All through late summer, fall.

24 Q    Okay.  Turning to the --

25          THE COURT:  Wait a second.  I don't understand.  What

1    did you -- why did you call last night?

2            THE WITNESS:  After the hearing or trial yesterday

3    when I was asked about the video, I went home and

4    double-checked to make sure that it, in fact, was not there,

5    and the same video wasn't there.  They had put another video

6    up that had "Progressive" in bold and same font, but I had not

7    proofed it, and I did not want it there at all.  I had them

8    remove it months ago.

9            MS. RYAN:  Your Honor, may I follow up a little bit?

10           THE COURT:  All right.

11   Q   (BY MS. RYAN) So is it your testimony that the rest of the

12   content was changed as well or was the same?

13   A    No.

14   Q    You were sitting here in court when we played it;

15   correct?

16   A    I changed --

17           THE COURT:  Just answer the question, please.

18   A    Okay.  I'm sorry.  Can you ask it again?

19   Q    Were you here in court when we played the video?

20   A    Yes.

21   Q    And that was downloaded from your website on -- I think

22   we played one from July 28 and from October 9; correct?

23   A    I don't know about the dates.  I'm sorry.

24   Q    So now you're saying it wasn't live?

25   A    No.  I worked on my website in June, and they were

1  supposed to take care of it, but they didn't.

2  Q    But you also testified that you didn't have any access to

3  change anything.

4  A    I called them on the phone and made them take it down.

5  That's how that happened yesterday.

6  Q    Okay.  Turning to the lawnmanagersinc.com domain name.

7  A    Yes.

8  Q    Where does that redirect?

9  A    Nowhere.

10  Q    Okay.  And so if someone were to search for

11  lawnmanagersinc.com and try to get to that website, it would

12  look as though lawnmanagersinc.com doesn't exist, correct, as

13  a company, as a functioning company?

14        MR. KELLY:  Object, Your Honor.  That would call for

15  speculation.

16        THE COURT:  Overruled.

17  Q    (BY MS. RYAN) You can answer the question.

18  A    I got a whole probably seven URLs -- is that what you

19  mean by web address?

20  Q    I'm asking you about lawnmanagersinc.com.

21  A    Yes.  Yes.  It's --

22  Q    Did you testify that you had it decommissioned?

23  A    Yes.

24  Q    Deactivated?

25  A    Yes.

1   Q    Some time ago?

2   A    Yes.

3   Q    And so it's been sitting there since that time, not

4   connecting to any business.  Doesn't connect to your business;

5   it doesn't connect to Lawn Managers' business; correct?

6   A    I don't think it does.

7   Q    Okay.  Did you receive any inquiries from GoDaddy

8   about --

9   A    No.

10  Q    -- selling the domain?

11  A    No.

12  Q    You didn't?

13  A    No, I did not.

14  Q    So between January 1, 2015, and today, did you think you

15  were infringing on Lawn Managers' trademark rights at any

16  time?

17  A    I did not know he had a trademark right.

18       THE COURT:  That's not the question.

19  A    I didn't think I was, no.

20  Q    You didn't think you were?

21  A    No.

22  Q    And after you got Ms. Heller's letter, did you consider

23  whether you might have been?

24  A    I took it to my lawyer, I believe, a few days after, and

25  he looked it over and sent a response back to her.

1    Q    And so at any point from January 1, 2015, till now, do

2    you believe that you were infringing on that trademark?

3    A    No.

4    Q    So why did you make the changes that you say you've made

5    this year?

6    A    I've learned since from being --

7              MR. KELLY:  Your Honor, this is invading

8    attorney-client --

9              THE COURT:  Overruled.

10   A    I -- once the lawsuit was filed, I started trying to make

11   corrective measures.

12   Q    And what corrective measures did you make in 2016?

13   A    I went to the various people that I could.  I'm sorry.

14   I'm drawing a blank here.  I went to the various people that I

15   was paying to advertise for me and made the "Progressive" big.

16   I am thinking --

17   Q    And who would that be specifically?

18   A    Well, I know Hibu runs Yellow Book or something like

19   that.  I had DataSphere, DataSphere.  KMOV, I think, stopped

20   before that, but I'm not for sure on KMOV.  I just -- what I

21   could do with the list that you provided, I went in and tried

22   to correct anything that was going on.

23   Q    Are you talking about the list we went over in your

24   deposition?

25   A    The list that I was first given, I believe, from

1   plaintiff.

2   Q     Oh, from the lawsuit?

3   A     Yes.

4   Q     And then in your deposition on September 15, 2016, we

5   reviewed that whole list; correct?  And there were a number of

6   them that you admitted you were advertising with; correct?

7   And so you're saying you've made corrections to those?

8   A     I've made corrections where I can, yes.  Some of them

9   aren't to my control.

10  Q     And you did that after your deposition?

11  A     I started as soon as the lawsuit began.

12  Q     And have you produced any documentation to support that

13  claim?

14  A     I thought it would stand alone when it was looked at

15  again.

16  Q     Pardon me?

17  A     I thought that it would stand alone as it was looked at

18  again by anyone.  The documentation is the change.

19  Q     So you didn't have your lawyers send a letter saying,

20  hey, we've made some changes; here's the information?  You

21  didn't do that, did you?

22  A     I think Don has done that.

23  Q     You think Don's done that?

24  A     I thought so.

25  Q     Okay.  Now, the lawn sign -- I have to find a number for

35

1   that.  The lawn sign we looked at yesterday with the blue with

2   the Progressive logo in the center like they have in the

3   center top --

4   A    Yes.

5   Q    Correct?  You used that for all of 2015 or part of 2015?

6   A    All of 2015.

7   Q    All of 2016?

8        THE COURT:  What exhibit?

9   A    Yes.

10       MS. RYAN:  Your Honor, I've got to flip around a

11  little bit.

12  Q    (BY MS. RYAN) This lawn sign.

13  A    Yes.

14       MS. RYAN:  Your Honor, we think this is Exhibit 105.

15  I'm sorry.  I should have scribbled it on there.  We'll verify

16  that.

17  Q    (BY MS. RYAN) We looked at this lawn sign yesterday?

18  A    Yes.

19  Q    Yes, Exhibit 105.  Correct?  You had this developed at

20  the same time as you started using Exhibit 18; correct?

21  A    Yes.

22  Q    And that was after you no longer had the right to use the

23  name "Lawn Managers"?

24  A    Yes.

25  Q    You're claiming the right to use "Progressive Lawn

1    Managers" but you no longer had the right to use "Lawn

2    Managers"; correct?

3    A    Correct.

4    Q    And you used this -- what time -- what date in 2015 did

5    you get this, did you have these printed?

6    A    I ordered all my printing in the winter.  I'm not sure

7    the exact date that they came in.

8    Q    So sometime in 2015 you started using these signs?

9    A    The beginning, I think, for maybe a few weeks of

10   production we attached a sticker to a sign because we hadn't

11   received these yet, these in '15.

12   Q    So starting some date in 2015 you used these signs?  Yes?

13   A    The very beginning, yes.

14   Q    For all of 2015?

15   A    Yes.

16   Q    And into 2016?

17   A    Yes.

18   Q    Okay.  Now, we've talked -- you talked a little bit

19   yesterday about the May 1 divorce decree versus the August 1

20   decree.

21   A    Yes.

22   Q    If May 1 was the real decree -- which is your testimony;

23   correct?

24   A    Yes.

25   Q    -- then when you broke into Lawn Managers on May 23,

1    2012, it wasn't your building anymore, was it?

2    A    I had the right to operate in that building until

3    December 31, and I still owned the stocks, and the building

4    was owned by the company.

5    Q    Weren't you -- in the Marital Settlement Agreement that

6    you signed that was entered on May 1 as an attachment to the

7    decree of dissolution of marriage, you were required to give

8    your stock to Randy; correct?

9    A    When he paid me on the settlement agreement, I was

10   required to give him my stock.  That happened in 2015.

11   Q    So you're saying -- well, let me ask you this.  Did you

12   tell the sheriff of Jefferson County that it was your

13   building?

14   A    Yes.

15   Q    You cut the chain on the gate with bolt cutters; correct?

16   A    Yes.

17   Q    And you broke the door to the building open with a

18   crowbar?

19   A    I think it was more of some kind of little tool, yes.

20   Q    But the door was -- had to be replaced; correct?

21   A    Yes.

22   Q    Did you have a lawyer at the time?

23   A    Yes.

24   Q    Did you call your lawyer before you broke into the

25   building?

1   A    I went to Hillsboro that day and tried to get a

2   restraining order against Scott Hewett.  I was being attacked.

3   Q    I asked you if you called your lawyer before breaking

4   into the building.

5   A    No.

6        MR. KELLY:  Excuse me.  May I object?  I'm not sure

7   what the relevance of this is.  This was brought up in the

8   2013 contempt hearing.

9        THE COURT:  What's the relevance of this?

10       MS. RYAN:  Your Honor, the relevance is they're

11  trying to show that a decree that was set aside on her motion

12  is the actual decree.  And we made it a subject of the

13  stipulation that we could agree to disagree.  That's what we

14  did.  But they've been bringing it up about the divorce

15  decree.  And the break into the building, I think, is relevant

16  to the whole question of intent and motivation here.

17       MR. KELLY:  I candidly can't follow.  This came up in

18  2013.  The judge found no clean hands against Mr. Zweifel.

19  That was brought up.  The question of the which one is which

20  also came up in 2013.

21       MS. RYAN:  Your Honor, I'm going to -- you can

22  finish, and then I will speak, Your Honor.

23       MR. KELLY:  And there were proceedings in front of

24  Judge Page where for purposes that May 1 is mine, the docket

25  sheets haven't been reflected to show that, the May 1.  So I

1    don't know what it matters which one this is, May 1 or this.

2    This has to do with the break-in that they adjudicated back in

3    2013.

4            THE COURT:  Do you have anything to add to the

5    comments?

6            MS. RYAN:  Your Honor, just that the August decree

7    was entered -- I could elicit the testimony in an offer of

8    proof that I think that the docket sheets that we've submitted

9    as Exhibits 137 and 138 show that the August decree was

10   entered on her request was her motion.  It attaches an Exhibit

11   D, which is her document and has her initials on it showing

12   that she printed it.

13           What she's trying to do is use a divorce decree that

14   doesn't have Exhibit D attached so that she can expand the

15   universe of customers she's complaining about.

16           THE COURT:  Well --

17           MR. KELLY:  I haven't even mentioned that.

18           THE COURT:  It's my job, I perceive, to decide on the

19   relevance of and the application of the state court orders.

20   That forms a substantial basis for both sides in this lawsuit.

21   That being said, I'm going to overrule the objection.  Let's

22   proceed.

23   Q    (BY MS. RYAN) Ms. Smith, is it correct that you filed a

24   motion to set aside the May decree?

25   A    My lawyer did.

```
 1   Q    Yes or no?

 2   A    Yes.

 3   Q    You did?

 4   A    Yes.

 5        MR. KELLY:  Your Honor, could I ask that the

 6   instructions to the witness come from the Court instead of

 7   counsel?  I was very generous throughout this trial as to

 8   testimony going beyond my questioning.  That's all I would

 9   ask.

10        THE COURT:  Say that again.

11        MR. KELLY:  Could I ask that the instructions to the

12   witness come from the Court instead of counsel?

13        THE COURT:  Oh, I see.  All right.  Listen to the

14   question and just answer the question.  All right.  Let's

15   proceed.

16   Q    (BY MS. RYAN) Was your divorce proceeding mediated?

17   A    Yes.

18   Q    And you mediated over a number of months; correct?

19   A    Years.

20   Q    Years, whatever.  So you reached an agreement?

21   A    Yes.

22   Q    It was reduced to writing?

23   A    Yes.

24   Q    And that's the Marital Settlement Agreement?

25   A    Yes.
```

1    Q    And that was attached to a decree of dissolution of

2    marriage?

3    A    Yes.

4    Q    In the 2014 settlement agreement, you and Randy were in

5    court litigating cross motions for contempt; correct?

6    A    Yes.

7    Q    July of 2014?  You reached an agreement?

8    A    Yes.

9    Q    It was reduced to writing?

10   A    Yes.

11   Q    It was entered as a consent judgment?

12   A    Yes.

13   Q    Now, the Marital Settlement Agreement says that all

14   right, title, and interest in certain customer accounts were

15   awarded to you and others were awarded to Mr. Zweifel;

16   correct?

17   A    It said zip codes, accounts and zip codes.

18   Q    Accounts and zip codes.  Certain customer accounts.  And

19   if I say "certain," I mean by zip code --

20   A    Yes.

21   Q    -- were awarded to you.

22   A    Yes.

23   Q    Okay.  The agreement also contains a nonsolicitation

24   provision; correct?

25   A    Correct.

1   Q    The nonsolicitation agreement had a time limit on it?

2   A    From '12 till '14.

3   Q    Is that a yes?

4   A    Yes.

5   Q    And then in 2014 when you were in court, Exhibit 12 was

6   negotiated; correct?

7   A    Yes.

8   Q    And we just looked at that; correct?

9   A    The divorce settlement of '14?

10  Q    Yes.

11  A    Yes.

12  Q    Well, it was not a divorce settlement.  It was a contempt

13  settlement.

14  A    Okay.

15  Q    Do you agree with that?

16  A    Yes.

17  Q    And that was to last -- that had a noncompete agreement;

18  correct?

19  A    Yes.

20  Q    And it replaced the nonsolicitation agreement?

21  A    Yes.

22  Q    And it extended it for two years, until July 25, 2016;

23  correct?

24  A    Yes.

25  Q    Do you need to look at it?

```
 1   A     No.

 2   Q     Now, when Randy was held in contempt in 2013, he paid

 3   that judgment, didn't he?

 4   A     Part of it.

 5   Q     Did he pay the judgment in 2013?  Your lawyer filed a

 6   satisfaction of judgment; correct?

 7   A     Yes.

 8   Q     So he paid it?

 9   A     Yes.

10   Q     He took an appeal, but he also paid the judgment?

11   A     Yes.

12   Q     When you and Randy reached an agreement in 2014 and it

13   was reduced to writing and filed with the court, Randy paid

14   the amount that was agreed to; correct?

15   A     Yes.

16   Q     He paid you $125,000?

17   A     Yes.

18   Q     And he transferred customers in two additional zip codes

19   to you?

20   A     Yes.

21   Q     That occurred; correct?

22   A     Yes.

23   Q     Now, turn back to Exhibit 12.  Would you open that up,

24   please.  Do you have it in front of you?

25   A     Yes.
```

44

1  Q    Does that agreement have any language in it requiring

2  Randy to transfer any customers back to you?

3  A    No.

4  Q    But you're arguing here today that customers that were

5  awarded to you in 2012 and the ones that you acquired in

6  2014 -- that those are yours forever; correct?  Isn't that

7  what you're arguing?

8  A    The accounts are mine.

9  Q    Isn't that what you're arguing?  The customer accounts --

10  you're claiming they're yours forever?

11  A    The accounts --

12  Q    Despite the fact the nonsolicitation and the noncompete

13  had end dates?

14  A    Yes.

15  Q    So are you -- I think there was maybe some suggestion

16  yesterday.  Are you claiming that it doesn't matter if those

17  customers think they're still doing business with Lawn

18  Managers?

19  A    No.  I'm not --

20  Q    Is that what you're saying?

21  A    No.

22  Q    You have admitted that you never informed Progressive's

23  customers, your customers, that Progressive is a new company;

24  correct?

25  A    No.

1   Q    Well, you never sent a letter that said "We are a new

2   company."

3   A    Every invoice, every statement, every piece of mail they

4   got said I was Progressive.

5   Q    Did you ever use the word "new" in a communication, "new

6   company," those two words, in communication from you or

7   Progressive --

8   A    No.

9   Q    -- to any of your customers?

10  A    No.

11  Q    As of earlier this month, your October 4 letter to a

12  customer about changing the name on their check, that says

13  that Progressive has a new name; correct?

14  A    Yes.

15  Q    Not that Progressive is a new company?

16  A    No.

17  Q    And the video we saw yesterday, which was up until this

18  morning or --

19  A    Last night.

20  Q    Sometime last night or some other time -- it was up last

21  night?  Is that what you're saying?

22  A    When I got home, it was up.

23  Q    Doesn't the video that -- the narration to the video say

24  that Progressive has more than 24 years of experience and more

25  than 20 professionally trained employees?

1   A    I do have 24 years of experience.

2   Q    And but you never had 20 employees.

3   A    Not since I've been on my own.

4   Q    Now, why were you claiming that you had more than 20

5   professionally trained employees?

6   A    What I was claiming is I have been in charge or been in

7   supervision of at least 20 employees.

8   Q    That video was created in 2013, and it was up on your

9   website from 2013 until last night or this morning; correct?

10  A    No.  It had been taken off earlier this year.

11  Q    So and it's your testimony that it miraculously reposted

12  or something?

13  A    That's my testimony when it reposted, it had

14  "Progressive" in big letters, but they did not have my

15  permission to be posted.

16  Q    So the more than 20 professionally trained employees,

17  would that be correct if you considered your employees and

18  Lawn Managers' employees together?  Isn't that what you really

19  meant?

20  A    What I really meant was we have huge turnover all the

21  time.  We're constantly hiring, constantly having to get rid

22  of.  It's never at six or seven.  It's never at three in the

23  office.

24  Q    I'd like you to turn to Plaintiff's Exhibit 95.

25       MR. KELLY:  Your Honor, this has gone beyond my

1    cross.  This wasn't discussed in the direct or my cross.

2              THE COURT:  Let me see.  Do you have a response to

3    the objection?

4              MS. RYAN:  Your Honor, I would ask the Court's leeway

5    to go a little bit beyond his direct and cross.  Otherwise, I

6    could re-call Ms. Smith in our responsive case in rebuttal.

7              THE COURT:  All right.  It's my understanding that

8    this witness is a joint witness.  We talked about this

9    yesterday about how she was to be examined.  I'm going to

10   overrule the objection.

11   Q    (BY MS. RYAN) Have you looked at this document recently?

12   A    What am I --

13   Q    Exhibit 95.

14   A    Exhibit 95.  Yes.

15   Q    So you've reviewed that recently?

16   A    Yes.

17   Q    And turning to the top of page 3, the second paragraph,

18   is this relating to a zoning hearing on the property you were

19   buying at 120 Old Meramec Station Road?

20   A    Yes.

21   Q    And you did appear in front of the Planning and Zoning

22   Commission of the City of Manchester?

23   A    Yes.

24   Q    And you appeared on this date?  Yes?

25   A    I started appearing on October of 2011.

1    Q     All right.  These are minutes of February 27, 2012.  You

2    were there on that date?

3    A     Yes.

4    Q     And it says in the second paragraph at the top of page 3,

5    "Linda Zweifel requested to open a branch of lawn care

6    services in Manchester.  She said Lawn Managers has been in

7    business in the St. Louis area for 32 years."

8          Did you tell the City of Manchester that you were

9    starting a new business?

10   A     No.

11         MS. RYAN:  Your Honor, I would like to offer

12   Plaintiff's Exhibit 95 into evidence, and I have a -- what I

13   provided to Mr. Kelly was a scan of a certified copy.

14         MR. KELLY:  No objection, your Honor.

15         MS. RYAN:  Somewhere I have the original with the

16   seal.

17         MR. KELLY:  There's no objection to the copy.

18         THE COURT:  All right.  Now, what -- let's see.  You

19   had said page 3.  What you meant was page 4.

20         MS. RYAN:  Oh, I'm sorry, Your Honor.  Yes.

21         THE COURT:  It's paginated.

22         MS. RYAN:  With the certification, yes.

23         THE COURT:  It will be received.

24   Q     (BY MS. RYAN) Now, are you claiming in this court that

25   Lawn Managers does not have the right to enforce its trademark

1    rights against you because Lawn Managers and Randy have done

2    wrong?  Is that what you're saying?  They've done bad things;

3    so they're not entitled to enforce the trademark rights

4    against you?

5    A    No.  I'm not claiming that.

6    Q    So what are you saying about all this business about the

7    Hillsboro case and the customers and the "we want you back"

8    letter?  What connection does that have to this case?

9    A    In the original divorce decree, I was to use the name

10   "Progressive Lawn Managers, Inc."  And so I had no idea it was

11   illegal to use "Progressive Lawn Managers, Inc." because I

12   thought it was part of -- a part of a settlement agreement

13   agreed on between Randy Zweifel and myself mutually through

14   mediation.

15   Q    But you knew that you no longer had the right to use

16   "Lawn Managers" by itself; correct?

17   A    Yes.  Yes, of course.

18   Q    As of January 1, 2015?

19   A    Yes.

20   Q    So at that point you developed a logo and a website that

21   reduced "Progressive" down to a tiny little word inside of a

22   graphic; correct?

23   A    One of my websites looked like that.

24   Q    That was your main website; correct?  PLMI.US?

25   A    I had three at the time.

Case: 4:16-cv-00144-DDN   Doc. #: 111   Filed: 11/30/17   Page: 50 of 111 PageID #: 1626

1   Q    Was that your main website?

2   A    It was one that was first built in '15.

3   Q    It was built in '15.  It became your main website;

4   correct?  Correct?

5   A    I still have two other websites.

6   Q    They redirect to that one; correct?

7   A    Yes.

8   Q    And that's the point where you began -- you had this sign

9   developed and started using the sign; correct?

10  A    Yes.

11  Q    So are you telling the Court here that it's not true that

12  Progressive is a new company?  Are you denying that it's a new

13  company?

14  A    Progressive in itself is a new company started in

15  February of 2012.

16  Q    Well, then are you just saying that you don't have to

17  tell your customers and the public that it's a new company?

18  A    There was no mention of it.

19  Q    Pardon me?

20  A    No one ever told me I had to.

21  Q    We filed this lawsuit in February of 2016, and we've been

22  litigating all that time, and nobody ever told you that you

23  needed to tell your customers what your company actually was

24  and that it was a new company and it was separate from Lawn

25  Managers?

1    A    I haven't --

2    Q    Nobody ever told you that?

3    A    -- had to do any of that since 2012.

4         COURT REPORTER:  I'm sorry.  I'm going to ask you to

5    reask your question.

6    Q    (BY MS. RYAN) So you're telling the Court that you don't

7    need to tell your customers and the public that Progressive

8    Lawn Managers is a new company?

9    A    I had no idea that I had to, no.

10   Q    You never knew that?

11   A    No.

12   Q    And no one ever discussed it with you?

13   A    No.

14   Q    And is it your belief that as long as Lawn Managers has a

15   single customer that was awarded to you in 2012 or now 2014,

16   now you're making that claim, that you're entitled to that

17   customer forever and that Lawn Managers needs to be

18   compensating you for that?  Is that what you're saying?

19   A    I need to be entitled to the revenue I've lost.

20   Q    Are you saying that those customers are yours forever?

21   A    The customers that were specifically awarded to me in

22   either '12 or '14 are mine.

23   Q    You're saying that they are yours forever.  Is that what

24   you're saying?

25   A    Not forever.  People die.

1          MS. RYAN:  Your Honor, I have nothing further.

2          THE COURT:  You may --

3          MR. KELLY:  Just a few, Your Honor.

4                    **REDIRECT EXAMINATION**

5    **BY MR. KELLY:**

6    Q    Just a few questions, Ms. Smith.  Hibu.

7    A    Can I move this?

8    Q    Yeah, please move that.

9    A    Okay.

10   Q    Talking about Hibu.  You pay a monthly service fee for

11   them?

12   A    Yes.

13   Q    And they automatically go through your website, check it

14   for operation, inform you of any issues, and make any

15   corrections; is that right?

16   A    Yes.

17   Q    City of Manchester in February of 2012 -- had you

18   hammered out all the details in your divorce with Mr. Zweifel?

19   A    We didn't have a divorce agreement yet.

20   Q    And let me ask you this.  The bulk of your revenues in

21   2015 -- how much were those the customers that had been

22   awarded to you in 2012 and '14?  How much of that --

23   A    Sixty, sixty-five percent.

24   Q    Would that be true for 2016?

25   A    It would be less for 2016 because of all the

53

 1   cancellations.

 2   Q    At least 50 percent?

 3   A    I'm not sure.  Something.

 4           MR. KELLY:  Thank you.  No further questions.

 5           THE COURT:  All right.

 6           MS. RYAN:  Your Honor, I have nothing further with

 7   this witness.  I'd like to re-call Debbie Alcorn.

 8           THE COURT:  Just one second.  You may step down.

 9   Thank you.

10           MS. RYAN:  Your Honor, I'm sorry.  I was a little bit

11   unclear.  I would like to re-call Ms. Alcorn in rebuttal to --

12   I guess we're in defendant's case at this point.

13           THE COURT:  Well, let me ask.  I don't know where we

14   are as far as the proceedings are concerned.  Have you

15   closed -- have you finished offering all of the plaintiff's

16   evidence in chief, in the case-in-chief?

17           MS. RYAN:  Yes.

18           THE COURT:  All right.

19           MS. RYAN:  Well, except for deposition lines, but we

20   need to discuss how you want that handled.

21           THE COURT:  Well -- you may step down.

22           In the plaintiff's case you're offering what now as

23   far as nontestimonial, nonlive witness evidence?

24           MS. RYAN:  Your Honor, we had deposition lines that

25   we had designated, but we haven't actually offered the

 1   transcript to you.  And I would -- I submitted lines for Ms.

 2   Smith; Chris Lawrence, her son.  I would withdraw the Chris

 3   Lawrence lines.  I don't need those.

 4             THE COURT:  Just one second.  How many depositions?

 5   Tell me what depositions.

 6             MS. RYAN:  One deposition.  Linda Smith.

 7             THE COURT:  Who else?

 8             MS. RYAN:  I intend to use the deposition of the

 9   accountant in cross-examination, Your Honor.

10             THE COURT:  Just give me a name.

11             MS. RYAN:  His name is Brian Toennies.

12             THE COURT:  He's the defendant's expert?

13             MS. RYAN:  Yeah, accountant.

14             THE COURT:  Who is expected to testify?

15             MS. RYAN:  Yes.

16             THE COURT:  Okay.  That's different than offering in

17   your case-in-chief.  Who else in your case-in-chief?

18             MS. RYAN:  That's all.

19             THE COURT:  Just Linda Smith's deposition?

20             MS. RYAN:  Yes.

21             THE COURT:  All right.  Is there an objection to

22   using Ms. Smith's deposition?

23             MR. KELLY:  It would appear to be redundant since she

24   testified, but I do have counter designations; so I don't know

25   how the Court would like to proceed.  If the Court is going to

1    allow them, then I would simply ask that the counter

2    designations --

3                THE COURT:  I will take the entire deposition into

4    evidence.

5                Do you have a copy of the entire deposition of Ms.

6    Smith?

7                MS. RYAN:  Yes.  We will dig it out, Your Honor.  We

8    have it in a box.

9                THE COURT:  All right.

10               MS. RYAN:  I would -- just to clarify things,

11   Exhibits 1 through 42 to the deposition are the same as 1

12   through 42 in our exhibit book.

13               THE COURT:  All right.  What about other than -- do

14   you have interrogatory answers that you're offering?

15               MS. RYAN:  There was a set of interrogatories

16   answers.  I believe I filed them with the designation as an

17   attachment, but they're also in Exhibit 14, I believe, to the

18   deposition and in the exhibit book.

19               THE COURT:  Okay.  So you're offering Plaintiff's

20   Exhibit 14, and that is interrogatory answers?

21               MS. RYAN:  Yes.

22               THE COURT:  All right.  So that's Exhibit 14.

23               MS. RYAN:  Yes.

24               THE COURT:  All right.  Is there any objection?

25               MR. KELLY:  Not to the interrogatory answers, Your

1   Honor.

2          THE COURT:  All right.  Then they'll be received.

3   Exhibit 14 will be received.

4          MS. RYAN:  Thank you.

5          THE COURT:  And we have the stipulations.  I take it

6   from both parties that the agreed-upon stipulations are being

7   offered into evidence by both sides.

8          MS. RYAN:  Yes.

9          THE COURT:  Okay.  And anything else in the

10  plaintiff's case?

11         MS. RYAN:  Well, there's exhibits.  You have books.

12  I suppose we can offer them electronically.  I would like to

13  ask that they be -- the copies be maintained under seal

14  because they do -- there are some exhibits with employee wages

15  and Social Security numbers.  There is some with customer

16  information, and then there's confidential business

17  information.

18         THE COURT:  All right.  Tell me which exhibits.

19         MR. KELLY:  And we stipulate to that, Your Honor.

20         THE COURT:  Pardon?

21         MR. KELLY:  We would agree and stipulate.

22         THE COURT:  All right.  Tell me what exhibits they

23  are.

24         MS. RYAN:  Maybe we, Mr. Kelly and I, could get

25  together and put a list together, Your Honor.  I know it would

 1    include 74 to 77, which are Progressive's financial statements

 2    and tax returns; that they're kind of scattered through here.

 3    And, frankly, the customer information with account numbers

 4    and that sort of thing, which is --

 5            THE COURT:  All right.

 6            MS. RYAN:  A lot of that is all through the case is

 7    confidential.

 8            THE COURT:  And are those exhibits among the copies

 9    that you've provided to the Court?

10            MS. RYAN:  Yes.

11            THE COURT:  Then at a recess, then, you can -- the

12    two of you can confer and give me a list of those exhibits.

13            MS. RYAN:  Thank you.

14            THE COURT:  Okay.  And do you have any other evidence

15    to offer in the plaintiff's case-in-chief?

16            MS. RYAN:  No, Your Honor.  I have a witness to call

17    in rebuttal.

18            THE COURT:  All right.

19            MS. RYAN:  Potentially two.  My expert is going to

20    need to leave shortly.

21            THE COURT:  Okay.  The plaintiff's case-in-chief has

22    closed to my understanding subject to the parties getting

23    together on those documents to be sealed.

24            All right.  Do you have any response to that

25    declaration?

58

1      MR. KELLY:  Yes, Your Honor.  We would move under

2  Rule 52(c) for a motion based on partial findings, we believe,

3  which is not limited to just the plaintiff's case, but the

4  Court can take into account all the evidence that came in and

5  make a determination.  And we believe the evidence is

6  uncontrovertible that there was a naked license -- actually

7  more than that in here in this case, where there was no

8  control executed.  And we don't believe that the evidence of

9  infringement of profits withstands the scrutiny required to

10  make a submissible case.  So we would move for a Rule 52(c) or

11  judgment based on partial findings.

12      THE COURT:  I will take that argument with the case.

13      MR. KELLY:  Thank you.

14      MS. RYAN:  Thank you.  Your Honor, should I

15  physically hand this transcript to the clerk?

16      THE COURT:  Yes.

17      MR. KELLY:  There are more depositions; so I think it

18  would probably be prudent to wait until they're all coming in.

19      Your Honor, in view of your taking the motion with

20  the case, I think it might be prudent for me at this time to

21  move for admission of the exhibits.

22      THE COURT:  Well, wait just one second.  Ms. Ryan has

23  indicated that she's got a time problem with a witness.

24      MR. KELLY:  Yeah.

25      THE COURT:  So why won't we -- if you want to take

1    this witness out of turn, so to speak, at this time, I will

2    let you do that.

3            MS. RYAN:  Your Honor, my intention was to have him

4    listen to Mr. Toennies testify and then respond, if Your Honor

5    was going to allow that, but I think there's not going to be

6    time for it.  His flight is at one o'clock.  He needs to get

7    out to --

8            MR. KELLY:  Yeah.  I had offered yesterday when I

9    heard he was on the clock if they wanted to do rebuttal

10   yesterday.  So if he wants to do a rebuttal today, I'm

11   happy --

12           THE COURT:  All right.  I will --

13           MS. RYAN:  That's fine.

14           THE COURT:  Okay.  You can call him at this time.

15           MS. RYAN:  Thank you.

16           THE COURT:  Mr. Torres, you've been previously sworn

17   in this matter, and you are still under oath, all right?

18   Please take the stand.

19                        **FERNANDO TORRES,**

20   **RE-CALLED AS A WITNESS, HAVING BEEN PREVIOUSLY DULY SWORN, WAS**

21   **EXAMINED AND TESTIFIED AS FOLLOWS:**

22                      **DIRECT EXAMINATION**

23   **BY MS. RYAN:**

24   Q    Mr. Torres, have you had an opportunity to review the

25   report and then the additional report -- let me see what they

60

1    called it -- supplemental report of Mr. Toennies, the addendum

2    that he prepared?

3    A    Yes.

4    Q    And do you have any observation about his discussion of

5    the term "EBITDA" in the report?  And keep it brief, please.

6    A    Sure.  I think the thrust of the report hinges on

7    insisting on using the conventional accounting calculation of

8    EBITDA that builds it back from the net income, adding back

9    depreciation, interest, taxes, and that assumes that the other

10   operating expenses in particular are fine as deductions.

11        So in his reports he never examined the

12   appropriateness or the deductibility of all the operating

13   expenses from revenue in order to arrive at the incremental

14   profits that the law calls for.

15   Q    So in other words, what you're saying is that he should

16   have started with gross revenue and then justified the various

17   deductions that he wants to claim should come off of the gross

18   revenue of Progressive Lawn Managers?

19   A    Yes.  Generally in trademark infringement cases, the

20   defendant's expert goes through the justifications of all the

21   expense items that need to be deducted and all the

22   apportionments that may be appropriate.

23   Q    Would that be similar to what a cost accountant does?

24   A    A cost accountant?

25   Q    A cost -- you know, an accountant who's tracking the

1    expenses that relate to the various operations.

2    A     Yes.  The difference is that there is a different

3    criteria when you're analyzing from an infringement

4    perspective than when you're analyzing from a financial or tax

5    perspective.

6    Q     So when you calculated the gross revenue -- and we've

7    offered that evidence -- that satisfied our burden; correct?

8    A     Yes.

9    Q     When you went further than that and attempted to sort out

10   what expenses could be deducted from that gross revenue in

11   order to arrive at defendant's profits -- which is the measure

12   that's called for under the statute; correct?

13   A     Correct.

14   Q     -- you were just doing that in order to provide some sort

15   of analytic framework and a valid number, but that's not our

16   burden, is it?

17   A     It's not the burden, but it's customary to provide a

18   reduction to profit rather than revenue because the plaintiff

19   is not claiming all the revenue.

20   Q     Right.  Yeah.  We're not claiming $2 million or whatever

21   in gross revenue.

22   A     Right.  Correct.

23   Q     Right.  So in order to make this make sense for the

24   Court, we needed to account for the appropriate deductions

25   from gross revenue; correct?

1    A    Correct.  And/or in case there was no expert on the

2    defense's side.

3    Q    All right.  And then the various items that you've

4    testified about that would not appropriately be deducted from

5    gross revenue, I think you talked about owner's compensation,

6    taxes, corporate taxes.  Payroll would be; correct?

7    A    Correct.

8    Q    For the employees?

9    A    Payroll expenses, payroll taxes are proper deduction,

10   yes.

11   Q    But corporate income taxes?

12   A    Corporate income taxes or other taxes that are not

13   necessary to provide the services.  Fines, legal expenses,

14   especially the legal expenses of the case at hand, are not

15   appropriate deductions.  And other categories like in this

16   case we said charitable contributions or life insurance

17   premiums that are not technically what the IRS calls

18   corporate-owned life insurance, because there's a different

19   tax treatment for life insurance.

20   Q    And also depreciation and amortization?

21   A    Depreciation and amortization when it's there.

22        MS. RYAN:  Your Honor, I have nothing further.

23        THE COURT:  All right.  You may inquire.

24        MR. KELLY:  I have no questions, Your Honor.

25        THE COURT:  All right.  You may step down.  Thank

1   you.

2          At this time, we're going to take a ten-minute break.

3   Thank you.

4          **(COURT RECESSED FROM 10:33 AM UNTIL 10:49 AM.)**

5          THE COURT:  All right.  Did you want to re-call --

6          MS. RYAN:  Your Honor, I do, but it's rebuttal.

7          THE COURT:  All right.

8          MS. RYAN:  He's got his expert still to put on.

9   Thank you.

10          THE COURT:  Okay.

11          MR. KELLY:  I was going to say, if she's going to be

12   long, I mean, since it's a nonjury case and you wanted to put

13   her on now.

14          THE COURT:  Well, she is not calling her witness at

15   this time; so you can go into the defendant's case.

16          MR. KELLY:  Your Honor, the defendant would call

17   Brian Toennies.

18          THE COURT:  Step up and be sworn, please.

19                    **(WITNESS SWORN BY THE CLERK.)**

20                         **BRIAN TOENNIES,**

21   **HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS**

22   **FOLLOWS:**

23                      **DIRECT EXAMINATION**

24   **BY MR. KELLY:**

25   Q    Good morning, Mr. Toennies.

1    A    Morning.

2    Q    You were here to talk today about the profits earned by

3    Progressive Lawn Managers; correct?

4    A    Yes.

5    Q    Could you tell the Court a little bit about your

6    background?

7    A    I'm a CPA.  I passed the CPA exam in 1988.  And I've been

8    working either in a small accounting firm or as an owner of a

9    small accounting firm since 1989.

10   Q    And where do you live?

11   A    In O'Fallon, Illinois.

12   Q    And where is your office?

13   A    Crestwood, Missouri.

14   Q    And what is your present job?

15   A    Owner/CPA of Brian Toennies & Associates.

16   Q    And what are your responsibilities in that capacity?

17   A    Tax preparation, tax planning, reviewing employees' work,

18   and meeting with clients and planning issues.

19   Q    And could you tell the judge about your educational

20   experience?

21   A    I got my bachelor's in accounting from Illinois State

22   University in Normal.

23   Q    Okay.

24   A    And passed the CPA exam in 1988.

25   Q    Have you spent your entire career working as a CPA in the

Case: 4:16-cv-00144-DDN  Doc. #: 111  Filed: 11/30/17  Page: 65 of 111 PageID #: 1641

1    St. Louis area?

2    A    Other than the first two years after college, yes.

3    Q    And where was that?

4    A    I worked for the federal government, Department of Labor,

5    for two years.

6    Q    And you have experience in calculating profits for a

7    business?

8    A    Yes.

9    Q    And what is that?

10   A    In tax return preparation, financial statement

11   preparation, and working with clients who are looking to buy

12   or sell a business.

13   Q    And you do not testify in court as a regular practice?

14   A    No.

15   Q    And is it the second time you've ever testified in court

16   professionally?

17   A    Yes.

18   Q    Do you have an understanding of the type of business --

19   excuse me -- the type of information that's relied upon to

20   calculate a business' profit?

21   A    Yes.

22   Q    And as a CPA, are you called upon to determine profits

23   for a business?

24   A    Yes.

25   Q    And being a CPA, does the law grant you certain

1  privileges?

2  A    Yes.

3  Q    And one of those is the authorization to prepare and sign

4  tax returns for individuals in business?

5  A    Yes.

6  Q    And by signing those returns, you're putting your

7  reputation and license on the line?

8  A    Yes.

9  Q    Can anyone else aside from a CPA sign and prepare returns

10 for --

11 A    Other people can.  Enrolled agents are allowed to sign

12 and practice before the IRS.

13 Q    And anybody else that you're aware?

14 A    Attorneys.  I think that's it.

15 Q    Now, you analyzed certain financial information in this

16 case to -- or come to the calculations you arrived at; right?

17 A    Yes.

18 Q    Is that the type of information that accountants

19 typically use to calculate profits and things like that?

20 A    Yes.

21 Q    All right.  And were you hired by my law firm to

22 calculate the profits for Progressive in this case for

23 certain --

24 A    Yes.

25 Q    You have some exhibits in front of you, booklets.  I

1  would direct your attention to Plaintiff's Exhibits 74, 75,

2  and 76.  And let me ask if those are records -- first, please

3  identify them and then ask you to -- let us know if you

4  reviewed them for purposes of your assignment in this case.

5  A    Yes.  They're the 2013, 2014, 2015 corporate tax returns

6  for Progressive Lawn Managers.

7  Q    Exhibit 74 is the '13?

8  A    Yes.

9  Q    Exhibit 75 is 2014?

10 A    The 75 is the 2014.

11 Q    And Exhibit 76 is 2015?

12 A    Yeah.

13 Q    And Exhibit 77 is 2016?

14 A    2016, yes.

15 Q    You reviewed all of those?

16 A    Yes.

17 Q    And did you review Plaintiff's Exhibit 78?

18 A    Yes.

19 Q    And that is what, sir?

20 A    A balance sheet and profit and loss statement for

21 Progressive Lawn Managers for 2013.

22      MR. KELLY:  All right.  And Plaintiff's Exhibit 79,

23 Norah, that was our cross reference to 01.  We crossed 01 off

24 because it matched your 79, but you have not used it.

25      MS. RYAN:  That's fine.  I have no objection to it

```
 1   being admitted.
 2            MR. KELLY:  Okay.  All right.
 3   Q    (BY MR. KELLY) Can you tell us what Exhibit 79 is?
 4   A    It's the report that I prepared for this case.
 5   Q    And what's its date?
 6   A    June 16, 2017.
 7   Q    Thank you.  Did you also look at information about the
 8   plaintiff in this case?
 9   A    Yes.
10   Q    And let me see.  I'm not sure.  You may have it in front
11   of you.  So let me hand it to you.
12            MR. KELLY:  Your Honor, is it all right if I stand
13   here?
14            THE COURT:  Yes, sir.  That's fine.
15   Q    (BY MR. KELLY) Exhibit S-3.  Could you identify that and
16   let us know if you reviewed that?
17   A    Yes.  Income statement for Lawn Managers for 2014.
18   Q    Exhibit T-3, please?
19   A    Income statement for Lawn Managers for 2015.
20   Q    Exhibit U-3?
21   A    2013 corporate tax return for Lawn Managers.
22   Q    V-3?
23   A    2014 corporate tax return for Lawn Managers.
24   Q    Exhibit W-3?
25   A    2015 corporate tax return for Lawn Managers.
```

```
1    Q    Exhibit X-3?

2    A    2016 tax return for Lawn Managers.

3    Q    Exhibit Y-3?

4    A    2016 income statement for Lawn Managers.

5    Q    And I don't know if you -- did you review Z-3?

6    A    I don't know that I did.  I don't remember.

7    Q    Then I take it back.

8    A    Okay.

9    Q    And Exhibit E-6, can you identify that for us, please?

10   A    That's the addendum to my report that we updated on

11   October 25, 2017.

12   Q    After you read Mr. Torres' supplemental report?

13   A    Yes.

14   Q    Thank you.  And there may have been some other items

15   you've read?

16   A    Yes.

17   Q    But those are predominantly what you've utilized here to

18   base your opinions?

19   A    Yes.

20   Q    And that's customary for accountants to base opinions on

21   profitability?

22   A    Yes.

23   Q    Did you prepare a report for this case, Mr. Toennies?

24   A    Yes.

25   Q    And that's in front of you?
```

1    A    Yes.

2    Q    It's Exhibit 79; is that correct?

3    A    Yes.

4    Q    What's the date of your report, sir?

5    A    June 16, 2017.

6    Q    Now, before we dive deep into your specific opinions, let

7    us know -- you prepared, helped prepare the tax returns; is

8    that right?

9    A    Pardon me?

10   Q    You helped prepare those tax returns?

11   A    Yes.

12   Q    How has Progressive been doing financially?  Give us a

13   overview from 2013 to the present.

14   A    Had been pretty lackluster, kind of steady downward trend

15   a little bit.

16   Q    And have you formed an opinion based upon your analysis

17   what the profits are for Progressive for the years 2015 to

18   2016?  If you need to refer to your report, please do so.

19   A    We calculated the EBITDA for Progressive Lawn Managers

20   for 2015 to be $23,829 and for 2016 to be $10,533.

21   Q    And that's actually EBITDA?

22   A    That's EBITDA.

23   Q    And what's the difference between EBITDA and the number

24   we pay taxes on in a tax return?

25   A    We don't allow deductions for depreciation, income tax,

1    interest and amortization in determining our EBITDA.  So we

2    add those back to the taxable income number.

3    Q    All right.  And you calculated an EBITDA number in case

4    that is the number the Court determines is the value that

5    should be used to calculate profits.

6    A    Yes.

7    Q    But you believe the net income statement is the statement

8    of profits that --

9    A    The tax return numbers are correct as they are, yes.

10   Q    Okay.  And Exhibit 79 contains your opinions and

11   calculations in this case; is that correct?

12   A    Yes.

13   Q    And E-6 contains your additional addendum opinions based

14   upon the information regarding 2017 --

15   A    Yes.

16   Q    -- for Progressive?  Mr. Toennies, I'm going to hand you

17   what's been marked as Exhibit M-3, and I'm going to take it

18   back so I can put it on the projector.  Is that information

19   you also reviewed?

20   A    Yes.

21   Q    And what is that?

22        MS. RYAN:  Excuse me.  What?

23   Q    M-3.

24   A    Monthly profit and loss statement for Progressive Lawn

25   Managers from January through August of 2017.

72

1   Q    You didn't do any investigation in this case whether

2   Progressive acts infringed anything --

3   A    Pardon?

4   Q    You didn't do any investigation about whether anything

5   Progressive did infringed any marks of Lawn Managers?

6   A    No.

7   Q    You didn't do any investigation of whether the financial

8   situation of Progressive, its profits were attributable to any

9   use of infringing mark?

10  A    No.

11  Q    You're just looking at the tax returns and telling us

12  what the EBITDA is and the profit?

13  A    Yes.

14  Q    All right.  Now, how do you calculate profit for a

15  company?

16  A    It would be the revenue from operations less ordinary and

17  necessary business expenses.

18  Q    And we're talking about expenses?  Is that what you call

19  the cost of providing services?

20  A    Costs, overhead expenses, administrative expenses.

21  Q    What are direct costs?

22  A    Direct costs are costs that are directly or proportional

23  to the revenue.  For instance, in a manufacturing business if

24  you're selling a product, the raw material would be a direct

25  cost, and the direct -- the labor to produce that product

1   would be a direct cost to that revenue.

2   Q    So if you were producing posters, the paper for the

3   posters would be a direct cost?

4   A    Yes.

5   Q    Now, what is overhead?

6   A    Overhead are other expenses that you're going to incur --

7   rent, utilities, insurance -- things that aren't directly

8   related to the production but are necessary in order to either

9   create the product or the service to generate revenue.

10  Q    In other words, without the overhead you can't make the

11  product or provide the service?

12  A    Correct.

13  Q    And the method you just described is how accountants use

14  to prepare taxes for businesses?

15  A    Tax returns and financial statements, yes.

16  Q    So we can look at the tax returns, and that will tell us

17  one profit number for purposes of taxes?

18  A    Yes.

19  Q    And whether that's the right number or not from a legal

20  standpoint, you're not here to say?

21  A    Correct.

22  Q    All right.  So how did you calculate EBITDA for

23  Progressive for 2015 in this case?

24  A    We started with the taxable income on the front page of

25  the corporate tax return and added back depreciation expense

1   and interest expense.  I don't think there was any

2   amortization, and there was no income tax expense.

3   Q    And you did the same for 2016?

4   A    Yes.

5   Q    And you came up with EBITDA numbers for Progressive, and

6   those are stated in your report?

7   A    Yes.

8   Q    And could you state those again for me, please?

9   A    For 2015 the EBITDA was $23,829.  For 2016 the EBITDA was

10  $10,533.

11  Q    Now, your numbers differ from those of Mr. Torres?

12  A    Yes.

13  Q    And let's just talk about 2015 and 2016.  And could you

14  determine how you reached different numbers?

15  A    He appeared to start with the revenue and the cost of

16  goods sold, which were the same as the numbers we had on the

17  tax return.  And then he used selected expenses.  He

18  identified several of them -- rent, labor -- but then he had a

19  category called "other expenses," and I couldn't tell which of

20  my expenses were excluded from his list.

21  Q    And so that Your Honor can follow along, what you're

22  looking at, I believe 120, is his report.  Can you refer the

23  Court to where -- it's in the white books, Mr. Toennies --

24  where in his opinion -- in his report this calculation shows

25  up.

1  A    In Table 2, on page 13.

2  Q    And if you look at that, there's a catch-all for "other"?

3  A    It's called "other in net," yes.

4  Q    Is there any explanation of what that is?

5  A    No.

6  Q    So what difference did that make in his EBITDA number and

7  your EBITDA number?

8  A    His EBITDA for 2015 -- well, he's calling it "incremental

9  profit."

10 Q    In this new --

11 A    In this new report.  Originally, he had called it

12 "EBITDA."  In the new report he's calling it "incremental

13 profit."  But I believe it's the same number.  Our number is

14 about -- his number is about $75,000 higher than ours.

15 Q    Higher than yours.

16 A    Uh-huh.

17 Q    And is that attributable to this mystery "other"?

18 A    Other expenses not being claimed, yes.

19 Q    Yeah.  Let me ask you this.  As a CPA, have you ever seen

20 the term "incremental profit" used before?

21 A    Not incremental profit, no.

22 Q    So this is the first time you've ever seen it?

23 A    Yes.

24 Q    And did Mr. Torres explain in his report what

25 incremental --

1   A    I don't remember seeing it.

2   Q    All right.  And what was the difference between your

3   EBITDA 2016 and Mr. Torres' EBITDA 2016?

4   A    His EBITDA is about 88,000; mine is ten.  So there's a

5   $78,000 difference.  His is higher.

6   Q    The same thing.  Is it that other mystery number?

7   A    Yes.

8   Q    And did you -- to reduce EBITDA, did you take out

9   charitable deductions or life insurance?

10   A    They're not included as deductions on the corporate

11   returns; so the number we started with did not include life

12   insurance or charitable contributions.

13   Q    Did you use those to lower your EBITDA number?

14   A    No, we did not.

15   Q    So what is the total EBITDA sum for -- that you

16   calculated for Progressive for the years 2015 and 2016?

17   A    The total we have would be $34,362, if I do the math

18   right in my head.

19           THE COURT:  For 2015?

20           THE WITNESS:  And 2016 combined.

21           THE COURT:  Oh.

22           THE WITNESS:  Is that what you asked?

23   Q    (BY MR. KELLY) Yes, I did.  Thank you.

24           Now, if you can't see this, I'll bring it up to you.

25   This is Exhibit M-3.

1    A    Yes.

2    Q    This is the profit and loss statement for Progressive

3    Lawn Managers for 2017.

4    A    Yes.

5    Q    And have you reviewed this?

6    A    Yes.

7    Q    All right.  Can you explain from an accountant standpoint

8    what this exhibit shows?

9    A    Well, it would show the profit and loss on a

10   month-by-month basis for the first eight months of the year.

11   One thing we've noticed and talked to Linda about this in the

12   past, they prebill the next year's work early.  Usually in

13   late 2016, they would send invoices out for deposits and

14   prepaid work for 2017.  She would typically hold a lot of

15   those deposits if they come in 2016 or they'll come in January

16   of 2017.

17           So early in the year you're going to see a spike in

18   the amount of deposits because a lot of that money will be

19   earned in later months because it's prepaid or deposits for

20   work she's going to do later in the year.

21   Q    Is that an irregular accounting method?

22   A    I think Lawn Managers was doing the same thing when they

23   were -- prior to the divorce.  So it's fairly common for

24   companies to do things like that, yeah.

25   Q    Does a profit and loss statement like this -- is that a

1  reasonable piece of data to rely on to determine EBITDA for a

2  company through an interim period of a financial year?

3  A    Not on an annual basis.  Since the deposits are skewed to

4  earlier in the year, once you have a full 12 months of

5  activity, the bottom line will average out and the revenue

6  will average out.  So if you look at just the first eight

7  months, it's going to appear higher than it would probably if

8  you looked at the annual numbers.

9  Q    It must be annualized.  Is that the word you used?

10 A    Well, you wouldn't annualize these numbers because you

11 would want to factor in that the last four months are going to

12 have an average, you would assume, less revenue than the first

13 eight months because of first two months are so much higher.

14 Q    Which is in line with prior years?

15 A    Which would put it in line with other years, yes.

16 Q    By way of example, if you tried to determine EBITDA for

17 January, would that number be astronomical?

18 A    Yes.

19 Q    And you saw Mr. Torres' updated report for October, and

20 he includes the calculations for EBITDA for 2017?

21 A    Yes.

22 Q    And do you agree with that number?

23 A    No.

24 Q    Did he appear to calculate it -- well, how did he

25 calculate it?

1  A    He calculated it the same way he did the other prior two

2  years.  And if we're -- but he just did it for that

3  eight-month period.  So he didn't try to annualize it.  He's

4  just looking at that eight-month period of time.  But he

5  excluded a number of expenses.

6  Q    Sorry.  So the starting number was not a reliable number

7  to start with?

8  A    Right.

9  Q    Did you come up with a calculation that you felt --

10  A    Yes.

11  Q    What was that, and how did you do it?

12  A    I also didn't factor in that below -- or month at the end

13  of the year may bring down the profit of the company, but just

14  based on those eight months, our EBITDA was $43,136.

15  Q    And if you were to look at the company through the end of

16  December, how would that affect that number?

17  A    You would assume it would come down.

18  Q    Now, is how Mr. Torres calculated EBITDA in his 2007

19  report the way you would do under a generally accepted

20  accounting principle?

21  A    No.

22  Q    All right.  So for purposes of this report, you're making

23  this calculation only if the judge finds Progressive infringed

24  Lawn Managers' mark; is that right?

25  A    Yes.

80

1    Q    And your reports in this case, which we identified, those

2    are based -- the opinions thereon are based upon a reasonable

3    degree of accounting certainty?

4    A    Yes.

5         MR. KELLY:  Your Honor, I don't have any other

6    questions.

7         THE COURT:  All right.  Cross-examination.

8                      **CROSS-EXAMINATION**

9    **BY MS. RYAN:**

10   Q    Mr. Toennies, Toennies, I'm probably going to

11   mispronounce your name again.

12   A    Brian is fine.

13   Q    Thank you.  Now, a moment ago you were testifying about

14   Table 2 in Exhibit 120; correct?

15   A    Yes.

16   Q    And you said, I think, that Mr. Torres didn't give any

17   breakdown for the numbers that he deducted from the gross

18   revenues.

19   A    Well, not in the line called "other."  We're not sure

20   what makes that number up.

21   Q    The gross revenue's consistent with the number --

22   A    The gross revenue and gross profit are, yes.  The only

23   one that's not consistent is the "other" expense line.

24   Q    Do you have your report in front of you?

25   A    Yes.

1    Q    Okay.  And where do you break down the numbers that

2    you've deducted?

3    A    I didn't break it down on my report.  They were on the

4    tax return.

5    Q    So you don't have any breakdown at all; correct?

6    A    Not in my report.

7    Q    You said something about direct costs?

8    A    Yes.

9    Q    Is there any information here to allow you to determine

10   direct cost versus indirect costs?

11   A    Cost of goods sold is generally considered direct cost;

12   so that would be this company's version of a direct cost.

13   Q    So that's this line right here, COGS?

14   A    Yeah, but --

15   Q    Cost of goods sold.  The line right here?

16   A    Yes.

17   Q    I'm sorry.

18   A    Yes.

19   Q    We need to not talk over each other because she's trying

20   to make a record there.

21        This line on Table 2?

22   A    Yes.

23   Q    Got my finger on it?  I'm not going to attempt to use the

24   markup on this thing but -- okay.

25        Have you ever testified about damages in a trademark

1    case?

2    A    No.

3    Q    And the other time that you testified was when?

4    A    In the divorce case of Randy and Linda.

5    Q    Was it in the divorce case or in the contempt action in

6    2014?

7    A    I think it was the contempt action.  I don't remember.

8    Q    And you testified on behalf of Ms. Smith?

9    A    Yes.

10   Q    You said the information Mr. Torres relied upon for 2017

11   was not reliable.  Didn't you just say that?

12   A    It's reliable for the eight months that it reports but

13   not on an annual basis.

14   Q    What other information is there for 2017?

15   A    Right now there's no other information.

16   Q    You talk in your report about the other lawn care client

17   companies that you have; correct?

18   A    Yes.

19   Q    And I think you criticize Lawn Managers for their -- the

20   size of their --

21   A    I don't know "criticize" was the right word but . . .

22   Q    Well, you say that it's out of line; correct?

23   A    Yes.

24   Q    What are the size of those other companies?

25   A    They're more comparable to Progressive Lawn Managers.

1   Q      Rather than Lawn Managers?

2   A      Yes.

3   Q      Now, you've offered some testimony about the prebilling,

4   and you said something about it skewing the 2017 numbers

5   because there's a bunch of deposits in January.

6   A      Yes.

7   Q      Is that what you said?

8   A      Yes.

9   Q      But that happens every year, doesn't it?

10  A      Correct.

11  Q      Is Progressive actually on a cash basis or -- I thought

12  you called it a modified cash basis.

13  A      It's more of a modified cash basis.  They do record

14  accounts payable and keep their expenses on an accrual basis,

15  but revenue's not truly treated on an accrual basis.  It's

16  more of as deposits are made.

17  Q      Say that again.  They treat what on an accrual --

18  A      Revenue is recorded as deposits are made, not as work is

19  performed.

20  Q      That's a cash basis, isn't it?

21  A      As work is performed would be accrual.  Cash basis is as

22  deposits are made.

23  Q      Now, I think you testified in your deposition that Ben

24  Orris in your office actually prepares the returns --

25  A      Yes.

Case: 4:16-cv-00144-DDN   Doc. #: 111   Filed: 12/30/17   Page: 91 of 111 PageID #: 1660

```
 1   Q    -- for Progressive?

 2   A    Yes.

 3   Q    That's correct?  And did he also assist with the

 4   preparation of your report?

 5   A    Yes, he did.

 6   Q    Did he actually write part of it?

 7   A    He may have proofed it for me and made some changes, but

 8   he didn't really write it.  I wrote it.

 9   Q    I thought you said you were out of town in your

10   deposition.

11   A    Yeah.  I wrote it and faxed it to him, and he had

12   somebody in the office type it, and he proofed it.

13             THE COURT:  Who is this?

14             MS. RYAN:  Pardon me?

15             THE COURT:  Who is the individual?

16             MS. RYAN:  Ben Orris, O-r-r-i-s, according to the

17   deposition transcript.

18             THE WITNESS:  Yes.

19             MS. RYAN:  Apparently, we have that correct.

20   Q    (BY MS. RYAN) Have you ever valued a trademark?

21   A    No.

22   Q    Have you ever done any consulting in the trademark area?

23   A    No.

24   Q    Have you ever done any intellectual property valuation of

25   any kind?
```

1    A    No.

2    Q    And would that same answer be correct for a trade name as

3    opposed to a trademark?

4    A    Correct.

5    Q    I asked you in your deposition whether you made an

6    assumption that the companies were operated differently;

7    correct?

8    A    Yes.

9    Q    And I asked you what evidence you had of that, and you

10   said you didn't have any.  Correct?

11   A    No.

12   Q    You didn't?

13   A    I have no evidence.

14   Q    How long has Progressive been in business?

15   A    Since 2012.

16   Q    So you have an opinion if they say they were in business

17   for 32 years or 24 years or some other number of years, do you

18   have an opinion about it?

19        MR. KELLY:  Your Honor --

20        THE COURT:  Just one second.

21        MR. KELLY:  That's not relevant to his opinions.

22        THE COURT:  Okay.  Do you have a response?

23        MS. RYAN:  Well, he's offered his professional

24   opinion as to the operations of the company and the value of

25   the company.  He has something in the report about goodwill

86

1   and the name, and it's a lead in to that, Your Honor.

2            THE COURT:  All right.  No.  I'm going to sustain the

3   objection, and you can -- because his opinion as to when it

4   began has not been offered as, you know, to counter any other

5   testimony in the case.

6            MS. RYAN:  That's fine.  Thank you.

7            THE COURT:  All right.

8   Q    (BY MS. RYAN) And I think you stated you got your cost

9   figures off of the tax return?

10  A    Yes.

11  Q    Mr. Torres used the tax return and the profit and loss

12  statements; correct?

13  A    Yes.

14  Q    Do profit and loss statements have more detail?

15  A    Yes.

16  Q    Have you consulted any authorities on how defendant's

17  profits are calculated in a trademark case?

18  A    No.

19  Q    And at the time of your deposition, you had not done that

20  either; correct?

21  A    No.

22  Q    I asked you in the deposition whether you were aware of

23  any inconsistencies between the companies, and you said that

24  you had no knowledge of any inconsistencies.  Is that still

25  your opinion?

1    A    What do you mean by "inconsistencies"?

2    Q    Well, let's see.  You state in your report, looking at

3    Sections 1E-4 and 5 -- maybe it's supposed to be "I" -- 1E-4

4    and 5, that the handling of the split of the business must

5    have caused some level of confusion among customers and

6    others.  And you said, yes, that the statement's in your

7    report.

8              And I said, "What is the basis for that statement?"

9              And you have that you have two businesses operating

10   under the same name; it's going to cause problems.

11             And I said, "Do you have any knowledge of any

12   inconsistencies?"

13   A    No.  No, I don't.

14   Q    And then I also asked you about the advertising costs,

15   and you said that a business like this would normally

16   advertise be a word of mouth; correct?

17   A    That's always a good form of advertising, yes.

18   Q    All right.  But that's not what Lawn Managers does;

19   correct?

20   A    I think everybody -- every business advertises by word of

21   mouth.

22   Q    Are you aware if -- we were talking about their marketing

23   cost, and you were saying they were out of line; correct?

24   A    They seemed high.

25   Q    And then I asked you whether it was part of their success

1  in business was those marketing costs?

2  A    Could be.

3  Q    Do you agree with me?

4  A    Lawn Managers is doing very well.  Their profits are up

5  every year, and their revenue's up every year.  They don't

6  seem to be struggling.

7  Q    All right.  I asked you in your deposition whether a

8  business can own its customers.

9       MR. KELLY:  Your Honor, objection.  Calls for a legal

10  conclusion.

11       THE WITNESS:  Thank you.

12       THE COURT:  I think any -- I don't think I need his

13  testimony to understand the relationships between the parties

14  and people in the community who do or don't have lawns.  Okay.

15       MS. RYAN:  Thank you.  I have nothing else, Your

16  Honor.  Thank you.

17       THE COURT:  All right.  Redirect?

18       MR. KELLY:  Yes.  Just a few.

19                    **REDIRECT EXAMINATION**

20  **BY MR. KELLY:**

21  Q    Mr. Toennies, who is Ben Orris?

22  A    Ben is an employee for me.  He's a CPA who's been with me

23  for about ten years.

24  Q    He also knows how to calculate profits?

25  A    Yes.

1   Q    And EBITDA?

2   A    Yes.

3   Q    And the tax returns -- you actually prepared those?

4   A    We prepare tax returns in our office.  I mainly review

5   them.  I don't prepare many anymore, but I prepared a few over

6   the years.

7   Q    As far as Progressive's, you were familiar with the

8   details of --

9   A    Yes.

10         COURT REPORTER:  Wait.  I didn't catch the last part

11   of your question.

12   Q    As far as Progressive, you were familiar with the details

13   that went into the tax returns?

14   A    Yes.

15         MR. KELLY:  Thank you.  No further questions.

16         THE COURT:  Anything further?

17         MS. RYAN:  Just one question, Your Honor.

18                        **RECROSS-EXAMINATION**

19   **BY MS. RYAN:**

20   Q    You did not prepare Progressive's tax returns, however;

21   correct?

22   A    Correct.  I reviewed them.

23   Q    And you said that in your deposition.  That's two

24   questions.  You said that, that you did not prepare them?

25   A    Correct.

```
 1            MS. RYAN:  Thank you.

 2            THE COURT:  Your office prepared them?

 3            THE WITNESS:  Our office prepared them, yes.

 4            THE COURT:  Okay.  All right.

 5            MR. KELLY:  I don't have any further witnesses, Your

 6    Honor.

 7            THE COURT:  Just one second.

 8            You may step down.  Thank you.  Okay.

 9            Do you have rebuttal evidence to offer?

10            MS. RYAN:  Your Honor, yes.  First --

11            THE COURT:  Let me ask -- I'm sorry.

12            MS. RYAN:  I've got two very brief witnesses.

13            THE COURT:  Okay.  Just one second.  I apologize.

14    You said you have no more witnesses.  Do you have any other

15    evidence to offer in the defendant's case?

16            MR. KELLY:  Yes, Your Honor.  I also have a list of

17    depositions that we have cited, and we will supply those to

18    the Court.  Would you like me to read what --

19            THE COURT:  Just tell me which depositions that the

20    defendant is offering.

21            MR. KELLY:  Yes.  Deposition of Debbie Alcorn.

22            THE COURT:  Just one second.  Who else?

23            MR. KELLY:  Crystal Alcorn.  Mr. Zweifel, his

24    deposition and his testimony from preliminary injunction

25    hearing and the temporary restraining order hearing.
```

```
1            MS. RYAN:  Your Honor --

2            THE COURT:  Just one second.  Okay.  Is there an

3    objection to any of those?

4            MS. RYAN:  Yes, there is objection to -- well, first

5    of all, I want to have my additional lines offered as well,

6    and we've submitted those.  But the testimony from the

7    preliminary injunction hearing and the TRO -- I don't believe

8    that's proper.  It could be used for cross-examination or to

9    impeach the witness or whatever, but just to wholesale offer

10   those transcripts into the record I think is improper, and I

11   object.

12           THE COURT:  All right.  I'll overrule.  They're

13   statements of a party opponent.  I'll overrule the objection.

14   And I will -- as before, I will take the totality of the

15   testimony of those proceedings.

16           MR. KELLY:  Your Honor --

17           THE COURT:  You need to provide the deputy clerk with

18   those depositions.

19           MR. KELLY:  We will.

20           THE COURT:  Those documents.  Anything else in the

21   defendant's case-in-chief?

22           MR. KELLY:  No testimony.  Just a housekeeping

23   matter.  Would you like the 52(c) motion in writing?  We have

24   it if you want, but it doesn't sound like it.

25           THE COURT:  No.  That won't be necessary.  No.  I
```

1    directed the deputy clerk to reflect in the minutes that at

2    the close of the plaintiff's case, the defendant made an oral

3    motion for a judgment as a matter of law that was, the Court

4    indicated, would be taken with the case.  Okay.

5              So now we -- all right.  Do you have rebuttal

6    evidence to offer?

7              MS. RYAN:  I do, Your Honor.  Two very brief

8    witnesses.

9              THE COURT:  All right.

10             MS. RYAN:  I would like to re-call Debra Alcorn.

11             THE COURT:  Ms. Alcorn, you've been previously sworn,

12   and you're still under oath.

13             THE WITNESS:  Yes, Your Honor.

14                         **DEBRA ALCORN,**

15   **RE-CALLED AS A WITNESS, HAVING BEEN PREVIOUSLY DULY SWORN, WAS**

16   **EXAMINED AND TESTIFIED AS FOLLOWS:**

17                      **DIRECT EXAMINATION**

18   **BY MS. RYAN:**

19   Q    Ms. Alcorn, I've handed you what's been marked

20   Plaintiff's Exhibit 161.  What is that?

21   A    It's a picture of a screen shot of Progressive's website

22   that I took last night.

23   Q    And that was yesterday evening?

24   A    Yesterday evening, yes.

25   Q    About what time?

1   A    It was approximately 5:00, 5:30.  It was shortly after we

2   left here.

3   Q    All right.  And turning to the final page of that

4   exhibit --

5   A    Yes.

6   Q    -- is there a link there for the video --

7   A    Yes.

8   Q    -- that was testified about earlier?

9   A    Yes.

10  Q    And did you play the video yesterday evening?

11  A    I did.

12  Q    It was on the website?

13  A    It was on the website.

14  Q    And it was played?

15  A    It was played.

16  Q    And all the verbiage in the video was the same as what

17  we've heard here in court?

18  A    Yes, it was.

19       MS. RYAN:  Your Honor, I'd like to offer Plaintiff's

20  Exhibit 161 into evidence.

21       THE COURT:  Any objection?

22       MR. KELLY:  No, Your Honor.

23       THE COURT:  It will be received.

24  Q    (BY MS. RYAN) Ms. Alcorn, I think you testified previously

25  that for a period of time Linda Smith -- and at that time her

94

1   name was Linda Zweifel -- was working out of the same premises

2   as Lawn Managers?

3   A    Yes.

4   Q    At the start-up of her new company?

5   A    Yes.

6   Q    Were you present at any time when she had a phone

7   conversation about the phone number?  And I was specifically

8   referring to (636)677-1122.  That was the company phone

9   number; correct?

10  A    That was Lawn Managers' company phone number, and, yes, I

11  was present as Charter was removing it from our first line.

12  At the time, we had lines, many lines coming in.  It was

13  removed from our first line, which then went dead.  And so I

14  called Charter to find out what was going on.

15  Q    And did you have a conversation with Ms. Smith at that

16  time?

17  A    I did have a conversation after I had -- Charter had told

18  me that she directed that the phone now be forwarded to her

19  new phone number at Progressive.  And when I questioned her

20  about it, she told me, yes, she was taking the phone number,

21  and Randy deserved it.

22  Q    And when did that occur?

23  A    That would have been in May, approximately around May 17.

24  Q    Of?

25  A    2012.

```
1              MS. RYAN:  Thank you.  I have nothing further of this
2    witness.
3              THE COURT:  Cross-examination.
4                         CROSS-EXAMINATION
5    BY MR. KELLY:
6    Q    Ms. Alcorn, as far as the video you saw last night, do
7    you remember what the logo indicated?
8    A    It says it's Progressive.  The logo still said
9    "Progressive."
10   Q    It was the big letters this time, last night?
11   A    Pretty much what exactly is on the screen shot is what I
12   did.
13   Q    At the top right here?
14   A    This is the screen shot on the home page.  And I'm sorry,
15   I thought you were talking about the logo down here, but that
16   shows on the printout also.
17   Q    Right.  Right down there in the video?
18   A    Yes.
19   Q    Yeah.
20   A    Yes.
21   Q    And Ms. Smith testified this morning that that was -- the
22   new logo was up and, in fact, it is; is that right?
23   A    Yes.
24             MR. KELLY:  Thank you.  No further questions, Your
25   Honor.
```

```
 1              THE COURT:  All right.  Anything further?
 2              MS. RYAN:  No, Your Honor.
 3              THE COURT:  All right.  You may step down.  Do you
 4   want to give that exhibit to the clerk as you walk around.
 5   Thank you.
 6              MS. RYAN:  Your Honor, I was going to call another
 7   person, but I think I'm just going to let it rest.
 8              THE COURT:  All right.  Any further evidence on
 9   behalf of the defendant?
10              MR. KELLY:  No, Your Honor.
11              THE COURT:  And no more evidence on behalf of the
12   plaintiff?
13              MR. KELLY:  Other than moving to admit my exhibits.
14              THE COURT:  Okay.  Why don't we do that right now.
15              Mr. Kelly, do you want to read the exhibits that
16   you're referring to that have not already been offered --
17              MR. KELLY:  Yes, Your Honor.
18              THE COURT:  -- and received?
19              MR. KELLY:  F-4, Your Honor.
20              THE COURT:  F-4.
21              MR. KELLY:  E-4.
22              THE COURT:  Just one second.  F-4 has already been
23   received.  E-4 has been identified but not yet offered.  So is
24   there an objection to E-4?
25              MS. RYAN:  I'm sorry, Your Honor.  No.
```

1          THE COURT:  It will be received.  What's the next

2    number?

3          MR. KELLY:  M-3, Your Honor, which is the 2017.

4          THE COURT:  Is that "M" as in Mary?

5          MR. KELLY:  "M" as in Mary.

6          THE COURT:  I had written "N," as in Nancy.  But that

7    followed the E-4 use?

8          MR. KELLY:  Yes, I think so.  Yeah, that was the 2017

9    monthly summary.

10          THE COURT:  All right.

11          MS. RYAN:  Progressive profit and loss statement for

12    2017?

13          MR. KELLY:  Yes.  Yes.

14          THE COURT:  All right.  Any objection to M-4?

15          MS. RYAN:  No, Your Honor.

16          THE COURT:  It will be received.  What's the next --

17          MR. KELLY:  I believe I discussed B-2, which -- that

18    was yesterday, I think.

19          THE COURT:  Yes.  Any objection to B-2?

20          MS. RYAN:  No, Your Honor.

21          THE COURT:  It will be received.

22          MR. KELLY:  I-2, which was the collection of

23    photographs, I believe.

24          THE COURT:  Any objection to I-2?

25          MS. RYAN:  No, Your Honor.  They've been identified

```
 1    at this point.

 2              THE COURT:  All right.  It will be received.

 3              MR. KELLY:  N-1, which was a brief transcript from

 4    a -- no.

 5              THE COURT:  N-1?

 6              MR. KELLY:  No.  I don't have that.  I can't read my

 7    writing.  I'll just go from the top.  Your Honor, I used

 8    Plaintiff's Exhibit 120 as Mr. Toennies' report with the

 9    consent of plaintiff.

10              THE COURT:  I think that was offered and received.

11              MS. RYAN:  Plaintiff's 120 was our --

12              THE COURT:  120 was offered and received.

13              MR. KELLY:  I'm sorry.  Yeah.  I've got -- well, I

14    know -- let me just get rid of these right here.  We've got

15    X-3, which was a 2016 return for Lawn Managers.

16              THE COURT:  X-3.  Any objection?

17              MS. RYAN:  No, Your Honor.  It duplicates the

18    plaintiff's.

19              THE COURT:  It will be received.

20              MR. KELLY:  W-3, which was 2015 for Lawn Managers.

21              THE COURT:  Any objection?

22              MS. RYAN:  I'm sorry.  No, Your Honor.

23              THE COURT:  It will be received.

24              MR. KELLY:  V-3, which was the 2014 tax return.

25              THE COURT:  Any objection?
```

1        MS. RYAN:  No, Your Honor.

2        THE COURT:  It will be received.

3        MR. KELLY:  U-3, which was the 2013 return for Lawn

4   Managers.

5        MS. RYAN:  No objection.

6        THE COURT:  It will be received.

7        MR. KELLY:  T-3, which was the Lawn Managers income

8   statement for 2015.

9        MS. RYAN:  No objection.

10        THE COURT:  It will be received.

11        MR. KELLY:  S-3, which was the Lawn Managers

12   statement for 2014.

13        MS. RYAN:  No objection.

14        THE COURT:  It will be received.

15        MR. KELLY:  E-6 was the addendum report of Brian

16   Toennies.

17        MS. RYAN:  I'm not objecting, Your Honor.

18        THE COURT:  It will be received.

19        MR. KELLY:  I used your number for Mr. Toennies.

20        THE COURT:  79?

21        MR. KELLY:  I think that's right, yeah.  Yes, 79.

22        THE COURT:  Any objection?

23        MS. RYAN:  No, Your Honor.

24        THE COURT:  It will be received.

25        MR. KELLY:  And I spoke yesterday.  We marked -- we

100

1    discussed the ones that I brought up in plaintiff's case

2    earlier, and I believe was it --

3                    THE COURT:  74, 75, 76, 77, 78, and 79.

4                    MR. KELLY:  Yes.

5                    MS. RYAN:  I thought those were already in.

6                    MR. KELLY:  I think those are already in, Your Honor.

7    Those are the tax returns for --

8                    THE COURT:  All right.  They're all received.

9                    MR. KELLY:  Plaintiff's 145.

10                   MS. RYAN:  Your Honor, I had an objection to that

11   one, and let me see what I have now.

12                   MR. KELLY:  That would be the clean copy of, I

13   believe, F-4.

14                   MS. RYAN:  And, Your Honor, just to preserve our

15   record, I would maintain my objection to 145.

16                   THE COURT:  When was that discussed?

17                   MR. KELLY:  During Mr. Zweifel's testimony.

18                   MS. RYAN:  I think Mr. Kelly referred to it, but it

19   was not.

20                   THE COURT:  What was that --

21                   MR. KELLY:  145.  He explained the entries in the

22   right column.

23                   THE COURT:  All right.  It wasn't offered, I don't

24   believe, and it was on cross-examination.  And what is it

25   again?

```
 1              MR. KELLY:  It's the clean version of the highlighted

 2    exhibit.

 3              THE COURT:  Oh.  And is there --

 4              MS. RYAN:  Yes, Your Honor.  To preserve my record, I

 5    want to object to that.

 6              THE COURT:  All right.  I'll overrule the objection.

 7    It will be received.

 8              MR. KELLY:  J-1, Your Honor, which was an order dated

 9    July 2, 2013, on cross-examination of Mr. Zweifel.

10              MS. RYAN:  Your Honor, it was covered by the

11    stipulation, but I don't have an objection.

12              THE COURT:  It will be received.  It was also

13    discussed in the defendant's case; right?

14              MR. KELLY:  No.  No.  I brought it up on cross.

15              MS. RYAN:  Well, it was talked about.  It wasn't

16    used.

17              MR. KELLY:  Okay.

18              THE COURT:  Well, Exhibit 12 -- isn't it the same

19    thing as Exhibit 12?

20              MS. RYAN:  No.  No, Your Honor.  It's different.

21              MR. KELLY:  12 is the handwritten order from July

22    2014.

23              THE COURT:  Well, they'll both be received.  So J-1

24    is in and 12 is in.

25              MR. KELLY:  I discussed Exhibits M-5 and L-5.  "M" as
```

1    in Mary.

2              THE COURT:  What about L-5?

3              MR. KELLY:  They're customer records.

4              THE COURT:  Okay.  Is there any objection?

5              MS. RYAN:  Your Honor, they're selective records

6    pulled out of our Exhibits 86 through 89, which were already

7    admitted.

8              THE COURT:  I'll overrule the objection.  And then

9    N-5 the same?

10             MR. KELLY:  B-6 is a small group of similar records,

11   Your Honor.

12             THE COURT:  B-6?

13             MR. KELLY:  B-6.  "B" as in boy.  I'm sorry.  I need

14   to start going with the military usage, bravo.

15             THE COURT:  When was that used?

16             MR. KELLY:  That was used with the witnesses from

17   Lawn Managers to go through customer accounts.

18             MS. RYAN:  We don't have a note that that was used.

19             THE COURT:  I don't have it.

20             MR. KELLY:  I didn't check it off.  Okay.  Really?

21   Okay.  I'll take that one off.

22             THE COURT:  What's the next one?

23             MR. KELLY:  P-3, "P" as in Peter.

24             THE COURT:  Any objection to P-3?  What is P-3?  It

25   was used in the cross-examination of --

1          MR. KELLY:  Yes.  It came up twice.  It's the post

2  office bills.

3          MS. RYAN:  Your Honor, I have objections to relevance

4  and 403; so I would like to preserve the record on that.

5          THE COURT:  All right.  Well, all right.  I'll

6  overrule the objection.  It will be a part of the case for the

7  Court.  All right.

8          MR. KELLY:  Your Honor, I believe I used the

9  Plaintiff's Exhibit 62, which was a call-out report dated May

10  6, 2015.

11          MS. RYAN:  Your Honor, I don't have an objection to

12  that.  I believe it would be incorporated into our 86 through

13  89 anyway.

14          THE COURT:  When was 62 used?

15          MR. KELLY:  I discussed it with one of the witnesses

16  to authenticate.  It was the -- it's an exhibit where you can

17  type into the computer an actual customer -- or note of

18  customer interaction, and I used it to compare versus

19  handwritten.  Ms. Alcorn, I'm told.

20          MS. RYAN:  I don't have an objection, Your Honor.

21  It's also found in Exhibit 86 right at the beginning.

22          THE COURT:  What was that number again?

23          MR. KELLY:  It's 62, Your Honor.

24          THE COURT:  Oh, 62, all right.  It will be received.

25          MR. KELLY:  The next one is 72, which should be, I

```
 1    think, my first exhibit.  It was some customer service

 2    reports.

 3              MS. RYAN:  No objection.

 4              THE COURT:  All right.  It will be received.

 5              MR. KELLY:  Then 43 is the next one.  It's, I

 6    believe, a picture of a van.

 7              MS. RYAN:  I have no objection.

 8              THE COURT:  It will be received.

 9              MR. KELLY:  And 46 is a copy of the complaint.  I

10    would assume no objection.

11              MS. RYAN:  I don't know why we need to admit it as an

12    exhibit, but that's fine.

13              THE COURT:  All right.  It will be received.

14              MR. KELLY:  Housekeeping.  H-2 -- I have that on my

15    note.  Oh, yes.  H-2, I believe, was just a list of customers

16    that Ms. Smith indicated she received in 2012.

17              THE COURT:  Any objection?

18              MS. RYAN:  Your Honor, I think I objected to that

19    exhibit on the grounds of foundation and -- foundation,

20    relevance, lack of authentication, lack of foundation, and I

21    would continue to assert that objection to H-2.

22              THE COURT:  I will overrule the objection.  H-2 will

23    be received.

24              MR. KELLY:  And the last one I'm showing, which

25    doesn't sound right to me, is one I started off with.  I'm
```

 1   just looking.  I believe I discussed the -- oh, yes, Mr.

 2   Torres' report.  That's N-3, his May 27, 2016, report.

 3          THE COURT:  Yes.

 4          MR. KELLY:  And also his May 8, 2017, report I

 5   discussed with him.

 6          THE COURT:  Okay.  N-3 no objection?

 7          MS. RYAN:  Your Honor, I have no objection to those.

 8   I would note that they are unredacted.

 9          MR. KELLY:  Did I use that one as well?

10          MS. RYAN:  Did you say O-3 or just N-3?

11          MR. KELLY:  I think 0-3.

12          THE CLERK:  Is the plaintiff's.

13          MR. KELLY:  Yes, N-3 and O-3, both of those.

14          THE CLERK:  Did you admit 0-3?

15          THE COURT:  O-3 is what?

16          MR. KELLY:  O-3 is Mr. Torres' report from May 8,

17   2017.  I discussed those for purposes of contrast.  Okay.

18          THE COURT:  Any objection to 0-3?

19          MS. RYAN:  No, Your Honor.

20          THE COURT:  It will be received.

21          MR. KELLY:  Alex is telling me that Exhibit 37 was

22   also discussed.  It was a mass mailing.

23          MS. RYAN:  It's the prepay letter to Pritee Shah that

24   Linda mailed her.  I have no objection to 37 coming in.

25          THE COURT:  All right.  So 37 will be received.

```
 1              MR. KELLY:  W-1.  W-1 was a photo of a van.

 2              THE COURT:  Right.  Any objection?

 3              MS. RYAN:  I don't have an objection to that, Your

 4    Honor.

 5              THE COURT:  It will be received.

 6              MR. KELLY:  And 15, Your Honor.  It was a Gmail

 7    exchange, and it had photos, small photos, of the vans in

 8    there, and we discussed that with Ms. Smith.

 9              MS. RYAN:  I don't remember that happening.

10              THE COURT:  15 was used.

11              MS. RYAN:  That's fine, then.  No objection.

12              THE COURT:  It will be received.

13              MR. KELLY:  17?

14              THE COURT:  Any objection to 17?  It was used.

15              MS. RYAN:  It's already in.

16              THE COURT:  Yes.

17              MR. KELLY:  Do you have it in?  Okay.  All right.

18              MS. RYAN:  That was offered in my direct examination.

19              THE CLERK:  W-3?  I heard before and after, but I

20    didn't hear.

21              MR. KELLY:  Let me take a look.  That was a 2015 tax

22    return.

23              THE CLERK:  Was it admitted?

24              MS. RYAN:  I have no objection.

25              THE COURT:  It will be received.
```

 1                    MR. KELLY:  Yeah.  There should have been U-3, V-3,

 2       W-3, and X-3.  I believe we started off -- those should all

 3       be --

 4                    THE COURT:  Those are all received.

 5                    MR. KELLY:  Yeah.

 6                    THE COURT:  There were some issues about Y-3.

 7                    MR. KELLY:  Y-3 was an income statement.

 8                    THE COURT:  Any objection to Y-3?

 9                    MS. RYAN:  No, Your Honor.

10                    THE COURT:  It will be received.  M-3 and N-3?  Just

11       going down what I have.

12                    MS. RYAN:  I have no objection to M-3 or N-3.

13                    MR. KELLY:  I think that's already in.

14                    THE COURT:  All right.  They will be received.

15                    MS. RYAN:  Your Honor, could I just ask you to

16       double-check on Exhibit 17?  I want to make sure 17 and 18 are

17       in.

18                    MR. KELLY:  I think I just looked on Alex's sheet,

19       and it looked like they're in.

20                    MS. RYAN:  And this is --

21                    MR. KELLY:  I show them in.

22                    MS. RYAN:  This is awkward, but it's the physical 105

23       with the stake in it, which I would like to offer into

24       evidence.

25                    THE COURT:  Okay.  What were the other two again?

```
 1                 MS. RYAN:  17 and 18.

 2                 THE COURT:  Yes, they've been received.

 3                 MS. RYAN:  Thank you.  And is it okay to leave 105

 4    with you?

 5                 THE COURT:  Yes.

 6                 MS. RYAN:  Thank you.

 7                 MR. KELLY:  Okay.

 8                 THE COURT:  All right.

 9                 MR. KELLY:  I think that's it, Your Honor.

10                 THE COURT:  Okay.  If you discover that something was

11    missed or whatever, you can discuss it and maybe file

12    something jointly.

13                 MR. KELLY:  Thank you.

14                 THE COURT:  All right.  In lieu of closing arguments,

15    do you want to, you know, file a memorandum?

16                 MR. KELLY:  Would you like findings of fact and

17    conclusions of law?

18                 THE COURT:  Well, actually, I'm asking you if you

19    want to provide proposed findings.

20                 MR. KELLY:  Oh, yes.

21                 MS. RYAN:  Yes, that would be fine.

22                 THE COURT:  All right.  And how much time do you need

23    for that?

24                 MS. RYAN:  Maybe two weeks.

25                 MR. KELLY:  I think two weeks.
```

```
 1              THE COURT:  Are you going to need a transcript?

 2              MS. RYAN:  That would be nice.

 3              MR. KELLY:  Yeah.

 4              THE COURT:  So you will need to talk with the court

 5     reporter.  So what I will do, talk with the court reporter and

 6     then each side can have 21 days after the transcript for

 7     proposed findings and conclusions.

 8              MS. RYAN:  Would that include a memo of law as well,

 9     Your Honor?

10              THE COURT:  Well, that's what would be the proposed

11     conclusions.

12              MS. RYAN:  Okay.

13              THE COURT:  If you want to attach a memo to that

14     that's a little more argumentative, that's fine.

15              MS. RYAN:  Your Honor, I had one additional thing I

16     wanted to bring up.

17              THE COURT:  Just one second.  So talk with the court

18     reporter about ordering a transcript of the proceedings, and

19     then when that is filed of record, then you'll have 21 days

20     thereafter simultaneously to file memos and proposed findings

21     and conclusions.

22              MS. RYAN:  Thank you.

23              THE COURT:  Okay.  Yes, ma'am?

24              MS. RYAN:  Actually, it's two more things.  The list

25     of exhibits that we want to have treated as under seal --
```

110

1  could we submit that by five o'clock tomorrow?

2          THE COURT:  Yes.

3          MS. RYAN:  And second thing is, in the event that you

4  do rule in plaintiff's favor, we do have a request for

5  attorneys' fees and expenses.  I just wanted to make sure that

6  it was understood that we would submit the details on that at

7  a later date.

8          THE COURT:  Yeah.  I think the local rules call for

9  21 days after a judgment that awards attorneys' fees.  Okay.

10         MS. RYAN:  Thank you.

11         THE COURT:  All right.  Anything further?  It is high

12  noon on November 1; so I will take the matter under submission

13  after the filings of the conclusions and -- proposed findings

14  and conclusions.  Thank you very much.  We will be in recess.

15         I just want to say also I think both sides have been

16  well represented by counsel.  Thank you very much.

17             **(PROCEEDINGS CONCLUDED AT 12:00 PM.)**

18

19

20

21

22

23

24

25

CERTIFICATE

     I, Shannon L. White, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

     I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

     I further certify that this transcript contains pages 1 through 110 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

     Dated at St. Louis, Missouri, this 29th day of November, 2017.


/s/Shannon L White
_____
/s/Shannon L. White
Shannon L. White, CRR, RMR, CCR, CSR
Official Court Reporter