UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LAWN MANAGERS, INC.,  a Missouri
Corporation,

                Plaintiff,

v.

PROGRESSIVE LAWN MANAGERS, INC.,
a Missouri Corporation,

                Defendant.

Cause No.:  4:16-cv-00144-DDN

**PLAINTIFF'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND PROPOSED PERMANENT INJUNCTION**

Plaintiff submits the following post-trial proposed findings of fact and conclusions of
law, along with the terms of a proposed permanent injunction.

**CONTENTS**

I.      PROPOSED FINDINGS OF FACT      Page 2

A.      Background      Page 2

B.      Divorce Proceedings in State Court      Page 3

C.      Contempt Proceedings and 2014 Settlement      Page 7

D.      The December 31, 2014 Deadline and Defendant's New Logo      Page 8

E.      Evidence of Actual Consumer Confusion      Page 10

F.      Additional Evidence Supporting Finding of Infringement      Page 13

G.      Defendant's Justifications      Page 18

H.      Defendant's "Unclean Hands" Defense      Page 20

I.      The "Naked License" Defense and Counterclaim      Page 23

J.      Plaintiff's Request for Injunctive Relief      Page 25

K.      Plaintiff's Damages: Defendant's Profits from the Infringement      Page 25

II.     PROPOSED CONCLUSIONS OF LAW      Page 28

A.      Trademark Registrations and Ownership of the Trademarks      Page 28

B.      Trademark Infringement and Confusion Evidence      Page 30

C.      Impact of the Consent to Use "Progressive Lawn Managers"      Page 33

D.      Defenses Remaining for Trial (Unclean Hands
        and Naked License) and De Novo Determination of Issues      Page 34

E.      Unclean Hands Defense and the Marital Settlement Agreement      Page 35

F.      The Naked License Claim and Licensee Estoppel      Page 40

G.      Damages and Relief      Page 44

III.    PLAINTIFF'S PROPOSED PERMANENT INJUNCTION      Page 46

A.      Background      Page 46

B.      General Nature of the Case      Page 46

C.      Permanent Injunction Order      Page 47

Exhibit A to Proposed Permanent Injunction      Page 52

## I.      PROPOSED FINDINGS OF FACT

### A.      Background

1.      Plaintiff, Lawn Managers, Inc. ("Lawn Managers" or "LMI"), filed the present action on February 4, 2016, asserting a claim of infringement of its federally registered trademarks by defendant, Progressive Lawn Managers, Inc. Defendant filed its answer on March 14, 2016 (Doc. 8), and an amended answer which included a counterclaim for cancellation on July 12, 2016. (Doc. 25) Plaintiff replied to the counterclaim on July 27, 2016. (Doc. 27)

2.      Lawn Managers is the owner of a federally registered trademark for the name "Lawn Managers" by virtue of two registrations with the United States Patent and Trademark Office.  Registration No. 4826435 was filed February 17, 2015, and granted October 6, 2015, and was for the word mark "Lawn Managers." Plaintiff also owns an earlier-filed design mark incorporating the words "Lawn Managers," Registration No. 4189623, filed November 14, 2011, granted August 14, 2012. (Pl. Trial Exhibits 82 and 83)

3.      Plaintiff is a Missouri corporation which operates a lawn care business, and has been located in High Ridge, Missouri since 1984. Plaintiff has been in business since 1979, using the name "Lawn Managers" since inception. Plaintiff incorporated under the name Lawn Managers, Inc. in 1981. (Transcript ("Tr.") Vol. 1 at 37) Plaintiff's business involves lawn and tree care, providing treatments of fertilizer and weed killers, spraying and the like, and does not involve mowing.  (Tr. Vol. 1 at 38)

4.      Defendant, Progressive Lawn Managers, Inc. ("Progressive" or "PLM"), is a Missouri corporation formed in February 2012, just prior to the divorce of the two principal owners of Lawn Managers, Inc. Defendant is in the same business as plaintiff, and offers the same seven step treatment program.  (Tr. Vol. 1 at 82)

5.      Plaintiff is 100% owned by Randall Zweifel ("Zweifel"), and defendant is 100% owned by Linda Smith, formerly Linda Zweifel ("Smith"). Zweifel and Smith were formerly married (Tr. Vol. 1 at 39), and Smith worked in the plaintiff's business from 1994 until the divorce, 17 years. (Tr. Vol. 1 at 40, 81)

**B.      Divorce Proceedings in State Court**

6.      Zweifel and Smith were divorced in the Circuit Court of Jefferson County, Missouri (in Hillsboro, Missouri) in mid-2012. In the divorce settlement titled Marital Settlement

Agreement ("MSA"), the parties divided the assets of Lawn Managers, Inc., the corporation, as well as non-business assets. (Joint Stipulation of Facts for Trial ("Jt. Stip.") at ¶ 1; Tr. Vol. 1 at 55) The split of the business assets was not 50-50 because Smith received the house, the BMW vehicle, the Denali vehicle, and other items. (Tr. Vol. 1 at 55) Smith's incorporation of Progressive in February 2012 anticipated the settlement contained in the MSA. (Tr. Vol. 2 at 131-132)

7.      Defendant asserted at trial that the correct divorce judgment and MSA was the one entered by the Hillsboro court on May 1, 2012, which does not have an Exhibit D listing Miscellaneous Commercial accounts awarded to Smith and merely recites that these accounts are awarded to Smith. Plaintiff relies upon the divorce judgment and MSA entered by the Hillsboro court on August 7, 2012 (which does have an Exhibit D). (Pl. Exhibit 10; Jt. Stip. at ¶ 6)

8.      This Court does not find it necessary to determine which is the correct decree and MSA. However, the Court does note that the evidence at trial showed that the May 1, 2012 judgment and MSA were set aside on the May 23, 2012 on the motion of Smith. (Pl. Exhibits 135, 136, 137; Tr. Vol. 3 at 39-40) Further, Smith claimed at the time (May 2012) that the MSA attached to the May 1, 2012 judgment was incorrect. Smith's current insistence that the May 1, 2012 decree is the correct decree casts some doubt upon Smith's credibility. (Pl. Exhibits 10, 11, 13, 135, 136, 137, 138; Tr. Vol. 1 at 56-59)

9.      As set forth infra, under the MSA, Zweifel and Smith divided the residential customer base of Lawn Managers, Inc. by zip code, and each agreed to a bare-bones non-solicitation provision as to the other's zip codes, which was to last for two years from the date of the divorce. (Sections 5.02 and 5.06 of the MSA; Jt. Stip. ¶s 8, 10, 11; Tr. Vol. 1 at 59-60)

10.     Zweifel testified that after the division of accounts and the non-solicitation agreement under the MSA was in effect, plaintiff did not solicit at all in "Linda's zip codes." (Tr. Vol. 1 at 60-61, 63). Debra Alcorn testified to the same effect. (Tr. Vol. 1 at 171-174)

11.     Zweifel also testified that the term "solicit" as used by the parties referred to LMI's practice of sending out bulk mail solicitations to prospective customers. (Tr. Vol. 1 at 40-41) When Smith was an owner of plaintiff LMI, she was in charge of the bulk mail solicitations, as well as being involved in many other aspects of running the business. (Smith depo at 9-10) Zweifel testified that sending the bulk mail solicitations was a big expense to the plaintiff company, but that plaintiff engages in this advertising to make up for the normal turnover in customers. (Tr. Vol. 1 at 41-42)

12.     Zweifel was awarded all of the "Commercial Customers" of the company, with the exception of the "Miscellaneous Commercial Customers" listed on Exhibit D to the August 7, 2012 divorce decree and MSA, which were awarded to Smith. (See paragraphs 7-8 above.)

13.     The evidence at trial indicated that "Commercial Customers" (the group of Commercial Customers awarded to Zweifel) are mowing companies servicing residential addresses, with the residences being provided lawn services by LMI (or PLM) on a subcontracted basis. The billing for the services goes to the mowing company with whom the resident or owner has an account, and LMI (or PLM) receives payment from the mowing company. (Tr. Vol. 1 at 156; Tr. Vol. 2 at 38)

14.     The evidence at trial indicated that "Miscellaneous Customers" (the group of Commercial Customers awarded to Smith) are business customers (such as churches, restaurant franchisees or subdivision associations) who are billed directly by the company providing the service at their business location or locations. (Tr. Vol. 1 at 156)

15.     The evidence at trial indicated that the Miscellaneous Commercial Customers and the Commercial Customers which were awarded, respectively, to Smith and Zweifel were located in both sets of zip codes. (Tr. Vol. 1 at 124, 205-206; Tr. Vol. 2 at 39, 42) As a result, each of the companies had a legitimate reason to be present in the other's zip codes even during the period of the non-solicitation agreement between 2012 and 2014, and during the subsequent two year non-compete agreement discussed below. Further, Zweifel (and the plaintiff company) legitimately was servicing residential addresses for his Commercial Customers in Smith's zip codes during the terms of the non-solicitation and non-compete agreements. (Tr. Vol. 1 at 205-206)

16.     The MSA also provided that Smith (and PLM, as this Court holds in its conclusions of law), could use the name "Lawn Managers" for a period of two years after the date of the divorce. Zweifel also agreed that Smith could use the name "Progressive Lawn Managers." (Pl. Exhibit 11 (the MSA) at page 15, Section 5.06; Jt. Stip. at ¶8) Zweifel testified that the purpose for this was to allow defendant to transition to the new name as a new company, but said that defendant's transition never happened. (Tr. Vol. 1 at 93)

17.     Zweifel was awarded all of the assets of Lawn Managers, Inc. that were not specifically awarded to Smith in the MSA. (Pl. Exhibit 11, MSA at Section 5.01) This included the name "Lawn Managers." (Id.)

18.     The corporations, LMI and PLM, were not made parties to the MSA or the divorce proceeding, but the MSA treats the individuals and their wholly-owned corporations as if there was no distinction between the individuals and the corporations. Further, the parties have conducted themselves throughout the post-divorce time period as if the corporations were bound by the MSA as well as the individuals, Zweifel and Smith.

6

## C.     Contempt Proceedings and 2014 Settlement

19.     Less than a year after the divorce, Smith filed a motion for contempt against Zweifel in state court in Hillsboro. The motion was ruled against Zweifel on July 2, 2013. (Deft. Exhibit J-1)  Zweifel paid the amount of the judgment entered against him, and also appealed to the Missouri Court of Appeals. The Missouri Court of Appeals held in a reported decision that the trial court's "judgment" did not have a collateral estoppel effect against Zweifel as to any issue not determined in the judgment: "The dismissal of Husband's appeal has no collateral estoppel effect on the remaining portions of the judgment not awarded or enforced as it did not result in a judgment on the merits." 431 S.W.3d 559, 560 (Mo. App. 2014). (Jt. Stip. at ¶13)

20.     Smith filed an amended (second) motion for contempt in Hillsboro raising new issues in October 2013, alleging in part that Zweifel and his company were soliciting and servicing customers in her (Smith's) zip codes and that Zweifel had "solicited" away customers that had been awarded to Smith in 2012. (Jt. Stip. at ¶14)

21.     After engaging in pre-trial discovery, the parties began the trial of the second motion for contempt in late July, 2014 in Hillsboro. (Pl. Exhibit 138, Hillsboro docket entries) Mid-trial, on July 25, 2014, Zweifel and Smith reached a settlement of Smith's second motion for contempt, entering into a hand-written "consent judgment" which was entered by the Hillsboro court. ("7/25/2014 Agreement/Consent Judgment") (Pl. Exhibit 12 (offered by defendant); Jt. Stip. at ¶15 (setting out the complete text))

22.     The parties have disputed whether the 7/25/2014 Agreement/Consent Judgment was an agreement (plaintiff's position) or a court order (defendant's position), but the Court finds that for purposes of this case, it is not necessary to determine this issue.

7

—

23.     As discussed below in the Court's conclusions of law, under Missouri law, the normal rules of contract construction apply to a settlement agreement incorporated into a divorce decree, so these rules are applicable to both the MSA and the 7/25/2014 Agreement/Settlement. Neither the MSA nor the 7/25/2014 Agreement/Consent Judgment is entitled to heightened deference from this Court, nor is the Court required to accept defendant's interpretation of the agreements or judgments.

24.     The 7/25/2014 Agreement/Consent Judgment provided, in pertinent part, for (1) the payment of a substantial sum of money by Zweifel to Smith ($125,000), (2) the transfer of customers in two additional zip codes from Zweifel to Smith, (3) the replacement of the non-solicitation agreement (as to residential customers) of the 2012 MSA with a non-compete agreement (as to residential customers) to last for an additional two years until July 25, 2016, and (4) an extension of Smith's right to use the "Lawn Managers" name until December 31, 2014. It further provided that each party was free to sign up and service new commercial accounts regardless of zip code. (Jt. Stip. at ¶ 15)  The 7/25/2014 Agreement/Consent Judgment did not call for Zweifel to transfer any customers back to Smith. (Id.; Tr. Vol. 1 at 152)

25.     There is no dispute that Zweifel paid Smith the sum agreed upon in the 7/25/2014 Agreement/Consent Judgment, or that the transfer of customers in the two additional zip codes to Smith was completed. (Tr. Vol. 1 at 122-123, 152; Tr. Vol. 3 at 43)

### D.     The December 31, 2014 Deadline and Defendant's New Logo

26.     Under the 2012 MSA and the 7/25/2014 Agreement/Consent Judgment, Progressive was to stop using the name "Lawn Managers" by December 31, 2014, although Zweifel again agreed that Smith could use the name "Progressive Lawn Managers" after that

date. (Jt. Stip. at ¶ 15)   The Court specifically finds that plaintiff LMI did not consent to defendant PLM's use of the name "Lawn Managers" after December 31, 2014.

27.      Prior to December 31, 2014, PLM's signage and website used a logo design in which the word "Progressive" was large and the words "Lawn Managers, Inc." were noticeably smaller, as follows:



(excerpted from Pl. Exhibit 17)

28.      As the December 31, 2014 deadline came around, Smith had a new logo developed for Progressive, shown below:



(excerpted from Pl. Exhibit 18)

29.      In the new Progressive logo shown above, which was used by defendant after December 31, 2014, the name of defendant "Progressive Lawn Managers, Inc." appears to be "Lawn Managers, Inc." (Pl. Exhibit 18; see also Pl. Exhibits 23, 24; Tr. Vol. 2 at 58-61; Deft.

Exhibit X-1 (photo of defendant's Scion vehicle); Pl. Exhibit 8 – attached photo of Scion vehicle)

30.     Smith testified that she had the new logo developed for Progressive in late 2014, and that Progressive began using the new logo in early 2015. (Tr. Vol. 2 at 123) Smith testified that Progressive used the new logo until Smith began to make changes in order to make "Progressive" larger again, sometime in mid-2017. (Tr. Vol. 2 at 152-153; Pl. Exhibit 99) The logo shown in Pl. Exhibit 18 was used on defendant PLM's yard signs starting at the beginning of 2015, as shown by Pl. Exhibit 105. (Tr. Vol. 3 at 35-36)

31.     Smith testified that she had the new 2015 logo developed because she never liked the earlier one (Pl. Exhibit 17) in which "Progressive" was in large type relative to "Lawn Managers." (Tr. Vol. 2 at 149-151) The Court finds this explanation for defendant's change in its logo to be less than credible.

32.     Shortly before plaintiff's suit was filed, on November 23, 2015, plaintiff's trademark counsel sent defendant a cease and desist letter. (Pl. Exhibit 8; Tr. Vol. 1 at 74-75) The letter requested that defendant modify its logo and signage so that the word "Progressive" in "Progressive Lawn Managers" was once again prominent. The photo of the Scion attached to Pl. Exhibit 8 was taken in October 2015 by an LMI employee. (Tr. Vol. 1 at 159) Defendant, by counsel, rejected the request in a letter dated December 3, 2015. (Pl. Exhibit 9)  (See, Jt. Stip. at ¶s 16, 17)

### E.     Evidence of Actual Consumer Confusion

33.     The Court finds that substantial actual consumer and customer confusion resulted from Progressive's use of its new logo after December 31, 2014, as well as from other conduct of Progressive as detailed in these findings. This evidence was virtually unrefuted.

34.     For purposes of these findings, the Court finds and holds that "customers" as used by the litigants in this case is the equivalent of "consumers" as generally discussed under trademark law, because all customers or potential customers qualify as consumers of plaintiff's services.

35.     The Court finds that the evidence supports the following findings of actual consumer and customer confusion resulting from Progressive's use of its new logo:

a.     Mr. Patrick King and Mrs. Laura Westerhold testified at trial that each of them viewed the signage of Progressive in the spring of 2017, on Progressive's building at 120 Old Meramec Station Road and on a commercial van of Progressive's, respectively, and that each of them was confused about the identity of the company using the signage and thought it was plaintiff LMI. Mr. King is a residential customer of LMI and Mrs. Westerhold is the wife of a Commercial customer of LMI. The Court finds the testimony of these two witnesses about the confusion they experienced as a result of defendant PLM's signage to be credible. (Tr. Vol. 1 at 25-27; 29-32; see also, Pl. Exhibits 93 and 92)

b.      There was evidence at trial that plaintiff LMI received more than 140 phone calls indicating customer confusion between January 1, 2016 and the trial. The evidence presented indicates substantial confusion among customers of both companies. Each call was documented by printing a customer record from plaintiff LMI's database, and then the addition of contemporaneous handwritten notes made by LMI employees. (Plaintiff's Exhibits 86, 87, 88, 89; Tr. Vol. 1 at 166-170 (D. Alcorn), Tr. Vol. 2 at 14 (D. Alcorn), Tr. Vol. 2 at 25-27 (L. Kaucher), Tr. Vol. 2 at 30-34 (C. Lawson), Tr. Vol. 2 at 45-46 (C. Alcorn)) The confusion indicated by customers included many customers calling one company while trying to reach the

other, customers calling the wrong company with questions about their account, and even included customers trying to cancel their service but calling the wrong company.

       c.      The Court discounts the significance of the single written customer record prepared by Mr. Zweifel personally, relating to a call from Patrick King. From the testimony at trial on cross-examination of Mr. Zweifel, this record does not appear to have been prepared contemporaneously with the telephone call from Mr. King to Zweifel, about which Mr. King testified.

       d.      The Court finds it significant that plaintiff LMI received a telephone call from a Manchester police officer in 2016 relating to a drive-off from a gasoline pump by a truck, in which the officer mistook Progressive for LMI and sought to reach "Linda Zweifel" (aka Linda Smith) at plaintiff's office. While not consumer or customer confusion per se, the Court finds it significant that even a law enforcement officer could not distinguish between the two companies. (Pl. Exhibit 90 and (90A (transcript of call); Tr. Vol. 2 at 50-51, )

       e.      The Court also finds credible the confusion evidence offered by plaintiff relating to defendant's Scion vehicle. In this incident in May 2017, a confused member of the public called LMI to report the "reckless driving" of a Scion. (Pl. Exhibit 91; Tr. Vol. 2 at 27-28) The Scion is owned by defendant PLM, and Smith testified that she had the signage on the Scion changed in January or February of 2017 to increase the size of the word "Progressive," (See Deft. Exhibit I-2; Tr. Vol. 2 at 156, 158). But the confusion call was made to plaintiff LMI in May 2017. (Pl. Exhibit 91) This indicates that the change in the signage was insufficient to prevent confusion, if the change had in fact been made as of May 2017.

       f.      Smith testified that the license plates for the Scion had been stolen. (Tr. Vol. 3 at 10)  Smith apparently was offering the "stolen license plate" testimony in response to plaintiff's

evidence about the call from the City of Manchester police officer, but that call involved a truck, not the Scion. (Pl. Exhibits 90 and 90A) Further, the loss of license plates would not have any effect on the caller's perception of the signage on either the Scion vehicle or the truck. The Court finds that Smith's explanation about this matter was not credible.

### F.     Additional Evidence Supporting Finding of Infringement

36.     The evidence at trial showed that Progressive, and Smith personally, took various other steps which support plaintiff's claim that Progressive has infringed LMI's trademark in the "Lawn Managers" name. These actions, none of which were authorized by the MSA between Smith and Zweifel, are as follows.

37.     Smith testified, on several occasions, that she has never notified Progressive's customers that Progressive is a separate company from plaintiff.  (Tr. Vol. 2 at 127-128; Tr. Vol. 3 at 44-45; Smith depo. at 131-132) Customer calls were made to plaintiff to the same effect, that the customers were never notified that Progressive was a separate company. (Tr. Vol. 2 at 13, 17-18) Smith testified that she did tell customers that defendant changed its name. (Tr. Vol. 2 at 127-128)

38.     In 2012, Progressive appropriated the business telephone number of LMI (636-6717-7122) and prominently used of the phone number in its advertising, which continued up until the trial. (See Pl. Exhibits 107, 108, 109; Tr. Vol. 1 at 66-67)   The Court does not credit the testimony of Smith that she owned the LMI business telephone number for years before May 2012. (Tr. Vol. 3 at 26) The Court does credit the testimony of an LMI employee that Smith changed the ownership of the phone number to herself just prior to the divorce between Smith and Zweifel. (Tr. Vol. 3 at 94-95)

39.     In 2012, Progressive appropriated the business post office box LMI used for receipt of customer payments, which had a significant effect on plaintiff. (Tr. Vol. 1 at 157)

40.     In February 2012, Smith stated to the City of Manchester Planning and Zoning Commission, that she was starting a new location of Lawn Managers, Inc., rather than truthfully stating to the commission that she was getting divorced and was starting a new company which would occupy the property. (Pl. Exhibit 95; Tr. Vol. 3 at 47-48)

41.     In May 2012, Smith broke into the premises of plaintiff, and admittedly took various items of plaintiff's business property, including the company's customer database which was on a computer server. (Tr. Vol. 1 at 55-56; Pl. Exhibit 129) Smith used a bolt cutter on the gate and broke the door to the building so that it had to be replaced; she had a lawyer at the time but did not call the lawyer prior to breaking into the building. (Tr. Vol. 3 at 37-38)

42.     In February 2016, Progressive was using a letterhead memo form to return checks that were mistakenly sent to defendant instead of plaintiff. The form contained, in reference to Progressive, the words "Home Office," and in reference to plaintiff, "the High Ridge location." (Pl. Exhibit 40, Tr. Vol. 1 at 160-163, and Linda Smith deposition at 120-124)  The existence and use of this memo form supports the conclusion that Progressive intentionally sought to mislead customers and the consuming public, to maintain the fiction that there was an affiliation between the companies.

43.     Progressive manipulated on-line banking arrangements, such that many on-line payments intended for LMI instead went to Progressive, requiring LMI to expend significant employee time to retrieve payments and correct the records. The evidence supports that this confusion impacted significantly impacted consumers and that it continues to the present. (Tr. Vol. 1 at 157-159, 199)

44.     Progressive    appropriated    and    controlled    the    internet    domain    name
"lawnmanagersinc.com" from 2012 to the date of trial. The Court finds from the evidence that
this domain forwarded to Progressive's main domain name and website (at "plmi.us") from that
website's launch until at least late 2016. Progressive thereafter retained the domain name but at
some point ended the forwarding. After the forwarding was ended, someone clicking on a link to
"lawnmanagersinc.com" would go to a place holder page at the domain company,
GoDaddy.com, thus making it appear that plaintiff was no longer in business. (Tr. Vol. 3 at 31-
32) Plaintiff offered evidence that prior to trial, it inquired with GoDaddy.com about purchasing
the domain name, without success. (Pl. Exhibit 103; Tr. Vol. 1 at 176-180)

45.     Progressive failed to correct a number of internet business directory listings which
incorrectly list Progressive as "Lawn Managers" but with Progressive's phone numbers. A large
number of these listings were set out in the Complaint, along with their internet addresses. The
evidence at trial showed that many of these listings were the result of advertising purchased by
Progressive, although some were not. (Smith depo. at 58-60) Progressive did not offer any
evidence that it had attempted to correct any of these listings.  (Tr. Vol. 3 at 33-34)

46.     Progressive misrepresented itself in its marketing, including in the video on
PLM's website, by stating that it has been in business for 30 years, 32 years, or 24 years, none of
which is true because Progressive was not incorporated until 2012. The Court finds that Smith's
testimony in this regard was disingenuous and not credible. The Court finds that the most
reasonable explanation for these misrepresentations is that Progressive was intending for
customers and prospective customers to believe that it was the same company as plaintiff LMI.

47.     Progressive stated in the video - posted on the "Contact Us" page of its "plmi.us"
website - that Progressive has more than 20 professionally trained employees. (Pl. Exhibits 99,

15

100, 101, 102)  The evidence at trial suggests that this video was posted on defendant's website from 2013 until the evening of the second day of trial (Tr. Vol. 2 at 47-50), including on July 28, 2017 and October 9, 2017. (Tr. Vol. 3 at 30-31) Smith admitted that PLM has never had more than 16 employees during a calendar year. (Tr. Vol. 2 at 118-120)

48.     The Court finds that Smith's testimony in connection with this video entirely unbelievable.

a.      Specifically, the Court disbelieves: (1) Smith's testimony on the afternoon of the second day of trial that the video had been taken down from Progressive's website months prior to trial (Tr. Vol. 2 at 121; 153-154; Tr. Vol. 3 at 29-30); and (2) Smith's testimony trial that months previously, she had directed Hibu, her website company, to take the video down, but that Hibu had not done so (Tr. Vol. 3 at 6; Tr. Vol. 3 at 46)) and (3) Smith's testimony that the video's reference to defendant PLM having "more than 20 professionally trained employees" was a reference to all of the employees that she, Smith, had supervised over the years including her time at Lawn Managers, Inc., rather than a statement about the actual size of PLM's employee workforce. (Tr. Vol. 45-46)

b.      On the third day of trial, Smith testified that she called Hibu on the evening after the second day of trial and the video was taken down overnight after this contact.  (Tr. Vol. 3 at 4-7)  This information was verified by a witness for plaintiff and by Pl. Exhibit 161.  (Tr. Vol. 3 at 92-93)

49.     The Court finds that the explanation for the video's misrepresentation about the number of employees of PLM is that PLM intended customers and prospective customers to believe that it was the same company as plaintiff LMI.

16

50.     Progressive used a $40 off coupon that was identical, except for the phone number, to that used by plaintiff LMI. Progressive's coupon was in use in 2015. (Pl. Exhibits 32 and 33, 30; Tr. Vol. 1 at 163-165; Tr. Vol. 2 at 124-125))

51.     Progressive used a "mole removal" flyer in the summer of 2016 that was identical in all respects to a flyer previously used by plaintiff LMI, including the color and the phone number on the flyer; the phone number used was the phone number appropriated from LMI in 2012. (Pl. Exhibit 87 at pp. 75-78 – p. 75 is the mole flyer received by customer Dave O'Neil)

52.     Both parties use yard signs, which are 11 inch by 14 inch cardboard signs which are posted on a stake in a customer's yard after a lawn treatment is rendered. (Tr. Vol. 1 at 64) Progressive used yard signs containing the infringing logo from 2015 forward. (Pl. Exhibit 105, Tr. Vol. 1 at 72).

53.     Plaintiff offered testimony that these yard signs, which may only be left in place for a few days, nonetheless receive many "views" from the consuming public as the signs are viewed from the street. (Tr. Vol. 1 at 64-66, 75-77) Both plaintiff and defendant use thousands of the signs during a year, because each customer typically receives a series of 7 standard lawn treatments and typically, a sign is left for each treatment. (Id.) Zweifel testified that there would be many thousands of views of these signs in a year. (Tr. Vol. 1 at 75-77)

54.     Defendant admitted using yard signs with the infringing logo -- the one which makes it appear that defendant is "Lawn Managers" (the logo as see in Pl. Exhibit 18) -- from January 2015 until sometime in 2017. The Court notes that on the yard signs defendant PLM used between 2015 and late 2017, the stake inserted in the signs covered the circle and arch image with the word "Progressive" in the center, on one side of the sign. (Pl. Exhibit 105, Tr. Vol. 1 at 72-73)

17

55.     Defendant PLM attached GPS devices to several of plaintiff's trucks, in an apparent attempt to obtain information to support its claim that plaintiff was violating the Hillsboro agreements, which was the basis for PLM's unclean hands defense. (Tr. Vol. 2 at 126; Smith depo. at 125,  133-135) Smith and employees of defendant took photographs of plaintiff's employees. (Tr. Vol. 2 at 126) The Court finds it significant that PLM went to such lengths in search of evidence to support its claims, but that the evidence presented at trial in support of the defense was so limited.

### G.      Defendant's Justifications

56.     Defendant, and Smith personally, evidently believe that PLM was and is entitled to use the name "Progressive Lawn Managers" in any manner it choses, because Zweifel's permission to use the name "Progressive Lawn Managers" was given in the 2012 MSA and the 2014 Agreement/Judgment. (See, e.g., Pl. Exhibit 9, Roberts letter dated December 3, 2015)

57.     Smith testified that she was never told that she needed to inform customers that PLM is a new company. (Tr. Vol. 3 at 50-51)

58.     Smith also testified that she began to make changes to PLM's logo and signage once the lawsuit was filed in order to make corrective measures, but offered no documentation or evidence other than her testimony to support this claim. (Tr. Vol. 3 at 32-34)

59.     Smith testified that she did not know plaintiff (or Zweifel) had a trademark right and did not believe she was infringing on that right. (Tr. Vol. 3 at 32) She also testified that no one ever told her that she needed to inform customers that PLM was a new company, separate from plaintiff LMI. (Tr. Vol. 3 at 50-51)

60.     The Court finds it less than credible that defendant was engaged in extensive litigation in this court over the use of the name "Lawn Managers" from February 2016 through

the date of trial, but that defendant was never told that it should inform its customers that it is a new company, so that its identity as a separate and distinct company from plaintiff would be apparent to the public. Further, Smith's testimony about this is inconsistent with Smith's testimony that she took steps after the lawsuit was filed to distinguish Progressive Lawn Managers, Inc., from Lawn Managers, Inc. (Tr. Vol. 3 at 33-34), and is inconsistent with Smith's claim that she made changes to defendant's logo in 2017 to make the word "Progressive" larger again.  (Tr. Vol. 3 at 4)

61.     The Court also declines to credit Smith's testimony that Progressive actively worked to change its marketing materials to distinguish itself from plaintiff. On the contrary, the evidence shows that when its permission to use "Lawn Managers" alone expired, Progressive changed its logo from a less infringing to a more infringing design (Pl Exhibits 18 and 105), and that the infringing logo was widely used by defendant.

62.     While the evidence at trial indicates that Progressive made a few changes in the months prior to trial in 2017 (specifically, increasing the size of the word "Progressive" in the logo on its website and yard signs and changing the signage on defendant's Scion), these changes were made only in the few months before trial.

63.     Defendant's conduct in allowing the video to remain on its website until after two days of trial, along with its attempt to deceive the Court about the video, are emblematic of defendant's attitude and approach to this proceeding.

19

## H.      Defendant's "Unclean Hands" Defense

64.      Defendant indicated in its pretrial filings that it would offer substantial evidence of misconduct on the part of plaintiff, in support of its unclean hands defense to this action. The Court declined to grant summary judgment to plaintiff on this defense prior to trial.

65.      However, upon hearing all of the evidence at trial, the Court is persuaded that the evidence offered by defendant regarding alleged misconduct by plaintiff was insufficient to support the defense.

66.      The alleged wrongful conduct was the claim that Zweifel and plaintiff LMI breached the MSA and the 7-25-2014 Agreement/Judgment by selling to and servicing customers in the zip codes set aside to Smith/Progressive. (Amended Answer and Counterclaim, Doc. 25, page 11 at ¶ 6)

67.      In filings made before trial, defendant claimed that plaintiff LMI had no right to service any customers in Smith's zip codes prior to the end of the non-compete between Smith and Zweifel on July 25, 2016, and that because of this, the alleged violation of the non-solicitation and non-compete agreements between Smith and Zweifel was the real source of the customer confusion between the two companies. (Doc. 57 at page 10, ¶s 22 & 24, and at page 19; Doc. 88 at page 6)

68.      The evidence at trial did not support this claim. The evidence at trial supports plaintiff's position that from 2012 forward, both companies had a legitimate right to be in the other's zip codes in connection with servicing commercial customers -- either the Miscellaneous Commercial customers awarded to Smith, or the Commercial customers awarded to Zweifel, which allowed Zweifel/plaintiff to service residential addresses in the zip codes set aside to Smith.

20

69.     In addition, there was evidence at trial that during the non-solicitation/non-compete period, defendant PLM was, and still may be, servicing a not-insignificant number of customers in the zip codes formerly set aside to Zweifel/LMI. (Pl. Exhibit 155; Tr. Vol. 1 at 61-62; Tr. Vol. 2 at 75-76) Defendant PLM also sent marketing materials to customers in the zip codes set aside to Zweifel, prior to the end of the non-compete. (Tr. Vol. 1, 175-176) This evidence makes it clear that Smith and defendant PLM did not feel bound by the same restrictions which they would have this Court impose upon plaintiff.

70.     After the 7/25/2014 Agreement/Consent Judgment, in November of 2014, defendant PLM sent marketing letters to the customers retained (purchased) by plaintiff LMI under the settlement. (Tr. Vol. 2 at 8-11) In response to defendant's marketing to customers it retained under the settlement, plaintiff LMI sent out a letter to those retained customers – the letter that was referred to at trial as the "fraudulent company letter." (Tr. Vol. 2 at 11, 18) The letter was not offered into evidence by defendant. Plaintiff's evidence was that Smith/defendant obtained the information to market to these customers from the 2014 court proceedings prior to the settlement, and that the letter was sent because plaintiff was concerned was that some were cancelling their accounts with plaintiff. (Tr. Vol. 2 at 18-19; Tr. Vol. 2 at 35)

71.     Plaintiff did not send marketing materials to residential customers in Smith's zip codes until after the non-compete between the parties expired on July 25, 2016. (Tr. Vol. 1 at 60-61) At that time, plaintiff sent solicitation letters to the customers that had been awarded to Smith in 2012. (Id.) Smith then obtained a restraining order against Zweifel and Zweifel had to tell the customers who had contacted him that he (and plaintiff LMI) could not provide services to them. (Id.)

21

72.     Both parties filed motions in limine prior to trial, relating to the unclean hands defense.

a.     Plaintiff filed a motion in limine, seeking to bar defendant's proposed exhibits relating to its unclean hands defense (Deft. Exhibits C-6, F-4 and G-4) because they were not disclosed until the eve of trial, on October 20, 2017.

b.     Defendant filed a motion in limine, seeking to bar the admission of plaintiff's rebuttal evidence relating to the unclean hands defense (marked as Pl. Exhibits 139-152), because the documents were not disclosed until August 25, 2017, after the close of discovery.

c.     Defendant's counsel described the documents produced by plaintiff in August 2017 as 1,300 pages of documents.[1] (Tr. Vol. 1 at 47-50)

d.     At trial, defendant offered only one of defendant's disputed exhibits, Deft.'s Exhibit F-4, which was admitted. This exhibit was a revised version of a potential rebuttal exhibit of plaintiff's (Pl. Exhibit 145, which plaintiff did not offer and which was part of the document production on August 25, 2017). Deft. Exhibit F-4 was a version that had been marked up by defendant with color coding and with some comments added by defendant. (Tr. Vol. 1 at 137-142)

73.      Deft. Exhibit F-4 was the only documentary exhibit offered in support of defendant's claim that plaintiff violated the orders and judgments of the Hillsboro court and that plaintiff's claims should therefore be barred by unclean hands.

74.     Defendant evidently asserts that the Hillsboro MSA and the 7/25/2014 Agreement/Consent Judgment provide that certain customers were awarded to Smith/defendant

---

[1] Defendant's counsel represented to the Court that plaintiff objected to, and did not produce, its financial documents. (Tr. Vol. 1 at 49) Plaintiff did initially lodge an objection to defendant's request for plaintiff's tax returns and financial statements, but produced the documents and they were examined by both experts. (Tr. Vol. 2 at 66-67 (Torres); Tr. Vol. 3 at 68-69 (Toennies)) It is mystery to plaintiff why this remained a subject of contention at trial.

PLM forever (despite the July 25, 2016 end date on the non-compete agreement), and that Zweifel/LMI violated the terms of these agreements. (Tr. Vol. 2 at 147; Tr. Vol. 3 at 44, 51)

75.     This Court finds as a matter of fact that defendant's evidence of unclean hands was both insufficient, and insufficiently related to the claims of trademark infringement, to bar plaintiff's claims, either with regard to liability or with regard to remedy. The Court addresses this claim further in the Conclusions of Law below.

## I.     The "Naked License" Defense and Counterclaim

76.     The final defense remaining to defendant PLM is the claim that plaintiff's trademarks are invalid and should be cancelled (asserted as a counterclaim) because in the MSA, Zweifel gave Smith a "naked license" to use the name "Lawn Managers." This license was granted for two years after the Smith/Zweifel divorce, and was later extended by approximately 6 months until December 31, 2014. The Court declined to grant plaintiff summary judgment on this claim, so it remained a "live" claim at trial. (Doc. 64 at 11-15)

77.     This claim falls under the statutory defense of abandonment under 15 USC Section 1127, and is addressed further under the Conclusions of Law below. A "naked license" is a license to use a trademark that is unaccompanied by quality control measures; that is, quality control is not provided for either by the written terms of the license or as the license is implemented by the licensor and licensee. The legal issues relating to "licensee estoppel" are addressed below in the Conclusions of Law -- only the factual issues are discussed here.

78.     An issue has been raised as to whether defendant is a licensee of plaintiff, since the license was between Zweifel and Smith, the owners of the corporate parties. The evidence at trial was more than sufficient to hold, for purposes of the license given by Zweifel to Smith to use the name "Lawn Managers," that the corporate entities are the alter egos of the individual

owners. Based upon the evidence, both plaintiff Lawn Managers, Inc. and defendant Progressive Lawn Managers, Inc., as well as Zweifel and Smith, conducted themselves at all times as bound by the license given by Zweifel to Smith.

79.     Alternatively and additionally, both plaintiff LMI and defendant PLM ratified the agreements of their principals, Zweifel and Smith, and for this additional reason, both corporations (plaintiff and defendant) are bound by the license given by Zweifel to Smith.

80.     Defendant failed to support the naked license defense as a factual matter. The evidence falls into three categories: (1) there was close working relationship over many years between Zweifel and Smith, (2) Progressive used the same series of lawn treatments and followed the same business practices as plaintiff, and (3) there was no evidence that the quality of services offered by PLM was deficient or of poor quality, or of a different quality than that of plaintiff. (Tr. Vol. 1 at 81-84; Tr. Vol. 2 at 41)

81.     Smith admittedly worked in the plaintiff's business for many years and was familiar with all aspects of the business. (As noted above, Smith worked in the plaintiff's business from 1994 until the divorce, 17 years. (Tr. Vol. 1 at 40, 81)) PLM took trained and licensed technician employees from LMI when the companies split. (Tr. Vol. 1 at 82-84)

82.     Zweifel testified that he and his employees were frequently in Smith's zip codes servicing residential addresses for commercial customers, and had many opportunities to observe the work of PLM's technicians. (Tr. Vol. 1 at 82-84; Tr. Vol. 2 at 41) Specifically, Zweifel and other LMI employees observed the standard of work of PLM on approximately 1500 occasions during the term of the license, when LMI employees were legitimately engaged in providing commercial services in PLM's zip codes. (Tr. Vol. 1 at 82-84) The license given in the MSA

may have been silent on the details of quality control, but the evidence showed that quality control in fact existed during the term of the license.

83.     PLM did not offer any evidence that its own services were substandard or defective, and indeed, Smith testified that PLM provided "exceptional" services. (Tr. Vol. 2 at 126) Moreover, PLM would be estopped to claim that its own services were of poor quality in an attempt to support its claim that plaintiff has abandoned its trademark.

84.     Defendant presented no evidence of a loss of trade significance, neither by way of testimony nor by way of survey evidence presented by an expert witness. Instead, the evidence at trial supports that the "Lawn Managers" mark is of significant value as an indicator of the source of lawn services. Its value to defendant is apparent from defendant's ongoing conduct. Further, the confusion evidenced by defendant's customers when they learned, in 2016, that defendant PLM was a separate company from plaintiff LMI, shows that the trade significance of the mark was unimpaired.

### J.     Plaintiff's Request for Injunctive Relief

85.     Zweifel testified about the injunctive relief plaintiff LMI is requesting in this case. (Tr. Vol. 1 at 91-93). Among the requests is that defendant PLM be ordered to cease using the name "Progressive Lawn Managers," because of the concern that if defendant is not restrained, it will return to the same infringing behavior as in the past. (Tr. Vol. 1 at 91) However, plaintiff recognizes that the Court has determined that defendant has plaintiff's consent to use the full name. Plaintiff has included a proposed permanent injunction at the end of these findings.

### K.     Plaintiff's Damages: Defendant's Profits from the Infringement

86.     Plaintiff offered the testimony of its expert witness, Fernando Torres, an economist with an intellectual property consulting company named I.P. Metrics, LLC, located in

San Diego, California. (Tr. Vol. 2 at 62) The testimony was offered to support plaintiff's request for an award of defendant's profits from its use of the infringing mark, in lieu of an award of plaintiff's actual damages. See 15 USC Section 1117(a). (Tr. Vol. 2 at 68) Mr. Torres testified to his educational background as an economist, his employment history, his professional affiliations, and his experience testifying as an expert witness, all of which is also reflected in his report, Pl. Exhibit 120. (Tr. Vol. 2 at 62-67)

87.     Mr. Torres examined plaintiff's and defendant's financial statements (Pl. Exhibits 78 (PLM), and 116, 118, 119 (LMI)), and tax returns of plaintiff and defendant for the years 2013, 2014, 2015 and 2016 (Pl. Exhibits 74, 75, 76, 77 (PLM) and Pl. Exhibits 117 (LMI)).  (Tr. Vol. 2 at 85-86) In his written report and his trial testimony, Mr. Torres noted that defendant PLM did not use any other trademarks in its business activities. (Tr. Vol. 2 at 73-75, 90)

88.     Mr. Torres offered the opinion that defendant's net revenues from the use of the "Lawn Managers" trademark, and the amount that should be awarded as defendant's profit, for the period January 1, 2015 through the date of trial was $322,753.00 (Pl. Exhibit 120 at 13 & 17; Tr. Vol. 2 at 85) In calculating the net profit figure for defendant PLM, in keeping with the usual manner of calculating trademark damages, Mr. Torres did not deduct certain "corporate level" expenses from defendant's gross revenues.  (Tr. Vol. 2 at 76-82, 101-103, 106-107; Tr. Vol. 3 at 62)

89.     Mr. Torres also calculated a cost for plaintiff to conduct corrective advertising, a different category of damages, arriving at a figure of $71,346.00 (Pl. Exhibit 120 at 16 & 17; Tr. Vol. 2 at 83-84, 85, 114-116) Mr. Torres did not calculate pre-judgment interest on the damages figure, but testified that it could be calculated. (Tr. Vol. 2 at 84)

90.     Defendant has asserted that Mr. Torres' approach and calculations were incorrect, and offered the testimony of its own expert, Mr. Brian Toennies, a local CPA who prepares tax returns for defendant. Mr. Toennies testified, essentially, that defendant should be entitled to claim all of the normal deductions taken on a federal tax return as deductions to its gross revenue, for purposes of calculating defendant's profits. (Tr. Vol. 2 at 106-107)

91.     Under Mr. Toennies' approach, defendant had a net loss for two out of the three years at issue, and a negative number ($3,175 plus -$10,944) in net profit in 2015 and 2016, according to its tax returns. (Pl. Exhibit 79 at 3 and Deft. Exhibit E-6; see also Doc. 88 at 8 (Deft. trial brief))  Defendant's tax return for 2017 was of course not completed at the time of trial. Mr. Toennies testified that he calculated defendant's earnings before taxes, depreciation and amortization as $23,829 for 2015, $10,533 for 2016 and $43,136 for 2017 to date, giving a total of $77,498.00 for the three year period. (Tr. Vol. 3 at 70, 74, 79)

92.     The Court finds that both experts testified honestly within the scope of their knowledge. However, Mr. Torres' approach to the question of defendant's profits is better supported by the law relating to an award of defendant's profits to plaintiff under 15 USC Section 1117(a).

93.     Mr. Torres' testimony regarding trademarks and branding, and regarding the size of the lawn care market in the St. Louis area was helpful to the Court in understanding the issues in this case. (Exhibit 120; Tr. Vol. 2 at 70, 71)

94.     The Court therefore holds that the evidence supports plaintiff's claim to an award of $322,753.00 in damages, consisting of defendant's profits from the use of the infringing mark for 2015, 2016 and 2017 to the date of trial.

95.     In addition, the Court finds that Mr. Torres correctly determined the probable cost to plaintiff of corrective advertising to inform the public that plaintiff and defendant are not affiliated, and awards plaintiff the sum of $71,346.00 in corrective advertising costs.

96.     The damage award to plaintiff therefore totals $394,099.00.

97.     The Court addresses the award of attorneys' fees, costs and expenses to plaintiff LMI in the Conclusions of Law below.


## II.     PROPOSED CONCLUSIONS OF LAW

### A.     Trademark Registrations and Ownership of the Trademarks

1.     The purpose of trademark law is to protect both the owner of a registered mark and to protect consumers and the public; specifically, to protect the public from deceit.[2] Trademark registration applies to both words by themselves and words and symbols combined. See, 15 U.S.C. Section 1127.

2.     Under 15 U.S.C. Section 1057(c), the filing date of an application for registration of a trademark becomes the effective registration date, if and when the USPTO grants registration. In other words, upon the granting of registration, the effective date of the registration is retroactive to the filing date. Both of plaintiff's registrations in this case were granted by the USPTO.

3.     Plaintiff's two trademark registrations were effective on the date they were filed. Therefore, the first registration, filed on November 14, 2011, pre-dates the date the

---

[2] See S. REP. NO. 1333, 79th Cong., 2d Sess. 4 (1946), reprinted in 1946 U.S.C.C.A.N. 1274, 1275 ("To protect trade-marks, therefore, is to protect the public from deceit, to foster fair competition, and to secure to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not.").

Smith/Zweifel divorce was granted in 2012, and was effective at the time of the divorce. In addition, the Court holds that plaintiff's common law trademark rights would have been effective at the time of the divorce in any case.

4.      Defendant's counsel seemed to suggest at trial that there was a misrepresentation of some sort in the trademark registrations filed on behalf of plaintiff, relating to whether there were any undisclosed license agreements. Plaintiff's registrations were filed by experienced trademark counsel on behalf of the plaintiff corporation, Lawn Managers, Inc. Upon examination of the registration files (Pl. Exhibits 82 & 83), the Court finds and holds that there were no misrepresentations in the registration filings, and no defect in the registrations. An application for a trademark registration does not have to list the applicant's licensees; rather, the application provides that the applicant can base its use of the trademark on its own use or that of a licensee.

5.      Defendant also seemed to suggest at trial that there was a deficiency of some sort in plaintiff's trademark rights because plaintiff made a minor change to the color of its design mark (the bare feet logo with the words "Lawn Managers") -- from green and yellow to blue. (Tr. Vol. 1 at 126-127, 192-193) Plaintiff's 2011 registration (for the combined word/design mark) did not make any claim to as to color. (Pl. Exhibit 82 at LMI 447) The green and yellow version of the logo creates the same commercial impression as the same design in blue, and defendant offered no evidence that any consumer confusion arose from the change to blue. Moreover, this issue, if there is an issue, was not plead by defendant. This case does not involve any issue under the trademark tacking doctrine. See, e.g., *Hana Fin., Inc. v. Hana Bank*, 135 S. Ct. 907, 190 L.Ed.2d 800 (2015).

6.      Under the Smith/Zweifel MSA, the registered trademark for "Lawn Managers" is the property of Zweifel because it was not specifically awarded to Smith and was therefore a

corporate asset that was part of the residual business property awarded to Zweifel under Section 5.01 of the MSA. Further, the MSA specifically provides that the name "Lawn Managers" was awarded to Zweifel ("Randy will retain the corporate name of Lawn Managers, Inc."). (Pl. Exhibit 11 at page 8, Section 5.01)

7.      Both the 2015 and the 2011 registrations protect plaintiff's rights to the "Lawn Managers" mark. The 2011 registration protects plaintiff's trademark rights in the words "Lawn Managers" because a registration for a design mark that contains words protects both the design and the words. Indeed, the words in a composite word-design mark are presumed to be dominant. McCarthy on Trademarks and Unfair Competition, Section 23:47 (4th ed.).

## B.      Trademark Infringement and Confusion Evidence

8.      The Court holds that plaintiff proved all of the elements of trademark infringement by defendant. Plaintiff had a valid and protectable trademark; plaintiff owns the trademark; and defendant used the mark – or a mark similar to the mark – without the consent of the plaintiff in a manner likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation or approval of the goods. *SquirtCo v. Seven–Up Company,* 628 F.2d 1086, 1090-1091 (8th Cir.1980) (Stating, "The ultimate issue on the infringement claim was whether the recent mark QUIRST so resembled the registered mark SQUIRT that its use was "likely to cause confusion, or to cause mistake, or to deceive." The Lanham Trademark Act, 15 U.S.C. §§ 1114(1), 1127.")

9.      All of the factors establishing "likelihood of confusion" under *SquirtCo v. Seven–Up Company,* 628 F.2d 1086, 1091 (8th Cir.1980) are present in this case. The factors to be considered under *Squirtco* are: (1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete

with each other; (4) the alleged infringer's intent to 'pass off its goods as those of the trademark owner; (5) incidents of actual confusion; and (6) the type of product, its costs and conditions of purchase." *Co–Rect Prods.,* 780 F.2d [1324] at 1330 (citing *SquirtCo,* 628 F.2d [1086] at 1091). "[T]he relative weight of the factors depends on the facts of the individual case." *First Nat. Bank in Sioux Falls v. First Nat. Bank, South Dakota,* 153 F.3d 885, 888 (8th Cir.1998).

10.     "Intent on the part of the alleged infringer to pass off its goods as the product of another raises an inference of likelihood of confusion, but intent is not an element of a claim for trademark infringement." *Squirtco*, supra, at 1091 (citing *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 157-58 (9th Cir.), cert. denied, 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963)). "Likewise, actual confusion is not essential to a finding of trademark infringement, although it is positive proof of likelihood of confusion." *Squirtco*, supra, at 1091 (citing *Standard Oil Co. v. Standard Oil Co.*, 252 F.2d 65, 74 (10th Cir. 1958)).  "Likelihood of confusion is a finding of fact." *Squirtco*, supra, at 1091 (citations omitted).

11.     The Court holds that the confusion evidence offered by plaintiff (see Pl. Exhibits 86, 87, 88, 89; and the supporting testimony for the exhibits) is admissible. Rule 803(3), FRE, the state of mind exception to the hearsay rule, permits the admission of such statements and testimony to show the declarants' (the customers') state of mind. The exhibits and testimony of the employee witnesses was admissible under Rule 803(5), FRE, recorded recollection. Rule 803(3) applies to the customers' statements, and Rule 803(5) applies to the testimony of plaintiff's employees about the customer calls.

12.     The majority of circuits favor admission of such evidence under Rule 803(3), and there are strong policy reasons favoring admission as well. See, *Report and Recommendation: Application of the Hearsay Rule to Evidence of Actual Confusion in Trademark Infringement*

*Cases*, INTA Enforcement Committee, International Trademark Association, pp. 2, 10 (2010). The Eighth Circuit has held that confusion evidence of this kind is admissible. See, *First National Bank in Sioux Falls v. First National Bank South Dakota*, 679 F.3d 763, 768-769 (8th Cir 2012) (admitting confusion log compiled by employees under Rules 803(3)); and *Bebe Stores, Inc. v. May Dep't Stores Int'l, Inc.,* 230 F.Supp.2d 980, 988 n. 2 (E.D.Mo.), ("[The defendant] insists that [the testimony of plaintiffs' employees] is inadmissible hearsay, but it is not being introduced to prove the truth of the matter asserted by the customer."), *aff'd in part, remanded in part,*313 F.3d 1056 (8th Cir.2002) (per curiam).

13.     Plaintiff's confusion exhibits are also admissible under Rule 807, the residual exception to the hearsay rule, because their accuracy and reliability was demonstrated at trial.

14.     Even in the absence of the evidence of *actual confusion*, plaintiff would prevail in this case. Each of the *SquirtCo* factors for determining the likelihood of confusion weighs in favor of plaintiff: (1) The mark is a strong one; (2) the disputed portion of defendant's mark (the words "Lawn Managers") is identical to plaintiff's mark; (3) plaintiff and defendant are in the same business, are in direct competition with each other, and use very similar business methods; (4) defendant intended to pass off its services as those of plaintiff; (5) there were many incidents of actual confusion as shown by the evidence, and (6) the services provided by the two parties are virtually identical. In particular, factors (4) and (5) are particularly strong on the evidence in this case.  *Co–Rect Prods.,* 780 F.2d [1324] at 1330 (citing *SquirtCo,* 628 F.2d [1086] at 1091); *First Nat. Bank in Sioux Falls v. First Nat. Bank, South Dakota,* 153 F.3d 885, 888 (8th Cir.1998).

### C.     Impact of the "onsent to Use "Progressive Lawn Managers"

15.     The Court gleans from the evidence and the demeanor of the witnesses at trial that defendant's infringing conduct from January 1, 2015 forward stems primarily from a belief on the part of Smith and Progressive that they are entitled to use the "Progressive Lawn Managers" name. It is uncontested that in the MSA, and in the 7/25/2014 Agreement/Consent Judgment, Zweifel agreed that Smith could use the name "Progressive Lawn Managers." Plaintiff asserted that it properly withdrew the consent, but this Court held in its summary judgment order that the consent could not be withdrawn.

16.     However, as this Court also held in its summary judgment order, defendant is not entitled to use the name "Progressive Lawn Managers" in any way that it chooses, if the manner of its use creates serious confusion about the two companies among the consuming public. Defendant did not seek summary judgment in its favor, much less on the basis of the "consent" defense. Defendant's continued reliance on the "consent" Smith received from Zweifel is misplaced.

17.     The "consent" or permission contained in the Hillsboro MSA and the 7-25-2014 Agreement/Judgment is not sufficient to shield Smith and defendant from a finding of trademark infringement. Zweifel gave Smith consent to use the name "Progressive Lawn Managers," but did not consent to an infringing use by Smith or Progressive.

18.     This Court held in its summary judgment order as follows:

The facts before the court demonstrate only that defendant had a consent agreement to use the name "Progressive Lawn Managers," not that it had consent to make an infringing logo, confuse customers, or otherwise hold itself out as the Lawn Managers business. Similarly, the undisputed facts show that while plaintiff may have released any claim to the name "Progressive Lawn Managers," there was never a release of claims to trademark infringement if Progressive's logo confused consumers. Even if plaintiff released its claim to the name "Progressive Lawn Managers," it does not follow that it released any future claim to infringement on the "Lawn Managers" mark. There are no facts indicating

33

that plaintiff stated it would not, following December 31, 2014, engage in legal action to protect its trademark. *Cf. Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc.,* 758 F. Supp. 512, 526–27 (E.D. Mo. 1991), *aff'd*, 989 F.2d 985 (8th Cir. 1993).

Finally, while a license carries with it the waiver of liability for infringement during the period of licensing, *see* 3 McCarthy on Trademarks and Unfair Competition §18:40 (4th ed.), the facts show that defendant's license to use the "Lawn Managers" mark expired on December 31, 2014. Plaintiff has alleged infringement after that date. Accordingly, the consent, release, and waiver defenses fail as a matter of law.

(Doc. 64 at 8)

## D. Defenses Remaining for Trial (Unclean Hands and Naked License) and De Novo Determination of Issues

19.     In its summary judgment ruling on plaintiff's motion, the Court declined to grant plaintiff summary judgment as to the defenses of unclean hands and the naked license defense and counterclaim raised by defendant, reserving those issues for trial.

20.     Plaintiff is entitled to a de novo determination by this Court of all issues of fact and law in this case. *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).

21.     That is the import of the decision to place this case back on the active docket in March 2017, when this Court stated,

> The property rights at issue here involve the application of federal trademark law. Plaintiff brought this action claiming that it has a trademark in the phrase "Lawn Managers," and that defendant has infringed on that mark, causing consumer confusion. (ECF No. 1). While this court will have to rely in part on the divorce decree to determine ownership of the trademark "Lawn Managers," the court is persuaded that this mark is no longer marital property subject to state court modification. The abstention principles that would otherwise support a stay no longer apply. Instead, "'the presence of federal law issues must always be a major consideration weighing against surrender' of federal jurisdiction." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26 (1983) (citations omitted).

(Doc. 49 at 3)

34

22.     Further, the record in this case indicates that Zweifel filed a reservation of rights under *England* in the pending contempt proceedings in Hillsboro, Missouri; the reservation of rights was filed on February 9, 2017. (Doc. 61-9 filed 6/7/2017; See also, Doc. 80 at 14, plaintiff's pretrial brief)

23.     On December 14, 2017, post-trial, defendant filed with this Court a memorandum and copy of an order from the Hillsboro court, entered December 4, 2017, in which the Hillsboro court denied Zweifel summary judgment in the contempt proceedings which apparently remain pending in Hillsboro. (Doc. 112, Exhibit A)

24.     The Hillsboro court's ruling on a summary judgment motion in the Hillsboro case has no impact on this Court's rulings in this case. Not only is a ruling denying summary judgment merely preliminary, but plaintiff in this case has the right to a de novo determination of all issues of fact and law in this case.

### E.     Unclean Hands Defense and the Marital Settlement Agreement

25.     As indicated in the Court's findings of fact above, the defense of unclean hands was not sustained at trial as an evidentiary matter. Defendant did not establish that plaintiff's conduct was the cause of the consumer confusion, which defendant premised on the claim that plaintiff had no right to be present in Smith's zip codes prior to the end of the non-compete in July 2016.

26.     The Court has determined that as a matter of fact, the consumer confusion was caused by defendant's infringing conduct. The evidence at trial showed that each party had a legitimate reason to be in the other's zip codes for the entire time period following the divorce – the legitimate reason being the servicing of commercial customers, either miscellaneous commercial customers (by defendant) or residential addresses serviced under commercial

35

mowing company accounts (by plaintiff). Defendant did not establish that plaintiff violated either the non-solicitation or the non-compete agreements between Smith and Zweifel.

27.     The Court has an alternative basis to rule in favor of plaintiff on the defense of unclean hands, as a matter of law. Defendant made references to Smith's theory that the customers awarded to Smith in the 2012 divorce were hers forever as her property, and that plaintiff violated the MSA between Smith and Zweifel by taking on customers that were awarded to Smith.

28.     Defendant's unclean hands defense is a classic red herring. Confusion exists because defendant PLM passed off its services – and itself – as plaintiff Lawn Managers, Inc., after January 1, 2015, when it no longer had a license to do so. Plaintiff's presence in "Smith's" zip codes did not cause or contribute to the confusion after January 1, 2015. Plaintiff LMI's presence in the zip codes simply meant that PLM's infringement was more likely to be discovered by the consumer.

29.     The same reasoning applies to the "We Want You Back" letter about which testimony was received.  (Pl. Exhibit 51 and Tr. Vol. 1 at 61, 89-90, 132-135, 213-214; Tr. Vol. 2 at 13)  Plaintiff's sending of the letter merely made defendant's infringement more obvious to the consumers who received the letter, by letting them know that the company they were doing business with was not plaintiff. (Tr. Vol. 2 at 3-7)

30.     Defendant's legal interpretation of the MSA is untenable. Under Missouri law, a separation agreement incorporated into a decree of dissolution is construed and interpreted using the normal principles of contract law.  *Hughes v. Hughes*, 23 S.W. 3d 838, 840 (Mo.App. 2000); *LeKander v. Estate of LeKander*, 345 S.W.3d 282, 286 (Mo. App. 2011) (cited in Doc. 64 at 5).

36

31.     The division of customer accounts or customer lists in the 2012 MSA (Pl. Exhibit 11 at 8, Section 5.02 of the MSA) was coupled with a two year non-solicitation agreement. (Pl. Exhibit 11 at 15, Section 5.06 of the MSA)

32.     "Customers" as such cannot be owned by anyone. Under Missouri law, customer accounts, lists or relationships can be protected for a limited period of time by a restrictive covenant, but cannot be claimed forever by a party to a restrictive covenant in the absence of language granting the party a "perpetual" right. Missouri courts require a party claiming a perpetual or permanent right to demonstrate "unequivocally" that the parties intended that the right be in perpetuity. *Siteman v. Marien Petroleum Co*., 511 S.W. 2d 436, 441 (Mo. App. 1974). To prevail, defendant must point to language in Section 5.02 of the MSA using the terms "permanent," or "perpetual" or words to that effect.

33.     Here, there is no such language in the agreements between Smith and Zweifel -- neither in the 2012 non-solicitation agreement, nor in the 2014 non-compete agreement. Instead, both the non-solicitation and the non-compete agreements were specifically limited in time.

34.     The interest awarded to Smith in 2012 in the MSA was coupled with a two-year restrictive covenant, not a perpetual covenant. To hold otherwise would be contrary to established Missouri law relating to restrictive covenants and, moreover, would be an illegal restraint of trade.

35.     To the extent that defendant's unclean hands defense is based upon the alleged violation of defendant's perpetual "ownership" of the customers awarded to Smith in 2012 and 2014, the claim fails as a matter of law as to the 2012 customers.

36.    Further, any claim by defendant to customers which plaintiff was already servicing as of the 7/25/2014 Agreement/Consent Judgment is barred by res judicata by the 7/25/2014 Agreement/Consent Judgment.

37.    Under the 2014 settlement, Zweifel paid Smith a substantial sum of money, at least part of which related to Smith's claim at the time that Zweifel was servicing customers he did not have the right to service. The 2014 agreement did not call for Zweifel to transfer any customers back to Smith, nor did it state that Smith had a continuing claim to the customers which were in dispute at the time of the settlement. Thus, Zweifel effectively "purchased" these customers from Smith.

38.    Defendant did not produce any evidence at trial that Zweifel or plaintiff was servicing any customers in Smith's zip codes that were not known, **or could have been known,** at the time of the 2014 settlement.

39.    Smith/Progressive is not entitled to make claims relating to the same customers in more than one proceeding – therefore, any customer that was known, or could have been known, on July 25, 2014, is no longer available to Smith or Progressive as the basis for a claim of unclean hands or damages.[3]

40.    There was no evidence presented at trial that between the date of the July 2014 agreement and July 25, 2016, plaintiff serviced any customers in "Linda's zip codes" that plaintiff did not already have on its customer list as of 7/25/2014.

41.    Finally, defendant's assertion that plaintiff had unclean hands because, after the end of the non-compete on July 25, 2016, LMI serviced customers who were awarded to Smith in 2012 or 2014, is unsustainable as a matter of law.

---

[3] Defendant is not a landlord in a subsisting commercial lease, and is not entitled to file multiple, serial proceedings to assert claims relating to the same customers.  There is no other legal scenario in which a claimant is allowed to make serial claims for damages after an initial claim has been resolved.

42.     There is no dispute that the non-compete contained in the 7/25/2014 Agreement/Consent Judgment ended on July 25, 2016. This Court holds that after that date, either party – Smith or Zweifel, or Lawn Managers, Inc. or Progressive Lawn Managers, Inc. – had the right to solicit and service any customer in any of zip code, including customers previously set aside to either Smith or Zweifel in the 2012 MSA.

43.     Therefore, defendant's attempt to show that Zweifel/plaintiff engaged in wrongful conduct in late July 2016 by sending a solicitation letter to customers awarded to Smith in 2012 cannot serve as the basis for an unclean hands defense in this case. Neither Smith nor Zweifel had any further protectable interest in customers in "their" zip codes after July 25, 2016. The non-compete was over, and either party was free to compete for customers, just as any other lawn service company could compete for those customers.

44.     Defendant's attempt to show that the marketing letter plaintiff sent in late July 2016 - to the customers that had been awarded to Smith in 2012 - contained statements that were untrue or improper, was unimpressive. (Pl. Exhibit 51 and see Tr. Vol. 2, 23-24) The letter was not improper, dishonest or egregious.

45.     Plaintiff has limited its claims to the period of time after January 1, 2015. This is the date when Progressive, under the agreements between Smith and Zweifel, was to cease using "Lawn Managers" and to assume its own identity in the marketplace.

46.     The Court agrees with plaintiff that no later than January 1, 2015, Progressive should have developed its own brand identity and informed all of its customers that it was a separate company from Lawn Managers. Defendant would also have been well-advised to launch a re-branding campaign starting on January 1, 2015 (or earlier).

47.     Instead, Progressive "doubled down" on its attempt to link itself to plaintiff after it no longer had the right to use the "Lawn Managers" name. This, Progressive had no right to do.

## F.     The Naked License Claim and Licensee Estoppel

48.     A "naked license" claim is primarily one that a non-licensee third party would assert against the owner of a trademark, as the basis for a claim that a trademark has lost its validity and that the third party is therefore free to use the trademark. See, *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1073,  1075-76 (5th Cir. 1997)  ("Because naked licensing is generally ultimately relevant only to establish an unintentional trademark abandonment which results in a loss of trademark rights against the world, the burden of proof faced by third parties attempting to show abandonment through naked licensing is stringent. *Moore Business Forms*, 960 F.2d at 489; *Taco Cabana Intern., Inc.*, 932 F.2d at 1113, 1121; *American Foods, Inc. v. Golden Flake, Inc.*, 312 F.2d 619 (5th Cir.1963).").

49.     Under the statutory language of 15 USC Section 1127, a "naked license" is a species of abandonment. Defendant's burden of proof to show the elements of abandonment is "clear and convincing" and the claim requires "strict proof," since abandonment results in a forfeiture of rights.  *McCarthy on Trademarks, Section 17:12, Clear and convincing proof of abandonment is required.*

50.     Defendant failed to sustain its naked license defense and counterclaim: on the facts, quality control existed and defendant did not offer any evidence of a loss of trademark significance. *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1080 (5th Cir. 1997).

51.     Quality control terms need not be contained in a written license agreement. "Even though a 'naked' license may be the basis for an inference of abandonment where the licensor

maintains no control over the quality of goods made by the licensee, the licensor is not limited by the absence of quality provisions in the license agreement. In fact, the licensor's right and obligation to exercise quality control is conferred by general trademark law, and only implemented by contractual agreements. A contractual provision giving the licensor the right to supervise and control the nature and quality of the licensee's goods and services is not an essential element if adequate quality control was in fact exercised. … If in fact the licensor has made a reasonable inspection of the goods bearing the mark and there is no showing that the goods fall below the essential quality standards, there will be no abandonment. … Even an oral license may be sufficient if actual control is exercised by the licensor … ." *McCarthy on Trademarks, Section 18:59, How much quality control is needed? – Actual quality control in the absence of contractual provisions.*

52.    The Fifth Circuit[4] has held, "The purpose of the quality-control requirement is to prevent the public deception that would ensue from variant quality standards under the same mark or dress. Where the particular circumstances of the licensing arrangement persuade us that the public will not be deceived, we need not elevate form over substance and require the same policing rigor appropriate to more formal licensing and franchising transactions. Where the license parties have engaged in a close working relationship, and may justifiably rely on each parties' intimacy with standards and procedures to ensure consistent quality, and no actual decline in quality standards is demonstrated, we would depart from the purpose of the law to find an abandonment simply for want of all the inspection and control formalities. *Taco Cabana Intern., Inc. v. Two Pesos, Inc.*, 932 F.2d 1113 (5th Cir. 1991) (trade dress infringement case in which the licensor entered into a cross-license with a third party to the litigation).

---

[4] There do not appear to be any 8th Circuit cases discussing "naked licensing."

41

53.     Further, the loss of rights due to the absence of terms is not automatic: "[A]bsent an ultimate showing of loss of trade significance, subsection 1127(2) (and the incorporated doctrine of naked licensing) is not available as a defense against an infringement suit brought by that trademark owner. See 2 McCarthy, § 17:17; …" *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1080 (5th Cir. 1997).

54.     Defendant plead in its answer that the naked license here lasted more than three years. (Doc. 25 at 14, ¶14) Under the statutory language of 15 USC Section 1127, a "naked license" is a species of abandonment, and the statute requires that the abandonment last at least three years before the owner of the registered mark loses its rights.[5] Here, the alleged "naked license" was, by its terms, granted only for a period of two years. Even with the extension of roughly six months granted in the 7/25/2014 Agreement/Consent Judgment, the total period of time that the claimed naked license lasted was two and one-half years, not three years. (May or August 2012 to December 31, 2014.)

55.     Defendant is also foreclosed from asserting the naked license defense and claim of abandonment as a matter of law, by the doctrine of licensee estoppel.

56.      The Eighth Circuit has long held that "[u]nder the doctrine of licensee estoppel a plaintiff-licensee is estopped from contesting the validity of its licensor's marks." *Seven-Up Bottling Co., v. Seven-Up Co.*, 561 F.2d 1275, 1279 (8th Cir. 1977) ("The establishment of an existing licensor-licensee relationship between Company and Bottling effectively constitutes an insuperable bar to recovery by Bottling with regard to its trademark claims. Under the doctrine of

---

[5] **NOTE:**  Plaintiff's experienced trademark counsel advises that it is doubtful whether the three year requirement applies to the naked license claim, and plaintiff's research has not disclosed any case law applying the three year requirement to a naked license claim or defense. But defendant asserted the requirement in its pleading, thus assuming the burden of proving that the alleged naked license was for longer than three years.

licensee estoppel a plaintiff-licensee is estopped from contesting the validity of its licensor's marks." (citations omitted)).

57.     The doctrine of licensee estoppel applies to both current and expired or terminated licenses. *Creative Gifts, Inc. v. UFO & Sherlock*, 235 F.3d 540, 548 (10th Cir. 2000).

58.     Where the "naked license" claim is used defensively by a licensee, the licensee is subject to estoppel and is not permitted to rely upon the claim. *McCarthy on Trademarks, Section 18:63, Licensee estoppel.*

59.     Defendant has asserted that under *Fair Isaac Corp. v. Experian Info. Solutions*, Inc., 650 F.3d 1139 (8th Cir. 2011), the license here was granted to Smith, not to Progressive, raising a question whether Progressive is the alter ego of Smith or is even a licensee.

60.     It is undisputed that defendant's license, which it claims through Smith, was given to it by plaintiff, through Zweifel. There is sufficient unity of interest between Smith and PLM, and Zweifel and LMI, each the sole owner of their respective corporations, to hold that PLM is the licensee of LMI. In the alternative, there is sufficient evidence of ratification of the Zweifel-Smith license by plaintiff and defendant to support that defendant is the licensee of plaintiff.

61.     Moreover, it would be patently unfair to allow defendant to claim that it has the right to use the name "Progressive Lawn Managers" by virtue of permission or consent granted to Smith by Zweifel, while at the same time holding that defendant is not bound by licensee estoppel with regard to its use of the "Lawn Managers" mark.

62.     Defendant, in its briefing, cited the case *Ritz Carlton Ritz Assocs., Inc. v. Ritz-Carlton Hotel Co., 35 Misc.2d 425, 230 N.Y.S.2d 408 (N.Y. Supreme Court 1962), aff'd. 19 App.Div.2d 522, 240 N.Y.S.2d 439 (N.Y. App. Div. 1963) (per curiam), aff'd.14 N.Y.2d 670, 249 N.Y.S.2d 873, 198 N.E.2d 905 (1964),* to support the proposition that licensee estoppel should not

be applied in this case. The case was cited to the Court by defendant more than once as a decision of "the Supreme Court" (Doc. 57 at 22; Doc. 88 at 4), implying that it was a decision of the United States Supreme Court. In fact, the opinion was the published opinion of a New York state trial court. Plaintiff pointed out the error of the citation in several filings prior to trial. (Doc. 61 at 10; Doc. 71 at 5; Doc. 80 at 16) Defendant then filed, on the second day of trial, a memorandum offering an explanation about the mistaken citation of the *Ritz Carlton* case. (Doc. 102)

63.     The Court relied upon the *Ritz Carlton* opinion in denying summary judgment to plaintiff on the naked license claim. If granted, summary judgment on this issue would have removed an issue from the trial and simplified both the briefing and the evidence in the case. Defendant's counsel should have acknowledged its error to the Court immediately, and should have conceded that established Eighth Circuit precedent required the naked license defense/counterclaim to be overruled.

64.     The doctrine of licensee estoppel bars defendant's naked license defense and counterclaim in this case as a matter of law.

### G.     Damages and Relief

65.     Plaintiff is entitled to a permanent injunction (see Section III. below), an award of defendant's profits, and its attorneys' fees, costs and expenses in this case.

66.     Defendant may argue that it would be improper to award damages in this case because it claims that it made little to no profits from the trademark infringement, relying upon its tax returns. "Under the Lanham Act, a plaintiff may recover as damages for trademark infringement (1) the defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. 15 U.S.C. Sec. 1117(a). The defendant bears the burden in calculating profits

of proving any operating costs to be deducted from sales revenue it realized during the period of trademark infringement. *Id.*"  *Tonka Corp. v. Tonk-A-Phone, Inc.*, 805 F.2d 793, 794 (C.A.8 (Minn.), 1986).

67.    In *Tonka Corp.*, the 8th Circuit rejected a "no profit" argument. "Tonk-A-Phone's claim that it made no profit in the 1983-84 and 1984-85 fiscal years is not supported by the evidence it provided to the district court. Notwithstanding appellants' failure to sustain this evidentiary burden, the district court factored-in Tonk-A-Phone's operating costs when it calculated the company's profits during the relevant period by relying on evidence already in the record. In our view, the district court made a reasonable and appropriate damages calculation in this case. We hold the award of damages by the district court is not clearly erroneous."

68.    Here, plaintiff's expert witness made a detailed examination of defendant's tax returns and financial statements, and considered each of defendant's operating costs and other costs in reaching his determination of the amount of defendant's net profits from the infringement.

69.    There is a substantial basis for a money judgment in the total amount of $394,099.00 in favor of plaintiff, Lawn Managers, Inc., and against defendant Progressive Lawn Managers, Inc.

70.    The statute says that the Court, "in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). *Community of Christ Copyright Corporation v. Devon Park Restoration Branch of Jesus Christ's Church*, supra, 634 F.3d 1005, 1009 (8th Cir. 2011). An exceptional case is one in which the party's action was groundless, unreasonable, vexatious, or pursued in bad faith. *Aromatique, Inc. v. Gold Seal, Inc.,* 28 F.3d 863, 877 (8th Cir.1994) (citing *Hartman v. Hallmark Cards, Inc.,* 833 F.2d 117, 123 (8th

Cir.1987)). A finding of bad faith is not required before attorneys' fees can be awarded, and deliberate and willful conduct is sufficient. *Community of Christ*, supra, 634 F.3d at 1013-1014.

69.     Here, similar to the *Community of Christ* case, the evidence shows that Ms. Heller wrote to Linda Smith in November of 2015, requesting that Progressive change its logo, signage, etc. to a non-infringing use of the name "Progressive Lawn Managers." That request was rejected out of hand by defendant (Pl. Exhibit 9), and defendant continued its infringement through the date of trial.

70.     Plaintiff is entitled to an award of attorneys' fees, costs and expenses under 15 USC Section 1117(a). An application for its attorneys' fees, costs and expenses shall be filed within 21 days of the entry of judgment, pursuant to Local Rule 54-8.02, after which the Court will rule on the amount of attorneys' fees, costs and expenses to be awarded to plaintiff.

### III.     PLAINTIFF'S PROPOSED PERMAMENT INJUNCTION

#### A.     Background

Plaintiff, Lawn Managers, Inc., is a Missouri corporation in good standing, which operates a lawn service business located in High Ridge, Missouri  63049. Defendant, Progressive Lawn Managers, Inc., is a Missouri corporation in good standing, which operates a lawn service business located in Manchester, MO  63021. Randall Zweifel is the sole shareholder of Lawn Managers, Inc.  Linda Smith is the sole shareholder of Progressive Lawn Managers, Inc.

#### B.     General Nature of the Case

Plaintiff has alleged that defendant has engaged in the deceptive and unauthorized use in commerce of plaintiff's name and trademark, "LAWN MANAGERS." Plaintiff has used the name "Lawn Managers" in commerce since its incorporation in 1981. Plaintiff registered a word-design composite mark for "LAWN MANAGERS" with a bare feet image with the United States

Patent and Trademark Office on November 14, 2011, Registration No. 4189623 and a word mark for "LAWN MANAGERS" with the USPTO on February 17, 2015, Registration No. 4826435. Plaintiff asserts that it has withdrawn its consent for defendant to use the name "PROGRESSIVE LAWN MANAGERS." Defendant asserts that it has good and sufficient defenses to plaintiff's claims, and that it has the right to use the name "PROGRESSIVE LAWN MANAGERS." The Court finds and determines that a permanent injunction should issue to protect plaintiff's rights.

## C.      Permanent Injunction Order

**IT IS ORDERED, ADJUDGED AND DECREED THAT:**

1.     This Court has jurisdiction over the subject matter of this case.  This Court has jurisdiction over the parties.  Venue is proper in this judicial district.

2.     Plaintiff's "LAWN MANAGERS" mark, which is the subject of the Complaint, is valid and enforceable. The Court finds and holds that this case was filed in good faith and was not filed maliciously or contumaciously in violation of any orders in the divorce proceeding, or subsequent proceedings, between Randall Zweifel and Linda Rene Smith.

3.     The Court's entry of judgment and of this permanent injunction order against defendant resolves in full all claims and issues that plaintiff raised, or could have raised, in the Complaint against defendant, and all issues that defendant raised or could have raised in its counterclaim against plaintiff.    The doctrine of res judicata and collateral estoppel shall apply with respect to all issues of fact and law and matters of relief within the scope of the Complaint and counterclaim.

4.     This Order shall be binding upon plaintiff and defendant and their respective principal shareholders (Randall Zweifel and Linda Rene Smith, respectively) and shall remain

47

effective in perpetuity, so long as plaintiff continues to maintain its rights and use of the "LAWN MANAGERS" mark.

     5.     Defendant and each of its principals, officers, agents, servants, employees, suppliers, attorneys, successors and assigns, and all persons in active concert, participation and privity with them, are permanently restrained and enjoined from:

     a.     Using the words "Lawn Managers" unless the word "Progressive" is prefixed to the words "Lawn Managers;"

     b.     Using any arrangement of the words "Progressive Lawn Managers" in such a way that it resembles or is similar in sight or sound to "Lawn Managers," in any trade name, trademark or service mark; provided, however, that if defendant ceases to use the word "Managers" it is not prohibited from using the word "Lawn" or the word "Progressive" or either of them.

     c.     Should defendant continue to use the name "Progressive Lawn Managers," the three words shall be contiguous, each word in the name shall be the same in font, and the word "Progressive" shall be in font size at least twice as large as that of "Lawn Managers," further, no part of the name shall be placed inside of a graphic or otherwise separated from the other words in the name.

     d.     Defendant shall not in any manner represent that it has been in business prior to 2012.

     6.     Defendant, and each of the entities named in paragraph 5. above, is also enjoined from:

     a.     Marketing, selling, offering to sell, advertising or publicizing any products or services using or bearing the words "LAWN MANAGERS" or any other words similar in

sight or sound to "LAWN MANAGERS," and from using the word "MANAGERS" alone or in combination with any other words.

       b.      Doing any other act or thing, or failing to do any other act or thing, which is likely to induce the mistaken belief that any of defendant's services or business activities are in any way affiliated, connected or associated with plaintiff or its business services or activities, or doing any other act, omission or thing likely to cause confusion as to, or dilute the distinctiveness, of plaintiff's "LAWN MANAGERS" mark.

       7.      The acts, omissions or things prohibited by this Order include without limitation:

       a.      Representing or implying that defendant is a part of or affiliated with plaintiff;

       b.      Representing or implying that defendant has been in business prior to the year 2012, although defendant may represent that it has experienced staff;

       c.      Representing or implying that defendant has a business location in High Ridge, Missouri;

       d.      Using an internet URL, domain name, meta-text or any other device to create or imply a connection between plaintiff's business or services and defendant's business or services; and

       e.      Using, any form of business logo, identifier or signage (including website(s), customer solicitation, communication or billing materials, and building, vehicle and lawn signs) which resembles that of plaintiff in color, layout or content.

       8.      Defendant is further ordered to:

       a.      Adopt and utilize in all website(s), customer solicitation, communication or billing materials, and building, vehicle and lawn signs a **new logo** which does not utilize the arch

49

and plant logo defendant is currently utilizing, and which shall comply with each provision of this order, within 30 days of the date of this Order

b.      Within 5 days of this Order, to permanently remove the video, previously located on defendant's "Contact Us" page on its website plmi.us, from any other location on the internet where said video, or a transcript of the text of said video, appears;

c.      Transfer the domain name "lawnmanagersinc.com" to plaintiff within seven (7) days of the date of this Order;

d.      Transfer the telephone number 636-677-1122 to plaintiff within seven (7) days of the date of this Order;

e.      Utilize an internet service such as yext.com, or by direct contact with the listing companies, correct the information about defendant's name and the number of years defendant has been in business with the Better Business Bureau, Angie's List, KMOV, and any other business directory or advertisement, whether or not the directory or advertisement is on-line, within 10 days of the date of this Order.

f.      Remove defendant's listing under the name "Lawn Managers" from any and all telephone directories, print and on-line, except for any listing for "Lawn Managers" using the telephone number 636-677-1122, since that telephone number shall be transferred to the ownership of plaintiff as provided herein;

g.      Issue a written notice letter to all of defendant's current customers and its former customers, including the addresses listed on Deft. Exhibit H-2, and in the form set out in Exhibit A, explaining that defendant is a separate company from plaintiff and is not and has not been affiliated with plaintiff since January 1, 2015, and apologizing for any confusion that has existed regarding the two companies;

50

h.      Utilize, from the date of this Order forward, standard agreed language as set forth in Exhibit A, to refer customers who mistakenly contact defendant to plaintiff, which language shall not disparage plaintiff or discourage any caller from contacting plaintiff; the Court also orders that plaintiff utilize similar language to refer callers who are customers of defendant to defendant;

i.      Inventory and report to plaintiffs all advertising, marketing and promotional materials employed by defendants through the date of this Order that used or bore the words "LAWN MANAGERS" or any other word similar in sight or sound, whether or not such use was previously disclosed to plaintiff, with said inventory and report to be completed and provided by defendant's counsel to plaintiff's counsel within 10 days of the date this Order is entered by the Court;

j.      Remove, dispose and pay for the removal and disposal of all advertising, marketing and promotional materials, including signage, employed by defendant through the date of this Order that uses or bears the words "LAWN MANAGERS" or any other words similar in sight or sound, with said removal and disposal to be completed within 10 days of the date this Order is entered by the Court, and a certification of completion to be provided by defendant's counsel;

k.      Notify all government agencies, domain name registrars, banks, financial institutions, web hosting companies, and any other entity that defendant is no longer using the name "LAWN MANAGERS" and that all such entities are directed to change their records to reflect defendant's correct name; and

l.      Counsel for defendant shall report to this Court in writing regarding the completion of the efforts and actions set forth above within 21 days of the entry of this Order.

9.      The jurisdiction of this Court is retained for the purpose of making any further orders necessary or proper for the construction or modification of this judgment, the enforcement of this Order, including the injunctive relief provided for under this Order, and the punishment of any violations thereof, including contempt.

10.     This Order shall bind the Parties hereto, their agents and employees, all their assigns and successors in interest, and the sole shareholders of each of the parties.

11.     In accordance with 15 U.S.C. Section 1116, the Clerk of the Court shall notify the Commissioner of Patents and Trademarks of the entry of final judgment, who shall enter it upon the records of the United States Patent and Trademark Office.


DONE AND ORDERED at St. Louis, Missouri, this _____ day of _____, 2017.

_____
United States District Judge


**Exhibit A to Proposed Permanent Injunction**

A.      Language of letter to be sent by defendant to its customers and former customers (that is, to all customers, residential and commercial, current or former, including the addresses shown on Deft. Exhibit H-2):


[on PLM new letterhead]

Dear Customer, Former Customer or Prospective Customer:

As you may be aware, Progressive Lawn Managers, Inc. was formed in 2012, and is located in Manchester, Missouri. Progressive Lawn Managers and Lawn Managers are separate companies and have been separately owned and operated since 2012.

Lawn Managers, Inc., is located in High Ridge Missouri and has been in business since 1979.

We are writing to clarify to you that the two companies are completely separate, and to apologize for any confusion that might have existed as to a connection between the companies.

The contact information for Progressive Lawn Managers, Inc. is shown on the letterhead of this letter.

Should you wish to contact Lawn Managers, Inc., the correct contact information is:

Lawn Managers, Inc.
1844 South Square Drive
High Ridge, Missouri   63049
Tel.:  636-671-7077
Email:  Office.LawnManagers@gmail.com
Website:  lawnmanagers.com
Facebook:  https://www.facebook.com/LawnManagers/
Office Hours:  Monday through Friday, 8 am to 4 pm


Payment Address for Lawn Managers, Inc.:
Lawn Managers, Inc.
P.O. Box 1334
High Ridge, MO  63049

Sincerely,


Linda Rene Smith
President, Progressive Lawn Managers, Inc.

B.      Mandatory language to be used by Progressive in response to telephone inquiries when the customer has reached the wrong company:    "We are sorry, but we are not finding a

record that you are a customer of ours. You may be a customer of Lawn Managers, Inc., and they

can be reached at 636-671-7077. Progressive Lawn Managers and Lawn Managers are separate

companies and have been separately owned and operated since 2012."



Respectfully submitted,

  /s/ Norah J. Ryan
Norah J. Ryan #4420  MBE#32123
Attorney at Law
3407 South Jefferson Ave.
St. Louis, MO 63118
314-241-9994
314-677-2089 (Fax)
norah@norahryan.com

Annette P. Heller, Attorney at Law
Mo. Bar No. 26748, Fed. Ct. No. 3368
400 Chesterfield Center, Suite 400
Chesterfield, MO  63017
Tel. 314-469-2610  Fax 314-469-4850
E-mail:  TMAttorneyHeller@aol.com


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served by operation of the court's CM-ECF system to opposing counsel on this _29th__ day  of December, 2017, to:   Mr. Don V. Kelly and to Mr. Kevin C. Roberts.

  /s/ Norah J. Ryan