UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LAWN MANAGERS, INC., a Missouri
Corporation,

               Plaintiff,

v.

PROGRESSIVE LAWN MANAGERS, INC.,
a Missouri Corporation,

               Defendant.

Cause No.:  4:16-cv-00144-DDN

**DEFENDANT'S PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW**

On October 30, 2017 through November 1, 2017, the Court held a non-jury trial on Plaintiff's Complaint for Trademark Infringement against Defendant.  At the trial, Plaintiff and Defendant appeared by counsel and presented evidence on the record.  The Court, having considered the evidence and arguments of counsel, hereby enters the following findings of fact, conclusions of law, and order.

## I.      FINDINGS OF FACT

**A.      STIPULATED FINDINGS OF FACT**

**1.**     Randy Zweifel ("Randy") is the 100% shareholder of plaintiff Lawn Managers, Inc. ("Lawn Managers"), a Missouri corporation in good standing.

**2.**     Linda Smith ("Linda") is the 100% shareholder of defendant Progressive Lawn Managers, Inc. ("Progressive"), a Missouri corporation in good standing.

**3.**     Prior to their divorce in May 2012, Linda and Randy each owned 50 percent of Lawn Managers, Inc., which ownership rights included ownership of Lawn Managers' rights to the word mark LAWN MANAGERS.

4.      In furtherance of their divorce Randy and Linda negotiated a marital settlement agreement ("MSA").  The MSA between Randy and Linda was incorporated into their divorce decree entered by the Circuit Court of Jefferson County in Hillsboro, Missouri, on May 1, 2012 ("05/01/12 Decree").

5.      The docket sheets for the divorce case reflect that the 05/01/12 2012 Decree and MSA was set aside and a second decree of dissolution of marriage with incorporated MSA was entered by the Hillsboro court on August 7, 2012 ("08/07/12 Decree").  Comments during a 2013 contempt proceeding between Linda Smith and Randy Zweifel by Judge Lisa Page would indicate that she recognized the 05/01/12 Decree as the operative decree and not the 08/07/12 Decree.  Given this history, the parties disagree as to which decree, as between the 05/01/12 Decree and MSA or the 08/07/12 Decree and MSA, is the currently in-force decree.

6.      The only difference between the 05/01/12 Decree and MSA and the 08/07/12 Decree and MSA is that in Section 5.02(1) of the MSA, which refers to miscellaneous commercial accounts, the 08/07/12 Decree and MSA refers to an accompanying Exhibit D, which was a list of miscellaneous commercial customers.

7.      Because all other provisions of the 05/01/12 Decree and MSA and the 08/07/12 Decree and MSA are the same, the 05/01/12 Decree and MSA and 08/07/12 Decree and MSA may simply be collectively referred to as "the Decree and MSA" for sake of simplicity.  To the extent the parties need to specifically refer to either the 05/01/12 Decree and MSA or the 08/07/12 Decree and MSA during trial or in briefing, they will refer to such documents as such.

8.      The Decree and MSA provided in part that:

5.06   Development of New Business Linda will establish a new lawn care company using the name Progressive Lawn Managers, Inc. doing business as Lawn Managers. The parties agree that Linda may use the name Lawn Managers for a period of time no longer than two years from the date of dissolution of

marriage. At the end of two years from the date of dissolution of marriage, or sooner if Linda wishes, Linda will use the name Progressive Lawn Managers, Inc. and will discontinue using the name Lawn Managers. For a period of two years from the date of dissolution of marriage, Linda and her employees will refrain from soliciting residential accounts and commercial accounts in the zip codes that have been awarded to Randy in Section 5.02(2)(b), and Randy and his employees will refrain from soliciting residential accounts and commercial accounts in the zip codes that have been awarded to Linda in Section 5.02(2)(a). Linda and Randy understand that the agreement to refrain from soliciting business in the zip codes awarded to the other party includes business for lawn care services, fertilization, weed control, insect control, and other types of lawn services.

***

8.01 (8)  Enforcement and Construction of Terms The terms of this Agreement are expressly intended to be construed as contractual, with reference so RSMo. Section 452.325, as amended, and therefore nonmodifiable, except as may otherwise be expressly noted; however, the parties also expressly intend for this Agreement to be construed as decretal for the purposes of enforcement. The parties agree that failure of either party to insist upon strict performance of one or more of the terms and provisions of this Agreement shall not be construed as a waiver or relinquishment in the future of any such term and provision all of which shall continue in full force and effect. Further, no waiver of any default shall be deemed a waiver of a subsequent default. The validity and construction of this Agreement shall be determined in accordance with the laws of the State of Missouri.

***

8.02 (3)  Review and Modification of This Agreement No modification or waiver of any of the terms of this Agreement shall be valid unless it is in writing and signed by both parties and where necessary, approved by a court of competent jurisdiction as required by law.

***

8.06  Binding Effect This Agreement shall be binding on the heirs, representatives, and assigns of the parties except as to the specific paragraphs that contain provisions for termination of obligations on the death of either or both parties.

9.      Under the Decree and MSA, Linda relinquished her share of Lawn Managers, Inc, in return for the specific consideration described in the Decree and MSA.

10.     Among other terms, the Decree with incorporated MSA:

3

       a.     Required Linda to assign her shares of stock in Lawn Managers, Inc. to Randy so that Randy had 100% ownership of Lawn Managers, thus divesting Linda of her rights to the Lawn Managers assets (except as specifically set aside to Linda) and its marks;

       b.     Provided that Linda may use the name Progressive Lawn Managers for her company;

       c.     Provided that residential accounts of Lawn Managers would be divided and allocated between Linda and Randy by zip codes with the requirement that the parties would not solicit business in the zip codes awarded to the other;

       d.     Provided in section 5.02(1) for the division between Linda and Randy of commercial accounts and accounts receivable of Lawn Managers

       e.     Provided in section 5.02(2)(a) that Linda was awarded all right, title and interest in all residential accounts and accounts receivables of Lawn Managers, Inc. in the following zip codes: 63341, 63368, 63366, 63376, 63304, 63303, 63301, 63367, 63385, 63362, 63379, 63349, 63021, 63122, 63131, 63141, 63124, 63010, and 63052;

       f.     Provided in section 5.02(2)(b) that Randy was awarded all right, title and interest in all residential accounts and accounts receivables of Lawn Managers in the following zip codes: 63055, 63069, 63073, 63005, 63011, 63017, 63025, 63038, 63040, 63042, 63043, 63044, 63045, 63074, 63105, 63114, 63117, 63130, 63132, 63146, 63031, 63033, 63034, 63135, 63137, 63138, 63026, 63088, 63119, 63123, 63125, 63126, 63127, 63128, 63129, 63144, 63104, 63108, 63109, 63110, 63111, 63116, 63139, 63012, 63016, 63019, 63028, 63048, 63049, 63051, 63070, and 63050.

**11.**    Section 5.06 of the MSA incorporated in the Decree provides among other things that:

     a.     Linda would establish a new lawn care company using the name Progressive Lawn Managers, Inc. doing business as Lawn Managers;

     b.     Linda could use the name Lawn Managers for a period of time no longer than two years from the date of dissolution of marriage;

     c.     At the end of two years from the date of dissolution of marriage, or sooner if Linda wished, Linda would use the name Progressive Lawn Managers, Inc. and would discontinue using the name Lawn Managers.

     d.     The non-solicitation language set out above in paragraph 8.

     e.     During the period of time that Linda used the name of Lawn Managers, she could use the credit of Lawn Managers, Inc. to purchase equipment for her new business, Progressive Lawn Managers, Inc.

     f.     If either Linda or Randy wished to sell any of their commercial accounts or any of their residential accounts as referenced in Section 5.02, then each of them would give the other the first opportunity to purchase the accounts up for sale;

     g.     From the date of dissolution of marriage until Linda could complete the purchase of real estate intended for her business for her new company and make it ready for operation, she could operate her new lawn care company from the current location of Lawn Managers at 1844 South Square Drive, High Ridge, Missouri, 63049 at an agreed rental rate, but only up to December 31, 2012.

**12.**     Linda started a new business in 2012, under the name "Progressive Lawn Managers."

**13.**     Linda filed a contempt motion against Randy on February 4, 2013.  The Jefferson County Circuit Court entered judgment in Linda's favor on this motion on July 2, 2013, ruling,

*inter alia* that Randy had failed and refused to pay certain sums due to Linda. Randy paid the judgment but also took an appeal to the Missouri Court of Appeals, which issued an opinion on May 20, 2014, reported at 431 S.W.3d 559.

14.     Linda filed an amended motion for contempt against Randy on October 21, 2013, raising issues that were not determined by the July 2, 2013 judgment.  Randy filed an answer and cross motion for contempt against Linda on June 18, 2014.

15.     During the trial of the cross motions for contempt in July 2014, the parties reached a settlement agreement, which agreement became part of an "Order and Judgment" dated July 25, 2014 ("July 25, 2014 Order).  The July 25, 2014 Order provides as follows:

<u>Order and Judgment</u>

Cause called for trial on parties cross motions for contempt.

Evidence was commenced but not concluded. Parties announce to the court that they have reached a settlement on the following terms:

1)  Respondent [Randy Zweifel] shall pay to Petitioner the sum of $125,000.00 (One hundred and twenty five thousand dollars; payable as follows:

a)  $80,000.00 payable by Cashier's Check by Monday, July 28, 2014 delivered to Petitioner's attorney.

b)  $5,000.00 per month due the 25th of each month beginning August 28th, 2014 until balance is paid in full. No interest to accrue as long as payments are made on or before the 28th of each month.

2) Parties agree that each may sign up and service new commercial accounts wherever they may be, regardless of zip code, this includes new misc. commercial accounts.

3) Parties agree that each of them <u>shall not</u> sign up or service any new residential accounts in the zip codes awarded to the other in their divorce settlement and decree agreement dated 5/1/12. This non compete agreement shall remain in effect for two years from today's date and is enacted in lieu of the prior non-solicitation clause found in paragraph 5.06 of the Settlement Agreement referred to above.

4)  All other terms of the parties divorce decree and settlement agreement shall remain in full force and effect.

6

5)  Respondent shall transfer to Petitioner all of his existing residential customers in the following zip codes:

     a)  63038 (Ellisville Area)
     b)  63040  (Grover Area)

This shall include any accounts receivables from those accounts. Said transfer to be conducted by Peter Brown from Real Green on Monday July 28th or as soon thereafter as it may be accomplished by Real Green. These zip codes are covered by paragraph 3) also.

6)  Petitioner shall upon final of those sums outlined in paragraph 1) within 5 days deliver to Respondent signed stock certificates to the Corporation Lawn Managers, Inc. or the functional equivalent if said original certificates cannot be found.

7)  Petitioner shall cease to use the name Lawn Managers effective Dec. 31, 2014. Petitioner may continue to use the name Progressive Lawn Managers, Inc.

8)  Both parties agree and do hereby dismiss their respective motions for contempt with prejudice.

9)  Both parties bear their own attorneys fees and costs.

[Signatures of Linda Smith f/k/a Linda Zweifel, Randy Zweifel, Kevin Roberts (counsel), Marsha Brady (counsel), and Judge Lisa Kay Page]

**16.**　　In a letter dated November 23, 2015 addressed to Progressive, counsel for Lawn Managers asserted, among other things, that Progressive was infringing Lawn Managers' trademark and demanded Progressive correct "its signs and trucks so that Progressive Lawn Managers are all the same size or that Lawn Managers is smaller than Progressive and if used with with [sic] a logo is set close to the logo."

**17.**　　In a letter dated December 3, 2015, counsel for Progressive replied to the letter from counsel for Lawn Managers by stating, among other things, Progressive was <u>not</u> improperly infringing Lawn Managers trademark.

**18.**　　On February 4, 2016, Lawn Managers filed this suit against Progressive, asserting that Progressive was infringing Lawn Managers' trademark rights.

**19.** On August 29, 2016, Linda filed a third motion for contempt against Randy in the Jefferson County Circuit Court in Hillsboro.  That proceeding remains pending as of the filing of this stipulation of facts.

**20.** Plaintiff is the record owner of USPTO Registration No. 4826435 for the standard character mark LAWN MANAGERS and USPTO Registration No. 4189623 for the following design plus word mark:



**B.**     **ADDITIONAL FINDINGS OF FACT**

**i.**     ***List of Testifying Witnesses and Their Background***

**21.** Randy.

**22.** Linda.

**23.** Crystal Alcorn, current office manager of Lawn Managers.  (C. Alcorn Depo. 6:9-10.)

**24.** Prior to becoming the office manager, Crystal Alcorn worked in customer service at Lawn Managers.  (C. Alcorn depo. 8:13-17.)

**25.** Crystal Alcorn has worked for Lawn Managers since September 3, 2014.  (C. Alcorn Depo. 6:7-8; 9:11-17.)

**26.** Crystal Alcorn has not worked for any other lawn service companies in the St. Louis area.  (C. Alcorn Depo. 7:1-2.)

**27.** Crystal Alcorn was not employed at Lawn Managers at the time Randy divorced Linda.  (C. Alcorn Depo. 8:25-9:3.)

**28.** Crystal Alcorn was at Lawn Managers at the time it was changing its logo. (C. Alcorn Depo. 9:18-20.)

**29.** Debra Alcorn, who became the office manager at Lawn Managers in 2012 as a result of the divorce between Randy and Linda. (R. Zweifel Depo. 59:9-16.)

**30.** Scott Hewitt, the general manager for Lawn Managers. (S. Hewitt Testimony, TT Vol. 2, 36:24-25.)

**31.** Scott Hewitt has worked for Lawn Managers for 33 years. (S. Hewitt Testimony, TT Vol. 2, 36:22-23.)

**32.** Lisa Kaucher, a customer service representative for Lawn Managers. (L. Kaucher Testimony, TT Vol. 2, 25:1-2.)

**33.** Lisa Kaucher has worked for Lawn Managers for one year. (L. Kaucher Testimony, TT Vol. 2, 25:6-9.)

**34.** Christine Lawson, a customer service representative for Lawn Managers. (C. Lawson Testimony, TT Vol. 2, 30:12-13.)

**35.** Christine Lawson has worked for Lawn Managers since 2013. (C. Lawson Testimony, TT Vol. 2, 30:18-21.)

**36.** Patrick King, a friend of Randy. (King Testimony, TT Vol. 1, 17-18.)

**37.** Laura Westerhold, who is married to a business associate of Randy. (Westerhold Testimony, TT Vol. 1, 30:25-31:15.)

**38.** Fernando Torres, Lawn Managers' expert, testified regarding as to Progressive's profits, Defendant's damages and the cost of remedial measures.

**39.** Brian Toennies, Progressive's expert, testified regarding as to Progressive's profits, and the cost of remedial measures.

9

## ii.    Pertinent Events Occurring Prior to May 1, 2012

**40.**    Randy and Linda were married in 1993 and filed for divorce in 2009.  (R. Zweifel Depo. 12:5-13; Ex. 137.)

**41.**    Linda started working at Lawn Managers in 1994.  (Zweifel Testimony, TT Vol. 1, 40:7-8.)

**42.**    In operating the Lawn Managers business prior to the divorce, Linda did a little bit of everything including working in the office, managing the office, helping with sales, marketing, answering phone calls, billing, handling service calls and engaging customers.  (R. Zweifel Depo. 13:17-18:1.)

**43.**    Linda and Randy mediated their divorce over a number of years.  (L. Smith Testimony, TT Vol. 3, 40:18- 19.)

**44.**    Randy asked Debra Alcorn to come back a little prior to the divorce.  (D. Alcorn Testimony, TT Vol. 1, 184:9-10; D. Alcorn Depo.10:3.)

**45.**    Debra Alcorn and Linda Smith do not get along (D. Alcorn Testimony, TT Vol. 1, 184:7-8; D. Alcorn Depo.9:18; 9:22.)

**46.**    When she came back to Lawn Managers, Debra Alcorn understood that Randy and Linda were getting divorced and that Linda would no longer be involved in the business.  (D. Alcorn Testimony, TT Vol. 1, 184: 12-14; D. Alcorn Depo. 11:22.)

**47.**    At the time Debra Alcorn returned, she understood that Linda was going it start up her own company and move into a new building."  (D. Alcorn Testimony, TT Vol. 1, 184: 18-20; D. Alcorn Depo.12:12–13.)

**48.**   Debra Alcorn learned from Linda that Linda would be operating a business that would include the words "Lawn Managers" in it.  (D. Alcorn Testimony, TT Vol. 1, 184: 21-23; D. Alcorn Depo.12:23.)

**49.**   Debra Alcorn did not recall having any discussions with any Lawn Managers personnel about the fact that Linda would be operating another lawn business with the name "Lawn Managers" in it.  (D. Alcorn Testimony, TT Vol. 1, 1845 1-5; D. Alcorn Depo.13:7.)

**50.**   Prior to the divorce, Randy and Linda agreed that Linda would set up a new company.  (L. Smith Depo. 14:2-9.)

**51.**   As of early 2012, though Linda knew a new business was going to be set up, all the details of that business were not worked out.  (L. Smith Depo. 14:10-13; Ex. 95.)

**52.**   Linda set up Progressive in February 2012 in furtherance of her eventually separating from Randy.  (L. Smith Testimony, TT Vol. 2, 131:17-19, 132:3-5; L. Smith Depo. 11:12-17; Ex. 2.)

**53.**   Linda began operating her new business shortly prior to the signature of the divorce decree by Judge Page.  (R. Zweifel Depo. 26:4-11; L. Smith Depo. 8:18-21.)

**54.**   The transfer of accounts from Lawn Managers to Progressive took place on April 25, 2012.  (L. Smith Testimony, TT Vol. 2, 132:9-11.)

**55.**   Real Green, a lawn service software company, effected the transfer of accounts from Lawn Managers to Progressive.  (L. Smith Testimony, TT Vol. 2, 312:12-13.)

**56.**   Exhibit H-2 is a list of customers transferred to Linda that was prepared by Real Green when it did the transfer on April 25, 2012.  (L. Smith Testimony, TT Vol. 2, 133:6-19.)

**57.**   Linda operated her new business out of Lawn Managers' offices for a month beginning on April 24, 2012.  (L. Smith Depo. 20:16-21:2.)

58.     Before moving out of the building, Linda found out that Lawn Managers had switched miscellaneous commercial accounts back to it.  (L. Smith Depo. 21:3-13.)

59.     On November 14, 2011, Lawn Managers filed an application (Application No. 85471833) with the United States Patent and Trademark Office (USPTO) to register the following design mark.



(Ex. 82.)

60.     In connection with the application to register the design mark, the USPTO issued an office action on March 4, 2012, requesting Lawn Managers disclaim the text portion of the mark, "lawn managers" on the basis that it was descriptive.  (Ex. 82, p. 16.)

61.     On March 16, 2012, Lawn Managers opposed the disclaimer request by asserting that "LAWN MANAGERS has become distinctive of the goods/services through the applicant's substantially exclusive and continuous use in commerce that the U.S. Congress may lawfully regulate for at least five years immediately before the date of this statement."  (Ex. 82, p. 24.)

### iii.     Pertinent Features of the Decree and MSA

62.     Exhibit 10 is the decree dated August 7, 2012.  Exhibit 11 is the MSA that accompanied that decree.  Exhibit 13 is the combined decree and MSA dated May 1, 2012. (L. Smith Testimony, TT Vol. 2, 134:6-11.)   Other than a paragraph on page 8, the Marital

Settlement Agreements dated May 1, 2012 and August 2012 are the same.  (R. Zweifel Depo. 14:5-15:15; Ex. 10, Ex. 11, Ex. 13.)[1]

63.     Randy understood that pursuant to the Decree and MSA, the divorce court was ordering the parties to perform the terms of the MSA.  (R. Zweifel Testimony, TT Vol. 1, 109:22-25; Zweifel Depo. 17:24-18:4.)

### a.  Division of Accounts

64.     Prior to the divorce Lawn Managers had approximately 4,000 residential customers and after the divorce it had approximately 2,100 customers.  (R. Zweifel Depo. 24:7-25:2.)

65.     The remainder of the accounts went to Linda.  (R. Zweifel Depo. 25:3-5.)

66.     Under the Decree and MSA, Randy received fifty-two zip codes and all of the residential accounts and accounts receivable for accounts in those fifty-two zip codes.  (Ex. 10; Ex. 11.)

67.     Linda received nineteen zip codes and all of the accounts and accounts receivable in those. (Ex. 10; Ex. 11.)

68.     Randy understood that the Decree and MSA gave him and Linda a finite list of accounts.   (R. Zweifel Testimony, TT Vol. 1, 110: 24-111:3.)

69.     As part of the property settlement, the parties agreed and the divorce ordered that Linda would get all right, title and interest to certain accounts.  (Ex. 10; Ex. 11, §5.02; §5.02; R. Zweifel Testimony, TT Vol. 1, 111:15-19; L. Smith Testimony, TT Vol. 2, 135:17-23.)

---

[1] For sake of space and brevity, rather than repeatedly citing in duplicate to Exhibit 13 throughout this document, the Court will cite only to Ex. 10 and Ex. 11 when referring generally to the 2012 Decree and MSA.  By citing to the divorce documents in this fashion the Court is not making any statement as to which of the decrees or MSA is operative.  To the extent a particular fact necessitates a specific reference to the May or August versions of the Decree and MSA, the Court will do so.

70.     Specifically, section 5.02 of the MSA granted Linda all right, title and interest in the residential accounts and accounts receivables for all of the customers and accounts of Lawn Managers in specified zip codes.  (R. Zweifel Testimony, 09/22/16 Preliminary Injunction Hearing, 62:18-63:18.)

71.     The Decree and MSA provided in section 5.06 that in the event either party wished to sell any of their commercial accounts, or any of the residential accounts that had been awarded to in Section 5.02 that each would give the other party the first opportunity to purchase those accounts.  (L. Smith Testimony, TT Vol. 2, 135:24-136:13; Ex. 11.)

72.     The division of accounts was not subject to any type of term limitation.  (L. Smith Testimony TT Vol. 3, 19:11-16.)

### b.  Non-Solicitation

73.     The Decree and MSA forbade Linda and Randy from soliciting in the other's zip codes for two years.  (Ex. 11, §5.06.)

74.     The non-solicitation language of section 5.06 of the MSA applied to <u>new</u> business the parties might seek and otherwise Linda owned all of the other accounts in her zip codes.  (R. Zweifel Testimony, 09/22/16 Preliminary Injunction Hearing, 63:17-64:12.)

### c.  Right to Use Lawn Managers' Offices

75.     The Decree and MSA provided in section 5.06 that Linda could use the Lawn Managers' office until December 2012 to operate her business.  (R. Zweifel Testimony, TT Vol. 1, 112:12-15; Ex. 11, §5.06; Zweifel Depo. 27:3-15.)

### d.  Lack of Terms Relating to Use of the "Lawn Managers" Name

76.     In addition to giving Linda the right to use "Lawn Managers" as the name of her company, the Decree and MSA stated that Linda could also use the "Lawn Managers" name to

14

obtain credit.  (R. Zweifel Testimony, TT Vol. 1, 112:3-7; R. Zweifel Depo. 21:13-20; Ex. 11, § 5.06.)

77.    The whole idea of the two-year right to use "Lawn Managers" was for Linda to be successful.  (L. Smith Depo. 119:17-22.)

78.    There was nothing in the Decree and MSA that gave Randy the right to control how Linda used the name "Lawn Managers."  (R. Zweifel Testimony, TT Vol. 1, 112:21-25(L. Smith Testimony, TT Vol. 2, 137:4-7; Ex. 10; Ex. 11.)

79.    The Decree and MSA did not say how Linda was to use the name "Progressive Lawn Managers."  (R. Zweifel Testimony, TT Vol. 1, 118:1-4; L. Smith Testimony, TT Vol. 2, 137:11-13; Ex. 10, Ex. 11.)

80.    The Decree and MSA did not give Randy the right to control what symbols, logos or colors Linda used in her business.  (R. Zweifel Testimony, TT Vol. 1, 113:1-3; (L. Smith Testimony, TT Vol. 2, 137:8-10; Ex. 10; Ex. 11.)

81.    The Decree and MSA gave no rights for Randy to evaluate or control the services provided by Linda's company or how Linda's company would use the "Lawn Managers" name.  (R. Zweifel Testimony, TT Vol. 1, 113:18-114:6; Ex. 10; Ex. 11.)

82.    Randy never asked to evaluate the quality of services that Progressive was rendering under the "Lawn Managers" name.  (R. Zweifel Testimony, TT Vol. 1, 115:23-116:3.)

83.    The Decree and MSA did not allow Randy to check Progressive's premises to evaluate the quality of Progressive's services.  (Admission in Plaintiff's Opening Statement, TT, Vol. 1:17-18; Ex. 10; Ex. 11.)

*e.  Lack of Terms Relating to Notification of Customers*

**84.**     The Decree and MSA did not provide for what Progressive and Lawn Managers were to tell customers about the division of accounts.  (L. Smith Testimony, TT Vol. 2, 137:14-17; Ex. 10; Ex. 11.)

**85.**     The Decree and MSA did not require the parties to notify the public that Linda's company would now be using the name "Lawn Managers."  (R. Zweifel Testimony, TT Vol. 1, 116:4-10; L. Smith Testimony, TT Vol. 2, 137:18-19; Ex. 10; Ex. 11.)

**86.**     There was nothing in the Decree and MSA that required either party to inform the public that Linda's company using the name "Lawn Managers" was a different company than Randy's company using the name "Lawn Managers."  (Ex. 10; Ex. 11.)

*f.  Company Goodwill*

**87.**     In Section 5.05 of the MSA, the parties agreed:

Lawn Managers, Inc. was changed from a "C" corporation to an "S" corporation on October 1, 2004 and the corporate restructuring caused a built-in gain ("BIG") to the company.  The difference between the fair market value of the company assets and the tax basis of those assets on October 1, 2004 generated a built in gain of $362,557.  The two major items contributing to the gain are the building at 1844 South Square Drive, High Ridge, Missouri 63049 ($190,000), and the goodwill of the corporation ($150,000), which includes the name of the company.

(Ex. 11, § 5.05.)

### iv.    Pertinent Events Circa May 2012

**88.**     After the May divorce, there were two companies operating using the name "Lawn Managers."  (R. Zweifel Testimony, TT Vol. 1, 114:17-115:10.)

**89.**     Lawn Managers' customers were switched to Progressive without their knowledge.  (D. Alcorn Testimony TT Vol. 2, 5:19-21, 6:15-18.)

**90.** Starting in May 2012 Lawn Managers and Progressive shared a P.O. Box. (D. Alcorn Testimony, TT Vol. 1, 185: 8-10.)

**91.** Customers of Progressive and Lawn Managers were sending their checks to the same P.O. Box. (D. Alcorn Testimony, TT Vol. 1, 185: 11-13.)

**92.** After May 2012, Debra Alcorn had a system in place with Progressive where she and Terri Kriska of Progressive would go down to the post office and sort the mail to make sure it went to the correct company. (D. Alcorn Depo. 21:21.)

**93.** Debra Alcorn used that system through the end of 2012. (D. Alcorn Depo. 22:7.)

**94.** After the May divorce, Lawn Managers obtained a new phone number. (R. Zweifel Testimony, TT Vol. 1, 66:12-15; Ex. 107.)

**95.** On August 14, 2012, the USPTO issued the registration for the design mark applied for in USPTO application No. 85471833. (Ex. 82.)

**96.** Prior to issuance of the registration Lawn Managers did not file anything with the United States Patent and Trademark Office notifying that Lawn Managers had given Linda the right to use the words "Lawn Managers." (R. Zweifel Depo. 44:22-45:2.)

### v.    2013 Contempt Proceedings

**97.** In 2013 there were contempt proceedings between Linda and Randy. (Ex. J-1; See also December 4, 2017 Order from Circuit Court of Jefferson County, Missouri.)

**98.** In the 2013 contempt proceedings, Linda alleged that Randy: had misappropriated some of the miscellaneous commercial accounts; had solicited residential accounts; had surreptitiously contacted, solicited and acquired certain residential accounts in Linda's zip codes; was actively soliciting accounts which were awarded to her; and had refused to pay money owed

to her under the Decree and MSA.   (See, December 4, 2017 Order from Circuit Court of Jefferson County, Missouri.)

99.     In the 2013 contempt proceedings, Randy filed a Response and Affirmative Defense that alleged, inter alia, that Linda: had mail addressed to Lawn Managers to Linda's business address; and transferred Lawn Managers' phone number to Linda's business.  (*See* December 5, 2017 Order from Circuit Court of Jefferson County, Missouri.)

100.    Exhibit J-1 is a copy of the order issued by the Circuit Court of Jefferson County, Missouri on July 2, 2013 ruling on the contempt proceedings.  (Ex. J-1; *see also* December 4, 2017 Order from Circuit Court of Jefferson County, Missouri.)

101.    In its July 2, 2013 ruling the Circuit Court of Jefferson County found Randy in contempt and stated:

> The Court finds that each of the affirmative defenses raised by the Respondent [Randy] fail due to the conduct of the Respondent in locking the Petitioner out of the business to which she was entitled to operate until December 31, 2012.  The Court finds that the Petitioner does comes to the Court with clean hands.

(Ex. J-1.)

102.    Randy paid the contempt judgment.  (L. Smith Testimony, TT Vol. 3, 43:2-7; Ex. J-1.)

### vi.     The July 25, 2014 Order

103.    After the 2013 contempt proceedings, Linda brought further contempt proceedings against Randy resulting in the entry of the July 25, 2014 Order. (L. Smith Testimony, TT Vol. 2, 145:1-9; Ex. 12.)

104.     The July 25, 2014 Order re-affirmed Linda's right to use "Progressive Lawn Managers."  ((L. Smith Testimony, TT Vol. 2, 145:13-17; Ex. 12.)

**105.**    The July 25, 2014 Order also extended Linda's right to use the name "Lawn Managers" for her business.  ((L. Smith Testimony, TT Vol. 2, 145:18-20; Ex. 12.)

**106.**    The July 25, 2014 Order required Randy to transfer two zip codes, 63038 and 63040 to Linda.  ((L. Smith Testimony, TT Vol. 2, 145:21-25; R. Zweifel Testimony, TT Vol. 1, 121:11-14; Ex. 12.)

**107.**    The customers in zip codes 63038 and 63040 were formally transferred from Lawn Managers to Progressive through the Real Green company as part of the July 2014 Order. (L. Smith Testimony, TT Vol. 2, 145:1-4: R. Zweifel Testimony, TT Vol. 1, 153:17-25; (R. Zweifel Testimony, 09/22/16 Preliminary Injunction Hearing, 83:24-84:11.)

**108.**    As before, those customers were switched without their knowledge.  (D. Alcorn Testimony, TT Vol. 1, 207:18-21.)

**109.**    The non-solicitation provision of the 2012 decree was changed in the July 25, 2014 Order to a non-compete for new residential accounts and extended to July 25, 2016.  (R. Zweifel Testimony, TT Vol. 1, 60:14-22; Ex. 12.)

**110.**    As with the 2012 Decree and MSA, there was nothing in the July 25, 2014 Order that required the parties to notify the public that customers had been transferred to Linda.  (R. Zweifel Depo. 30:8-12; 32:3-8.)

**111.**    As a result of the July 25, 2014 Order, Lawn Managers transferred customers in zip codes 63038 and 63040 to Progressive. (R. Zweifel Testimony, 09/22/16 Preliminary Injunction Hearing, 83:20-23.)

### vii.    Lawn Managers 2015 Mark Registration Application

**112.**    Less than two months after the expiration of the time period granted Progressive to use the name "Lawn Managers," Lawn Managers filed an application with the USPTO to

register the words "Lawn Managers" as a service mark. (R. Zweifel Testimony, TT Vol. 1, 129:7-11; Ex. 83.)

113.    In that application, the signatory for Lawn Managers' February 2015 mark registration application stated at the time of filing that:

> The signatory believes that the best of the signatory's knowledge and belief, no other person has the right to use the mark in commerce either in the identical form or in such near resembles as to be likely when used on, or in connection with, the goods, services of such person to cause confusion or mistake or to deceive.

(Ex. 83:  R. Zweifel Testimony, TT Vol. 1, 131:17-132:14.).

114.    In 2015 it was Randy's understanding that Linda was using the name "Progressive Lawn Managers."  (R. Zweifel Testimony, TT Vol. 1, 131:14-16.)

### viii.    Accusation of Infringement

115.    In late November 2015, Annette Heller, counsel for Plaintiff, sent a letter to Progressive requesting Progressive "correct your signs and trucks so that Progress Lawn Managers are all the same size or Lawn Managers is smaller than Progressive and if used with with [sic] a logo is set close to the logo."  (Ex. 8.)

116.    The letter from Heller indicated that "the phrase Lawn Managers should be the same size type and style as Progressive as you have used it on your web site."  (Ex. 8.) The letter therefore indicated that Progressive's website signage was acceptable. (L. Smith Testimony, TT Vol. 2, 149:4-6; Ex. 8.)

117.    Randy claims he first learned that Progressive was using signage that he found objectionable in 2015.  (R. Zweifel Testimony, TT Vol. 1, 73:20-74:3.)

118.    Prior to her receiving the letter from Heller, Lawn Managers never informed Progressive that its signage improperly used the word "Lawn Managers."   (R. Zweifel

Testimony, TT Vol. 1, 125:20-25; R. Zweifel Depo. 34:23-35:3; L. Smith Testimony, TT Vol. 2, 147:22-25.)

**119.**    After getting the letter from Heller, Linda called Lawn Managers' counsel because she did not understand the letter.  (L. Smith Testimony, TT Vol. 2, 148:1-9; L. Smith Depo. 30:5-16.)

**120.**    After not getting a response from Heller, Linda gave the letter to Kevin Roberts, her attorney.  (L. Smith Depo. 30:5-16.)

**121.**    Roberts replied back in a letter dated December 3, 2105.  (Ex. 9.)

**122.**    In his letter, Roberts stated: "My client's logo and name does have a very distinctive signage including the Progressive Lawn Managers Inc. and the byline underneath "The Natural Solution" as was contained in the photos that you sent to us.  This in no way is intended to infringe upon the Lawn Managers' name."  (Ex. 9.)

### ix.    Lawn Manager's Complaint and Claims

**123.**    Lawn Manager's filed its Complaint against Progressive on February 4, 2016.

**124.**    In the Complaint, Lawn Managers alleges as follows:

9.    Pursuant to a subsequent agreement in 2014, Progressive had permission to use the name "Lawn Managers" until December. 31, 2014, at which time its permission to use the name ended. Progressive no longer has the right to use the name "Lawn Managers," as its license to do so expired on December 31, 2014.

***

23. Plaintiff previously took the position that it would be acceptable for defendant to use the full name "Progressive Lawn Managers" and to use the words "Manager" or "Management" if and so long as defendant displayed the word "Progressive" in the same type size and with the same prominence as the remaining words, but plaintiff has been advised that the use of the words "Manager" or "Management" in any form by defendant would infringe plaintiff's trademark, and defendant has refused to make any changes to its trade dress, business name or marketing.

24. Defendant's use of the words "Manager" or "Management" in its trade dress, business name and marketing, in connection with words denoting lawn, garden and tree services, infringes plaintiff's trademarks.

25. Defendant's use of plaintiffs trademark has caused actual confusion among the
public and customers.

26. As a result of defendant's actions, plaintiff has been damaged in an amount not presently ascertainable.

***

28. Defendant's infringement of plaintiff's trademarks, unless enjoined by this Court, has caused and is likely to cause confusion, mistake and deception of consumers, prospective customers, and members of the public. As a result, plaintiff has suffered and will suffer irreparable injury to and dissipation of its reputation and good will for which plaintiff has no adequate remedy at law.

(Ex. 46.)

**125.**     The Complaint filed in this case has only one claim for relief.  This claim is limited to a claim for "Federal Trademark Infringement (15 USC Section 1114)."  (Ex. 46.)

**126.**     In its prayer for relief in the Complaint, Lawn Managers requests that the Court prohibit Progressive from using the "the name "Lawn Managers," "Lawn Management," "Managers," "Management" or any variation of "Manager" or 'Management" *in any manner* in connection with the marketing or operation of defendant's business."  (Ex. 46, Prayer for Relief ¶¶ 1.a, 2, 3 (emphasis added).)

**127.**     In addition to its claim of mark infringement, Lawn Managers raises additional issues regarding the conduct of Linda.  The facts egarding these issues are described in the following sub-sections.

> *a.  Testimony Regarding May 2012 Break-In of Lawn Managers' Offices*

22

**128.**   Throughout the trial Lawn Managers' witnesses have testified regarding a supposed break-in of Lawn Managers' premises.  (R. Zweifel Testimony, TT Vol. 1, 55:24-56:2.)

**129.**   The 2012 Decree and MSA provided that Linda could use Lawn Managers offices up to December 2012 to operate here business.  (L. Smith Testimony, TT Vol. 2, 136:23-137:3; Ex. 11, §5.06; Ex 13 §5.06.)

**130.**   On Memorial Day weekend, Linda was locked out of her offices by Randy.  (R. Zweifel Testimony, TT Vol. 1, 147:20-23; L. Smith Depo. 33:7-:34:12.)

**131.**   Linda called the police to inform she had broken into the offices.  (L. Smith Depo. 35:18-36:5.)

**132.**   According to Randy, Linda broke into the building in and took Lawn Managers' database.  (Zweifel Testimony, TT Vol. 1, 55:24-56:2.)

**133.**   The issue of the break-in was brought to the attention of the divorce court in 2013, and the court found Randy to have violated the Decree and MSA by locking Linda out of the premises she was entitled to use.  (Ex. J-1; R. Zweifel Testimony, TT Vol. 1, 148:9-21; December **5**, 2017 Order from Circuit Court of Jefferson County, Missouri.)

   b.   *Assertion that Linda Wrongfully Appropriated Lawn Managers' Phone Number*

**134.**   Lawn Managers claims Linda appropriated Lawn Managers' phone number sometime in the fall or spring prior to the divorce – before either the May 1, 2012 decree was signed or the August 7, 2012 signed decree.  (R. Zweifel Testimony, TT Vol. 1, 146:22-24; R. Zweifel Depo. 46:3-8; 47:2-11; Ex. 43, ¶ 13-15.)

**135.**   According to Randy, Linda appropriated the phone number when she was an employee of Lawn Managers.  (R. Zweifel Testimony TT Vol. 1, 66:16-67:15.)

**136.**   Linda claims the phone number was hers prior to April 25, 2012.  (L. Smith Testimony, TT Vol. 3, 26:5-27:6.)

**137.**   As part of this case Randy wants the phone number returned to "him."  (R. Zweifel Testimony, TT Vol. 1, 90:23-91:2, 106:8-107:5)

**138.**   Randy learned of the appropriation in May 2012.  (R. Zweifel Depo. 46: 4712-16.)

**139.**   Randy could not recall submitting anything to the divorce court regarding Linda's supposed wrongful appropriation of Lawn Managers' phone number.  (R. Zweifel Testimony, TT Vol. 1, 147:12-14.)

**140.**   After May 2, 2012, there was a motion to amend the divorce decree.  (R. Zweifel Testimony, TT Vol. 1, 146:25-147:3; Stipulated fact # 5; Ex. 136; Ex. 136.)

**141.**   Even though there was a motion to amend the divorce decree in 2012, Randy did not bring up the issue of Linda's appropriation of Lawn Managers' phone number to the divorce court.  (R. Zweifel Testimony, TT Vol. 1, 147:4-6.)

**142.**   The issue of the phone number appropriation was brought to the attention of the divorce court in 2013 and the court did not issue a ruling in Randy's favor on this point. (December **5**, 2017 Order from Circuit Court of Jefferson County, Missouri; J-1.)

**143.**   The evidence shows that the parties were involved in further contempt proceedings in 2014 and 2016 and there is no evidence that Randy ever brought the issue of the phone number to the attention of the Circuit Court of Jefferson County.  (Ex. 137; Ex. 138; Ex. J-1; Ex. 12.)

   *c.  Request to Prohibit Progressive From Using "Progressive Lawn Managers" or the Word "Managers."*

**144.**   Linda's right to use the name "Progressive Lawn Managers" is set for in both the 2012 Decree and MSA and the July 25, 2014 Order.  (Exs. 10, 11, 12, 13.)

24

**145.**   It is the position of Lawn Managers that it has withdrawn its consent for Linda to use the name "Progressive Lawn Managers."  (R. Zweifel Depo. 50:7-11.)

**146.**   Lawn Managers claims that the name "Progressive Lawn Managers" infringes Lawn Managers' right to the name "Lawn Managers."  (R. Zweifel Testimony, TT Vol. 1, 91:10-12.)

**147.**   Lawn Managers is asking this Court to order Progressive to stop using "Progressive Lawn Managers."  According to Randy, he wants the phone number returned to "him."  (R. Zweifel Testimony, TT Vol. 1, 129:12-15; R. Zweifel Testimony, TT Vol. 1, 91:10-12.)

**148.**   Lawn Managers has not offered anything to Linda in return for its request to withdraw the right to use the words "Progressive Lawn Managers."

**149.**   Lawn Managers also claims that the use of the words "Manager" or "Management" in any form by Progressive infringes Lawn Managers' mark.  (R. Zweifel Testimony, TT Vol. 1, 130:14-131:9; Ex. 46, ¶¶ 23, 24.)

### x.   Chronology of Logos, Marks, and Signage Used by Progressive

**150.**   The Court makes the following findings regarding the logos, marks and signage used by Progressive since it began operation in 2012.

#### a.  Uniforms

**151.**   As part of the divorce, some six or seven Lawn Managers employees went with Progressive.  (L. Smith Testimony, TT Vol. 2, 139:12-14, 15-17.)

**152.**   In 2012, Progressive's employees who worked in the field wore uniforms that had the text "Lawn Managers" on them; these were the same uniforms used by Lawn Managers

employees.  (L. Smith Testimony, TT Vol. 2, 139:18-24; R. Zweifel Testimony, TT Vol. 1, 114:7-16.)

**153.**     The Progressive employees used those uniforms until the end of 2014.  (L. Smith Testimony, TT Vol. 2, 139:25-140:1.)

*b.  Vehicles*

**154.**     As part of the divorce, Linda received service vehicles that Lawn Managers had previously been using for its business.  (L. Smith Testimony, TT Vol. 2, 137:20-22.)

**155.**     The service vehicles included four vans and two trucks with tanks.  (L. Smith Testimony, TT Vol. 2, 138:15-21.)

**156.**     The vehicles had signage on them that read "Lawn Managers."   (L. Smith Testimony, TT Vol. 2, 138:22-139:8.)

**157.**     Immediately after the divorce, Progressive and Lawn Managers were both using the same vehicles with the same lettering on them.  (L. Smith Testimony, TT Vol. 2, 149:15-21.)

**158.**     The following image shows what Lawn Manager's vans looked like going back to 2005:



(R. Zweifel Testimony, TT Vol. 1, 69:4-8; Ex. 110, first page.)

**159.**     By comparison, the following image shows what Lawn Manager's vans looked after the divorce:



(R. Zweifel Testimony, TT Vol. 1, 69:4-8; Ex. 110, third page.)

**160.** The following images show what Progressive's tank trucks with the "Lawn Managers" signage looked like in 2012 until Progressive started changing signage on some of its vehicles in 2013:





(L. Smith Testimony, TT Vol. 2, 140:20-141:25; Ex. 15.)

**161.**    The vehicles Progressive was using had Progressive's phone number along with the "Lawn Managers" name.  (L. Smith Testimony, TT Vol. 2, 141:7-12.)

**162.**    At the time it started doing business none of Progressive's vehicles had any signage that read "Progressive Lawn Managers."  (L. Smith Testimony, TT Vol. 2, 139:9-11.)

**163.**    For at least a year and a half after the divorce, Progressive used trucks in its operations that had the "Lawn Managers" name on them.  (R. Zweifel Testimony, TT Vol. 1, 115:14-22.)

**164.**    Progressive used vehicles with "Lawn Managers" signage on them through 2013 and to the end of 2014.  (L. Smith Testimony, TT Vol. 2, 140:2-17, 141:13-142:4; Ex. 15.)

**165.**    In May 2013, Progressive began using vehicles with "Progressive" on them.  (L. Smith Testimony, TT Vol. 2, 140:2-17, 143:18-21.)

**166.**    The following are images of a van with the text "Progressive Lawn Managers" on the side that Progressive started using in May of 2013 and has continued to use through the present.





(Ex. I-2, p. 8, 9; Ex, W-1; L. Smith Testimony TT Vol. 2, 142:17-25, 143:1-17, 157:10-158:4.)

**167.** Progressive's GMC Super Duty truck has had the following signage since 2013,



(Ex. I-2, p. 5; L. Smith Testimony TT Vol. 2, 156:2016-19.)

**168.** In 2013, Progressive started using a circular logo with blades of grass.  (L. Smith Testimony TT Vol. 2, 142:21-152:7.)

**169.** From May of 2013 to the end of 2014, Progressive was simultaneously using vehicles with "Lawn Managers" signage and vehicles with "Progressive Lawn Managers" signage.  (L. Smith Testimony, TT Vol. 2, 143:22-25.)

**170.** In 2015 and 2016, Progressive's Scion vehicle had the following signage on it.



(Ex. 8. p.3; Ex. X-1.)

**171.**   In January or February 2017, Progressive changed the signage on the Scion so it looked as in the following two images:





(Ex. I-2, p. 1, 10-11; L. Smith Testimony TT Vol. 2, 155:23-156:3  158:5-10.)

**172.**    The following image shows what the signage on Progressive's tank truck has looked like since January 2017.



(Ex. I-2, p. 6; L. Smith Testimony TT Vol. 2, 156:20-157:1.)

*c.   Building Signage*

**173.**    Since 2013 Progressive has had the following signage on its building;



(Ex. I-2, p.2; L. Smith Testimony TT Vol. 2, 156:4-10.)

**174.**   In 2015, Progressive added the following banner on the front of its building:



(Ex. 8, p. 2.)

**175.**   In April 2017, Progressive removed the above banner and replaced it with the following banner.



(Ex. I-2, p. 3; L. Smith Testimony TT Vol. 2, 156:11-15.)

### d.  Mailers, Brochures, and Letterhead

**176.**   Exhibit 32 is a copy of a coupon that was available on Progressive's website in 2015.  (D. Alcorn Testimony, TT Vol. 1, 165:9-13; Ex. 32.)

**177.**   The coupon marked as Exhibit 32 appears as follows.



(Ex. 32.)

**178.**   Progressive stopped using the separate coupon marked as Exhibit 32 at the end of 2014.  (L. Smith Depo. 96:13-23.)

**179.**   Exhibit 30 is a trifold brochure that Progressive started using and is still using the same format today.  (L. Smith Testimony TT Vol. 2, 123:23-124:7.)  Ex. 30 appears as follows:



**180.** In February 2016 Progressive was using the following letterhead for correspondence:



(Ex. 40; C. Alcorn Testimony TT Vol. 1, 160:14-161:12.)

**181.** As of April 2015, Progressive was using checks and envelopes that appeared as follows:





(C. Alcorn Testimony TT Vol. 1, 199:14-25: Ex. 86, pp. 1-3.)

**182.**   As of March 2016, Progressive was using mailers like that shown with the "Progressive" name at the top of the mailer.   (Ex. 37; Ex. 86, pp. 6, 57-59, 66-67; L. Smith Testimony TT Vol. 2, 158:25-159:15.)



**183.**   Since the beginning of 2015, Progressive has been using a folder to leave with estimates given to customers.   This cover of this brochure appears as follows.



(Ex. B-2; L. Smith Testimony TT Vol. 2, 158:14-24.)

**184.**    When Progressive received a check made out to "Lawn Managers," it would send a letter informing the customer that Progressive had changed its name.  (Ex. 39; L. Smith Depo. 115:6-117:4.)

**185.**    Progressive has been telling customers that it has changed its name since January 1, 2014.  (L. Smith Depo. 117:5-19; L. Smith Testimony, TT Vol. 3, 45:1-16.)

**e.**      **Lawn Signs**

**186.**    Exhibit 104 comprises copies of lawn signage used by Progressive in 2013 after the divorce.  These are set out below.



(Ex. 104.)

**187.** Exhibit 105, shown below, is a copy of a Progressive yard sign developed when Progressive redesigned its web page depicted in Exhibit 18.  (L. Smith Testimony, TT Vol. 3, 35:14-21.)



**188.** Linda used the yard sign shown in Exhibit 105 starting in 2015 and into 2016.  (L. Smith Testimony, TT Vol. 3, 36:4-17.)

*e. Websites*

**189.**   When Progressive was allowed to use the name "Lawn Managers," it obtained and started using a website with the domain name: lawnmanagersinc.com.  This domain name has not been active since 2016 or early 2017.  (L. Smith Testimony TT Vol. 2, 154:9-155:4, Vol. 3, 31:22-32:6.)

**190.**   The domain "lawnmanagersinc.com" no longer redirects to Progressive's website. (D. Alcorn Testimony, TT Vol. 1, 176:18-177:5; L. Smith Testimony, TT Vol. 3,  31:6-9.)

**191.**   GoDaddy lists"lawnmanagersinc.com" as "parked."  (Ex. 103.)

**192.**   In 2012, Progressive had a website created that looked as follows:



(Ex. 17; L. Smith Testimony TT Vol. 2, 122:12-15.)

**193.**   That website is no longer in use.  (L. Smith Testimony TT Vol. 2, 122:12-15.)

**194.**   In November 2014, Lawn Managers started using a revised website that looked as follows:

38



(L. Smith Testimony TT Vol. 2, 123:8-13, Vol. 3, 28:7-14; Ex. 18.)

    **195.** This last website added the word "Progressive" and the Arch to Progressive's existing round logo that Progressive had been using since 2013.  (L. Smith Testimony TT Vol. 2, 151:18-152:9.)

    **196.** Linda did not think Lawn Managers or any other company had anything similar to her new logo.  (L. Smith Testimony TT Vol. 2, 152:10-15.)

    **197.** Exhibit 22 shows that on April 29, 2016, one of Progressive's website had the following display:



(Ex. 22.)

**198.** Exhibit 23 shows that on September 14, 2016, one of Progressive's website pages had the following display:



(Ex. 23; C. Alcorn Testimony, TT Vol. 2, 59:2-18.)

**199.** Exhibit 24 shows the contacts page on Progressive's website in September 2016 with a link to the video marked as Exhibit 101.  (C. Alcorn Testimony TT Vol. 2, 59:-60:12; Ex. 24.)

**200.**    Progressive hired Hibu to maintain the Progressive website via a monthly service fee.  (L. Smith Testimony, TT Vol. 3, 50:10-16.)

**201.**    Hibu would automatically go through Progressive's website and make corrections to it.  (L. Smith Testimony, TT Vol. 3, 52:10-16.)

**202.**    Linda had Progressive's website manager, Hibu, correct the Progressive website in May 2017.  Hibu made changes to Progressive's logo on the website, but omitted to correct a video on the site with Progressive's old logo.  (L. Smith Testimony TT Vol. 2, 153:3-25.)

**203.**    Exhibit 99 depicts a page of Progressive's corrected website as of July 6, 2017. As of that date, the header of all pages Progressive's website appeared as follows:



(L. Smith Testimony, TT Vol. 2, 152:16-21; Ex. 99.)

**204.**    Hibu, the company that made the changes to the website did not remove the video or fix logo on the video accessible on page 9 of the Progressive website.  (L. Smith Testimony TT Vol. 3, 6:16-7:2.)

**205.**    Page 9 of Progressive's website appeared as follows as of July 6, 2017:



(Ex. 99, p. 9; C. Alcorn Testimony, TT Vol. 2, 49:13-19.)

206.    As of August 3, 2017, Progressive's website, shown immediately below, looked the same as it did on July 6, 2017, showing Progressive's new logo with the words "PROGRESSIVE LAWN MANAGERS."  (Ex. 100, C. Alcorn Testimony TT Vol. 2, 50:3-10.)



42

**207.**     Ex. 101 is a copy of the video available on Progressive's website.  The audio portion of the video specifically refers to "Progressive Lawn Managers," but the logo at the start of the video is Progressive's old logo.  (Ex. 101.)

**208.**     Exhibit 102 is a copy of the video available on Progressive's website in early October 2017.  (C. Alcorn Testimony, TT Vol. 2, 49:9-12.)

**209.**     The audio portion of the video specifically refers to "Progressive Lawn Managers," but the logo at the start of the video was still Progressive's old logo.  (Ex. 102.)

**210.**     As of the date of trial, the video shown in Exhibits 101 and 102 had been removed from Progressive's website, and a revised video with a new logo with "Progressive" in big letters had been put up on Progressive's website.  (L. Smith Testimony TT Vol. 3, 4:1-6, 29-13-30:13, 46:11-15.)

**211.**     Ex. 161 is a copy of a page from Progressive's website copied at 5:00 p.m., October 31, 2017.  The video link that was up on October 31, 2017 shows a new logo different from the logo shown in Exhibits 101 and 102.  (D. Alcorn Testimony TT Vol. 3, 92:19-93:18; Ex. 161.)

*f.   Check Deposit Name*

**212.**     Lawn Managers complains that Progressive having a filing with its bank allowing it to cash checks is wrongful.  In support of this claim Debra Alcorn asserted that if a Progressive customer wrote a check out to "Lawn Managers" that would not be a problem for Progressive. (D. Alcorn Testimony, TT Vol. 1, 186: 22-187:25.)

**213.**     However, Lawn Managers' employees agree that a misnomer or another defect on a check would prevent Progressive from cashing checks from its customers.  (D. Alcorn Testimony, TT Vol. 1, 160:14-25; Ex. 40.)

**214.**    Crystal Alcorn returned a check sent into the customer because the bank would not let Lawn Managers cash it if it had the wrong address on it. (C. Alcorn Testimony, TT Vol. 2, 55:2-24; Ex. 87, p. 43.)

### g.    Third-party Sites

**215.**    In 2016, Linda requested corrective measures be made to sites with listings for her company.  (L. Smith Testimony, TT Vol. 3, 33:12-25.)

### xi.    Lawn Managers Logo Change

**216.**    After the divorce, Lawn Managers was using lawn signs that appeared as follows.



(R. Zweifel Testimony, TT Vol. 1, 64:1-8; Ex. 107; Ex., 108.)

**217.**    Lawn Managers decided to change the appearance of its logo after 2012.   (D. Alcorn Testimony, TT Vol. 1, 192:25-193:12; D. Alcorn Depo.17:23; C. Alcorn Depo. 9:18-10:14; R. Zweifel Depo. 38: 24-39:3.)

**218.**    In 2015, Lawn Managers changed its logo from yellow and green to one with blue tones.  This logo is shown below.



(R. Zweifel Depo. 40:10-18, 41:2-5; R. Zweifel Testimony, TT Vol. 1, 70:15-19; Plaintiff's Answer to Defendant's Interrogatory No. 4; Ex. 43; Ex. 110, p. 5.)

**219.** The change in logo color was due to Debra Alcorn's suggestion.  (D. Alcorn Testimony, TT Vol. 1, 193:13-16; D. Alcorn Depo. 17:23.)

**220.** The topic of changing the logo came up at the end of 2014.  (D. Alcorn Depo. 17:23.)

**221.** Debra Alcorn made the suggestion because some of Lawn Managers' signage was yellow and green and some was blue.  (D. Alcorn Depo.18:9.)

**222.** Specifically, the logos Lawn Managers was using a different logo on paperwork than what was on the vans, which in turn was different from what was on the Internet.  (D. Alcorn Testimony, TT Vol. 1, 193:21-194:2; D. Alcorn Depo. 18:9.)

**223.** At the time, Lawn Managers did not have a logo on its vans.  (D. Alcorn Testimony, TT Vol. 1, 193:21-194:2.)

**224.** Debra Alcorn's suggestion was to make everything blue.  (D. Alcorn Testimony, TT Vol. 1, 194:3-4; D. Alcorn Depo. 18:9.)

45

**225.**      At the time, the Lawn Managers vans had blue on them, the logo on the internet was green, and the logo on the letterhead was green.  (D. Alcorn Testimony, TT Vol. 1, 194:5-6; D. Alcorn Depo. 18:22.)

**226.**      Lawn Managers had blue on its vans going back to 2012.  (D. Alcorn Testimony, TT Vol. 1, 194:8-9; D. Alcorn Depo.19:20.)

**227.**      Lawn Managers decided on the color blue because it felt that was what the customers recognized.  (D. Alcorn Testimony, TT Vol. 1, 194:11-12; D. Alcorn Depo.19:20.)

**228.**      The color blue had been in the letters on the trucks.  (D. Alcorn Depo.19:25.)

**229.**      Lawn Managers had been using a mix of blue, yellow, and green prior to when it changed its logo.  (C. Alcorn Depo. 10:2-14.)

**230.**      At the time of this change, there was no discussion at Lawn Managers that going to a blue color after 2014 might create confusion with Linda's company.  (D. Alcorn Testimony, TT Vol. 1, 194:14-18; D. Alcorn Depo.20:8.)

**231.**      According to Debra Alcorn, at the time Lawn Managers changed its logo, Lawn Managers had no idea what colors Progressive was using.  (D. Alcorn Testimony, TT Vol. 1, 194:14-22; D. Alcorn Depo.20:8.)

**232.**      After it changed its logo, Lawn Managers continued to use its old color scheme in places.  (R. Zweifel Testimony, TT Vol. 1, 127:16-24; 90:4-10.R. Zweifel Depo. 70:11-16.)

**233.**      Lawn Managers did not make any announcement when it changed its logo.  (R. Zweifel Testimony, TT Vol. 1, 127:5-7; R. Zweifel Depo. 43:7-13.)

####      xii.      Confusion as to the Parties Prior to January 1, 2015

**234.**      Lawn Managers did not record incidents of confusion prior to January 1, 2015.  (D. Alcorn Testimony, TT Vol. 1, 188: 1-3; D. Alcorn Depo. 10:19-23, 13:15–16, 14:1.)

**235.**    Lawn Managers did not make records of interactions with customers out in the field regarding either confusion or issues with Progressive.  (D. Alcorn Depo. 78:21–24.)

**236.**    Prior to January 2015, there was always confusion regarding Progressive and Lawn Managers.  (D. Alcorn Testimony, TT Vol. 1, 192:16-20.)

**237.**    In fact, during that time, there was myriad, widespread confusion among the customers regarding Progressive and Lawn Managers.   (D. Alcorn Depo.16:15; Opening Statement, TT Vol. 1:11-20.)

**238.**    The confusion resulting from Linda's business using "Lawn Managers" was obvious and continuous from 2012 through the end of 2014.  (R. Zweifel Testimony, TT Vol. 1, 117:6-24; R. Zweifel Depo. 33:8-15.)

**239.**    The confusion continued through 2013 and most of 2014.  (D. Alcorn Depo. 16:25.)

**240.**    The confusion started to subside in 2014, but not by much.   (D. Alcorn Testimony, TT Vol. 1, 192:21-24.)

### xiii.    Confusion as to the Parties – January 1, 2015 Through July 25, 2016

**241.**    Prior to January 1, 2015, Lawn Managers' employees would tell customers or potential customers that called Lawn Managers and who expressed any type of confusion about Progressive and Lawn Managers which company the customer belonged to.  (D. Alcorn Testimony, TT Vol. 1, 191:5-154; D. Alcorn Depo.15:15-20)

**242.**    Lawn Managers would tell those customers that there was a new company that was treating their lawn and gave the phone number the customer needed to call.  (D. Alcorn Depo.15:21–16:6.)

243.    The record shows that actions of Progressives done in conformity with the divorce orders prior to January 1, 2014 had effects after 2014.  (Ex. 86, pp. 55-56; D. Alcorn Testimony, TT Vol. 1, 168:13-16.)

244.    Pages 55 and 56 relate to a list of customers in Linda's zip codes.  Lawn Managers claims some of these customers cancelled service with Lawn Managers because of a marketing letter from Progressive received from Progressive in November 2014.  (D. Alcorn Testimony, TT Vol. 1, 168:13-16 Ex. 86, p.55-56; Page 55 of Exhibit 86 also appears separately as Exhibit 61.)

245.    Debra Alcorn never saw the marketing letter that Linda disseminated.  (D. Alcorn Testimony, TT Vol. 2, 9:10-13, 22:1618.)

246.    The customers listed on page 55 of Exhibit 86 are customers who cancelled between November 2014 and May 2015.  (D. Alcorn Testimony, TT Vol. 2, 9:16-18.)

247.    Debra Alcorn created the customer cancel list of Exhibit 86 in November 2015.  (D. Alcorn Testimony, TT Vol. 2, 8:24-9:3.)

248.    Debra Alcorn made the customer cancel report to show Randy the customers Lawn Managers lost, purportedly because of marketing letters that Linda sent out in November 2014.  (D. Alcorn Testimony, TT Vol. 2, 8:24-9:3.)

249.    Every customer on page 55 of Exhibit 86 is in a zip code that was awarded to Linda, and Linda has been free to solicit these customers since May 2012.  (D. Alcorn Testimony, TT Vol. 2, 22:2-7.)

250.    Page 55 of Exhibit 86 reflects not just when the customer cancelled, but when the customer requested cancellation.  When a customer requested cancellation, they were cancelled immediately.  (D. Alcorn Testimony, TT Vol. 2, 9:19-25.)

48

251.    Chris Lawson prepared the separate note for the Filtered Customer Cancel Report regarding customers Matt and Lindsay Browne that appears at page 56 of Exhibit 86.   (C. Lawson Testimony, TT Vol. 2, 32:17-33:7; Page 56 of Exhibit 86 appears also at page 3 of Exhibit 88.)

252.    The Brownes cancelled on May 6, 2015 because they received a mailer from Progressive in November 2014.  (C. Lawson Testimony, TT Vol. 2, 34:18-35:23.)

253.    Accordingly, pages 55 and 56 of Exhibit 86 reflect that the customers requested cancellation between November 2014 and May 2015.  (D. Alcorn Testimony, TT Vol. 2, 10:1-3, 10:4-12; C. Lawson Testimony, TT Vol. 2, 34:18-35:23.)

254.    Customers were therefore cancelling in May 2015 based upon something they received from Progressive in November 2014.  (D. Alcorn Testimony, TT Vol. 2, 10:13-15; C. Lawson Testimony, TT Vol. 2, 34:18-35:23.)

255.    At the time Progressive sent the subject mailer in November 2014, Progressive was allowed to use the words "Lawn Managers" to market itself.  (D. Alcorn Testimony, TT Vol. 2, 10:16-18.)

256.    Pages 55 and 56 of Exhibit 86 shows that something Progressive did legally in November 2014 was causing cancellations to Lawn Managers into 2015.  (D. Alcorn Testimony, TT Vol. 2, 10:19-22 C. Lawson Testimony, TT Vol. 2, 34:18-35:23.)

257.    In response to Progressive's November 2014 mailer, Lawn Managers sent letters to customers in Linda's zip codes warning of a "fraudulent company."  (D. Alcorn Testimony, TT Vol. 2, 11:20-23.)

258.     Some of the customers listed on page 55 of Exhibit 86 cancelled simply because they did not want to be caught up in a dispute between Lawn Managers and Progressive.  (D. Alcorn Depo.25:13-26:2.)

### xiv.     Confusion Due to Lawn Managers Presence in Linda's Zip Codes

259.     Lawn Managers' trucks have always been in Linda's zip codes servicing commercial accounts.  (D. Alcorn Testimony, TT Vol. 1, 205:22-206:1.)

260.     After July 2014, Lawn Managers was subject to a non-compete preventing it from signing up any new "residential" customers in Linda's zip codes.  (R. Zweifel Testimony, TT Vol. 1, 124:25-125:12; L. Smith Testimony, TT Vol. 2, 146:17-147:9.)

261.     However, Lawn Managers could service and was servicing more customers in Linda's zip codes that qualified as "miscellaneous commercial accounts."   (R. Zweifel Testimony, TT Vol. 1, 124:7-125:12.)

262.     A "commercial account" is a residential lawn serviced through a contract with another service provider like a lawn mowing company.  (D. Alcorn Testimony, TT Vol. 1, 156:15-23.)

263.     When Lawn Managers serviced a lawn (whether residential or commercial account) it would put up a lawn sign.  (R. Zweifel Testimony, TT Vol. 1, 124:17-23.)

264.     Because of the July 2014 Order, Lawn Managers would frequently have to tell residential customers in Linda's zip codes who saw its lawn signs and called it for service that it could not service those accounts.  (R. Zweifel Testimony, TT Vol. 1, 125:4-12; C. Alcorn Testimony, TT Vol. 2, 53:21-54:2.)

265.    If a customer called Lawn Managers for residential work in a zip code that was allocated to Linda, Lawn Managers would tell the customer "We can't service your zip code." D. Alcorn Testimony, TT Vol. 1, 195:12-17; 209:24-210:2; Ex. 86, p. 2.)

### xv.    Confusion Relating to TRO/Preliminary Injunction Orders

266.    In 2016, Linda obtained a TRO and preliminary injunction against Randy based upon his sending a solicitation mailer to customers awarded Linda in 2012.  As a result of the 2016 temporary restraining order and injunction entered against him, Randy was prohibited from soliciting or servicing the customers awarded Linda in 2012.  (R. Zweifel Testimony, TT Vol. 1, 61:5-15.)

267.    Lawn Managers had to tell the customers who called in response to the mailer that it could not service them at the time.  The customers that received Lawn Managers' "we want you back" mailer were solicited and then told by Lawn Managers that Lawn Managers could not service them. (R. Zweifel Testimony, TT Vol. 1, 61:5-15, 134:8-12; C. Alcorn Testimony, TT Vol. 2, 54:3-8.)

268.    The customers were left hanging.  (R. Zweifel Testimony, TT Vol. 1, 150:22-151:1; D. Alcorn Testimony, TT Vol. 1, 217:12-14.)

269.    At the same time Lawn Managers was telling people it could not service their accounts, it was, in fact, servicing accounts in Linda's zip codes.  (R. Zweifel Testimony, TT Vol. 1, 134:24-25:3.)

270.    So those customers would be seeing Lawn Managers' trucks and signs in their neighborhood, but were being told by Lawn Managers "We can't help you."  (R. Zweifel Testimony, TT Vol. 1, 135:4-7.)

271.    Lawn Managers was still getting calls in response to the "we want you back"

51

mailer in the spring of 2017.  (R. Zweifel Testimony, TT Vol. 1, 135:18-21; R. Zweifel Depo. 64:19-65:6.)

### xvi.    Lawn Managers Records of Purported Customer Confusion

#### a.  In General

**272.**    In January 2015, Lawn Managers started documenting phone calls from customers it thought were confused regarding Lawn Managers and Progressive.  (D. Alcorn Testimony, TT Vol. 1, 188:4-9; D. Alcorn Depo. 14:4–5; 14:8–14.)

**273.**    Lawn Managers' employees started documenting calls from customers on the advice of Lawn Managers' counsel.  (C. Alcorn Depo. 12:3-21.)

**274.**    After January 1, 2015, when Progressive's customers would call Lawn Managers, Lawn Managers would tell the customers: "We don't know who your company is.   We recommend you look at your invoice to get the phone number of the company they are trying to reach."  (D. Alcorn Testimony, TT Vol. 1, 192:4-7; D. Alcorn Depo.15:15–20, 16:25.)

**275.**    The customers who called after 2014 called Lawn Managers using the phone number Lawn Managers obtained after the divorce.  (D. Alcorn Testimony, TT Vol. 1, 184: 12-15.)

**276.**    Lawn Managers employees never asked the supposedly confused customers calling in what the basis of their confusion was and specifically never asked whether the customers were confused simply because Progressive was using the name "Progressive Lawn Managers."  (D. Alcorn Testimony, TT Vol. 2, 6:21-7:4; L. Kaucher Testimony, TT Vol.2, 29:5-10; C. Lawson Testimony, TT Vol. 2, 34:11-15.)

**277.**    Exhibits 72, 86, 87, 88, 89, B-6, L-5, and M-5 are reports of interactions with customers, which according to Lawn Managers, were made immediately after the interaction with the subject customer.  (D. Alcorn Testimony, TT Vol. 1, 169:11-17; 170:8-19; 190:11-14.)

**278.**    Exhibits 87, 88, 89, B-6, L-5, and M-5 were all prepared by employees of Lawn Managers.  (D. Alcorn Testimony, TT Vol. 1, 188: 18-25.)

**279.**    For most of the callers documented, the reports of confusion do not indicate where the caller obtained Lawn Managers' telephone number for the purpose of making the call. Lawn Managers' employees do not know from where these callers obtained Lawn Managers' phone number.   (C. Alcorn Depo. 14:20-25; 16:13-22: 24:1-29:12; 33:7-34:8; D. Alcorn Testimony, TT Vol. 1, 198:7-16.)

**280.**    Exhibit 62 is an example of a report made regarding a customer supposedly expressing confusion between Progressive and Lawn Managers.  This exhibit is a call log for customer Matt and Lindsay Browne.  (D. Alcorn Testimony, TT Vol. 1, 189: 1-4; Ex. 62.)

**281.**    This exhibit shows that Lawn Managers' computer system allowed for the typed entry of notes of conversations with customers with computer-generated time stamps.  (D. Alcorn Testimony, TT Vol. 1, 189:5-22.)

**282.**    For the bulk of the records contained in Exhibits.68-72, 86-89, and B-6, L-5, and M-5, the reports of supposed confusion were handwritten on the bottom of a printout of the customer information display.  (Ex. 87; Ex. 88; Ex. 89; Ex. B-6; Ex. L-5; Ex. M-5.)

**283.**    The customer print screens show a cancel date, which indicates when the customer was transferred out from Lawn Managers or cancelled.  (D. Alcorn Testimony, TT Vol. 1, 196:15-20.)

**284.**    If a customer record displays a cancel date of 4/25/2012 that indicates that the customer was electronically transferred to Progressive.  (D. Alcorn Testimony, TT Vol. 1, 1946:21-24.)

**285.**    A customer record with a cancel date of 4/25/2012 indicates a customer with whom Progressive had the right to use the "Lawn Managers" name after the divorce.  (D. Alcorn Testimony, TT Vol. 1, 197:8-11.)

**286.**    A customer record with a cancel date of July 2014 indicates a customer with whom Progressive had the right to use "Lawn Managers" for five months of 2014.  (D. Alcorn Testimony, TT Vol. 1, 197:18-22.)

**287.**    Those customers transferred in July 2014 would undoubtedly have been using Lawn Managers phone number obtained after May 2012.  (D. Alcorn Testimony, TT Vol. 1, 197:23-198:1.)

**288.**    When the split of customers occurred in 2012 and 2014, one day the customers were Lawn Managers customers, the next day they were a Progressive customers.  (D. Alcorn Testimony, TT Vol. 1, 198:2-6.)

**289.**    Some of the customers in the Lawn Managers customer records actually told Lawn Managers that they knew there were two companies.  (D. Alcorn Testimony, TT Vol. 1, 198:17-20.)

*b.  Exhibit 72*

**290.**    Exhibit 72 is a collection of reports of interactions with customers who called Lawn Managers.  (R. Zweifel Testimony, TT Vol. 1, 94:24-95:7; Ex. 72.)

54

291.    Nine of the reports in Exhibit 72 concern customers who were awarded to Linda in 2012, which means that Lawn Managers did in fact service those customers' lawns at one point.

292.    Virtually all of the reports give no indication why the customer called Lawn Managers.

293.    Several of these records indicate that customers were confused, not due to any infringing signage used by Progressive, but by the fact there were two companies with similar names or with a shared history.  (See, Brune (p. 4), Mason (p. 5).)

c.  *Exhibit 86*

294.    Exhibit 86 is a collection of reports of interactions with customers who called Lawn Managers.  (D. Alcorn Testimony, TT Vol. 1, 166:3-168:17; Ex. 86.)

295.    Ten of the reports in Exhibit 86 concern customers who were awarded to Linda in 2012 or 2014, which means that Lawn Managers serviced those customers' lawns at one point.

296.    The following callers whose interactions are documented in this exhibit were told by Lawn Managers that Lawn Managers could not service the caller's lawn: Hammer (p. 23), Basler (p. 36), Held (p. 37), Saller (p. 46), Landrum (p. 69), Smith (p. 76), Bahnak (p. 78), Bretsch (p. 80).  (Ex. 86.)

297.    The following table summarizes some of the reports of customer confusion in Exhibit 86.

| Exhibit 86 Summary of Customer Reports | | | |
|---|---|---|---|
| Page | Customer | Remarks | Transcript |
| 1-3 | Tripathi | Lawn Managers has no idea why this customer made a check out to Progressive. Progressive's check and envelope sent to Lawn Managers regarding this customer prominently show the Progressive name. | Vol , 198:21-199:25 |
| 6 | Furfaro | There is no indication that this customer was | Vol. 1, 200:17- |

55

| **Exhibit 86 Summary of Customer Reports** | |
|---|---|---|---|
| | | confused by Progressive improperly using "Lawn Managers."  Per Debra Alcorn Furfaro was confused because Progressive's name has "Lawn Managers" in it.  His note to Debra Alcorn specifically refers to "Progressive Lawn Managers." | 21; Vol. 2, 7:17-18:8 |
| 36 | Basler | Ms. Basler stated she received Lawn Managers contact information from Susan Rhodes in May 2015, who indicated she had Lawn Managers phone number stored in her contacts (Ex. 87, p. 46.).  Lawn Managers told Ms.  Basler that it did not service her area. | Vol. 1, 202:19-206:8 |
| 46 | Saller | This is an example of a customer in zip code 63021 who was told in July 2015 that Lawn Managers does not service the customer's zip code. | Vol. 1, 207:10-13 |
| 61 | McGreer | This is an example of a customer that was transferred in July 2014 and not given any information why.  As of July 2014, Lawn Managers had serviced this customer for two years with its new number. | Vol. 1, 207:14-208:6 |
| 73 | Spewak | This customer indicates he did not want to get caught up in drama between companies.  This customer is in Linda Smith's zip code. | Vol. 1, 208:7-15 |
| 76 | Smith | This customer had been awarded to Linda in 2012.  The customer asked in April 2016 whether Lawn Managers split into two companies.  This customer was also told that Lawn Managers did not service zip code 63010. | Vol. 1, 209:3-11 |
| 78 | Bahnek | This is an example of another customer who in April 2016 that Lawn Managers did not service the customer's zip code, 63010. | Vol. 1, 209:21-210:6 |
| 80 | Bretsch | This customer had been awarded to Linda in 2012 and for two and a half years was serviced by Progressive having the right to call itself "Lawn Managers."  Customer was told by Lawn Managers that Lawn Managers did not service the customer's zip code. | Vol. 1, 210:7-20 |
| 91 | Shaddarsanam | This customer had been awarded to Linda in 2012 and, after the July 2016 "we want you back" mailer went out, called unsure which company serviced his lawn. There is no record of this customer being confused | Vol. 1, 210:21-211:18. |

| | | Exhibit 86 Summary of Customer Reports | |
|---|---|---|---|
| | | before July 2016. | |
| 95 | Lause | This customer had been awarded to Linda in 2012 and called after receiving a July 2016 "we want you back" mailer.  She was solicited by Lawn Managers and then told by Lawn Managers that it could not service her. | Vol. 1, 211:19-212:22 |

*d.  Exhibit 87*

298.   Exhibit 87 is a collection of reports of interactions of calls with customers that Crystal Alcorn primarily fielded.  (C. Alcorn Testimony, TT Vol. 2, 44:22-45:8.)

299.   Nearly 30 of the 56 customers listed in this exhibit are customers that were awarded to Linda in 2012 or 2014, which means that these customers were, in fact, serviced by Lawn Managers at one point.  (*See* Golfo (p. 3), Nerich (p. 5), Rogers (p. 10), Rauch (p. 11), Smith (p. 12), Thornburgh (p. 13), Midkiff (p. 15), Wade (p. 16), Cherven (p. 22), Palmer (p. 23), Green (p. 24), Woodruff (p. 25), Santoni (p. 26), Puckett (p. 28), London (p. 29), Moon (p. 34), Haynes (p. 35), Spivey (p. 38), Woodruff (p. 39), Haque (p. 40), Rhoades (p. 46), Whalen (p. 56), Thornburgh p. 57), Mason (p. 60), Frederking (p. 63), Bogdanos (p. 65), Weeks (p. 67), Weeks (p. 68), Fuhler (p. 79).)

300.   Lawn Managers told at least seven of the callers identified in the reports of Exhibit 87 that it could not service their lawns.  (*See* Agarwal (pg. 1), Mercurio (p. 8), Rogers (p. 9), Mika (p. 13), Weid (p. 17), Boettner (p. 18) and Mason (p. 47).)

301.    For most caller interactions in this exhibit, there is no indication where the caller had obtained the number for Lawn Managers and therefore why the caller called Lawn Managers.  Several callers indicated they had seen Plaintiff's trucks or Plaintiff servicing in the relevant ZIP code.  (*See* Agarwal (p. 1), Burdt (p. 17), 337 Mission Bay (p. 18), Pemberton (p. 47).)

**302.**     At least five callers identified in this exhibit, reported receiving letters from <u>Lawn Managers</u>.  (*See* Stahl (p.6), Brahmbhatt (p. 2), Rogers (p. 10); Kelleher (p. 21), Palmer (p. 23).)  One of these customers specifically reports receiving a letter from Lawn Managers with its phone number and address on it.  (*See* Stahl (pg.6).)

**303.**     Several customers are documented as knowing or specifically asking if there was more than one company with the words "lawn managers" in their names.  Agarwal (pg. 1), Brahmbhatt (pg. 2), Nerich (pg. 5); Johnson (pg. 8), Rauch (pg. 11), Wade (pg. 16), Cherven (pg. 22), Palmer (pg. 23), Santoni (pg. 26), London (pg. 29), Partridge (pg. 52), Whalen (pg. 56).

**304.**     The following table summarizes some of the reports of customer confusion in Exhibit 87.

| Exhibit 87 Summary of Customer Reports | | | |
|---|---|---|---|
| Page | Customer | Remarks | Transcript |
| 6 | Stahl | This pertains to a customer in a zip code awarded to Linda Smith.  The customer indicated on March 2, 2016 that he had received a mailer with Lawn Managers' phone number and address on it. | (C. Alcorn Testimony, TT Vol. 2, 52:19-53:4.) |
| 9 | Mercurio | This note pertains to a March 18, 2016 call with a customer in a zip code awarded to Linda.  Crystal informed the customer that Lawn Managers did not service that zip code. | (C. Alcorn Testimony, TT Vol. 2, 53:5-17.) |
| 29 | Jackie London | This customer was assigned to Linda in 2012.  She called on September 9, 2016.  She would have received the "we want you back" mailer.  She called to ask the difference between Progressive and Lawn Managers. | (C. Alcorn Testimony, TT Vol. 2, 54:9-22.) |
| 42 | Cindy Roach | This person called claiming she received a letter saying Lawn Managers changed its name to "Progressive Lawn Managers."  Crystal returned the check sent into the customer because the bank would not let Lawn Managers cash it if it had the wrong address on it. | (C. Alcorn Testimony, TT Vol. 2, 55:2-24.) |
| 46 | Susan Rhodes | This person was a customer awarded to Linda back in 2012.  She indicated that she | (C. Alcorn Testimony, TT |

| | | had Lawn Managers phone number ((636)671-7077) programmed into her contacts.  That phone number went into effect in May or June 2012.  Crystal Alcorn denied the customer had been solicited by Lawn Managers.  There is no explanation why the customer had Lawn Managers name in her contacts. | Vol. 2, 55:25-57:17.) |
|---|---|---|---|

### e.  Exhibit 88

**305.**     Exhibit 88 is a collection of reports of interactions of calls with customers that Chris Lawson fielded.  (C. Lawson Testimony, TT Vol. 2, 30:22-31:3.)

**306.**     Not one customer in this exhibit indicates that he or she was confused about any signage used by Progressive.

**307.**     Of the 15 customer interactions memorialized in Exhibit 88, 10 involve customers awarded to Linda Smith in 2012 or 2014, which means that these customers were serviced by Lawn Managers at one point.  (*See, e.g.*, Bishop (p. 3), Sundet (p. 4), Chronister (p. 5), Nilsen (p. 9), Stark (p. 10), Travis (p. 11), Medlin (p. 12), Brueckmann (p. 13), Bevier (p. 15) and Swearington (p. 16).)

**308.**     At least three callers documented in this exhibit were told by Lawn Managers that Lawn Managers could not service the callers' lawn.  (See, Bishop (p. 3), Schaller (p. 14), Bevier (p. 15).

### f.  Exhibit 89

**309.**     Exhibit 89 is a collection of reports of interactions of calls with 18 callers that Lisa Kaucher fielded, save for the records relating to customer Dan Graney.  (L. Kaucher Testimony, TT Vol.2, 25:13-16.)

59

310.   Every customer in Exhibit 89 contacted Lawn Managers after Lisa Kacuher started working for Lawn Managers in September 2016.  (L. Kaucher Testimony, TT Vol.2, 29:11-17.)

311.   Not one customer in this exhibit indicates that he or she was confused about any signage used by Progressive.

312.   All of the reports involve customer calls that occurred after Lawn Managers sent out the "we want you back" mailer in July 2016.

313.   For most callers, there is no indication where they obtained the phone number to call Lawn Managers.

314.   One customer of Lawn Managers who moved into a zip code awarded Linda Smith purportedly received a mailer from Progressive.  He knew to call Lawn Managers after receiving the mailer.  (Graney p. 5).  The word "Progressive" is prominently displayed in the mailer in all capitals.

315.   At least four people documented as calling knew of the hostile relationship between Lawn Managers and Progressive (Bishop (pg.3), Bevier (pg. 15)) or knew there were two companies using "Lawn Managers" (Travis (pg. 11).  One customer asked if her service was with Lawn Managers or Progressive Lawn Managers, because, in her words, "I get confused between the two."  (Lynas (pg. 21.)

g.  *Exhibit L-5*

316.   This exhibit shows that Lawn Managers received 17 customer calls.  All of them were after the "we want you back" mailer went out in July 2016, specifically during the period October 2016-January 2017.  (D. Alcorn Testimony, TT Vol. 1, 214:5-14.)

**317.**    Not one caller referenced in this exhibit is noted as being confused by any signage of Progressive.

**318.**    Every caller in this exhibit was told that Lawn Managers could not service the caller's lawn.  (Expressly confirmed in this exhibit for Schmidt (p.2), Vandewater (p. 4), Kish (p. 6), Housman (p. 10), Kinder (p. 11), Yakovitz (p. 12), Griesemer (p. 14), Jag Ppromotions (p. 16), and Schaller (p. 17).

*h.  Exhibit M-5*

**319.**    Exhibit M-5 is a group of records of interactions of 26 customers who contacted Lawn Managers after the "we want you back" mailer went out in July 2016.  (D. Alcorn Testimony, TT Vol. 1, 215:11-216:1; Ex. M-5.)

**320.**    Many callers in this exhibit specifically mention receiving the "we want you back" mailer or a letter from Lawn Managers.  (*See, e.g.*, the following customers: Conver (p. 5), Nichols (p.  8), Seevers (p. 10), Mc Alevey (p. 11), Jackson (p. 12), Colestock (p. 13), Spielman (p. 14), Jones (p. 15), Sutton (p. 16), Medlin (p. 17), Brueckmann (p. 24), and Barbee (p. 25).)

**321.**    Not one caller documented as calling in this exhibit is noted as being confused by any signage of Progressive.

**322.**    In Exhibit M-5, all but one of the customers who called were customers that were transferred to Progressive in either 2012 or 2014.  (D. Alcorn Testimony, TT Vol. 1, 216:1-217:3.)

**323.**    Every caller documented in this exhibit was told by Lawn Managers that Lawn Managers could not service the caller's lawn.  Many callers in this exhibit specifically mention receiving the "we want you back" letter or a letter from Lawn Managers.  (*See, e.g.*, the following customers: Conver (p. 5), Nichols (p.  8), Seevers (p. 10), Mc Alevey (p. 11), Jackson

(p. 12), Colestock (p. 13), Spielman (p. 14), Jones (p. 15), Sutton (p. 16), Medlin (p. 17), Brueckmann (p. 24), and Barbee (p. 25).)

324.    This exhibit shows that some customers were obviously angry about being drawn into a dispute between Lawn Managers and Progressive (Chilton (p. 1)) or about not being able to be serviced by Lawn Managers (Conover (p. 5).)

325.    This exhibit also shows that some customers were given vague explanations from Lawn Managers to the effect that Lawn Managers cannot talk about the situation. (*See* Jones (p. 15) and Sutton (p. 16).)

326.    This exhibit also shows that several people called Lawn Managers after receiving the "we want you back" letter and Lawn Managers did not call them back to explain the situation. (*See* Jackson (p. 12), Colestock (p. 13), and Spielman (p. 14).)

327.    Several callers in this exhibit requested an explanation of the Lawn Managers' letter or indicated that they were unware of the division of customers in 2012. (*See* Medlin (p. 17), Conover (p. 19), Force (p. 20), Colbert (p. 21), Krejci (p. 23), Brueckmann (p. 24), Barbee (p. 25) and Cherven (p. 26).)

     *i.   Customers Told by Lawn Managers That "We Do Not Service Your Zip Code"*

328.    The reports of confusion created by Lawn Managers show that customers in Linda's zip codes who called Lawn Managers were repeatedly told by Lawn Managers that Lawn Managers did not service that customer's zip code.  The following table lists customers whose interactions were reported in Exhibits 86, 87, and 89 that were told by Lawn Managers *before July 25, 2016* that it did not service the customer's zip code.

| "We Do Not Service Your Zip Code" - Pre July 25, 2016 | |
| --- | --- |
| Ex. 86 | Hammer (23); Basler (36), Held (39), Saller (46), Smith (76), Bahnak (78), Bretsch (80) |
| Ex. 87 | Agarwal (1), Mercurio (9), Rogers (10), Mika (14), Weid (18), Boettner (20), |

| | Mason 60 |
|---|---|
| Ex. 89 | Shah (8), Bevier (15) |

329.    All those people were told that Lawn Managers does not service their zip code, when in fact Lawn Managers was servicing people in that zip code.  (*See* Findings of Fact in Section 14, above.)

330.    Some were confused because Lawn Managers had in fact serviced their lawn. (Ex. 87, Mika (14).)

331.    The following table lists customers whose interactions were reported in Exhibits 87, L-5, and M-5 that were told by Lawn Managers *after July 25, 2016* that it did not service the customer's zip code.

| "We Do Not Service Your Zip Code" – Post July 25, 2016 | |
|---|---|
| Ex. 87 | Mason (60) |
| Ex. L-5 | 26 people called after the "we want you back" letter went out, and if they requested service they were told Lawn Managers could not service their zip codes: Kaiser (2), Skrobonja (3), Jansen (4), Conover (5), Higginbotham (6), Jackson (7), Nichols (8), Marevel (9), Seevers (10, McAlevey (11), Jackson (12), Colestock (13), Spielman (14), Jones (15), Sutton (16), Medlin (17), London (18), Conover (19), Force (20). |
| Ex. M-5 | 17 people called after the "we want you back letter" went out, and if they requested service they were told Lawn Manager could not service their zip codes. |

   *j.    Customers Who Expressed Anger, Not Confusion, After Lawn Managers Sent the July 25, 2016 Mailer*

332.    Lawn Managers customer confusion reports show that after receiving Lawn Managers' July 25, 2016 several callers expressed anger or puzzlement over the content of the letter or the situation caused by the letter.  The following table lists customers who the records reflect expressed anger or puzzlement after getting the "we want you back" mailer.

| Customers Noted as Angry or Puzzled at the Situation | |
|---|---|
| Ex. 86 | Lause (95) |
| Ex. 89 | Chilton (1) |
| B-6 | Behan (1) |

| L-5 | Conover (L-5), Force (20), Colbert (21), Brueckmann (24), Barbee (25), Cherven (26) |
| M-5 | Kish (6), Kinder (11), Schaller (17) |

**333.** Lawn Managers has no record of any of the customers listed in the above tables supposedly being confused prior to the mailer going out in July of 2016.

**334.** Lawn Managers was getting calls from customers about its "we want you back" mailer into 2017. (D. Alcorn Testimony, TT Vol. 1, 212:23-213:2; D. Alcorn Depo.79:13.)

**335.** Debra Alcorn has no explanation for why customers would be calling Lawn Managers in 2017 after receiving a "we want you back" letter that was supposedly only mailed by Lawn Managers in the summer of 2016. (D. Alcorn Depo.79:18.)

### xvii.  Other Supposed Incidents of Confusion

**336.** Laura Westerhold testified and swore in an affidavit that she saw a Progressive vehicle on May 18, 2017 and was confused by the signage on the vehicle into thinking that the vehicle belonged to Lawn Managers. (Westerhold Testimony TT Vol. 1, 30:4-22; Ex. 92.)

**337.** According to Westerhold, she saw a white van with green grass and flowers that said "Lawn Managers" on it. There was nothing on the van that said "Progressive." (Westerhold Testimony TT Vol. 1, 30:4-22; Ex. 92.)

**338.** Exhibit 91 is a note prepared by Lawn Managers employee of a May 31, 2017 phone call received by Lawn Managers from a person claiming to have witnessed a person driving erratically in a Scion motor vehicle. (Ex. 91; L. Smith Testimony TT Vol. 3, 7:6-13.)

**339.** In January or February 2017, Progressive had changed all of the signage on its vehicles having allegedly infringing signage so that the signage prominently displayed the word "Progressive." (I-2, p. 1: L. Smith Testimony TT Vol. 3, 7:6-9:15.) Accordingly, as of the time

of the Westerhold incident and the May 31, 2017 phone message, Progressive had changed all of the signage on its vehicles.  (I-2, p. 1: L. Smith Testimony TT Vol. 32 7:6-9:15.)

340.    Exhibits 90 is a recorded phone message made to Lawn Managers from a police officer indicating that a vehicle had driven away from a gas station without paying for gas.  (Ex. 90.)  Exhibit 90A is a typed transcript of that phone call.  (Ex. 90A.)

341.    The incident involved in Ex. 90 and 90A involved a case of plates stolen from Linda's car and was not a case involving a Progressive vehicle.  (L. Smith Testimony, TT Vol. 3, 10:21-11:1.)

342.    Patrick King testified and gave an affidavit regarding an event in which he claims to have seen for the first time a banner hanging on the front of Progressive's building in Manchester.  (King Testimony, TT Vol. 1: 28:8-29:5; Ex. 93.)

343.    In both his testimony and affidavit, Mr. King positively reported the conversation as occurring in April of 2017.  King Testimony, TT Vol. 1: 28:8-29:5; Ex. 93.)

344.    In filing out a report of customer confusion for purposes of this case, Randy reported the conversation as occurring as month later.  (Ex. 72, Bates page 793, R. Zweifel Testimony, TT Vol. 1, 94:17-99:2.)

**xviii.    Evidence as to Monetary Relief Sought**

*a.  Testimony of Fernando Torres – Generally*

345.    In furtherance of its claim for a monetary award, Lawn Managers hired Fernando Torres to prepare reports and testify on its behalf.  (F. Torres Testimony TT, Vol. 2, 62:11-17; Ex, 80. 120; (Ex. O-3 is a copy of Ex. 80); Ex. N-3.)

346.    Torres prepared three reports on behalf of Lawn Managers: a) Ex. N-3; b) Ex. 80 (O-3); and c) 120.)

**347.**   Torres is not an accountant, nor is he authorized to prepare taxes for others.  (F. Torres Testimony TT, Vol. 2, 88:6-10.)

### b.  Testimony of Brian Toennies – Generally

**348.**   Brian Toennies testified on prepared reports on behalf of Progressive as to Lawn Managers' claims for monetary recovery.  (B. Toennies Testimony TT, Vol. 3, 63:25-64:4; Ex. 79; Ex. E-6.)

**349.**   Exhibits 79 and E-6 contain Toennies' opinions and calculations.  (B. Toennies Testimony TT, Vol. 3, 71:7-15.)

**350.**   Toennies is a certified public accountant, having been licensed in 1989.  (B. Toennies Testimony TT, Vol. 3, 64:5-9.)

### c.  Progressive's Revenues

**351.**   Torres reviewed Progressive's tax returns for the years 2013 through 1016.  These returns were admitted respectively as Exhibits 74–77.  (F. Torres Testimony TT, Vol. 2, 102:4-25; Ex. 74; Ex. 75; Ex.76; Ex. 77.)

**352.**   Progressive had gross revenues of $784,887 for 2013.  (F. Torres Testimony TT, Vol. 2, 102:4-6; Ex. 74.)

**353.**   Progressive had gross revenues of $714,271 for 2014.  (F. Torres Testimony TT, Vol. 2, 102:20-21; Ex. 75.)

**354.**   Progressive had gross revenues of $764,567 for 2015.  (F. Torres Testimony TT, Vol. 2, 102:22-23; Ex. 76.)

**355.**   Progressive had gross revenues of $693,583 for 2016.  (F. Torres Testimony TT, Vol. 2, 102:24-25; Ex.77.)

**356.**    Torres never made any inquiry as to reason for the drop in revenue.  (F. Torres Testimony TT, Vol. 2, 103:4-12.)

**357.**    Since 2013, Progressive's financial performance has been lackluster, showing a steady downward trend.  (B. Toennies Testimony TT, Vol. 3, 70:12-15.)

**358.**    According to its tax returns, Progressive's profits for the years 2013 through 2016 are respectively as follows:

2013:  -$20,789

2014:  -$5,397

2015:  $3,175

2016:  -$10,944

(Ex. 74; Ex. 75; Ex. 76; Ex. 77.)

### d.  Torres' General Methodology

**359.**    In furtherance of forming his opinions, Torres never spoke to any customers.  (F. Torres Testimony TT, Vol. 2, 88:14-15.)

**360.**    Torres never spoke to any principals or employees of the parties.  (F. Torres Testimony TT, Vol. 2, 88:19-21.)

**361.**    Torres did not speak to any other lawn care providers to determine how business for a St. Louis area lawn business fluctuates during the year.  (F. Torres Testimony TT, Vol. 2, 88:22-25.)

**362.**    Torres did nothing to determine the recognition of Lawn Managers by any population demographic or the strength of Lawn Managers' brand.  (F. Torres Testimony TT, Vol. 2, 89:1-11.)

363.     Torres' calculations do not assess whether any logo change by Lawn Managers was good or bad for business.  (F. Torres Testimony TT, Vol. 2, 89:18-90:1.)

364.     In making his calculations and rendering his opinions, Torres simply assumed that Progressive's entire sales were being generated on the basis of an infringing mark.  (F. Torres Testimony TT, Vol. 2, 73:23-74:7.)

365.     To make his calculations Torres had to assume liability is found.  Otherwise, his whole report is moot.  (F. Torres Testimony TT, Vol. 2, 74:9-10.)

366.     Though Torres opined that there was a nexus between use of the mark and the generation of revenue and sales, he offered no evidence to back up this statement.  (F. Torres Testimony TT, Vol. 2, 74: 13-18.)  Instead, he said that Progressive's insistence on using "Lawn Managers" showed the nexus.  (F. Torres Testimony TT, Vol. 2, 90:2-13.)

367.     Torres can cite no customer that purchased services from Progressive because it used an infringing mark.  (F. Torres Testimony TT, Vol. 2, 90:22-24.)

368.     He did not take into account whether Progressive used any signage or postings that were not infringing.  (F. Torres Testimony TT, Vol. 2, 91:22-92:1.)

369.     Torres believes that the only corrections Progressive made to its advertising occurred in the month before trial.  (F. Torres Testimony TT, Vol. 2, 114:1-8.)

370.     Thus, Torres has not seen any photographs of Progressive's trucks going back to 2013 and thus is unaware that Progressive has been using vehicles since 2013 with the word "Progressive" prominently displayed upon them.  (F. Torres Testimony TT, Vol. 2, 92:2-4.)

371.     Torres' report does not try to assess what revenues of Progressive were due to legal prominent use of its marks.  (F. Torres Testimony TT, Vol. 2, 92: 5-7.)

**372.** Torres did not account in his report that there might references to Lawn Managers on third-party sites not controlled by Progressive.  (F. Torres Testimony TT, Vol. 2, 92:8-13.)

**373.** Torres did not analyze the effect on the marketplace of Progressive's use or right to use the words "Lawn Managers" for the period May 2012 to December 31, 2014.  (F. Torres Testimony TT, Vol. 2, 92:14-20.)

**374.** Torres admits that the information available is not sufficient to differentiate the effects of confusion that would have been created before or after January 1, 2015.  (F. Torres Testimony TT, Vol. 2, 92:21-25.)

**375.** Torres' opinions do not account for confusion in the marketplace that is attributable to conduct of Progressive in compliance with the divorce orders.  (F. Torres Testimony TT, Vol. 2, 93:1-6.)

**376.** Torres could not identify one customer that Lawn Managers lost to Progressive based upon infringing acts of Progressive.  (F. Torres Testimony TT, Vol. 2, 93:19-23.)

**377.** According to Torres, any revenues generated after 2015 would have been infringing.  (F. Torres Testimony TT, Vol. 2, 94:17-19.)

**378.** According to Torres, all of the sales were generated under the same umbrella brand.  (F. Torres Testimony TT, Vol. 2, 75: 5-7.)

**379.** Thus, in calculating Progressive's profits, Torres included revenues not only derived from residential customers that were in zip codes awarded to Linda (F. Torres Testimony TT, Vol. 2, 93:24-94:2), but also revenues derived from specific customers awarded to Linda in 2012.  (F. Torres Testimony TT, Vol. 2, 94: 20-22.)

**380.** At least 60 percent of Progressive's revenues in 2015 and 50 percent of Progressive's customers in 2016 were from customers specifically awarded to Linda in 2012 and

2014, whom Lawn Managers was prohibited from servicing.  (L. Smith Testimony, TT Vol. 3, 52:20-53:3.)

**381.**    Torres cannot state for any year how much of Progressive's revenue was from customers awarded Linda in the 2012 and 2014 divorce orders.  (F. Torres Testimony TT, Vol. 2, 101:3-7.)

**382.**    According to Torres, in 2015 and 2016, Progressive made under $9,000 in revenue from accounts in zip codes awarded to Randy in each of 2015 and 2016.  (F. Torres Testimony TT, Vol. 2, 75:19.)

*e.    Government Data Utilized or Cited By Torres*

**383.**    Torres admitted he cited data from the Department of Commerce in his report, but did not use it for his calculations.  (F. Torres Testimony TT, Vol. 2, 95:22-96:22.)

**384.**    Torres used census data in his report for owner-occupied residential units, but he has no idea how many of these units are apartments, condominium owners, duplexes, or single-family homes.  (F. Torres Testimony TT, Vol. 2, 97:3-17.)

**385.**    Torres relied on census data to make his calculations, but has no idea what percentage of residential homes in the data use a lawn care service or what type of lawn services homes purchase.  (F. Torres Testimony TT, Vol. 2, 98:24-99:6.)

**386.**    Torres does not know what percentage of homes in the zip codes that either Randy or Linda was awarded use a lawn care service.  (F. Torres Testimony TT, Vol. 2, 99:7-12.)

**387.**    Torres changed the terminology in table 2 of his report from his May 2017 report to his October 2017 report.  (F. Torres Testimony TT, Vol. 2, 106:16-24.)

70

**388.**     Torres' October 2017 report changed his figures in table 1 for 2015 from his May 2017 report without pointing out the change.  (F. Torres Testimony TT, Vol. 2, 108:2-14.)

**389.**     Torres's October 2017 report does not provide a rebuttal to Brian Toennies' calculations.  (F. Torres Testimony TT, Vol. 2, 107:7-10.)

**390.**     Torres used government data relating to "landscaping services" for his report.  (F. Torres Testimony TT, Vol. 2 94:23-95:1.)

**391.**     Lawn Managers does not provide landscaping services.  (R. Zweifel Testimony, TT Vol. 1, 108:25-109:4.)

### f.   Toennies' General Methodology

**392.**     To reach his opinions, Toennies looked at the tax returns for the years 2013–2016 for Progressive.  (B. Toennies Testimony TT, Vol. 3, 66:25-67:16.)

**393.**     Toennies helped prepare Progressive's 2013–2016 tax returns.   (B. Toennies Testimony TT, Vol. 3, 70:6-11.)

**394.**     Toennies also looked at Progressive's profit and loss statement for 2013–2016. (B. Toennies Testimony TT, Vol. 3, 67:17-21; Ex. 78.)

**395.**     Exhibit 79 is the June 16, 2017 report that Toennies prepared for the case.  (B. Toennies Testimony TT, Vol. 3, 68:3-6; Ex. 79.)

**396.**     Exhibit E-6 is an October 25, 2017 addendum prepared by Toennies to his June 16, 2017 report.  (B. Toennies Testimony TT, Vol. 3, 6:9-11; Ex. E-6.)

**397.**     Toennies also looked at Lawn Managers 2014 and 2015 income statements for Lawn Managers.  (B. Toennies Testimony TT, Vol. 3, 68: Ex. T-3; Ex. U-3.)

**398.**     Toennies also looked at Lawn Managers 2013-2016 tax returns.  (B. Toennies Testimony TT, Vol. 3, 68:20-69:2; Ex. U-3, Ex. V-3; Ex. W-3; Ex. X-3.)

**399.**    Toennies also looked at Lawn Managers 2016 income statement.  (B. Toennies Testimony TT, Vol. 3, 69:3-4; Ex. Y-3.)

**400.**    Toennies also looked at Progressive's monthly profit and loss statement for each month of 2017 through the end of August 2017.  (B. Toennies Testimony TT, Vol. 3, 71:16-25; Ex. M-3.)

**401.**    Toennies calculated a profit figure for Progressive for the years 2015 and 2016 by taking revenue from ordinary operations and subtracting ordinary and necessary business expenses.  (B. Toennies Testimony TT, Vol. 3, 72:14-17.)

**402.**    The ordinary and necessary business expenses include costs, overhead expenses, and administrative expenses.  (B. Toennies Testimony TT, Vol. 3, 72:18-20.)

**403.**    Accountants prepare tax returns and financial statements taking into account all expenses, including overhead, necessary to provide a service.  (B. Toennies Testimony TT, Vol. 3, 72:21-18.)

The tax returns for Progressive for 2015 and 2016 indicate the profits earned or not earned by Progressive for those years according to tax and financial reporting accounting methods.

### g.  Progressive's 2015 and 2016 Profits

**404.**    In his May 2017 Report, Torres opined that Progressive's profits for 2015 and 2016 were $186,423.  (F. Torres Testimony TT, Vol. 2, 103:23-104:3; Ex. 80; Ex. O-3.)

**405.**    In the United States, taxes are not paid on EBITDA.  (F. Torres Testimony TT, Vol. 2, 99:13-15.)

**406.**    In calculating Progressive's profits, Torres only used incremental costs for services.  (F. Torres Testimony TT, Vol. 2, 101:8-10.)

**407.** Torres did not use all of the overhead in making his calculations. (F. Torres Testimony TT, Vol. 2, 101:8-13.)

**408.** According to Torres, certain costs are not deducted for infringement analysis. (F. Torres Testimony TT, Vol. 2, 77:19-78:9.)

**409.** According to Torres, if an expense is not tied to revenue, the cost should not be deducted in calculating an infringer's profits. (F. Torres Testimony TT, Vol. 2, 78:10-12.)

**410.** Torres claims that Brian Toennies did not examine the appropriateness or the deductibility of all the operating expenses from revenue in order to arrive at the incremental profits that Torres claims the law calls for. (F. Torres Testimony TT, Vol. 3, 60:4-14.)

**411.** Torres first used the term "incremental profit" in his October 25, 2017 report. (B. Toennies Testimony TT, Vol. 3, 75:8-14.)

**412.** The term "incremental profit" is not a term used by CPA's. (B. Toennies Testimony TT, Vol. 3, 75:19-23.)

**413.** Torres did not explain what "incremental profit" is in his October _, 2017, report. (B. Toennies Testimony TT, Vol. 3, 75:24-76:1.)

**414.** According to Toennies, Progressive's EBITDA for 2015 was $23,829 and for 2016 it was $10,533. (B. Toennies Testimony TT, Vol. 3, 70:16-22, 74:5-10: Ex. 79.)

**415.** To calculate EBITDA, Toennies did not allow for deductions for depreciation, income tax, or amortization. (B. Toennies Testimony TT, Vol. 3, 70:23-71:6.)

**416.** Toennies calculated EBITDA for 2015 and 2016 by starting with the taxable income on the front page of Progressive's tax returns and added back depreciation and interest expense. There was no amortization of income tax expense to add back. (B. Toennies Testimony TT, Vol. 3, 73:22-74:4.)

417.    The difference between Toennies' EBITDA number and Torres' EBITDA number arises from Torres adding back in select, unexplained expenses mentioned in Table 2 of his report into his calculations.  (B. Toennies Testimony TT, Vol. 3, 74:13-75:18, 76:2-7.)

418.    Toennies broke down his expenses in the tax returns his office prepared.  (B. Toennies Testimony TT, Vol. 3, 81:1-6.)

419.    As a result of Torres's method, his EBITDA calculation for 2015 is $88,000 higher than Toennies' calculation and his EBITDA calculation for 2016 is $78,000 higher than Toennies' calculation.  (B. Toennies Testimony TT, Vol. 3, 76:2-5.)

420.    Toennies did not include charitable contributions or life insurance to reduce his EBITDA calculations.  (B. Toennies Testimony TT, Vol. 3, 76:8-14.)

421.    According to Toennies, Progressive's total EBITDA for 2015 and 2016 is $34,362.  (B. Toennies Testimony TT, Vol. 3, 76:15-18.)

*h.  Opinions Regarding Progressive's 2017 Profits*

422.    Exhibit N-3 is an accurate summary of Progressive's monthly revenues for 2017 through August 2017.  (L. Smith Testimony, TT Vol. 3, 21:8-13.)

423.    Exhibit M-3 is a summary by month of profits and losses for Progressive for the months January through August 2017.  (B. Toennies Testimony TT, Vol. 3, 76:24-77:6.)

424.    Torres has no tax return for either party for 2017.  (F. Torres Testimony TT, Vol. 2, 76:5-7.)

425.    In his October 2017, report, Torres opines that adding Progressive's profits for 2017 to his 2015 and 2016 figures brings Progressive's profits from using an infringing mark to $322,753  (F. Torres Testimony TT, Vol. 2,104:4-7; Ex.120.)

74

**426.**     Thus, according to Torres, Progressive made $136,330 in only eight months of 2017.  (F. Torres Testimony TT, Vol. 2, 104:8-10.)

**427.**     Torres did not calculate a figure for incremental profit in the 2017 figures.  (Ex. 120.)

**428.**     Revenues for companies like Progressive fluctuate based upon seasons.   (F. Torres Testimony TT, Vol. 2, 104:20-25; (B. Toennies Testimony TT, Vol. 3, 77:7-20.)

**429.**     According to Torres, Progressive's revenues for the rest of 2017 would be proportional to the revenues shown in years past.  (F. Torres Testimony TT, Vol. 2, 105:1-10.)

**430.**     Progressive's records show that for any calendar year, revenues for the year are skewed because accounted for early in the year and not steadily throughout the year.  (L. Smith Testimony, TT Vol. 3, 21:14-19; (B. Toennies Testimony TT, Vol. 3, 77:7-20, 83:3-10.)

**431.**     This is a fairly common accounting method.  (B. Toennies Testimony TT, Vol. 3, 77:21-24.)

**432.**     However, a partial monthly profit and loss statement like Ex. M-3 is not a reasonable piece of data to determine EBITDA for a company through an interim period of a financial year because deposits are skewed earlier in the year.  (B. Toennies Testimony TT, Vol. 3, 77:25-78:8.)

**433.**     By way of example, if you calculated Progressive's EBITDA just for January, the number would be astronomical.  (B. Toennies Testimony TT, Vol. 3, 78:16-17.)

**434.**     To get an appropriate picture of Progressive's 2017 financial performance, you would have to factor in the last four months of performance.  (B. Toennies Testimony TT, Vol. 3, 78:9-15.)

**435.** Torres' calculated EBITDA for the first eight months of 2017 using the same method he did for 2015 and 2016, but he did not annualize his figures. (B. Toennies Testimony TT, Vol. 3, 78:19-79:5.)

**436.** Torres' starting number for his 2017 calculations was not a reliable number to start with. (B. Toennies Testimony TT, Vol. 3, 79:6-8.)

**437.** The figure for Progressive's 2017 EBITDA through August 2017, without annualizing, is $43,136. (B. Toennies Testimony TT, Vol. 3, 79:9-14.)

**438.** If you looked at Progressive's performance through the end of December, Toennies' partial EBITDA figure would go down.

**439.** Torres did not calculate his 2017 EBITDA figure using generally accepted accounting principles. (B. Toennies Testimony TT, Vol. 3, 79:18-21.)

*i.  Torres' May 27, 2016 Report*

**440.** Torres prepared a report dated May 27, 2016 that opined as to Progressive's purportedly wrongful profits. (F. Torres Testimony TT, Vol. 2, 109:8-12.)

**441.** In his May 27, 2016 report, Torres opined that Progressive had wrongful profits of $478,332 for the period January 1, 2015 through May 31, 2016. (F. Torres Testimony TT, Vol. 2, 110:8-12.)

**442.** Torres rendered that opinion without seeing one financial record from Progressive. (F. Torres Testimony TT, Vol. 2, 110:13-111:14.)

*j.  Lawn Managers' Lack of Actual Damages*

**443.** Torres could not identify one customer that Lawn Managers lost to Progressive based upon infringing acts of Progressive. (F. Torres Testimony TT, Vol. 2, 93:19-23.)

*k.  Opinions as to Corrective Advertising and Relevant Evidence*

**444.**   According to Torres, $71,346 is necessary for corrective advertising to remedy Progressive's claimed infringement.  (Ex. 120.)

**445.**   In making his estimate for corrective advertising, Torres did not see any of Lawn Managers expenses for mailing.  (F. Torres Testimony TT, Vol. 2, 111:23-112:4.)

**446.**   A mass mailing has a less than one percent effective rate.  (R. Zweifel Testimony, TT Vol. 1, 143:17-19.)

**447.**   Torres does not know how many of the households that he says need a corrective advertising flyer had ever seen anything with defendant's name or mark.  (F. Torres Testimony TT, Vol. 2, 113:3-6.)

**448.**   Nor can Torres say how many of those households have ever used Progressive's services.  (F. Torres Testimony TT, Vol. 2, 113:7-9.)

**449.**   Nor can Torres say how many of those households have ever used a lawn care service since January 1, 2015.  (F. Torres Testimony TT, Vol. 2, 113:10-13.)

**450.**   Nor can Torres say how many of those households even have a yard.  (F. Torres Testimony TT, Vol. 2, 113:14-15.)

**451.**   Torres does not know how many of those households he says need a corrective advertising flyer have received a mailer from Lawn Managers in the past.  (F. Torres Testimony TT, Vol. 2, 113:16-18.)

**452.**   There is nothing in Torres' report that indicates how many people would read any mailers sent out.  (F. Torres Testimony TT, Vol. 2, 113:22-25.)

**453.**   Torres never asked for information about the number of yard signs used by Progressive or any metric on the number of people who saw the sign on Progressive's building. (F. Torres Testimony TT, Vol. 2, 116:13-25.)

**454.**     Exhibit P-3 is a true and accurate summary of all US Postmaster transactions for Lawn Managers from 2012 to July 2016.  (Ex. P-3;  R. Zweifel Testimony, TT Vol. 1, 143:13-144:25; D. Alcorn Testimony, TT Vol. 2, 12:6-22.)

**455.**     The total amount stated on Exhibit P-3 for four years of US Postmaster transactions is $139,019.67.  (Ex. P-3; (R. Zweifel Testimony, TT Vol. 1, 145:22-24.)

**456.**     The major part of marketing done by Lawn Managers is sending out mass mailings to single-family dwellings.  (R. Zweifel Depo. 35:24-36:3.)

**457.**     In 2012, plaintiff spent $50,000 to $60,000 on direct mail advertising, a figure that includes the costs of company employee salaries.   (Defendant's Answer to Plaintiff's Interrogatory 16.)

### xix.     Supposedly Improper Servicing or Solicitation by Progressive

**458.**     Ex. 155 a list of customers that Progressive is servicing in zip codes awarded Randy.  (L. Smith Testimony TT Vol. 3, 20:22-25.)

**459.**     There is no evidence that Progressive's servicing of those customers was a violation of the decrees.

**460.**     There is no evidence that Lawn Managers ever accused Progressive in divorce court of improper solicitation.

**461.**     Lawn Managers has never advised Linda before this case that her servicing of any customers in a zip code awarded Randy was improper.  (L. Smith Testimony, TT Vol. 3, 21:1-7.)

**462.**     Lawn Managers' general manager, Scott Hewitt, has never seen Progressive treating residences in Lawn Managers' zip codes.  (S. Hewitt Testimony, TT Vol. 2, 42:21-25.)

**463.**     Linda has never purposefully solicited any customer awarded to Randy in the 2012 decree.  (L. Smith Testimony, TT Vol. 3, 23:17-19.)

**464.** Any such solicitations would have been few (3-4 customers) and inadvertent.  (L. Smith Testimony, TT Vol. 3, 21:20-21.)

### xx.    Findings Relating to Unclean Hands Against Lawn Managers

**465.** According to Randy, he has never sent mailings into Linda's zip codes prior to July 25, 2016.  (R. Zweifel Testimony, TT Vol. 1, 60:23-61:1, 101:20-23, 102:8-15, 151:9-24; R. Zweifel Testimony, 08/31/16 Temporary Restraining Order Hearing, 61:1-12.)

**466.** In fact marketing letters were sent to customers in Linda's zip codes prior to July 25, 2016.  (R. Zweifel Testimony, TT Vol. 1, 151:25-152:4.)

**467.** Randy excuses the sending of those letters by claiming the customers, even though specifically awarded to Linda, were bought by him in July 2014.  (R. Zweifel Testimony, TT Vol. 1, 151:25-152:4.)

**468.** Randy has never approached Linda about purchasing any of the accounts awarded to Linda under the 2012 Decree and MSA.  (L. Smith Testimony, TT Vol. 2, 136:20-22.)

**469.** At the time of the July 2014 Order, Lawn Managers had been servicing accounts that had been awarded Linda in 2012.  ((L. Smith Testimony, TT Vol. 2, 144:17-22; R. Zweifel Testimony, TT Vol. 1, 118:15-21; R. Zweifel Testimony, 09/22/16 Preliminary Injunction Hearing, 82:12-15; 111:14-22; D. Alcorn Testimony, TT Vol. 1, 194:23-195:1.)

**470.** At the time of the 2014 motion for contempt, there was a list of customers that Lawn Managers had been servicing that was provided in evidence.  (R. Zweifel Testimony, 09/22/16 Preliminary Injunction Hearing, 82:21-24; (L. Smith Testimony, TT Vol. 3, 18:2-8; E-4.)

**471.** As part of the July 25, 2014 Order Randy paid Linda $125,000.  (L. Smith Testimony, TT Vol. 3, 43:16-17.)

472.    According to Randy, he paid the $125,000 as part of that contempt order, $77,000 of which he deemed to be an amount the Court felt was still owed to Linda under the divorce and the remainder was for approximately 72 accounts he was servicing.  (R. Zweifel Testimony, 09/22/16 Preliminary Injunction Hearing, 82:25-83:11.)

473.    Randy claims that the customers he admitted servicing before the July 25, 2014 Order were his customers as a result of the July25, 2014 Order.  (R. Zweifel Testimony, TT Vol. 1, 154:4-6.)

474.    However, between May 2012 and the July 25, 2014 Order, Linda never formally transferred any accounts to Randy.  (L. Smith Testimony, TT Vol. 2, 146:4-6; R. Zweifel Testimony, TT Vol. 1, 154:1-3.)

475.    The July 25, 2014 did not provide for the transfer of any accounts from Linda to Randy, including any of the approximately 72 customers in Linda's zip codes that Lawn Managers had been servicing prior Order.  (Ex. 12; L. Smith Testimony, TT Vol. 2, 146:7-9.)

476.    The July 25, 2014 Order states that all other terms of the divorce decree and settlement agreement remain in full force and effect.  (R. Zweifel Testimony, TT Vol. 1, 121:15-17; R. Zweifel Testimony, 09/22/16 Preliminary Injunction Hearing, 69:13-70:4.)

477.    There is nothing in the July 25, 2014 Order indicating that Randy was paying Linda money for anything but a past breach or purchasing any customers from Linda.  (L. Smith Testimony, TT Vol. 2, 146:13-16; R. Zweifel Testimony, 09/22/16 Preliminary Injunction Hearing, 113:4-114:1; R. Zweifel Testimony, 09/22/16 Preliminary Injunction Hearing, 65:16-21.)

**478.** Randy continued to service accounts specifically awarded to Linda under the 2012 Divorce decree after July 25, 2014.  (R. Zweifel Testimony, TT Vol. 1, 118:22-25, 123:20-21; R. Zweifel Testimony, 09/22/16 Preliminary Injunction Hearing, 112:8-20; 115:21-116:7.)

**479.** Randy did not provide Linda any notification that he continued to service those customers after the July 25, 2014 Order.  (R. Zweifel Testimony, TT Vol. 1, 120:22-121:9.)

**480.** Randy has no reason to believe that any of the divorce orders are not valid.  (R. Zweifel Depo. 29:13-16.)

**481.** There is nothing in the July 25, 2014 that indicated as of July 25, 2016 the customers that Linda had been specifically awarded could be solicited Randy.  (L. Smith Testimony, TT Vol. 2, 147:10-14.)

**482.** In July 2016, Randy set upon a course of conduct to take the data in his computer showing the accounts awarded to Linda in 2012 and deliberately send letters to every single one of those customers.  (R. Zweifel Testimony, 09/22/16 Preliminary Injunction Hearing, 117:2–9; Ex. 51.)

**483.** In furtherance of that conduct, he sent the "we want you back" mailer to 2,000 customers in Linda's zip codes.  (R. Zweifel Testimony, TT Vol. 1, 135:8-9; R. Zweifel Testimony, 09/22/16 Preliminary Injunction Hearing, 65:22-66:12; Ex. 51.)

**484.** The mailer that went out in July 2016 was the first notice that Lawn Managers provided to customers that customers in certain zip codes had been transferred to Linda.  (R. Zweifel Testimony, TT Vol. 1, 116:11-117:2; R. Zweifel Depo. 30:22-31:22; 32:14-33:7.)

**485.** Randy sent out the mailer because he felt the non-compete agreement set forth in the July 2014 Order was over.  (R. Zweifel Testimony, TT Vol. 1, 89:20-90:3.)

**486.**   Debra Alcorn and Randy prepared the content of that mailer.   (D. Alcorn Testimony, TT Vol. 1, 213:20-23; D. Alcorn Depo. 78:25.)

**487.**   The introductory line in the mailer states:

"Due to circumstances beyond our control, in May 2012 your account and those of some of our other longstanding customers were turned over to another company. Unfortunately, we were not allowed to contact you or any customers that were switched to the other company to explain the situation."

(R. Zweifel Testimony, TT Vol. 1, 132:25-133:8; Ex. 51.)

**488.**   Randy does not believe that there is anything false in the mailer.   (R. Zweifel Testimony, TT Vol. 1, 133:9-10; R. Zweifel Testimony, TT Vol. 1, 90:4-10.)

**489.**   All of the mailers went to the specific customers that had been awarded to Linda under the 2012 Decree and the July 25, 2014 Order.   (R. Zweifel Testimony, TT Vol. 1, 132:22-24; R. Zweifel Testimony, 09/22/16 Preliminary Injunction Hearing, 66:13-22; D. Alcorn Testimony, TT Vol. 1, 213:24-214:2.)

**490.**   All of these mailers went to addresses in Progressive's zip codes.   (D. Alcorn Testimony, TT Vol. 1, 214:3-4.)

**491.**   By sending out the "we want you back" mailer, Randy believed he could get 10% of Linda's customers awarded to her in 2012, an amount equal to $66,000 for one year of service.   (R. Zweifel Testimony, TT Vol. 1, 135:25-136:2; 09/22/16 Preliminary Injunction Hearing Randy, 100:22-102:15.)

**492.**   Customer calls to Lawn Managers increased significantly after sent out we want you back letter.   (R. Zweifel Testimony, TT Vol. 1, 133:11-20.)

**493.**   As a result of the mailer going out, many people contacted Lawn Managers about the mailer.   (R. Zweifel Testimony, TT Vol. 1, 134:5-7.)

**494.** In September 2016, Randy admitted he had been servicing 20-30 accounts awarded to Linda in 2012. (R. Zweifel Testimony, 09/22/16 Preliminary Injunction Hearing, 67:13-24.)

**495.** After July 25, 2016, Linda became aware that customers awarded to her in the divorce were being contacted by Lawn Managers. (L. Smith Testimony TT Vol. 3, 11:5-11.)

**496.** The sending of that mailer had an immediate effect on Progressive's business - Progressive started getting angry phone calls from customers, customers started canceling and people were confronting Progressive's employees in the field. (L. Smith Testimony TT Vol. 3, 11:24-12:7.)

**497.** When Linda learned what Lawn Managers had done, she applied for a TRO in Jefferson County Circuit Court. (L. Smith Testimony TT Vol. 3, 12:8-16.)

**498.** After Randy sent the "we want you back" mailer in July 2016, almost 400 of Progressive's customers cancelled, causing several hundred thousand dollars in lost revenue. (L. Smith Testimony TT Vol. 3, 19:5-10.)

**499.** Progressive's 2016 revenue was down several hundred thousand dollars from that of 2015. (L. Smith Testimony TT Vol. 3, 19:-20:3.)

**500.** Ex. E-4 is the list of accounts given by Randy to Linda in 2014 that disclosed the accounts he was then servicing. (Ex. E-4; (L. Smith Testimony TT Vol. 3, 18:2-8.)

**501.** Ex. 145 is a table prepared by Randy Managers in response to discovery requests in the ongoing contempt proceedings in Jefferson County. (R. Zweifel Testimony, TT Vol. 1, 142:7-18; Ex. 145.)

**502.**   Ex. 145 sets forth Lawn Managers' reasons why it believes it was appropriate to service particular customers in Linda's zip codes.  (R. Zweifel Testimony, TT Vol. 1, 142:19-23; Ex. 145.)

**503.**   Exhibit F-4 is highlighted copy of Exhibit 145 a listing of customers that Randy Zweifel prepared in the ongoing contempt proceedings that contains a listing of customers serviced in Linda's zip codes and the reasons why, according to Randy, he was allowed to service those customers.  (L. Smith Testimony TT Vol. 3, 16:25-17:10.)

**504.**   Linda went through the listing in Exhibit F-4 and categorized groups of listed customers by the reasons Randy gave for servicing them.  (L. Smith Testimony TT Vol. 3, 17:5-18:1.)

**505.**   The 34 customers marked with pink highlighting on Exhibit F-4 are customers that Randy admitted were given to Linda in 2012 or 2014, but which he felt he had an unrestricted right to solicit as of July 25, 2016.  (L. Smith Testimony TT Vol. 3, 17:11-17.)

**506.**   The customers marked with yellow highlighting are ones that Randy disclosed back in 2014.  (L. Smith Testimony TT Vol. 3, 17:18-22.)

**507.**   The customers marked with yellow highlighting also are ones that Randy indicates he could service as a result of the July 25, 2014 Order that Randy did not disclose in 2014.  (L. Smith Testimony TT Vol. 3, 17:23-18:1.)

**508.**   According to Exhibits F-4 and 145, Randy disclosed 73 accounts being serviced in Linda's zip code prior to the July 25, 2014 Order.  (Ex. 145; Ex. F-4.)

**509.**   According to Exhibits E-4, F-4 and 145 Randy did not disclose at least 27 that he was servicing back in 2014 during the 2014 contempt proceedings.  (Ex. E-4; Ex. F-4; Ex. 145.)

To the extent that any of the foregoing findings of fact constitute conclusions of law, they are hereby adopted as such.

## II. Conclusions of Law

### A. The Narrow Scope of Trademark Infringement.

As a threshold matter, it is important to note the scope of the matter properly before the Court.  This not a proper forum to relitigate or collaterally attack any of the Divorce Court's numerous proceedings since 2012 or otherwise encroach on state courts' exclusive jurisdiction over controversies as to the dissolution of a marriage.  *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 367–68 (1989); *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 13 (2004) ("[I]n general it is appropriate for the federal courts to leave delicate issues of domestic relations to the state courts.").  In Missouri, a "court's order as it affects distribution of marital property shall be a final order not subject to modification," Mo. Rev. Stat. § 452.330.5, and the Marital Settlement Agreement specifically provided that its terms were nonmodifiable and "decretal" for the purposes of enforcement.  Thus, despite Lawn Manager's contention to the contrary, there is not any question that Progressive has the right to use the name "Progressive Lawn Managers" in accordance with the Decree, nor is there question that all right, title, and interest to certain customers was awarded to each party by zip code.  The arrangement settled upon by Linda and Randy and judicially decreed as to the division of their business in their divorce, however problematic it has become, cannot be disturbed by this Court.

Similarly, the parties have presented a voluminous record of testimony and exhibits that, at first blush, would seem to belie the reality that the monetary and equitable relief Lawn Managers seeks is based on a single theory of liability: trademark infringement under federal law.  Much of this evidence is purely spillover from the ongoing contempt proceedings still

underway in state court.  Crucially, Lawn Managers has not brought any related claims such as unfair competition, false advertising, trademark dilution, or trademark infringement under Missouri law.  Thus, the relevance of any particular evidence in this case can be determined by inquiring whether that evidence has any bearing on one of the elements of Lawn Manager's trademark infringement claim, Progressive's affirmative defense of unclean hands, or Progressive's counterclaim of abandonment.

Using this principle as a guide, the Court first turns to the elements of a claim for trademark infringement.  In addition to showing causation, to prevail on a federal trademark-infringement claim under 14 U.S.C. § 1114, a plaintiff must prove: "1) that it owns a valid, protectable mark, (2) that the defendant has used a mark in commerce without the plaintiff's consent; and (3) that there is a likelihood of confusion between the plaintiff's mark and the defendant's mark." *ZW USA, Inc. v. PWD Sys., LLC*, 208 F. Supp. 3d 1025, 1039 (E.D. Mo. 2016).  In light of this narrow framework, much of the evidence presented at trial – most of which is inextricably entangled with the proceedings and findings of the Divorce Court – is not germane to the issue at bar.

For example, Lawn Managers has repeatedly injected in this case the fact that Linda took the former phone number of Lawn Managers, Inc. for her business around the time of the divorce.  According to Randy, he wants the phone number returned to "him."  (R. Zweifel Testimony, TT Vol. 1, 90:23-91:2.)  Lawn Managers contends that this number contains a High Ridge, Missouri, prefix and thus is being used by Progressive to suggest that it has a High Ridge location.  Besides being irrelevant to this issue of trademark infringement, the Court notes that the Decree provides that Linda could use the High Ridge location offices through December 31, 2012.  Accordingly, it would have been appropriate for her to have a phone number suggesting a

High Ridge location.  Moreover, if the intent of the 2012 Decree was to ensure customers did not know Linda's business was a new business, then having a High Ridge telephone number would have assisted in that fact.  There is likewise inconsistency in Lawn Managers' testimony on this matter.  At trial, Plaintiff, through Debra Alcorn, testified that Smith took phone number after divorce, yet Zweifel indicated in his deposition testimony that the phone number was taken before the divorce.  Regardless of the timing, given Lawn Managers' contention that the May 2012 Decree was set aside and the actual decree was not entered until August 2012, if there was any dispute as to Linda's entitlement to the phone number, that phone number was marital property, subject to the jurisdiction of the divorce court.  Randy had ample opportunity to address the supposed wrongful taking of the phone number at any time in May 2012, August 2012, June 2013, July 2014, or in the 2016 proceedings in the Circuit Court of Jefferson County. Notably, however, Randy admits that he never did.

Likewise, Lawn Managers' evidence concerning Linda's alleged break-in to Lawn Managers' premises is clearly within the purview of the divorce court and indeed was raised (and rejected) in that court in 2013.  (Ex. J-1; R. Zweifel Testimony, TT Vol. 1, 148:9-21; December 5, 2017 Order from Circuit Court of Jefferson County, Missouri.)  It has no bearing on the trademark infringement claim before the Court.  Other examples, such as evidence concerning misstatements in Progressive's marketing materials, the payee names acceptable on checks cashed in Progressive's bank account, or Progressive's failure disclose it was a separate company in various circumstances, are similarly either not germane to trademark infringement or are consistent with the parties' accord to allow Smith to hold her company out to the public initially as being part of Plaintiff's enterprise.

Lastly, evidence concerning Progressive's oversight in allowing the allegedly infringing logo to continue to appear in a promotional video on its website has little, if any, bearing on this case.  *See Kampgrounds of Am., Inc. v. N. Del. A–OK Campground, Inc.,* 415 F.Supp. 1288, 1297 (D. Del. 1976) (finding franchisee's minor residual statements of affiliation with former franchisor in advertising to amount to negligence at worst rather than nefarious intent to cause actual confusion where defendant had made attempt to change advertisement), *aff'd by unpublished order*, 556 F.2d 566 (3d Cir. 1977).  Much like in *Kampgrounds*, Progressive here made an attempt to remove the offending logo from its website, instructing its website manager to remove the video.  The Court further notes that Lawn Managers' own evidence shows that video that was posted on Progressive's website at the time of trial utilized a logo prominently featuring the word "Progressive."

Casting aside this immaterial evidence, the Court next turns to Progressive's counterclaim of abandonment, which, if meritorious, renders a determination of infringement moot.

**B.  The Threshold Counterclaim of Abandonment Through Naked Licensing.**

Progressive brings a counterclaim for cancellation of Lawn Managers' marks under the theory of abandonment through naked licensing.  Under the Lanham Act, a mark is deemed abandoned "[w]hen any course of conduct by the owner, including acts of omission as well as commission, cause the mark to become the generic name for goods or services on or in connection with which it is used *or otherwise to lose its significance as a mark*."  15 U.S.C. § 1127 (emphasis added).  A registered trademark may be cancelled, thus negating a claim of trademark infringement, if it has been abandoned.  15 U.S.C. § 1064(3).  Naked licensing is a form of abandonment that occurs when a trademark owner grants a license to use its mark and

"then fails to control the quality of the products made by the licensee, thus permitting a deception of the public."  *Heaton Distrib. Co. v. Union Tank Car Co.*, 387 F.2d 477, 485 (8th Cir. 1967); *see also AmCan Enters., Inc. v. Renzi*, 32 F.3d 233, 235 (7th Cir. 1994) ("A bare license is a fraud upon the public and unlawful." (internal alterations removed)).

As the Court previously recognized, Randy granted Linda a license to use the name "Lawn Managers" from 2012 until December 31, 2014.  (Mem. & Order, ECF #64, p. 6–7.) However, this arrangement went far beyond a mere license.  In short, the parties' principals' pact was a benevolent plan to deceive the public in order to effect a fair allocation of property in a divorce, but years of ongoing litigation demonstrate that the parties to that agreement failed to consider its ramifications.  Essentially, it is obvious that in conjunction with the division of assets in the Decree and MSA, Randy leveraged the goodwill associated with the "Lawn Managers" name as a bargaining chip in lieu of paying additional compensation to Linda.  Thus, the unfettered right to use the name "Lawn Managers" was ostensibly intended as a right to purposefully delude customers into thinking that Progressive Lawn Managers, Inc. was the same company as Lawn Managers, Inc.

To have informed the Lawn Managers' customers transferred to Progressive that Progressive was a new company would have defeated the purpose of the parties' principals' accord, which implicitly acknowledged that Linda's company would need to trade on the goodwill of Lawn Managers, Inc. to make her new venture successful in the first years of its operation.  This notion was validated in 2016, when Lawn Managers disseminated its "We Want You Back" solicitation – thus revealing the bifurcation of the enterprise – and customers immediately started cancelling with Progressive.

More importantly, the evidence has shown that, in licensing its mark to Linda for use in her business, Randy imposed no requirements for use and exercised no quality control over the manner in which Progressive or Linda used that mark, rendering this a "naked" license.  The 2012 Decree made no provision for Randy to inspect or control the services provided by Progressive or how Progressive used the "Lawn Managers" name.  Whether Progressive upheld the same standards Lawn Managers used under its mark during that time is irrelevant; the granting of an uncontrolled license to use a mark constitutes a *de facto* abandonment of that mark by the licensor.  15 U.S.C. § 1127 (defining abandonment as either discontinued use with intent not to resume use or a course of conduct that causes the mark to lose its significance as a mark); *AmCan Enters., Inc. v. Renzi*, 32 F.3d 233, 235 (7th Cir. 1994).  Where a registered mark has been abandoned, that registration may be canceled.  15 U.S.C. § 1064(3).  Here, the sparse agreement between the parties is evidence enough to demonstrate that this was a naked license, as no restrictions on Progressive's use of the mark were ever contemplated, let alone enforced.

In response to Progressive's counterclaim, rather than attempting to refute that the license to Linda was a "naked" one, Lawn Managers relies solely on the defense of licensee estoppel. Licensee estoppel is the notion that a licensee of a trademark or tradename is estopped from bringing any adverse claim against the validity of the licensor's mark.  *Seven-Up Bottling Co., v. Seven-Up Co.*, 561 F.2d 1275, 1279 (8th Cir. 1977).  However, the Court finds that Lawn Managers has failed to prove licensee estoppel is applicable here because 1) the word mark "Lawn Managers" was not registered at the time the naked license was issued, 2) there would be no inconsistent terms to which Linda agreed and thus should be estopped from disputing, because the license in this case was one sentence in a consent decree and had no terms other than duration, and 3) Progressive was not actually the licensee of the license in question, that being

Progressive's sole shareholder rather than Progressive itself.  (Mem. & Order, ECF #64, p. 13–14.)  While Lawn Managers contends that Progressive is estopped as the agent of the actual licensee, this argument has been unequivocally rejected by the Eighth Circuit.  *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139, 1150 (8th Cir. 2011).[2]

In sum, the rights granted Linda under the 2012 Decree to use the name "Lawn Managers" for her business were not simply a naked license to use another's brand to sell a product or service.  It was a license for Linda's lawn business to hold itself out to the public as actually being the same enterprise as Lawn Managers, Inc. for two years.  This reading of the 2012 Decree is not only confirmed by the broad and brief terms of the license, but also by the Decree's grant to Linda of the right to obtain credit for her new business in the name of Lawn Managers.  Moreover, Randy again used the goodwill of the Lawn Managers name in July 2014 as consideration to avoid another contempt citation when he agreed in the July 25, 2014 Order to extend the time that Linda could use the Lawn Managers name, again without any restriction or right to control, through the end of 2014.

Further, the 2012 Decree gave Linda the right to call her business "Progressive Lawn Managers" indefinitely.  Thus, Linda had the right and option to tell customers and potential customers that her company's name was Lawn Managers, Progressive Lawn Managers, or both, and this is exactly what the evidence shows happened in the period between May 2012 and December 2014.  In this respect, the facts show that when Progressive started doing business in May 2012, the same employees that had previously serviced lawns as employees of Lawn

---

[2] Lawn Managers attempts to distinguish *Fair Isaac* by relying on *Twin City Pipe Trades Serv. Ass'n, Inc. v. Wenner Quality Servs., Inc.*, 869 F.3d 672 (8th Cir. 2017), for the proposition that a closely held corporation is in privity with its shareholder, but this case is inapposite because it refers merely to the privity required for collateral estoppel, not the alter ego requirement necessary to impose licensee estoppel on a party other than the named licensee.  *See Fair Isaac*, 650 F.3d at 1150.

Managers, were now servicing lawns as employees of Progressive.  As employees of Progressive, the employees were wearing the same "Lawn Managers" uniforms they had worn as Lawn Managers employees.  They were traveling in trucks previously owned by Lawn Managers and still emblazoned with the name "Lawn Managers."  In other words, by doing exactly what the 2012 Decree allowed, Linda told the public that Progressive Lawn Managers is synonymous with Lawn Managers.

Accordingly, it is clear that Lawn Managers, whether it intended to or not, abandoned its mark and thus is estopped from complaining of any infringements of that mark.  *AmCan Enters., Inc. v. Renzi*, 32 F.3d 233, 235 (7th Cir. 1994) ("If the licensor does not maintain adequate quality control, the mark may be deemed abandoned, or, equivalently, the licensor may be estopped to complain about infringements of it.").

### C. Causation of Customer Confusion.

Even if Lawn Managers were not precluded from complaining of infringements to its "Lawn Managers" word mark, Lawn Managers cannot show any causation for the confusion in the marketplace that would support an award of monetary or equitable relief.

It is undeniable that the divorce orders and the parties' compliance with those orders created extensive actual confusion in the marketplace unrelated to any alleged infringement. This confusion is the product of: a) the orders allowing Linda to use the name "Lawn Managers" for her business through the end of 2014; b) the transfer of customers from Lawn Managers to Progressive without any notice to the customers; c) Progressive's simultaneous use of both the "Lawn Mangers" name and "Progressive Lawn Managers" name prior through the end of 2014; d) Progressive's use of the "Progressive Lawn Managers" name after 2014; and e) the fact that the orders prohibited the servicing of residential accounts but allowed the servicing of

miscellaneous or commercial accounts – a distinction never explained to, and even if it had been explained, would not have been well understood or readily accepted among, the public.   As a result, Lawn Managers has not provided any proof that any of actionable confusion was actually caused by Progressive's alleged infringement or even arose in the period after Progressive's right to use the "Lawn Managers" name expired.   Profits are only recoverable where a plaintiff has proved with reasonable certainty that they are attributable to infringing conduct.  *Rolex Watch, U.S.A., Inc. v. Michel Co.*, 179 F.3d 704, 712 (9th Cir. 1999).  It is irrefutable that consumers' confusion vis-à-vis the parties pre-dates any of Progressive's allegedly infringing actions.  Lawn Managers' principal and its office manager testified that there was continuous and obvious confusion regarding the parties during the years 2012 through 2014 (as evidenced by, *inter alia*, the receipt of misdirected mail, emails, and phone calls on a regular basis), which is *prior* to when Defendant's alleged infringement of Plaintiff's logo began.  Counsel for Plaintiff further conceded this point in her opening arguments, stating,

> Prior to 2015, there was confusion – some of it caused by the defendant at the time of the divorce. … [T]here was a lot of confusion that year, first year, second year, where payments went to the wrong place and there was back and forth between the two parties, trying to straighten out.

(TT. Vol. Vol. 1: 11–15.)

Moreover, the evidence showed that this confusion persisted well into 2015, as Progressive's 2014 advertising caused purported customers of Lawn Managers to cancel.  This confusion is not surprising in the least.  The parties' relationship is somewhat akin to that of a former franchisor and franchisee, save for the fact that unlike a franchisee, Defendant was never placed under any restriction or supervision as to how it used the licensed mark or conducted its business.  Where confusion is due to a past relationship of the parties, there is no basis for a claim.  *Chicago Blackhawk Hockey Team v. Madsen*, No. 90 C 5833, 1991 WL 18411, at *8

(N.D. Ill. Feb. 13, 1991) ("[C]onfusion merely related to the prior relationship was not a basis for a claim, only confusion caused by unfair or infringing action taken after the termination of the relationship could be the basis of a meritorious claim."); *see also Shakey's Inc. v. Covalt,* 704 F.2d 426, 432 (9th Cir. 1983) (noting that confusion evidence as to whether former franchisee was still affiliated with franchisor had "not adequately addressed the possible causes of that confusion" and merely assumed that the allegedly infringing actions caused the confusion and finding that the former franchisee had no duty to ensure all its customers were aware it was no longer affiliated with the franchisor); *accord Frisch's Rest., Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1270 (6th Cir. 1985).

Given the level of confusion admitted to exist prior to 2015, it is unreasonable to expect that that confusion would simply dissipate overnight once Defendant's rights to use the "Lawn Managers" name terminated.  As noted, Plaintiff's own evidence shows that the confusion did not cease effective December 31, 2014, but continued into 2015 and to this day.  Plaintiff's extensive records of customer interactions provide strong confirmation that customers were confused and upset due to reasons unrelated to whatever signage Progressive may have been using.  Reviewing Lawn Managers' records of purportedly confused customers, it is noteworthy how many involve former customers of Lawn Managers who were transferred without notice in 2012 and 2014.  There can be no wonder why they might call Lawn Managers or express some type of confusion between the parties.  This confusion was only exacerbated by the way Lawn Managers was increasingly servicing commercial or miscellaneous accounts in Linda's zip codes and then repeatedly telling callers living in those zip codes, "we do not service your zip code."  Thus, it is not clear that any of this confusion can be attributed to the allegedly infringing signage used by Progressive.

Further exacerbating customers' confusion between the parties is that since 2013, Progressive has been using a judicially approved name (Progressive Lawn Managers) that incorporates the entirety of Lawn Managers' claimed mark.  Both the evidence and law indicate that this usage by Progressive contributes to the public's inability to distinguish themselves from each other.  Confusion may be presumed where a trade name incorporates the entirety of the claimant's mark for use in the same industry.  *See Perfumebay.com Inc. v. eBay Inc.*, 506 F.3d 1165, 1174 (9th Cir. 2007) (affirming ruling that "eBay" and "PerfumeBay" are similar, because the latter incorporates the former in its entirety, and created likelihood of confusion where parties were offering similar products over the Internet).  However, the law does not afford protection against confusion caused by use of lawfully similar names.  *See Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 445 (9th Cir. 1980) ("[S]election of a mark with a common word, just as one with a common surname, naturally entails a risk of some uncertainty and the law will not assure absolute protection." (internal quotation marks omitted)); *cf. Cleo Syrup Corp. v. Coca-Cola Co.*, 139 F.2d 416, 419 (8th Cir. 1943) (noting as a caveat to admissibility that witnesses who had mistaken Cleo Cola as being affiliated with Coca Cola had indicated on cross examination that their confusion resulted purely from common use of the word "cola" in the parties' trade names).

The fact that using the Progressive Lawn Managers name alone is confusing to the public is borne out in the allegations of Lawn Managers' Complaint and its continuing request that the Court prohibit Progressive from using the name "Progressive Lawn Managers" or any words containing "managers" or "management."  Beyond this, Lawn Managers' own evidence shows that as recently as May 2017, people who viewed Progressive's vehicles with prominent "Progressive" markings called Lawn Managers to complain about the way those Progressive

vehicles were being driven.  Despite the obvious actual confusion and potential for confusion caused by the Progressive's legitimate uses of the "Lawn Managers" mark and Progressive's similar name, Lawn Managers' employees who testified about receiving calls from confused customers did not make any inquires to determine what the source of the consumers' confusion was.  If anything, the common thread of the confusion evidence presented seems to be that customers were confused or upset at not having been informed of the company's bifurcation *ab initio* and were frustrated by the seemingly arbitrary geographic division of the company. Indeed, even if the parties had been required (or even permitted) to disclose the bifurcation, Lawn Managers and Progressive still would have been using the same trade name to operate in adjacent – and, in the case a commercial accounts, overlapping – territories divided by zip code, a division difficult to convey and not likely to be well understood by consumers.  Thus, this Court finds that Lawn Managers has not met its burden of proving that the confusion in the marketplace, though clearly extant, results from any infringement on the part of Progressive.

### D.  Defense of Unclean Hands.

Even if the Court finds some level of infringement, Lawn Managers' course of conduct since the divorce precludes equitable relief.  As a years-long record of contempt proceedings in the Circuit Court of Jefferson County, Missouri (the "Circuit Court"), bears out, Lawn Managers' conduct toward Progressive has not been equitable.  Although "equity does not demand that its suitors shall have led blameless lives as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814–15 (1945) (dismissing patent infringement suit for unclean hands based on perjury in prior action between the parties) (internal quotations and citations omitted).  Thus, under the doctrine of unclean hands, it is in this Court's

power to determine that Lawn Mangers is foreclosed from seeking equitable relief such as an injunction or an accounting of Progressive's profits as a result of Lawn Managers' conduct toward Progressive since Progressive's right to use the "Lawn Managers" name expired. *Graham Const. Servs., Inc. v. Hammer & Steel, Inc.*, 755 F.3d 611, 620 (8th Cir. 2014).

The facts are that Lawn Managers has been using its mark in violation of the relevant divorce decree and order to the detriment of Progressive.  Most significantly, Lawn Managers has openly admitted to serving customers awarded to Linda in the 2012 Decree.  Further:

a.      As part of the 2014 contempt proceedings brought against him, Randy disclosed that his company was already servicing some 72 residential properties in Linda's zip codes.  To prevent further encroachment by Lawn Managers in Linda's zip codes due to Randy's self-serving interpretation of the Decree, the parties agreed that the provision of the 2012 Decree prohibiting solicitation would be amended to a non-compete agreement so that neither would sign up or service any new residential accounts in the other's zip codes.  However, the July 2014 order of the Divorce Court specifically held that all other terms of the Decree would remain in effect.  The evidence also shows that Randy did not fully disclose the actual number of customers in Linda's zip codes that he had been servicing before the July 25, 2014 Order.

b.      Several times Randy denied in absolute terms that Lawn Manages ever sent letters to customers in Linda's zip codes, but the evidence at trial was otherwise.  The testimony from Lawn Managers' witnesses indicates that letters were, in fact, sent to customers in Linda's zip codes, including customers specifically awarded to her in the 2012 Decree.  Moreover, Lawn Managers' employees admit that these mailings were made to counteract non-infringing mailings that Progressive made in 2014 when it was allowed to use the "Lawn Managers" name.

      c.      Even in the face of the July 25, 2014 non-compete proscription, Lawn Managers'

business ballooned to at least 200 and as much as 500 residential customers within Defendant's

ZIP codes (the exact number varying depending upon which of Lawn Managers' records one

examines).

      d.      In July 2016, Lawn Managers started sending mailers containing its mark to the

specific customers to which Linda had been awarded "all right, title and interest" in the 2012

Decree as part of the property division.  This involved directly soliciting approximately 2000

customers that had been awarded to Progressive.  As a result of this violation of the 2012 Decree,

Progressive suffered a rush of cancellations and significant drop in revenue, and the Circuit

Court of Jefferson County, Missouri, entered a temporary restraining order and preliminary

injunction against Randy.

      Courts are necessarily given wide equitable discretion to impose the doctrine of unclean

hands against an unclean litigant, *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324

U.S. 806, 815 (1945), and improper business dealings have been held to fall within this doctrine,

*Gilead Scis., Inc. v. Merck & Co, Inc*., No. 13-CV-04057-BLF, 2016 WL 3143943, at *27 (N.D.

Cal. June 6, 2016).  This is especially true where, as here, a plaintiff has acted deliberately to

create trademark confusion.  *Metro Publ'g, Ltd. v. San Jose Mercury News, Inc.*, 861 F. Supp.

870, 880 (N.D. Cal. 1994) (finding plaintiff's deliberate attempt to create trademark confusion

constituted unclean hands and granting summary judgment against trademark holder "on this

basis alone").

      The bottom line here is that Lawn Managers has conducted its business and marketing

operations in such a way as to exacerbate pre-existing consumer confusion.  These are not the

actions of an innocent victim of trademark infringement.  Clearly, Lawn Managers' misconduct

has "in some measure affect[ed] the equitable relations between the parties in respect of something brought before the court for adjudication," which is sufficient to invoke the unclean hands doctrine.  *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933).

At the very least, Lawn Managers' unclean hands bar it from recovering Progressive's profits and obtaining an injunction, because disgorgement of profits and injunctions are equitable remedies.  *Fuller Prod. Co. v. Fuller Brush Co.*, 299 F.2d 772, 777 (7th Cir. 1962) ("An accounting for profits … is an equitable remedy subject to the principles of equity.") (citing 17 U.S.C. § 1117); *Minn. Pet Breeders, Inc. v. Schell & Kampeter, Inc.*, 41 F.3d 1242, 1245 (8th Cir. 1994) (acknowledging that both an accounting of profits and an injunction are equitable relief under the Lanham Act).  But further, Section 1117 specifically provides that any recovery for "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action" is "subject to principles of equity."  15 U.S.C. § 1117(a).  Thus, Lawn Managers' claims for costs of the action and even damages – which would normally be considered a legal remedy – are subject via statute to equitable defenses such as unclean hands.  *Rainbow Play Sys., Inc. v. Backyard Adventure, Inc.*, No. CIV.06-4166, 2009 WL 3150984, at *5 (D.S.D. Sept. 28, 2009); Restatement (Third) of Unfair Competition § 32 (1995) ("Misconduct on the part of a trademark owner may in some circumstances limit or preclude an award of damages, profits, or injunctive relief in an action for trademark infringement.").

To thwart Progressive's unclean hands defense, Lawn Managers asserts that Progressive likewise serviced customers in zip codes awarded to Randy.  However, Lawn Managers did not adduce evidence that servicing those customers was either material or wrongful under the decrees, which made exception for commercial and miscellaneous customers.  Accordingly, this

99

Court finds that Lawn Managers' judicially admonished and enjoined course of conduct bar it from recovery for trademark infringement.

### E.   Requirements for Monetary Relief Under the Lanham Act.

Even if Lawn Managers' mark had not been abandoned and Lawn Managers was not barred from recovery through the doctrine of unclean hands, Lawn Mangers' request for monetary relief is legally and factually deficient.  Lawn Manager's own evidence demonstrates that there is no basis for an award of actual damages here.  In this respect, Torres devotes a portion of his report to analyzing the potential for an actual damage award, but his report and testimony acknowledge that there is no evidence of actual damages here, and Lawn Managers did not assert actual damages at trial.  Accordingly, Lawn Managers is not entitled to an award of actual damages.[3]

Lawn Managers similarly encounters barriers in its attempt to collect Progressive's profits.  First, Lawn Managers has not made a clear showing that, if Progressive infringed its word mark, that infringement was willful.  It is clear that a showing of willfulness is required in order to recover attorney fees or treble damages.  15 U.S.C. § 1117(b); *First Nat. Bank in Sioux Falls v. First Nat. Bank S. Dakota*, 679 F.3d 763, 771 (8th Cir. 2012).  Further, many circuits have held that regarding claims for infringement, "[u]nder the Lanham Act, plaintiffs must show either actual damages or willful action on the part of the defendant as a prerequisite to recover disgorgement of profits."  *Klein–Becker USA, LLC v. Englert*, 711 F.3d 1153, 1161 (10th Cir. 2013) (citations omitted); *see also Masters v. UHS of Delaware, Inc.*, 631 F.3d 464, 475 (8th Cir. 2011) (assuming in dicta that willfulness is a prerequisite to any monetary relief for infringement

---

[3] As actual damages are not present in this case, statutory treble damages, which are based on actual damages, are not available.  15 U.S.C. § 1117; *Xiem Studio, LLC v. Nguyen*, No. 4:14-CV-1366-CEJ, 2015 WL 3795852, at *4 (E.D. Mo. June 18, 2015); *Peter Kiewit Sons', Inc. v. Wall Street Equity Group, Inc.*, No. 8:10-CV-365, 2014 WL 4843674 at *9 (D. Neb. Sept. 29, 2014).

under the Lanham Act); *Hanesbrand, Inc. v. Seduzione Leggs, LLC*, 2015 WL 12781218, at *2 (W.D. Mo. Feb. 6, 2015).[4]   Even in Circuits that do not consider willfulness an outright prerequisite to recovering profits for trademark infringement, willfulness is considered a crucial factor in determining whether an accounting of profits is appropriate.  *See, e.g., Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 349 (5th Cir. 2002) (recognizing "[i]t is obvious … that willful infringement is an important factor which must be considered when determining whether an accounting of profits is appropriate," but declining to require it as a bright-line rule).[5]

To determine whether infringement was willful, a court must determine "whether [the] defendant had the intent to derive benefit from the reputation or goodwill of [the] plaintiff." *Univ. of Kansas v. Sinks*, 565 F. Supp. 2d 1216, 1256 (D. Kan. 2008) (internal quotation marks omitted).  "Intent requires more than indifference or a mere connection.  It is a conscious desire." *Id.*; *see also Int'l Olympic Comm. v. San Francisco Arts & Athletics*, 781 F.2d 733, 739 (9th Cir. 1986), *amended by* 789 F.2d 1319 (9th Cir. 1986) (holding that conduct is not willful if a party "reasonably thought that its proposed usage was not barred by the statute").  Here, the Court is not convinced that Progressive acted with intent to deceive the public in any manner that went beyond that contemplated by the MSA and orders of the divorce court.  Although Progressive perhaps could have been more vigilant in avoiding the impression it was still affiliated with

---

[4] There is a circuit split on this matter originating from the uncertain intent of 1999 amendments to the Lanham Act, *Masters*, 631 F.3d at 472, but many circuits continue to consider willfulness a prerequisite to monetary damages under the Lanham Act.  *See, e.g.*, *Contessa Food Prods. Inc. v. Lockpur Fish Processing Co.*, 123 Fed. Appx. 747, 751 (9th Cir. 2005); *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 261 (2d Cir. 2014); *Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd.*, 282 F.3d 23, 36 n.11 (1st Cir. 2002).

[5] In jurisdictions following that line of precedent, factors to be considered in determining whether an award of profits is appropriate in a trademark infringement case include: "(1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off."  *Id.* (quoting *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 554 (5th Cir. 1998)).

Lawn Managers, the evidence shows that Progressive has consistently used patently non-infringing forms of signage and advertising along with the allegedly infringing signage.  This paints a picture not of a willful infringer but one who does not understand principles of trademarks, not to mention of two parties who have demonstrated obvious confusion and disagreement as to what their rights are under the 2012 Decree.  Under these circumstances, the Court is not prepared to find that Progressive's conduct, even if it amounted to infringement, was willful.

### F.  Calculation of Profits.

If an award of profits were appropriate here, the profit figures proffered by Lawn Managers would not aid the Court because the methodology used to derive them is flawed.  For example, it is an untenable position for Lawn Managers to claim entitlement to revenues from not just geographic areas (zip codes in this case) where it was legally barred from servicing residential customers, but also from specific customers Lawn Managers was legally prohibited from servicing under the 2012 Decree and MSA and the July 25, 2014 Order.  Customers in these zip codes constitute the majority of the profits Plaintiff is attempting to disgorge.  By analogy to competitors with overlapping but not identical service territories, Plaintiff can only be entitled to revenues from those areas where it was lawfully competing.  *See Minn. Pet-Breeders, Inc. v. Schell & Kampeter, Inc.*, 843 F. Supp. 506, 514 (D. Minn. 1993), *aff'd*, 41 F.3d 1242 (8th Cir. 1994) ("[The Eighth Circuit] limits any award of profits under the theories of unjust enrichment, deterrence or sustained damages (compensation) to those profits resulting from sales in 'the geographical area of [plaintiff's] actual product market penetration.'" (quoting *Truck Equip. Serv. Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1221 (8th Cir. 1976))).  Nevertheless, in calculating Progressive's profits, Torres included these revenues from customers Lawn

Managers was judicially barred from servicing.  On this basis alone, the Court may reject Lawn Managers' claim for Progressive's profits.

Yet the claim for Progressive's profits is independently deficient because of other patent flaws in the methodology and assumptions of Torres.  Of particular note, Torres simply and unrealistically assumed that all of Progressive's revenues were due to using an infringing mark. However, the evidence here indicates that assumption is not only unsupported; it is contrary to the evidence.  In this respect, the bulk of Progressive's revenues, at least for the years 2015 to 2016, come from repeat customers who were specifically awarded to Linda pursuant to orders in the divorce proceedings.  Moreover, the undisputed evidence is that Progressive has been using signage on vehicles, buildings, and printed materials since 2013 that prominently uses the word "Progressive."  Torres made no accounting, much less mention, for these facts in his report or testimony.  Torres also makes no accounting for how Progressive's name fully incorporates claimed mark – a usage that both the evidence and Lawn Managers' allegations and request for relief indicate is singularly causing confusion.  Even more damning is that in calculating Progressive's profits, Torres made no accounting for the confusion in the marketplace caused by Progressive legally using the "Lawn Managers" name prior to 2015.  In fact, Torres admitted he could not determine revenues attributable to confusion caused by the legal usage of "Lawn Mangers" prior to 2015 from revenues attributable to confusion caused by improper usage after 2014.  Finally, Lawn Managers' extensive records of customer interactions provide strong confirmation that customers were confused and upset due to reasons unrelated to whatever signage Progressive may have been using.  Still, Torres' report accounts for none of these facts.

Torres' testimony is also based more on proxy data and estimations than hard evidence. For example, Torres used limited data available from the Better Business Bureau to determine

the number of competitors in the area, but obtained no information about the operations of those competitors, and used census data from 2014 to determine the number of owner-occupied residential units in the applicable zip codes, failing to account for how many these units are condominiums or otherwise do not have a need for lawn-care service.  Earlier versions of Torres' report reveal even more willingness to arrive at conclusions as to profits that are not grounded in facts: in his May 2016 report, Torres rendered an opinion on profits before he had the parties' financial information.   Although later iterations of Torres' report gradually included more calculations based on actual data, they left new questions and infirmities.  Accordingly, the Court finds Torres' report and opinions too unreliable to serve as the basis for an award of profits.

      Even if Lawn Managers were entitled to an award of Progressive's profits here, Progressive's financial records and tax returns reveal that the profits it could be expected to disgorge are either vanishingly small or non-existent.  According to Progressive's tax returns, it had a razor-thin profit margin of a few thousand dollars in 2015 and operated at a loss in 2016.  Nevertheless, Torres opines that Progressive made some $300,000 in profit since January 1, 2015.  Of that amount, Torres attributes roughly $125,000 to just eight months of 2017, using incomplete data and without properly annualizing his figures to account for seasonal fluctuations and the timing of expenses.  The facts are that Progressive's revenues and actual profits are nowhere near these sums.

Torres' methods of calculating Defendant's profits are in contravention of Eighth Circuit precedent.  *Levin Bros. v. Davis Mfg. Co.*, 72 F.2d 163, 165 (8th Cir. 1934).  Torres declined to use Defendant's full overhead expenses in calculating Defendant's profits, instead using just incremental costs for services, but has cited no authority deeming this proper.  This results in an inflation of Plaintiff's potential recovery in this case.  In order to deduct overhead expenses, the

expense need only have been "of actual assistance in the production, distribution or sale of the infringing product."  *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 516 (9th Cir. 1985); *accord Levin Bros.*, 72 F.2d at 165.

In sum, the Court finds that Lawn Manager's expert testimony as to profits is unreliable, and thus, if an award of profits is to be made, it must be based on the testimony proffered by Progressive's expert.

### III. CONCLUSION AND ORDER

In summation, the Court finds no evaluation of infringement is necessary because: 1) Lawn Managers is estopped from complaining of infringements as a result of its technical abandonment of its mark through naked licensing; 2) Lawn Managers' conduct, which has resulted in a monetary contempt judgment and injunction in state court, precludes it from any equitable recovery (including an accounting of profits) under the doctrine of unclean hands; 3) Progressive's conduct does not amount to willful infringement; and 4) the specific conduct about which Lawn Managers complains (*i.e.*, use of a logo where the word "Progressive" was not displayed prominently in connection with the phrase "Lawn Managers") has ceased.  The Court denies Lawn Managers' request for attorney fees.

**IT IS HEREBY ORDERED** that plaintiff's prayer for relief in its complaint is denied.

**IT IS FURTHER ORDERED**, because plaintiff has inadvertently abandoned its "Lawn Managers" mark through naked licensing, that the federal registration for that mark be canceled.

[JUDGE'S SIGNATURE BLOCK]

Respectfully submitted,

_____/s/ *Don V. Kelly*_____
Don V. Kelly (MO #37121)
Alex Hurst  (MO #68154)
EVANS & DIXON, LLC
One Metropolitan Square
211 North Broadway, Suite 2500
St. Louis, MO  63102
**dkelly@evans-dixon.com**

Kevin C. Roberts
ROBERTS, WOOTEN & ZIMMER, LLC
10438  Business 21 – P.O. Box 888
Hillsboro,  Missouri  63050
**KevinRoberts@RWZLaw.com**

Counsel for Defendant

## CERTIFICATE OF SERVICE

This certifies that a copy of the foregoing was served electronically to all parties on the above-captioned matter at the electronic address as disclosed with the Court on this 29th day of December 2017.

/s/ *Don V. Kelly*_____