UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LAWN MANAGERS, INC.,                    )
                                        )
        Plaintiff,                      )
                                        )
    v.                                  )        No. 4:16 CV 144 DDN
                                        )
PROGRESSIVE LAWN MANAGERS,              )
INC.,                                   )
                                        )
        Defendant.                      )

## MEMORANDUM OPINION

This case arises from a trademark dispute between plaintiff Lawn Managers, Inc., ("Lawn Managers") and defendant Progressive Lawn Managers, Inc., ("Progressive") over the latter's use of the mark "Lawn Managers." Plaintiff alleges one count of trademark infringement under 15 U.S.C. § 1114, and defendant counterclaims for cancellation of trademark registration under 15 U.S.C. §§ 1115, 1119, and 1064.

The Court has subject matter jurisdiction over the action, pursuant to 28 U.S.C. §§ 1331 and 1338 and 15 U.S.C. § 1121. The parties have consented to the exercise of plenary authority by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

This action was tried to the Court sitting without a jury from October 30 to November 1, 2017. After carefully considering the pleadings, trial testimony, exhibits, and the parties' memoranda, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

1.      Plaintiff Lawn Managers is a lawn care business, incorporated in Missouri since 1981. Its principal, holding 100% of its ownership, is Randall Zweifel.

2. Defendant Progressive is also a lawn care business, incorporated in Missouri since 2012. Its principal, holding 100% of its ownership, is Linda Smith.

3. Randall Zweifel and Linda Smith were previously married; they divorced in 2012. Prior to their divorce, Zweifel and Smith each owned 50% of Lawn Managers and its assets, including the trademark at issue in this case. They worked together in this business for 17 years.

4. Zweifel and Smith entered a marital settlement agreement, dated April 17, 2012, that was incorporated into the divorce decree issued by the Circuit Court of Jefferson County, Missouri, on May 1, 2012. This decree provided in pertinent part that Smith would relinquish her share in plaintiff and establish a new company named "Progressive Lawn Managers." In return, Smith would receive a license to use the name "Lawn Managers" for two years, as well as some of plaintiff's assets, including some vehicles and lawn equipment and the ability to temporarily use plaintiff's facilities and credit. All of plaintiff's assets not specifically named were reserved to Zweifel, who assumed sole ownership of plaintiff.

5. The May 2012 divorce decree also provided that plaintiff's residential customer lists were divided by ZIP Code areas and awarded to each party. Zweifel and Smith each agreed not to solicit residential or commercial account business in the areas awarded to the other for two years. *Id.*

6. In October 2013, Zweifel and Smith filed cross-motions for contempt for unrelated violations of the divorce decree. They reached a settlement agreement in July 2014, which was incorporated into a second judgment of the Jefferson County Circuit Court, issued July 25, 2014. Among its terms, the 2014 Judgment extended defendant's license to use plaintiff's trademark until December 31, 2014. It further replaced the ZIP Code area non-solicitation agreement with a two-year non-compete agreement for residential customers, to expire July 25, 2016.

7. The 2014 Judgment expressly provided that plaintiff and defendant were not enjoined from entering ZIP Code areas previously awarded to the other, so long as such entry was for purposes of signing up or servicing commercial customers, as opposed

to residential ones. Thus, even as residential customers assigned to defendant watched plaintiff's vehicles driving through their neighborhoods, they were being told by plaintiff's staff that "we can't service your ZIP Code." The public was not immediately privy to the 2012 Decree or the 2014 Judgment and was not made aware of their terms in phone calls with plaintiff's staff.

8.      Between 2012 and December 31, 2014, defendant variously made use of "Lawn Managers" and "Progressive Lawn Managers" in assorted forms of advertising, business materials, and representations to third parties.

9.      From 2012 to 2015, there was constant and obvious consumer confusion, due to the post-divorce proceedings and the resulting two-year license agreement. The confusion manifested itself in phone calls to one party meant for the other party and checks that had to be hand-sorted to make sure they went to the correct company.

10.     Immediately prior to December 31, 2014, defendant Progressive's signage and its website used a logo design containing the words "Progressive Lawn Managers," with the word "Progressive" larger than the words "Lawn Managers, Inc.":



11.     From January 2015 onward, defendant used a visual logo that, while it still contained the words "Progressive Lawn Managers," used very small font size for the word "Progressive" to the left of the words "Lawn Managers." This small type was, moreover, superimposed on an image of grass underneath the St. Louis Gateway Arch and was difficult to distinguish from the image:



12.    This logo was not devised solely for artistic or esthetic reasons.  In this regard, "Progressive" is the one word responsible for distinguishing defendant's mark from plaintiff's, and the change was implemented simultaneously with the expiration of defendant's license to use plaintiff's mark.  Defendant did not make a good-faith effort to dissipate confusion, but acted to deliberately exacerbate any consumer confusion with the intent of profiting from plaintiff's accrued consumer goodwill for as long as possible.

13.    On February 17, 2015, plaintiff registered the word mark "Lawn Managers" with the United States Patent and Trademark Office ("USPTO").  Plaintiff has used the name "Lawn Managers" in commerce since its incorporation in 1981.  Prior to the divorce, on November 14, 2011, plaintiff had registered the following logo:



14.    In 2015, defendant advertised a $40 coupon that, except for the phone number listed, was identical to that used by plaintiff.  The coupon used the name "Lawn Managers."



15.    From 2015 onward, defendant used the logo at issue on yard signs, consisting of 11x14-inch cardboard signs posted on stakes in customers' yards after lawn treatments.  These signs were visible to passersby on the street.  However, given the signs' size and the distance from which passersby would view them, only the words "Lawn Managers" and not "Progressive" would be reasonably legible.

16.    In a letter dated November 23, 2015, plaintiff's counsel notified defendant that it considered defendant's logo to infringe plaintiff's trademark of the words "Lawn

Managers," stating that the small size of the font and the placement within the image would cause consumers to reasonably overlook the word "Progressive" and thus mistake "Progressive Lawn Managers" for "Lawn Managers."

17. In December 2015, defendant's counsel responded that it refused to change its logo, signage, or business practices.

18. In February 2016, defendant returned to customers checks intended for plaintiff that had been mistakenly sent to defendant. The returned checks were accompanied by company letterhead stationery that referred to defendant as the "Home Office" and to plaintiff as "the High Ridge location," rather than conveying the truth that plaintiff and defendant were separate, competing companies.

19. Plaintiff began this federal lawsuit action on February 4, 2016, alleging trademark infringement arising out of defendant's continued use of the aforementioned logo. Defendant Progressive counterclaimed for trademark cancellation.

20. Between January 2016 and October 2017, when this case was tried, plaintiff received more than 140 phone calls that indicated substantial consumer confusion. These calls included customers calling one company while trying to reach the other, calling the wrong company with questions about their accounts, and attempting to cancel service with the wrong company.

21. Until late 2017, defendant used an advertisement video on its website. This video used the visual logo at issue and represented defendant as employing more than 20 people, a number that did not reflect defendant's actual employee records but that *was* comparable to the number of people employed prior to the division of plaintiff and defendant. The video further represented defendant as having been in business for a number of years that was only possible if defendant was, in fact, plaintiff.

22. Linda Smith, defendant's principal, made no effort to tell customers that plaintiff and defendant were separate companies. Instead, she just told them that she changed her business name.

23. From 2012 until the time of trial in October 2017, when plaintiff's crews serviced commercial property in defendant's ZIP Code areas, they observed the work

being done by defendant's crews and observed and reported that the work performed by defendant's crews was consistent with plaintiff's standards. The work crews employed by defendant had previously been employed by plaintiff and made use of the same procedures and equipment they had always used. They did not communicate their observations to defendant or make any effort to supervise defendant's work.

24.     During the period between January 1, 2015, and the time of trial in October 2017, defendant's revenues were $2,036,830.00, with reasonably calculated profits of $322,753.00.     However, for the purpose of determining the amount of plaintiff's damages, the evidence is insufficient to allow the Court to distinguish the effect of customer confusion occurring between 2012 and 2014 from that occurring after 2014.

25.     The cost of corrective advertising will be $71,346.00.

26.     Since the 2012 divorce decree, and during the pendency of this federal action, Smith and Zweifel have been engaged in multiple, ongoing contempt proceedings related to their divorce.


## CONCLUSIONS OF LAW

This case is an admixture of federal trademark law, difficult personal relationships, and Missouri state divorce law. In this context, the Court may interpret the provisions of the parties' principals' 2012 divorce decree and the 2014 judgment to resolve questions of federal trademark law. *See, e.g., McGraw-Hill Companies, Inc. v. Vanguard Index Tr.*, 139 F. Supp. 2d 544, 551 (S.D.N.Y.2001); *Benefit Concepts New York, Inc. v. Benefit Concepts Sys., Inc.*, 1995 WL 133773, at *3 (S.D.N.Y. 1995). Where these provisions are unclear, this Court applies Missouri contract law, because the marital settlement agreement made between the principals of plaintiff and defendant itself provided it was to be construed under Missouri law. *Cf., LeKander v. Estate of LeKander*, 345 S.W.3d 282, 286 (Mo. App. 2011). Missouri state law holds that marital settlement agreements are final once they are ratified by a state court's order. *See* Mo. Rev. Stat. § 452.330.5 ("A court's order as it affects distribution of marital property shall be a final

order not subject to modification."). This federal Court is not the proper forum to relitigate Smith's and Zweifel's divorce proceedings or otherwise encroach on the state court's jurisdiction over domestic matters. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 13 (2004) ("[I]n general it is appropriate for the federal courts to leave delicate issues of domestic relations to the state courts.").

However, "the presence of federal law issues must always be a major consideration weighing against surrender [of federal jurisdiction]." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26 (1983). The purpose of federal trademark law is twofold: (1) "to protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get" and (2) "where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation[.]" S. Rep. No. 79-1333, at 3 (1946).

Nothing in this Court's decision purports to set aside or alter the terms of the 2012 Decree and 2014 Judgment, but it may construe them in a manner consistent with both federal trademark law and the apparent intent of the parties. *See McGraw-Hill*, 139 F. Supp. 2d at 551-52; *Lekander*, 345 S.W.3d at 286.


1. **Progressive's Counterclaim of Trademark Cancellation**

The Court first considers defendant's counterclaim of trademark cancellation, which, if proved, would negate plaintiff's claim outright. This Court previously declined to grant summary judgment for plaintiff on this issue, and now returns to consider it through the better lens of trial evidence. This Court is empowered by 15 U.S.C. § 1119 to determine the right to registration or the right to the cancelation of a registration.

Defendant argues that by allowing it to do business as Lawn Managers for two years, and then indefinitely as Progressive Lawn Managers, plaintiff abandoned its trademark under the theory of "naked licensing." The Lanham Act provides that a mark is deemed abandoned "[w]hen any course of conduct by the owner, including acts of omission as well as commission, causes the mark to become the generic name for the

goods or services on or in connection with which it is used or otherwise to lose its significance as a mark." 15 U.S.C. § 1127. If a registered trademark is abandoned, a court may cancel it. 15 U.S.C. § 1064.

Abandonment by naked licensing or "uncontrolled licensing" occurs when a trademark owner grants a license to use its mark but "fails to control the quality of the products made by the licensee, thus permitting a deception of the public." *Heaton Distrib. C. v. Union Tank Car Co.*, 387 F.2d 477, 485 (8th Cir. 1967). Because abandonment results in a forfeiture of rights, defendant's burden of proof is by "clear and convincing" evidence. *Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1010 (8th Cir. 2011); 3 McCarthy on Trademarks and Unfair Competition § 17:12 (5th ed. 2018).

Plaintiff's two-year license of its trademark to defendant, which allowed defendant to do business as Lawn Managers, was not a naked license. The fact that the underlying divorce decree and judgment contain no terms of use for the phrase "Lawn Managers" is not dispositive. "A contractual provision giving the licensor the right to supervise and control the nature and quality of the licensee's goods and services is not an essential element if adequate quality control was in fact exercised." 3 McCarthy § 18:59.

In determining what amount of "adequate" quality control plaintiff must have exerted to avoid defendant's defense of abandonment, the Court considers whether plaintiff "(1) [retained] express contractual control over [defendant's] quality control measures, (2) [had] actual controls over [defendant's] quality control measures, and (3) was unreasonable in relying on [defendant's] quality control measures." *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 512 (9th Cir. 2010).

No provision in the marital settlement agreement gave plaintiff the right to control the nature and quality of defendant's use of the mark. Nor did plaintiff actually control the nature and quality of defendant's services. Plaintiff's work crews observed the work done by defendant's work crews and found it complied with plaintiff's standards. However, there is no indication in the record that plaintiff's work crews communicated their observations to defendant or made any effort to supervise defendant's work.

8

Accordingly, the Court concludes that plaintiff does not meet either of the first two of the factors set out in *Freecycle*.

Plaintiff nonetheless prevails on the third factor in *Freecycle*. When a licensor and licensee have had a sufficiently close prior working relationship, and no actual decline in quality has been demonstrated, the licensor (plaintiff) may reasonably rely on the licensee's (defendant's) own efforts to ensure the quality of its mark. In these cases, it "would depart from the purpose of the law to find an abandonment simply for want of all the inspection and control formalities." *Taco Cabana Intern., Inc. v. Two Peros, Inc.*, 932 F.2d 1113, 1121 (5th Cir. 1991). Examples of such relationships include *Taco Cabana Intern., Inc. v. Two Pesos, Inc.*, 932 F.2d 1113 (8-year business association between two brothers); *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1017-18 (9th Cir. 1985) (10-year business association with licensee, for whom licensor manufactured 90% of components sold); and *Taffy Original Designs, Inc. v. Taffy's, Inc.*, 1966 WL 7124, at *9 (N.D. Ill. 1966) (17-year business association between sisters).

The 17-year business relationship between Zweifel and Smith was more than sufficient to give plaintiff reasonable assurance of the quality of service defendant would provide to customers. This is doubly true given that the work crews employed by defendant had previously been employed by plaintiff, they used the same procedures and equipment they had always used, and the quality of the service was consistent with plaintiff's quality. Accordingly, there was no naked licensing, and defendant's counterclaim of trademark cancellation by abandonment fails.

## 2. Lawn Manager's Claim of Trademark Infringement

Prevailing in a claim for trademark infringement requires that a plaintiff prove "(1) that it owns a valid, protectable mark, (2) that the defendant has used a mark in commerce without the plaintiff's consent; and (3) that there is a likelihood of confusion between the plaintiff's mark and the defendant's mark." *ZW USA, Inc. v. PWD Sys., LLC*, 208 F. Supp. 3d 1025, 1039 (E.D. Mo. 2016).

*(1) Plaintiff owns a valid, protectable mark.*

A trademark is established by the use of the mark in commerce. 15 U.S.C. § 1127. It cannot be created absent such use save with a *bona fide* intention to make such use and a contemporaneous application for federal registration. *Id.* Plaintiff has a right to the word-mark "Lawn Managers." At all times relevant to these proceedings, it had every right to grant defendant a license to use this mark and to set an expiration date on this license. Plaintiff does not own defendant's trademark, "Progressive Lawn Managers," and it has no right to grant or rescind consent to the use of that trademark. Still, defendant cannot use "Progressive Lawn Managers" in any way that it chooses, if the manner of its use infringes plaintiff's own trademark.

*(2) After December 31, 2014, defendant used plaintiff's mark in commerce without plaintiff's consent.*

For the duration of defendant's license, from May 2012 to December 2014, defendant was entitled to tell customers and potential customers that its name was Lawn Managers, Progressive Lawn Managers, or both. And the evidence shows defendant did so. The representations made to customers and potential customers prior to December 31, 2014, were done with plaintiff's consent and therefore do not persuade that defendant infringed.

Defendant's license to use plaintiff's mark expired on December 31, 2014. Accordingly, any use of the mark "Lawn Managers" after December 31, 2014, or a mark confusingly similar to it, was done without plaintiff's consent. In the November 2015 letter, plaintiff explicitly confirmed to defendant that plaintiff did not consent to defendant using its mark.

*(3) There was a likelihood of confusion between plaintiff's mark and defendant's mark.*

In determining whether a "likelihood of confusion" exists, courts consider:

(1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to "pass off" its goods as those of the trademark owner; (5) incidents of actual confusion; and (6) the type of product, its costs and conditions of purchase.

*Co-Rect Prods., Inc. v. Marvy! Advertising Photography, Inc.*, 780 F.2d 1324, 1330 (8th Cir. 1985) (citing *SquirtCo v. Seven-Up Company*, 628 F.2d 1086, 1091 (8th Cir. 1980)). Applying each of these factors to this case, the Court concludes the following.

(1) Plaintiff's Lawn Managers mark is of moderate strength, being descriptive with associated secondary meaning. *Abercrombie & Fitch Co. v. Hunting World*, 537 F.2d 4, 9-10 (2nd Cir. 1976). Descriptive marks are not generally eligible for trademark protection, but may develop secondary meaning with a showing that they have become associated in the consumer's mind with the product or service at hand. Five years' continuous and exclusive use prior to application is *prima facie* evidence of such a showing. *Id.*

(2) The entirety of plaintiff's mark is contained within defendant's mark, distinguished only by defendant's addition of the word "Progressive." Defendant failed to distinguish its mark from plaintiff's in the mind of the consumer, considering the size and placement of the word "Progressive."

(3) The services represented by plaintiff's and defendant's marks compete with one another directly within the same market.

(4) Defendant intended to pass off its services as those of plaintiff.

(5) Substantial evidence of actual consumer confusion was presented at trial.

(6) The services provided by both parties are essentially identical in type, costs, and conditions of purchase.

Taken together, the *SquirtCo* factors weigh in favor of plaintiff. The second and fourth factors weigh most heavily in this Court's assessment. In reaching this conclusion, the Court finds that the following pieces of evidence most strongly support an inference that defendant intended to pass off its services as those of plaintiff.

Prior to December 31, 2014, defendant's trademark was presented in a "Progressive"-centric logo, but as the December 31 deadline approached, defendant redesigned its logo in a way that substantially minimized the word "Progressive." This discredits defendant's argument that the logo was changed solely for artistic reasons. Rather, the diminution of "Progressive," the *one word* responsible for distinguishing defendant's mark from plaintiff's, indicates deceptive intent, particularly when the change was implemented very near the expiration of defendant's license to use plaintiff's mark.

Defendant used a letterhead memo form in February 2016 to return checks intended for plaintiff that had been mistakenly sent to defendant. This form referred to defendant as the "Home Office" and to plaintiff as "the High Ridge location." The use of "Home Office" and "the High Ridge location" clearly suggests that the latter is a branch or subsidiary of the former, rather than conveying the truth that plaintiff and defendant were separate, competing companies.

Defendant's principal Smith testified that she made no effort to tell customers that plaintiff and defendant are separate companies. Instead, Smith testified that "I just tell them I've changed my name." The natural construction of this statement is that "I" refers to Lawn Managers and that therefore Lawn Managers has changed its name to Progressive Lawn Managers. As discussed above, defendant had the right to do this until January 2015; it had no right to continue the practice thereafter.

Plaintiff received more than 140 phone calls between January 2016 and the time of trial that were indicative of substantial consumer confusion. They included customers calling one company while trying to reach the other, calling the wrong company with questions about their account, and attempting to cancel service with the wrong company.

Until late 2017, defendant advertised with a video using the infringing logo that represented defendant as employing more than 20 people, a number that did not reflect defendant's actual employee records but that *was* comparable to the number of people employed prior to the division of plaintiff and defendant. The video further represented

defendant as having been in business for a number of years that was only possible if defendant was, in fact, plaintiff.

In addition to these factors, the Court considers that defendant did not enter the market for the first time as Progressive, but its principal was a former owner of Lawn Managers who had permission for some time to operate as Lawn Managers or Progressive. Defendant argues that the parties' prior relationship, and not an infringing mark, was the source of customer confusion. But evidence of actual confusion before January 2015 does not preclude this Court's conclusion that defendant infringed plaintiff's trademark after January 1, 2015. *See, e.g., L & L Wings, Inc. v. Marco-Destin, Inc.*, 676 F. Supp. 2d 179, 188 (S.D.N.Y. 2009) ("When an ex-licensee continues to use a mark after its license expires, likelihood of confusion is established as a matter of law . . . because consumers have already associated the formerly licensed infringer with the trademark owner.").

Because defendant was granted a license to do business as Lawn Managers, consumer goodwill arising out of defendant's services accrued largely to Lawn Managers rather than to defendant. And there is substantial evidence of actual consumer confusion as a result of this two-year license. Defendant argues that "it is unreasonable to expect that that confusion would simply dissipate overnight once Defendant's rights to use the 'Lawn Managers' name terminated." (Doc. 117 at 94). It is not unreasonable, however, to expect that defendant would make a good-faith effort to dissipate confusion. Defendant did not make that effort. To the contrary, defendant deliberately exacerbated any consumer confusion with the intent of profiting from plaintiff's accrued consumer goodwill for as long as possible. Defendant's actions following the expiration of its license infringed plaintiff's trademark.

## 3. Relief

Plaintiff seeks injunctive relief and damages under the Lanham Act. A showing of likelihood of confusion entitles the owner of the mark to injunctive relief, while a showing of actual confusion and willful infringement entitles the owner to damages. *See*

*Masters v. UHS of Delaware, Inc.*, 631 F.3d 464, 471 n.2 (8th Cir. 2011); *Co-Rect Products*, 780 F.2d at 1330. Both have been shown here. In calculating damages, a victorious plaintiff may claim "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). Plaintiff must prove only defendant's sales, while defendant must prove any claimed deductions. In other words, "[t]he defendant bears the burden in calculating profits of proving any operating costs to be deducted from sales revenue it realized during the period of trademark infringement." *Tonka Corp. v. Tonka-A-Phone, Inc.*, 805 F.2d 793, 794 (8th Cir. 1986); *see also* 15 U.S.C. § 1117(a). If "the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. § 1117(a).

The Court previously stated it would consider defendant's unclean hands defense when assessing damages. Defendant claims that plaintiff's advertisement to customers in plaintiff's ZIP Code areas in July 2016 sullied plaintiff's hands in this suit. Under Missouri law, the protection of customer accounts, lists, or relationships is assumed to be limited in duration, unless a party demonstrates "unequivocally" that both parties intended it to run perpetually. *See, e.g., Armstrong Bus. Servs., Inc. v. H & R Block,* 96 S.W.3d 867, 875 (Mo. Ct. App. 2002). Rather than any such indicator of perpetual intent, both the 2012 divorce decree and the 2014 Judgment expressly limited the non-solicitation and non-compete provisions to a term of years. Accordingly, plaintiff was entitled to renew advertising to customers following the expiration of the 2014 Judgment's non-compete provision in July 2016, and this advertisement did not sully plaintiff's hands in a suit for trademark infringement. Defendant produced no other evidence to support a finding that plaintiff acted inequitably toward it as to the trademark at issue.

Defendant also argues that the Court must apportion the profits to reflect only those caused by the use of the infringing mark. However, plaintiff has proven that apportionment is inherently impossible in this case. *See Hamilton-Brown Shoe Co. v.*

*Wolf Bros. & Co.*, 240 U.S. 251, 261-62 (1916). The same evidence shows that the damage to consumers' ability to differentiate between plaintiff and defendant was already done by the date infringement began. While this does not support defendant's contention that there was no infringement, it does make it difficult to trace causation from confused consumers to an infringing act of defendant instead of to plaintiff's two-year license.

Substantial consumer confusion arose from plaintiff's two-year license agreement with defendant. The terms of the marital settlement agreement expressly provided defendant the right to use "Lawn Managers" or "Progressive Lawn Managers" interchangeably at defendant's sole discretion. Defendant could and did hold itself out to the public as plaintiff, with plaintiff's consent, until December 31, 2014.

Despite the division of *residential* customers by ZIP Code areas, plaintiff and defendant maintained the right to enter one another's ZIP Code areas for purposes of servicing *commercial* customers. The public was not immediately privy to the 2012 Decree or the 2014 Judgment and was not made aware of their terms in phone calls with plaintiff's staff. Thus, even as residential customers assigned to defendant watched plaintiff's vehicles driving through their neighborhoods, they were being told by plaintiff's staff that "we can't service your ZIP Code."

Plaintiff's principal and staff testified that there was "constant" and "obvious" consumer confusion from 2012 through 2014, and plaintiff's counsel conceded the existence of extensive consumer confusion prior to 2015 arising directly out of the post-divorce proceedings and resulting two-year license agreement.

Plaintiff's expert witness testified that the information available was not sufficient to differentiate the effects of confusion occurring before January 2015 from those occurring after for purposes of calculating damages.

After carefully reviewing the expert reports, defendant's tax returns, and defendant's financial statements, the Court has determined that defendant's profits from 2015-2017 were $322,753.00. Defendant has not submitted credible evidence supporting its claim that the profits should be reduced. *See H-D Michigan Inc. v. Biker's Dream Inc.*, 1998 WL 697898, at *6-10 (C.D. Cal. 1998) (holding when deduction data is

"incomplete and contradictory," guessing is not appropriate and the court will find the infringer failed to prove cost deductions); *New York Racing Ass'n v. Stroup News Agency Corp.*, 920 F. Supp. 295, 301 (N.D.N.Y. 1996) (holding when the plaintiff proves gross sales and the defendant fails to prove cost deductions, "then the profits to which the plaintiff is entitled under the Lanham Act are equal to the infringer's gross sales"); *Aris Isotoner Inc. v. Dong Jin Trading Co., Inc.,* 1989 WL 236526, *5 (S.D.N.Y. 1989) ("[T]he court may resolve any doubts against the defendant in calculating profits, particularly if the uncertainty is due to the defendant's inadequate recordkeeping or failure to produce documentary evidence.").

But given the nature of the parties' licensing agreement between 2012 and 2014, a damages award of $322,753.00 would be excessive. The degree of consumer confusion generated prior to 2015 was substantial and, ultimately, impossible to divide from that perpetuated later by defendant's willfully infringing activity. Additionally, during the relevant period of January 1, 2015, to July 25, 2016, the parties were under a non-compete agreement. The Court equitably accounts for the fact that the parties were not legally competing for residential customers in several ZIP Code areas for approximately half of the relevant profit period. Thus, the residential account profits for that time period cannot be traced to defendant's infringement. Accordingly, considering the positions of the parties and the additional costs assessed as a result of defendant's infringing conduct, the Court awards plaintiff compensatory damages of $80,688.00 (25% of its claimed damages of $322,753.00), $71,346.00 for corrective advertising, plus reasonable attorney fees, the costs of the action, and injunctive relief.

An appropriate Judgment Order is filed herewith.


                                          _____/s/ David D. Noce_____
                                          **UNITED STATES MAGISTRATE JUDGE**

Signed on June 11, 2018.